```
 1 | UNITED STATES DISTRICT COURT
   | SOUTHERN DISTRICT OF NEW YORK
 2 | --------------------------------x

 3 | NICHOLAS MAGALIOS,

 4 |                 Plaintiff,

 5 |        V.                                19 CV 6188(CS)

 6 |                                             TRIAL

 7 | C.O. MATHEW PERALTA,
   | C.O. TIMOTHY BAILEY,
 8 | C.O. EDWARD BLOUNT,

 9 |                 Defendants.

10 | --------------------------------x

11 |                                    United States Courthouse
   |                                    White Plains, New York
12 |                                    April 26, 2021

13 |

14 |

15 | Before:  THE HONORABLE CATHY SEIBEL, District Judge

16 |

17 |                        APPEARANCES

18 | SIVIN & MILLER, LLP
   |     Attorneys for Plaintiff
19 | GLENN D. MILLER

20 |

21 | LETITIA JAMES
   |     Attorney General for the State of New York
22 | JESSICA ACOSTA-PETTYJOHN
   | BRUCE J. TURKLE
23 |     Assistant Attorneys General

24 |

25 |
```

```
 1                        INDEX OF EXAMINATION

 2    Examination of:

 3
      DONALD ROY VANTASSELL
 4
        Direct Examination by Mr. Miller                   32
 5
        Cross Examination by Ms. Acosta-Pettyjohn          77
 6
        Redirect Examination by Mr. Miller             87, 97
 7
        Recross Examination by Ms. Acosta-Pettyjohn        95
 8

 9    NICHOLAS MAGALIOS

10      Direct Examination by Mr. Miller                  101

11

12

13                         E X H I B I T S

14    Exhibit No.                                  Received

15
      Plaintiff's 2                                69
16
      Plaintiff's 6                               109
17
      Plaintiff's 8                                45
18
      Plaintiff's 9                                66
19
      Plaintiff's 10                               74
20
      Plaintiff's 11                               75
21

22

23

24

25
```

```
 1                 (A jury of eight was duly impaneled and sworn.)
 2                 THE COURT:  All right.  Let's get the jury.
 3                 I assume openings are going to be five, ten minutes
 4     apiece, not long.  Ten, fifteen?
 5                 MR. MILLER:  Maybe fifteen.
 6                 THE COURT:  Okay.
 7                 (In open court; jury present)
 8                 THE COURT:  Have a seat, ladies and gentlemen.
 9                 Welcome back.
10                 As I told you right before we broke for lunch, you
11     are now a jury.  There is no higher function in our legal
12     system, so, from now on, when you enter and leave the
13     courtroom, we're all going to stand for you just like they do
14     for me, because you are every bit as important to this process
15     as I am.  Maybe more.
16                 Let me introduce or re-introduce you to some of the
17     people who are here in the courtroom.
18                 As I told you before, I am Judge Cathy Seibel.
19                 The plaintiff is Mr. Nicholas Magalios and his lawyer
20     is Mr. Glenn Miller, and they're assisted by Katie Sinise.
21                 The defendants are -- let me make sure I get all this
22     right -- Mathew Peralta, Timothy Bailey, and Edward Blount, and
23     their lawyers are Bruce Turkle and Jessica Acosta-Pettyjohn.
24     And they have some paralegal assistance.  Let me make sure I
25     get that gentleman's name right, also.  Mr. Ravenal Trinidad,
```

1     who's in the first row there.

2            You've met Mr. Clark, who's my courtroom deputy.

3     He's going to be your point of contact during the trial.  If

4     you have any questions or problems, he's the one you should

5     speak to.

6            Mr. Ryan Partelow, who's sitting to my left, is my

7     law clerk.  His job is to help me research any legal issues

8     that come up during the trial.

9            Closest to you is Christina Arends-Dieck, who's the

10    court reporter, and, on the far side, we have Tabitha Dente,

11    who's also a court reporter.  They are taking down everything

12    that's said at the trial word for word so that we'll have a

13    transcript.

14           Now let me give you some preliminary instructions

15    about your role as jurors.

16           In the American system of justice, judges and jurors

17    have separate roles.  My job is to instruct you as to the law

18    that governs the case.  I'm going to give you some instructions

19    now.  I may give you instructions from time to time during the

20    trial.  And at end of the trial, I'm going to give you detailed

21    instructions about the law you'll need to apply when you

22    deliberate.

23           Your job as jurors is to determine the facts based on

24    the evidence presented at the trial.  You are the only triers

25    of the facts, and your decisions on the factual issues will

1    determine the outcome of the case.

2              You must not take anything that I say or do during

3    the trial as indicating what my opinion is or what your verdict

4    should be.  It's not even part of my job to have an opinion on

5    those subjects and, if I had one, it must not influence yours.

6              Now let's talk a little bit about evidence.

7              You must pay close attention to the evidence.

8    Evidence consists of the testimony of the witnesses, documents

9    or other items that are admitted into evidence as exhibits and

10   any stipulations agreed to by the lawyers.  A stipulation is

11   simply an agreement between the lawyers as to facts or

12   testimony.

13             Certain things are not evidence and you should not

14   consider them as evidence.  For example, statements and

15   arguments by the lawyers are not evidence.  They are simply

16   arguments in which the lawyers will tell you what they think

17   the evidence shows and how they think you should analyze the

18   evidence.  You should give weight to these statements and

19   arguments only to the extent they appeal to your common sense

20   and under no circumstances should you consider anything a

21   lawyer says as evidence.

22             It follows that questions from the lawyers are not

23   evidence.  Only the answers given by the witnesses are the

24   evidence.  So, for example, if a witness is asked:  It was

25   raining that day, wasn't it?  If the witness says no or I don't

                 CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                            (914)390-4103

1   know, then, based on that question and answer, there's no

2   evidence that it was raining no matter how sure the lawyer

3   sounded when the lawyer was asking the question.  It's only the

4   answers that are evidence.

5             Objections to questions are not evidence.  The

6   lawyers are obligated to raise an objection if they believe

7   evidence is being offered that's improper under the rules of

8   evidence.  You should not be influenced by the objection or by

9   my ruling on the objection.  If the objection is sustained, you

10   should ignore the question and any answer that may have been

11   given.  If the objection is overruled, you should treat the

12   answer like any other answer.

13             Any testimony that I exclude or strike or tell you to

14   disregard is not evidence and you must not consider it.  If I

15   instruct you that some evidence is to be considered only for a

16   certain purpose, you must follow that instruction and consider

17   it only for that purpose.  And, of course, anything you may see

18   or hear outside the courtroom is not evidence and should be

19   disregarded.  You're to decide the case based only on the

20   evidence presented here in court.

21             Now, in deciding the facts of the case, you'll have

22   to decide the credibility of the witnesses; that is, how

23   truthful and believable they are.  How do you decide what to

24   believe and what not to believe?  You're going to listen to the

25   witnesses, you're going to observe them, and then you're going

1       to make that decision just as you would decide such questions
2       every day in your ordinary life.  Ask yourselves:  Did the
3       witnesses know what they were talking about?  Did they appear
4       to be honest, open and truthful?  Did they have a motive to
5       falsify, exaggerate or distort?  Is there any reason to think
6       they might be mistaken about what they're telling you?  How
7       does their testimony square with the other evidence in the
8       case?  Considering these sorts of issues will help you
9       determine what testimony to accept and what testimony to
10      reject.

11              As the trial proceeds, you may form impressions of a
12      witness or of a subject, but you must not allow these
13      impressions to become fixed or hardened because if you do, in a
14      sense, you're foreclosing consideration of the evidence that is
15      to follow and this would be unfair to one side or the other or
16      both.

17              A case can only be presented step by step, witness by
18      witness, until all the evidence is before you.  We know from
19      experience that frequently we'll hear a person give his version
20      of an event which sounds most impressive and even compelling
21      and, yet, when we hear another person's version of the same
22      event or even the same person questioned further about that
23      event, what seemed quite compelling and impressive may be
24      considerably dissipated or weakened.  Likewise, if someone
25      describes something and it doesn't make much of an impression,

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1      but then someone else supports what the first person said, what

2      didn't seem particularly compelling or impressive when you

3      first heard it may be considerably strengthened.  So remember

4      that there may be another side to any witness' story and there

5      may be more to come on any issue.  You must, therefore, keep an

6      open mind until the trial is over and not reach any conclusions

7      until you have all the evidence before you.

8              To ensure that you decide the case based only on the

9      evidence and that you not be influenced in any way by anything

10      that might occur outside the courtroom, I have to give you a

11      specific set of instructions.

12              First, do not discuss the case with anybody while it

13      is going on.  That includes family members, friends,

14      co-workers, anybody.  As I said before, you can tell your

15      friends and family and employer that you're a juror, that it's

16      a civil case, it's probably going to be over this week, but

17      don't tell anybody anything else about the case until after

18      you've been discharged.  And when I say don't discuss the case,

19      I mean don't Tweet about the case, don't blog about the case,

20      don't post about the case, et cetera.  Until you're discharged,

21      you can't say anything by any means or in any forum other than

22      you're on a jury for a civil trial for about a week.  I cannot

23      emphasize strongly enough how important it is that you not

24      discuss the case, whether it's in person, by social media or

25      otherwise, until the case is over.

1             That instruction probably doesn't surprise you.  It

2    may be a little bit surprising that you may not discuss the

3    case even amongst yourselves while it is going on.  You will

4    have the opportunity and, indeed, the duty to discuss the case

5    amongst yourselves later on, but that can happen only after all

6    the evidence is in and the case is given to you to discuss and

7    decide in the jury room.  This rule is important because

8    experience has shown that when people express an opinion about

9    the case or about a witness or about an issue, they may become

10   attached to their opinion and their views may harden and it's

11   important that that not happen and that everybody keep an open

12   mind until all of the evidence is in.

13             So don't talk about the case even with each other

14   until I tell you to do so.  And when I say don't talk about the

15   case, I mean don't create a Facebook group, don't create a

16   group text, don't communicate with each other about the subject

17   matter of the case.  It's strange that the one thing that

18   brings you all together is the one thing you can't talk about,

19   but stick to the Yankees or the weather or the traffic or

20   anything but this case.

21             Next, you are not to read anything published in the

22   newspapers or online or elsewhere about the case if that should

23   occur.  I don't expect it to, but if there is anything, don't

24   read it.  Likewise, you are not to listen to or view any

25   reporting about the case if there should be anything on TV, the

1    radio or the internet, nor are you to expose yourself to

2    anything on social media regarding the case.  If you come

3    across anything, again, I don't suspect it, but if you do, you

4    must immediately turn it off, turn the page, click out of it,

5    don't read it.

6              Next, don't do any research or any investigation

7    about the case on your own.  Do not visit any place you may

8    hear described during the trial.  Don't do any research on the

9    internet or in the library or any other reference source.

10   Don't Google anyone or anything related to the case.  I know

11   it's hard in this day and age not to go to the internet when

12   you're curious about something, but, again, I cannot emphasize

13   enough how important it is that you not do that or any form of

14   outside research relating to the case while the trial is going

15   on.

16             The reasons for these rules against exposing yourself

17   to media reports or doing any outside research are that what

18   you learn might be wrong and it would be unfair to the parties

19   if you were to have information from outside sources that the

20   parties did not know about and did not have the opportunity to

21   address.

22             Next, let me know if anybody that you recognize comes

23   into the courtroom.  It's a public place, so that could happen,

24   but it's important that you not hear from anyone in the

25   courtroom anything about what may have happened here when

1     you're not present.  During your breaks or when you're in the

2     jury room, we may be discussing matters, and it's important

3     that you not hear about them through an acquaintance who comes

4     in the room.  If you happen to see someone you know come in the

5     room, just let Mr. Clark know at your first opportunity.

6             Next, don't allow anyone to speak to you about the

7     case.  Again, I don't expect this to happen, but if you're

8     approached by anyone to speak about the case, just politely

9     tell them the judge said you can't talk about it.  If someone

10    does seek to approach you or contact you about the case, make

11    sure you let Mr. Clark know about that right away.

12            The lawyers, the parties and the witnesses are not

13    supposed to talk to the jury outside the courtroom, even to

14    offer a friendly greeting.  As I mentioned before, if you

15    happen to see any of the trial participants outside the

16    courtroom, they're going to ignore you.  Please do not take

17    offense.  They will be acting properly by doing so and they'll

18    be following my instruction.  Experience has shown that even

19    innocent conversations with jurors can be misinterpreted, so

20    courts have a hard and fast rule that lawyers, parties and

21    witnesses cannot speak to jurors, period.

22            The parties are entitled to have you personally

23    render a verdict in the case on the basis of your independent

24    evaluation of the evidence presented here in court.  Speaking

25    to others about the case or exposing yourself to information

1    outside of court could compromise your fairness to the parties.

2    So that's the basis for all these rules.

3            Finally, if anything should happen that's unusual or

4    you think I ought to know about, let Mr. Clark know, but don't

5    discuss it with your fellow jurors. Either give Mr. Clark a

6    note or give him a call or pull him aside and tell him, you

7    know, something's up and you want to speak to me. Again, I say

8    this in every case. I don't expect anything unusual or

9    improper to occur in this case. It is just safer to take the

10   precaution of alerting you in advance.

11           Now let me say just a few words about the trial

12   procedure. The trial has basically five parts.

13           First, each side has the opportunity to make opening

14   statements. As I've told you already, the opening statements

15   by the lawyers are not evidence. The purpose of the opening

16   statements is to give you an idea in advance as to what the

17   lawyers expect you to hear from the witnesses, but the only

18   evidence itself comes from the witnesses and the exhibits. And

19   we'll start with opening statements in a couple minutes.

20           After the opening statements, we will start with the

21   testimony of the witnesses. Plaintiff's witnesses go first.

22   Each witness will first give what's called direct testimony;

23   that is, answer the questions of the lawyer who called the

24   witness. And then the other party gets to cross-examine the

25   same witness. Sometimes there is redirect testimony and

1    occasionally recross-examination.  Documents or objects

2    sometimes are received in evidence.  After the plaintiff's

3    case, the defendants may present witnesses or evidence.  Those

4    witnesses, if the defendants choose to present them, will be

5    examined and cross-examined just as the plaintiff's witnesses

6    were.  And if the defendants choose to present evidence, it's

7    possible plaintiff might then present some brief rebuttal to

8    that evidence.

9              Third, after all the evidence has been received, each

10   side will have the opportunity to make closing arguments.

11   They'll review the evidence and make arguments to you as to

12   what conclusions they think you should or should not draw from

13   the evidence.  Again, these closing arguments are not evidence,

14   but they may be helpful to you in reviewing the evidence before

15   your deliberations.

16             And, fourth, after these closing arguments, or

17   summations, as they're called, I will give you detailed

18   instructions as to the law that applies and controls in this

19   case and you must follow those instructions.  These

20   instructions to the jury are sometimes referred to as the jury

21   charge.

22             Fifth and finally, after the jury charge, you will go

23   to the jury room to deliberate and discuss the evidence in

24   order to decide the facts and render a verdict.

25             Now, just some housekeeping matters.

1           Mr. Clark has already shown you the jury room.

2           Did you already get phone numbers and everything,

3    Walter?

4           THE DEPUTY CLERK:  Yes, Judge.

5           THE COURT:  All right.  You've already exchanged

6    phone numbers.  That's just in case we have a last-minute

7    schedule change or if you get a flat tire on your way down here

8    or something.  Hopefully blizzard season is behind us, so we

9    don't have to worry about that.

10           Starting tomorrow, our trial day is going to be 9:30

11    to 2:30 with one 30-minute break in the middle.  The Court will

12    supply lunch, so you don't have to worry about that.

13           Please make every effort to be on time in the morning

14    and after the break.  If any one of us is late, look at how

15    many people we'll be keeping waiting.  I will try my best not

16    to keep you waiting by having the lawyers bring up any issues

17    they have for me before 9:30 or after 2:30 or during the break.

18           If you wish, you can take notes.  Mr. Clark will give

19    you pads and -- oh, he's ahead of me, like he always is.  He

20    has given you pads and pens for that purpose.  If you do take

21    notes, you have to leave them in the jury room when you go home

22    for the night.  Any notes you take are for your own personal

23    use, to help you remember or to help you focus, but they're not

24    to be relied on by anyone else.  It's completely up to you

25    whether you want to take notes.  Some people find that it helps

1    them concentrate or helps them remember.  Other people find it
2    distracting.  So that is your individual call.  If you don't
3    take notes, you'll rely on your independent memory of the
4    evidence.  Either way, when you deliberate, you should be
5    talking about what the evidence was and not what is or is not
6    in one juror's notes or another's.

7              With those preliminaries out of the way, we are ready
8    to start with opening statements.  Plaintiff has the burden of
9    proof, so plaintiff gets to go first.

10             Mr. Miller.

11             MR. MILLER:  Thank you, your Honor.

12             Good afternoon, everybody.

13             Sort of a first for me speaking through this.  I'm
14   not sure how my voice sounds to everybody, but I'll do my best
15   to project and not really worry about how it sounds as long as
16   everybody can hear me.

17             On September 3rd, 2017, Nicholas Magalios was an
18   inmate at Fishkill Correctional Facility when he was assaulted
19   for no good reason by defendants Correction Officers Peralta
20   and Bailey.  Correction Officer Blount stood by and watched
21   when he knew he had a duty as a correction officer to intervene
22   in situations where fellow officers were beating down an
23   inmate.

24             September 3rd was a Sunday.  It was the day of the
25   week that Mr. Magalios typically would receive a visit from his

1    wife Lisa.  He worked at the prison Monday through Friday as a

2    mason and Sunday, Saturday and Sunday, were his days of

3    relaxation.  And Sunday was usually the day that he would look

4    forward to Lisa to come visit.

5              And on September 3rd, as early as possible, Lisa

6    arrived.  And Mr. Magalios, you'll hear, needs to go through a

7    certain process before entering into this rather large visiting

8    room at Fishkill.  Mr. Magalios will tell you that when he

9    entered into what's known as a frisk room, he saw Officer

10   Blount.  Officer Blount is the fellow sitting in the middle

11   over there.  Mr. Blount, or Officer Blount, was one of the

12   officers assigned to this frisk room.  And before an inmate can

13   go into the visiting room for his visit, he gets padded down.

14   That went smoothly.

15             And after he exited that frisk room, Mr. Magalios

16   headed into what's known as a smaller visiting room.  There's a

17   large one for families usually with larger tables, you know,

18   for kids and siblings, et cetera, and then there's a smaller

19   visiting room, which is called sort of like a one-on-one

20   visiting room.  And as it sounds, that's a room where one meets

21   with a spouse or a parent, a one on one.  And in that room

22   where Mr. Magalios was assigned, Officer Mathew Peralta was

23   assigned to that room.  Officer Peralta's sitting on your left.

24   Officer Peralta was assigned to this small visiting room along

25   with another officer named Crystal Pumarejo and a third officer

1    who doesn't really play a role in the -- on the incident that

2    we're going to be discussing during this trial.

3         Mr. Magalios will tell you that when he got assigned

4    his table, he proceeded to one of these one-on-one tables in

5    this small visiting room and he'll tell you that he did

6    something that he always did.  He did something that inmates

7    always do when they greet their guests.  He gave Lisa a hug and

8    a kiss and they sat down.

9         But something unusual happened when Mr. Magalios gave

10   Lisa a hug and a kiss.  Officer Pumarejo, who was standing

11   along a wall where there's a small officer station, yelled out

12   across a bunch of tables and, excuse my language, but this is

13   what she said, no fucking kissing.

14        Mr. Magalios will tell you he was surprised, number

15   one, at the instruction.  He was surprised, number two, at the

16   tone and the volume.  He was upset that he and his wife were

17   humiliated in front of the other visitors who were in this

18   area.  He'll also tell you that he sat down.  He's forced, as

19   an inmate, to face where the officers are.  Lisa had her back

20   to the officers.  And there was some tension.  No words, but

21   there was tension.  Mr. Magalios was upset that he was

22   embarrassed.  He was upset at the language and the tone.  And

23   there was some looking back and forth until maybe five minutes

24   after the visit began, Officer Peralta walked over to

25   Mr. Magalios' table and he said is there a problem.

1     Mr. Magalios simply said I just don't know why you were yelling

2     at us across this room.  Officer Peralta responded is there a

3     problem.  Mr. Magalios said no, sir, obviously, to placate him.

4     Officer Peralta said I didn't think so and he went back to

5     hanging out along this wall where there's like a desk with

6     Officer Pumarejo and this third officer.

7              The visit didn't go well.  Mr. Magalios and Lisa both

8     felt tension.  They were not happy at the way they were

9     treated.  And the visit was cut short by Nick and Lisa.  They

10    just weren't enjoying the visit.  And so at about 1:00, unlike

11    2:30 to 3, when they normally would end the visit, they said

12    let's end this now, this is not going well.

13             They headed to a station where Lisa goes one way

14    through a processing gate to exit the facility and Nick goes

15    back into that same frisk room that he entered through.  And

16    during the trial, I promise you you're going to see photos of

17    this frisk room.  You're going to see photos of the visiting

18    area.  You might see a sketch that covers the entire thing.

19    I'm just asking you, for the time being, to try to sort of

20    visualize what I'm describing.

21             And Nick will tell you that he entered back into this

22    frisk area, but this time, after a visit, the frisk is a little

23    more intense and it's on another side of the frisk room.  And

24    there are private little stalls or booths where inmates

25    actually get strip frisked before they go back to their housing

1    area.  And that's what Nick was expecting to happen.  He was

2    expecting to go through this area.  He was expecting to be

3    strip frisked.  He was expecting to get some food packaging

4    that Lisa had left for him that needs to go through a certain

5    process before the inmate can then take it up to his housing

6    area.  That's what he expected.  But he'll tell you that when

7    he entered into this frisk area, he noticed a couple of things

8    that were unusual.

9         He noticed Officer Bailey, who's sitting on your

10    right, who was assigned to the visiting yard in that frisk

11    room.  And he saw Officer Bailey with gloves, something that

12    these officers don't wear when they're assigned to their posts

13    in the visiting room.  He'll tell you that he saw Officer

14    Bailey and maybe one or two other officers tell some inmates

15    waiting to be strip searched to move, to get out of there.  And

16    Nick will tell you that there were at least two inmates sitting

17    on a bench waiting to be strip frisked and literally instructed

18    to leave.  And they did.  And that's when Nick realized that

19    something was unusual, something was up.

20         And then he saw Officer Peralta, the one who had

21    approached his table in the small visiting room, enter this

22    frisk room, putting on gloves.  And at that point, Nick knew

23    something's going to happen, something's up.  And the only

24    question in his mind at that point was how bad is this going to

25    be.  How much did I upset Officer Peralta out there in that

1    small visiting room.  Here I am with no inmate witnesses, no

2    cameras, officers not assigned to the frisk room coming in with

3    gloves.  Nick is saying to himself what are they going to do to

4    me.

5              This is what they did to him.  They put him up

6    against the wall with his hands, his palms, flat against the

7    wall and they put his legs way out, if you can sort of

8    visualize that stance.  That's not something that happens when

9    they exit.  And Officer Peralta roughly frisked him and then

10   grabbed his throat and whispered threats in his ear, things

11   like I can kill you and get away with it; I know where you

12   live.

13             Nick will tell you that, when that was happening,

14   Officer Bailey was standing right there, right beside him.  And

15   he will tell you that Officer Blount was standing just a couple

16   feet away watching.  And he'll tell you that, once he did this

17   rough frisk and made those threats in his ear with his legs out

18   like this, Officer Peralta kicked his legs out and he went

19   crashing to the floor, landing on his right shoulder.

20             Nick will tell you that Officer Bailey grabbed his

21   head with his hand and kept it flat on the ground while Officer

22   Peralta punched and kicked him for between 30 and 60 seconds.

23   He doesn't know if anybody else was punching and kicking him

24   because his face was held down by Officer Bailey.  There were

25   other officers there, but he only knows for sure that it was

1    Officer Peralta who was kicking and punching and he knows for

2    sure that Officer Bailey was holding his head down and he knows

3    for sure that Officer Blount was just standing there doing

4    nothing to intervene.

5           Nick will tell you that when the beating was over,

6    Officer Peralta left, presumably back to his post, Officer

7    Bailey left, presumably back to his post, and he was on the

8    floor in pain.  And at some point, the two inmates who were

9    sent away came back.  One of them said, hey, what happened, and

10   he told this inmate what happened.

11          Nick will tell you that, at some point, he then went

12   into this frisk booth to be strip frisked, something he was

13   expecting to happen.  Who did the strip frisk?  Officer Blount.

14   He will tell you that Officer Blount, with a straight face and

15   not a comment, as if nothing had happened, strip frisked him.

16   Then he waited with his packages to go back to his housing

17   unit.

18          His housing unit was called 16-2.  And you'll learn a

19   little bit about this housing unit.  It's sort of like an honor

20   dorm.  It's where inmates who make contributions to the

21   facility get to stay.  Most of them get separate rooms, maybe

22   some other privileges.  That was Nick's dorm.  And he will tell

23   you that, when he proceeded back to his dorm, he was in pain.

24   He was very upset.  He really didn't know what to do.  He

25   didn't know what they were going to do.  And he'll tell you

1  some of the things that were going through his mind about

2  possibilities about what they might do.

3           But when he arrived back at his dorm, he told the

4  desk officer a bunch of his friends who also work during the

5  week saw him and they said what happened, you know, they saw he

6  was in pain, they saw he was very upset.  He told them -- he

7  showed them his back that was bruised from the kicks and the

8  punches.

9           He needed to get on the phone with Lisa immediately.

10 He felt he needed to make a record outside the prison about

11 what happened to him.  And he called Lisa.  They're now

12 divorced, by the way.  We hope Lisa will show up.  She's been

13 subpoenaed.  But he called her and he told her what happened.

14          And at some point, when a sergeant came around, he

15 immediately told the sergeant what happened to him.  That

16 sergeant's name is Vantassell, and he's going to be called as a

17 witness in this case.  Vantassell, Mr. Magalios will tell you,

18 did what he was supposed to do.  He took him to the infirmary.

19 Not for a sick call necessarily, but that's what you do when

20 someone is injured.  You take them to the infirmary for photos.

21          Nick was taken to the infirmary.  Photos were taken.

22 He wrote a statement.  At the time, he knew Peralta as Officer

23 P.  He had seen Blount and Bailey around the facility a number

24 of times.  If not that day, the next day, he learned precisely

25 what their names were.

1          After the photos were taken, he went back to his dorm

2     and, from that point on, Nick Magalios did everything he could

3     to hold these men accountable. It's not easy when you're in

4     prison and the only people you can speak to are colleagues of

5     those who beat you, but he wrote a grievance. He wrote letters

6     to the Attorney General. He wrote letters to the Commissioner.

7     He might have written a letter to the governor. I don't

8     recall. But he did everything he could. And because of what

9     he did, risking retaliation, that's why we're here today.

10    Because Lisa found a lawyer, and that's why we're here today.

11         Now, you heard earlier when I talked about how they

12    threw him on the ground and his right shoulder crashed to the

13    floor. You'll hear that just maybe a week or two before this

14    incident, he was complaining about some clicking in his right

15    shoulder. We are not claiming that his right shoulder was

16    completely healthy before this, but what Nick will tell you is,

17    as a result of this assault, this shoulder got so bad,

18    conservative treatment failed, physical therapy failed,

19    injections failed. He had to have surgery to his right

20    shoulder about a year and a half later.

21         Nick will tell you, in addition to the injury to his

22    shoulder and the physical pain, the bruises and the abrasions

23    around his body, he'll tell you not only about the fear that he

24    went through at the time of the incident, but the fear every

25    day, until he was released in December of 2018, of retaliation.

1   And maybe if you've never been in a prison, it's hard to

2   imagine, but he will do his best to explain to you the fear he

3   had of retaliation until the very day he was released.

4            Members of the jury, Nick Magalios took about maybe

5   two days to get a job when he was released from prison in 2018,

6   and he's been working continually at that job until now.  And

7   right now, all he's asking for is what you all promised us

8   during jury selection this morning, that he will be on the same

9   playing field, even playing field, as the three defendants in

10  this case.  And if you follow that simple instruction, no

11  matter what your verdict is, justice will have been served.

12            And I thank you for your attention.

13            THE COURT:  Thank you, Mr. Miller.

14            Who will be opening for defendants?

15            MR. TURKLE:  I will.

16            THE COURT:  All right.

17            MR. TURKLE:  Can I use this podium?

18            THE COURT:  Yes.

19            And, ladies and gentlemen, you see that we have these

20  two I call them booths surrounded by Plexiglas.  And within the

21  Plexiglas, there is a HEPA filter.  And we have had experts on

22  epidemiology and fluid dynamics advising the court, and they

23  have told us that if you stand where Mr. Turkle is standing or

24  where the witnesses will sit, you can safely take off your mask

25  and the HEPA filter will ensure that anything you breathe out

 1    will not get breathed in by the rest of us.  So it's up to the

 2    lawyers.  If they want to take off their masks, they'll stand

 3    there; if they don't, they can speak to you from their tables

 4    with their masks on.

 5              So you can go ahead, Mr. Turkle.

 6              MR. TURKLE:  Thank you, your Honor.  May it please

 7    the Court.

 8              Good afternoon, ladies and gentlemen.

 9              As the Judge told you earlier, my name is Bruce

10    Turkle, and I, along with my colleague, Jessica

11    Acosta-Pettyjohn, have the responsibility and the honor of

12    defending Correction Officer Edward Blount, Correction Officer

13    Mathew Peralta and Correction Officer Timothy Bailey in this

14    action.

15              The story that Mr. Miller just told you was a fiction

16    and, as the evidence will show, is contrary to what occurred.

17    In Mr. Miller's version, Mr. Magalios, then an inmate at the

18    Fishkill Correctional Facility, claims that on September 3rd,

19    2017, he was assaulted by several correction officers while

20    other correction officers stood idly by while the altercation

21    ensued.

22              Under Mr. Miller's version of the events, at

23    approximately 9 a.m. on September 3rd, Mr. Magalios began a

24    visit with his wife.  In the course of the visit, a correction

25    officer, whom Mr. Magalios could not then identify, but later

1    claimed was Officer Peralta, and an unidentified female

2    correction officer separately approached Mr. Magalios and

3    directed him to stop kissing his wife.  Now, you will hear

4    testimony that, while a short embrace and a kiss at the

5    beginning and the end of a visit is permitted, prolonged and

6    extensive kissing and touching is not.  Nonetheless, extended

7    embraces are not considered a major offense and it's very rare

8    that an inmate is actually disciplined for such conduct.

9    Typically, a minor warning is enough to end the activity.

10           Now, the alleged interactions between Mr. Magalios

11   and the correction officers who asked him to stop the kissing

12   lasted only a few seconds.  Mr. Magalios was not disciplined

13   for his conduct.  The correction officers, including the one

14   that Mr. Magalios claims is Officer Peralta, are not alleged to

15   have spoken further with either Mr. Magalios or his wife for

16   the duration of the visit.

17           Now, Mr. Magalios contends that, although the

18   officers did not speak further with them, that they stared at

19   them.  It is not clear how long the stares lasted or the

20   frequency or from what distance the stares came, but what

21   Mr. Magalios is telling us is that, notwithstanding the

22   responsibility of these correction officers to oversee the

23   activities of dozens of other inmates and their visitors in

24   this visiting area, that they focused their attention on

25   Mr. Magalios and his wife.

1          Now, Mr. Magalios contends that the alleged staring

2    made him feel uncomfortable, causing him to terminate the visit

3    after only four hours, at approximately 1 p.m.

4          Now, you will hear testimony that inmates leaving a

5    visit must undergo a strip frisk to ensure that no contraband

6    was passed during the visit.  Mr. Magalios contends that as he

7    approached the frisk area, there were two inmates nearby, but

8    that Correction Officer Bailey allegedly whisked those inmates

9    away and directed Mr. Magalios to where his strip frisk would

10   be performed.

11         You will hear testimony that the strip-frisk area is

12   fairly well populated with correction officers and inmates

13   moving about throughout the area, making it unpredictable as to

14   how many inmates or officers might be in the area at a

15   particular time.

16         Now, Mr. Magalios contends that, at approximately

17   1:05 p.m., after the two inmates were directed elsewhere,

18   Correction Officer Peralta and several other correction

19   officers placed Mr. Magalios against a wall, kicked his legs

20   out from under him, punched him in the ribs and upper left

21   shoulder, placed a knee on his back and mushed his face into

22   the ground, an assault he claims lasted several minutes;

23   however, none of these correction officers are alleged to have

24   any previous altercations with Mr. Magalios or his wife.  There

25   were no prior run-ins, no grievances, no bad blood, yet these

1    correction officers, virtual strangers to Mr. Magalios,

2    allegedly left their post, jeopardized their careers, risked

3    criminal charges for the purpose of assaulting Mr. Magalios.

4          What's more, Mr. Magalios does not contend that this

5    alleged incident occurred in a secluded area or under cover of

6    darkness, but in the early afternoon in a fairly

7    well-trafficked strip-frisk area where any number of inmates

8    and correction officers could witness the incident.

9          And why did these officers assault Mr. Magalios?

10   Because Officer Peralta allegedly took exception to the manner

11   in which he was kissing his wife.  If this scenario seems

12   strange, it should.  These events never happened.

13         Mr. Magalios contends that on the afternoon of

14   September 3rd, 2017, he was ambushed, attacked and injured in

15   the strip-frisk area, yet no inmate or officer reported hearing

16   a ruckus or threats or fighting or screaming or even that an

17   apparent incident had occurred.

18         Now, some current or former inmates may testify as to

19   their knowledge of the alleged incident, but none of those

20   inmates will testify that they saw Mr. Magalios being attacked

21   by correction officers.

22         Moreover, Mr. Magalios' actions were not consistent

23   with an inmate who had allegedly been roughed up.  As soon as

24   the alleged attack ended, he was strip frisked, as inmates are

25   after a visit, then he headed to the package room, retrieved a

1    package left for him by his wife, carried the package to his

2    housing unit and began unpacking his belongings.  Along the

3    way, Mr. Magalios did not report to a correction officer that

4    he had allegedly been assaulted, did not complain about any

5    pain, did not ask for any medical assistance.  He simply

6    carried his package back to his housing unit and went about his

7    business.

8              Now, the evidence will show that Mr. Magalios arrived

9    back at his housing unit around 1:20.  He was on the phone with

10   his wife almost immediately thereafter.  However, Mr. Magalios

11   did not report the alleged incident to a DOCCS -- a Department

12   of Corrections official for more than two hours after the

13   alleged incident occurred, around 3:30 p.m.  Even then, he

14   merely told an officer he wanted to speak to the area sergeant.

15   It was not until around 3:50 p.m., several hours after the

16   alleged incident, that Mr. Magalios reported the incident to

17   the area sergeant.  And there is no record that the correction

18   officer or the area supervisor or any DOCCS staff member

19   reported anything out of the ordinary in Mr. Magalios'

20   appearance.  No signs of a struggle.

21             The supervising sergeant, as you heard, properly

22   responded to Mr. Magalios' complaint by bringing him to the

23   infirmary, but Mr. Magalios was not kept in the infirmary or

24   hospitalized or sent to a specialist or prescribed medication

25   stronger than Tylenol.

1          Mr. Magalios contends that the alleged September 3rd,

2    2017 incident resulted in continuous pain in his right

3    shoulder, causing him to return to the infirmary a few days

4    later.  At that time, an X-ray of the shoulder was taken.  He

5    further contends that more than one year later, in October

6    2018, he underwent shoulder surgery, and he claims that he

7    continues to suffer shoulder pain.

8          Now, Mr. Magalios, of course, attributes all of this

9    to the events of September 3rd, 2017, but the evidence will

10   show that Mr. Magalios suffered from a degenerative condition

11   in his right shoulder that predated the alleged September 3rd

12   incident.  Actually, on August 3rd, 2017, almost a month before

13   the alleged incident, Mr. Magalios went to the Fishkill

14   infirmary complaining of shoulder pain and a decreased range of

15   motion.  On September 1st, 2017, days before the alleged

16   incident, an X-ray was taken, which reflected degenerative

17   arthritis in his right shoulder.  Both the September 1st, 2017

18   pre-incident X-ray and a September 28th post-incident X-ray

19   showed the same degenerative condition.  What's more, the

20   September 28th, 2017 X-ray showed no objective evidence of an

21   acute traumatic event.  There was no joint separation, no

22   fracture, no injury.

23          Now, you will hear medical evidence presented by a

24   board-certified orthopedist, Dr. Ramesh Gidumal, who has more

25   than 30 years experience treating and operating on individuals

1    with arm and shoulder injuries.  Dr. Gidumal will describe his

2    review of plaintiff's medical records, including reports of

3    X-rays and an MRI and his physical examination of plaintiff on

4    December 7th, 2020.  He will confirm that the medical evidence

5    reveals that plaintiff suffers from a degenerative arthritic

6    condition in his right shoulder that predated and was not

7    exacerbated by anything that occurred on September 3rd.  He

8    will also explain that the October 23, 2018 arthroscopic

9    surgery performed on Mr. Magalios by a Dr. Holder was not the

10   result of anything that allegedly occurred on September 3rd.

11   You will hear evidence that the pre-operative and

12   post-operative report and diagnosis was of a right shoulder

13   impingement and acromioclavicular joint arthritis.  Neither

14   condition resulted from or was exacerbated by anything that

15   allegedly occurred on September 3rd, 2017.

16            Now, ladies and gentlemen, I ask that you listen

17   carefully to the evidence as it comes in and judge for yourself

18   how credible it is, how reasonable it seems.

19            I submit the evidence that you will hear and see

20   during the course of this trial will lead you to only one

21   conclusion, that Mr. Magalios has manufactured this claim

22   against Officers Peralta, Bailey and Blount for personal gain.

23   Officers Peralta, Bailey and Blount did not ambush

24   Mr. Magalios.  Officers Peralta, Bailey and Blount did not

25   assault Mr. Magalios.  Officers Peralta, Bailey and Blount did

1    not injure Mr. Magalios.  It is simply not credible that these

2    officers --

3              MR. MILLER:  Objection.  Argument.

4              THE COURT:  Stick to what the evidence is going to

5    show.

6              MR. TURKLE:  The evidence will show that these

7    officers worked in different areas of the facility, did not

8    assault Mr. Magalios or look the other way, and they did not

9    conspire to provide false testimony and false memoranda related

10   to the incident.

11             The evidence will show that the right shoulder pain

12   Mr. Magalios attributes to the conduct of Officers Peralta,

13   Bailey and Blount resulted from a pre-existing arthritic

14   condition.  The evidence will show the condition was not caused

15   by or worsened by anything Mr. Magalios claims happened on

16   September 3rd.

17             I submit to you that, at the conclusion of this

18   trial, you will return a verdict for the defense.

19             Thank you very much for your service and for your

20   attention, particularly under these unique circumstances.

21             THE COURT:  Thank you, Mr. Turkle.

22             All right.  You've now heard the opening statements

23   and we're now going to move on to the evidence.

24             Plaintiff may call his first witness.

25             MR. MILLER:  Thank you, your Honor.

1            Plaintiff calls Sergeant Vantassell.

2       DONALD VANTASSELL,

3            Called as a witness by the Plaintiff,

4            Having been duly sworn, testified as follows:

5            THE DEPUTY CLERK:  Please state your full name for

6       the Court and spell out your last name slowly.

7            THE COURT:  You can take off your mask in there.

8            THE WITNESS:  Thank you.

9            THE COURT:  And you can have a seat.  And you can

10      pull the mic so it's -- take the microphone and pull it so it's

11      close to you so that we can hear you.

12            THE WITNESS:  My name is Donald Roy Vantassell,

13      sergeant at Fishkill Correctional Facility.

14            THE COURT:  Can you spell your last name.

15            THE WITNESS:  V-A-N-T-A-S-S-E-L-L.

16            THE COURT:  Thank you.

17            All right.  Make sure you use the microphone,

18      Mr. Miller, so that Sergeant Vantassell can hear you in the

19      witness box.

20            MR. MILLER:  Okay.  Thank you, your Honor.

21      DIRECT EXAMINATION

22      BY MR. MILLER:

23      Q.   Sergeant Vantassell, can you hear me?

24      A.   Yes, sir.

25      Q.   Loud and clear?

 1   A.   Yes, sir.

 2   Q.   Okay.  If at any time my voice drops, let me know.  Okay?

 3   A.   Yes, sir.

 4   Q.   Were you subpoenaed to appear in court today by my office?

 5   A.   I don't know whose office, but I was subpoenaed to come

 6   here.

 7   Q.   Okay.  And you're currently employed by New York State

 8   DOCCS?

 9   A.   Department of Corrections and Community Supervision, yes,

10   DOCCS.

11   Q.   And you're employed currently as a sergeant at Fishkill

12   Correctional Facility?

13   A.   That's correct.

14   Q.   And were you employed as a sergeant at Fishkill on March

15   3rd, 2017?

16   A.   Yes.

17   Q.   I'm sorry.  September 3rd.

18   A.   Yes.

19   Q.   The day of the incident that we're here for.

20   A.   Yes, sir.

21   Q.   You know the defendants in this case?

22   A.   I have dealt with him in the past, yes, I do know him.

23   Q.   There's three defendants.

24   A.   Oh, the defendants.  Yes.  I'm sorry.

25   Q.   There are three defendants.  Do you know them?

1    A.    I know two of them.  The other one I'm not -- I mean, I'm
2    sure I've seen him, but I don't know him personally.
3    Q.    Can you identify those that you know.
4    A.    I know Officer Bailey and Officer Blount.
5    Q.    And for how many years have you known them?
6    A.    Just at work.  As long as they've been employed.  I'm sure
7    I have more time than all of them.
8    Q.    Would it be fair to say that you know Bailey and Blount
9    for over 10 years?
10   A.    That would probably be -- I would say that's probably
11   close.
12   Q.    Have you been their supervisor these entire -- the entire
13   time that you know them?
14   A.    No, sir.
15   Q.    So at some point before you passed the sergeant's exam,
16   were you a corrections officer assigned to Fishkill?
17   A.    Yes, sir.
18   Q.    Can you just -- because this might become important, tell
19   us the day -- the date, if you can, that you were promoted from
20   corrections officer to sergeant.
21   A.    The date?
22   Q.    Or the month and year.
23   A.    June 9th, 2016.
24   Q.    Okay.  So at the time of this incident, you were a
25   sergeant for approximately 14 months, correct?

 1    A.    Correct.

 2    Q.    And before that, Bailey and Blount were your colleagues,

 3    correct?

 4    A.    Yes.

 5    Q.    You were all corrections officers?

 6    A.    Yes.

 7    Q.    You were all members of the same union?

 8    A.    Yes.

 9    Q.    And can you tell us for how many years they were your

10    colleagues as co-corrections officers?

11    A.    I can't give you a date.  I have no idea.  I'm not -- I

12    don't have a personal relationship with these individuals other

13    than work, so -- I had different bids than they had, different

14    shifts.  I've seen them in passing.

15    Q.    Okay.  Officer Peralta was a pretty new corrections

16    officer in September 2017, correct?

17    A.    I don't know.

18    Q.    No idea?

19    A.    I have no idea how much time he has on the job.

20    Q.    Okay.  As you sit here today, are you able to answer that

21    question?

22    A.    No.

23    Q.    I'm going to be asking you some questions about the claims

24    in this case, but before I do that, I just want to ask you some

25    preliminary questions that will allow the jury to sort of

1    understand procedures and layouts at Fishkill.  Okay?

2    A.   Yes, sir.

3    Q.   And, frankly, I think that's why it's good that you're the

4    first witness.

5         Let me just start out by asking you if you reviewed any

6    documents in preparation for your testimony here today.

7    A.   No, sir.

8    Q.   Well, did counsel show you a sketch or photos of the

9    facility?

10   A.   Out in the hallway.

11   Q.   Okay.  What did they show you?  What were you shown?

12   A.   I was shown the facility visiting room, I guess.  I don't

13   really know -- I don't work there.  It's not my area that I

14   have to be at.  I've probably worked there maybe a dozen times

15   or so in my whole career of 32 years.

16   Q.   Okay.  So would it be fair to say that, no matter how many

17   times you worked in the visiting area or in the frisk-room

18   area, you're familiar with the layout?  Would that be fair to

19   say?

20   A.   I would not be able to say that because it's probably

21   changed over the years.  I mean, I'll look at it.  I don't --

22   you know, I -- I can't sit there and say that certain things

23   are still the same way they are.  I haven't been over there in

24   probably four years.

25   Q.   When you took the sergeant's exam, did you need to know

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1   the procedures for the frisk room and the visiting room?

2   A.    Yes, sir.

3   Q.    And you studied.  You passed.  Congratulations.  Right?

4   So you had to know what the procedures are for the frisk room,

5   right?

6   A.    That's correct.

7   Q.    And you needed to know the procedures for visiting,

8   correct?

9   A.    To some extent, yes.  I didn't get a hundred on the test.

10  Q.    Okay.  I would like to know if you were familiar with the

11  procedures in the frisk room and the visiting room in September

12  of 2017.

13  A.    Somewhat, yes, I would say.

14  Q.    Were you ever assigned either overtime or an extra

15  assignment to work in the visiting room or the frisk room?

16  A.    The only time I worked in there as a sergeant was on

17  Saturday nights for special visits.  I did not work there at

18  all as a sergeant for the visiting area, no.

19  Q.    Okay.  You've spoken to counsel about your testimony

20  before testifying here today?

21  A.    In regards to what?

22  Q.    About your testimony here today.

23  A.    Yes.  To some extent, yes.

24  Q.    Well, to some extent has quite a range, so why don't you

25  be more specific.

1    A.   It was just about my memo.  That was it.

2    Q.   Okay.  Do you -- as you sit here today, do you have a

3    recollection of the events of September 3rd, 2017?

4    A.   I do.

5    Q.   And would that be based on your reading of your personal

6    memo?

7    A.   Yes.

8    Q.   How many times did you speak to counsel in preparation for

9    your testimony?

10   A.   I don't know.  Two.  Two or three.

11   Q.   Two or three.  And would that be over the phone?  In

12   person?

13   A.   It was over the phone.

14   Q.   Okay.  And you never met me, right?

15   A.   No, sir.

16   Q.   You never met anyone from my office?

17   A.   No, sir.

18   Q.   Tell us about Fishkill.  Approximately how far is it from

19   White Plains, New York?

20   A.   Let's see.  It took me an hour and a half, so I would say

21   it's probably about an hour.

22   Q.   Okay.  And the facility has several housing units and 16-2

23   is one of those units, correct?

24   A.   Yes, sir.

25   Q.   And you're aware that Mr. Magalios was housed in 16-2 in

1   September of 2017?

2   A.   Yes, sir.

3   Q.   And that housing area has individual rooms and it's also

4   got some cubicals, right?

5   A.   Yes.

6   Q.   And most of the inmates who are housed in 16-2 are either

7   honor inmates or do work around the prison, correct?

8   A.   I wouldn't say honor inmates, but, yes, there's a lot of

9   inmates that do work around the prison that live there, yes.

10  Q.   Okay.  How many officers would be assigned to that unit on

11  any given tour?

12  A.   On most tours, it would be one.  On tour 3, it would be

13  two.

14  Q.   Tour 3 covers what period of time?

15  A.   For the officers, it's 2:30 to 10:30.

16  Q.   So at 2:30 in the afternoon, tour 3 takes over, correct?

17  A.   Yes, sir.

18  Q.   And when tour 3 takes over, there would be two officers

19  assigned to the unit, correct?

20  A.   Correct.

21  Q.   And there would be other officers not assigned to the

22  unit, but who would do part of their job in that unit, correct?

23  A.   I don't understand that question.  I'm sorry.

24  Q.   Well, for example, a rec officer wouldn't spend the entire

25  tour of duty in 16-2, but he would have access to it, right?

 1   A.   He might be able to use the restroom, but he's not
 2   supposed to be there.
 3   Q.   What about an escort officer?
 4   A.   The escort is the number-two officer.
 5   Q.   Okay.  And no other officers enter that unit during a tour
 6   3?
 7   A.   No, there's other staff that enters.  They come and pick
 8   up counts and different functions.  To go there and hang out,
 9   no.
10   Q.   No, okay, maybe you misunderstood my question.
11        Just to perform certain functions, other officers do go to
12   16-2, right?
13   A.   Yes, I would imagine so.
14   Q.   And there's also what's known as an area sergeant who
15   would make stops during his tour in 16-2, right?
16   A.   Correct.
17   Q.   And normally, just based on reviewing the logbook, maybe
18   twice per tour a sergeant would make his rounds into 16-2?
19   A.   Correct.
20   Q.   And you were part of tour 3 that day, right?
21   A.   Yes, sir.
22   Q.   So the first time you made your tour into 16-2 was about
23   3:50 p.m.?
24   A.   I believe it was, yes.
25   Q.   Could you just briefly tell us what your job was as the

1  area sergeant.

2  A.   I oversee the whole side of that building.  If there's

3  issues, an inmate has an issue or an officer has an issue.  Any

4  type of issues.  Could be, you know, if the power is out.  It

5  could be anything.  So I'm in charge of that.  And then I have

6  to take care of the mess hall, the yards, all these other areas

7  in that side of the building.  And then I would make another

8  round and then it would be time to go home.

9  Q.   Okay.  And when you make your round, let's say, at 16-2 --

10  I understand that there's other housing units, as well --

11  A.   Correct.

12  Q.   -- the logbook would be marked at the time that you made

13  your round, right?

14  A.   The time that I walked on the unit, yes.

15  Q.   So in looking at the logbook for 16-2, one would know

16  exactly what time a sergeant made his round into that unit,

17  correct?

18  A.   The time would be approximate because my watch might be

19  different than their clock or -- but within a few minutes, yes.

20  Q.   Okay.  And did you review this logbook before coming here

21  to court?

22  A.   No, sir.

23       MR. MILLER:  One second, your Honor.  Glasses and

24  masks don't work well together.

25       THE COURT:  Take your time.

1                    MR. MILLER:  Okay.

2                (Pause)

3    Q.    In front of you, Sergeant, there's a manila folder, and

4    I'm going to ask you to take a look at numbers 499 and 500.

5    A.    495?

6    Q.    499 and 500.

7    A.    They're not marked, but which one would you like me to

8    look at?  Is there a page number?

9    Q.    499 and 500.

10                THE COURT:  Is there an exhibit number?

11                MR. MILLER:  Your Honor, I believe counsel provided

12   that.  I believe it's based on the Bates stamps.

13                THE COURT:  Well, if you want it to be in the record

14   of this trial, it needs to have an exhibit number.  If you

15   don't, that's fine.

16   A.    Okay.  I have 499.

17   Q.    And 500?

18   A.    Yes, sir.

19   Q.    Okay.  Just could you tell us what those items are.

20   A.    It appears to be a logbook page from post 16-2 for tour 2.

21   Q.    Okay.  And --

22   A.    And that is continued on the next page.

23   Q.    Okay.  So it goes into tour 3?

24   A.    Yes, sir.

25   Q.    Okay.  Now, in looking at these two pages, are you able to

1    tell us --

2              THE COURT:  No, no, no.

3              MR. MILLER:  Okay.  I can do it the other way.

4              THE COURT:  If you're going to have the witness tell

5    us what an exhibit says, you have to put in the exhibit.

6              MR. MILLER:  Okay.  Your Honor, I'm going to offer

7    these two items, the logbook --

8              THE COURT:  You know you can't do it that way.  It

9    has to be plaintiff's exhibit something.

10             MR. MILLER:  Okay.  I was going to give you the

11   number.

12             THE COURT:  Okay.

13             MR. MILLER:  Plaintiff's Exhibit 8.  First I'll mark

14   it for I.D., your Honor.

15             THE COURT:  Yes.

16   Q.    And, Sergeant, I want you to take a look at 499 and 500,

17   and I'll ask a couple of leading questions.

18        Are these pages from the logbook for housing unit 16-2 for

19   September 3rd, 2017?

20   A.    Yes.  I believe they are.

21   Q.    And these logbooks are filled out typically by the officer

22   in charge of that housing unit for that particular tour, right?

23   A.    That's correct.

24   Q.    And usually there's what's known as a template stamp that

25   would indicate the name of the assigned officer and the area

1    sergeant and the tour and other items, correct?

2    A.    Yes.

3    Q.    And it's obviously that officer's duty to make sure that

4    these items are filled out accurately, correct?

5    A.    That is correct.

6            MR. MILLER:  Okay.  Your Honor, I would offer these

7    two pages into evidence as Plaintiff's Exhibit 8.

8            THE COURT:  No objection?

9            MS. ACOSTA-PETTYJOHN:  So, your Honor, I didn't hear

10   if he recognized any of the handwriting on that exhibit.

11           THE COURT:  Is this a document that you produced in

12   discovery to Mr. Miller?

13           MS. ACOSTA-PETTYJOHN:  Yes.

14           THE COURT:  Do you have any doubt as to what it is or

15   its authenticity?

16           MS. ACOSTA-PETTYJOHN:  No, your Honor.  I just --

17   again, I just didn't hear if he recognized his handwriting on

18   this document or not.

19           THE COURT:  If I understood, his handwriting wouldn't

20   be on this document.  It would be the handwriting of the

21   officer in the unit.

22           Am I right about that, Sergeant?

23           MR. MILLER:  That's what I gather, your Honor.

24           THE COURT:  Am I correct, Sergeant, that your

25   handwriting wouldn't appear on this document?

1                    THE WITNESS:  My handwriting is in the log book, yes.

2                    THE COURT:  Oh, it is in the logbook?

3                    THE WITNESS:  Yes.

4                    THE COURT:  All right.

5                    MR. MILLER:  I can clear that up, also, your Honor.

6       First I offer it into evidence as Plaintiff's 8.

7                    THE COURT:  Plaintiff's 8 is received.

8                    (Plaintiff's Exhibit 8 received in evidence)

9       Q.    Now, Sergeant, you said that your handwriting does appear

10      on this document and that's because, when you make your round,

11      you need to sign your name at the time in this chronological

12      log that you made your round, correct?

13      A.    That is correct.

14      Q.    Okay.  So what I'm going to ask you to do is start with

15      the tour before yours, which was tour 2, and first tell me who

16      was the officer assigned to 16-2 on that day for that tour.

17      A.    By this account, it should -- it was R. Bennett.

18      Q.    Okay.  And who was the supervising sergeant assigned to

19      tour 2 for 16-2?

20      A.    It appears to be Sergeant Campbell.

21      Q.    Okay.  And do you see Sergeant Campbell's signature in the

22      log for the times that he made his rounds to 16-2?

23      A.    I see that there's a faded entry, but it does appear to be

24      a sergeant's signature, yes.

25      Q.    Okay.  And that's on the first page of this exhibit,

 1   right?

 2   A.   Yes.

 3   Q.   And that's at about 8:40, correct?

 4   A.   Okay.  I mean, it's blacked out here.

 5   Q.   Well, it's between 8:30 and 8:55, correct?

 6   A.   Correct.

 7   Q.   Okay.  So let's assume it's 8:40.

 8   A.   Okay.

 9   Q.   All right.  At least that's what the exhibit says.

10   A.   Okay.

11   Q.   All right.

12        Now, 8:40 would have been a time in the morning, assume

13   that Mr. Magalios went to his visit at 9:00, when Mr. Magalios

14   was still in 16-2, right?

15   A.   At 8:40 -- visits are on the weekends.  He could have been

16   in the yard.  You know, the yard's open at 8:30.  So he could

17   have been in the yard.

18   Q.   Okay.

19   A.   But I don't know if he was on the unit.

20   Q.   Okay.  Let's go to the next page.

21   A.   Okay.

22   Q.   When was the next time that Sergeant Campbell made his

23   round into 16-2?

24   A.   It appears 11-- either -- it's 11:33 or 11:43.

25   Q.   Between 11:30 and 11:47, right?

20214qmargt      Vantassell - Direct - Mr. Miller

1    A.    Yes.

2    Q.    And that was the last time that Sergeant Campbell made his

3    round into 16-2 that day, correct?

4    A.    It appears, yes.

5    Q.    Okay.  Now, when is the -- what is the time that the next

6    sergeant made his round into 16-2 that day?

7    A.    That would be mine at 3:50 p.m.

8    Q.    Right.  So between 11:43 a.m. and 3:50 p.m., no sergeant

9    made a round into 16-2, correct?

10   A.    That's correct.

11   Q.    So I want you to assume that when Mr. Magalios returned to

12   his unit from his visit at approximately 1:30, the next

13   sergeant to appear in that unit was yourself, sir, at 3:50,

14   correct?

15   A.    That is correct.

16   Q.    And in your experience as a sergeant, would it be fair to

17   say that when an inmate gets beaten down by an officer, it's a

18   good idea for him to report it to a supervisor and not a

19   colleague of the officer who committed the beating?

20   A.    I disagree with that.

21   Q.    Okay.  Whether you disagree or not, is that a common

22   occurrence?

23   A.    No.  Absolutely --

24   Q.    Is it your testimony that it's not a common occurrence

25   that an inmate would want to report something like this to a

1    sergeant as opposed to a corrections officer?

2    A.    I'm sure they would want to report it to a sergeant, but

3    they could report it to any staff member.

4    Q.    Okay.  They could have.

5    A.    Yes.

6    Q.    Okay.  Thank you.

7          Now, I want to direct your attention -- by the way, you

8    knew Mr. Magalios on September 3rd, 2017, right?

9    A.    Yes, sir.

10   Q.    You were the area -- you were the regular area sergeant

11   for 16-2, right?

12   A.    Yes, sir.

13   Q.    And so you were aware that he had been at Fishkill in 16-2

14   for a couple of months already, right?

15   A.    I guess he might have been there a couple months.  I don't

16   know exactly how long.  But I had seen him around.

17   Q.    Yes.

18   A.    He lived on other housing units as well.

19   Q.    Okay.  And wouldn't it be fair to say that, from your

20   perspective, as the supervising sergeant for 16-2, Mr. Magalios

21   never gave anyone any trouble, right?

22   A.    I never had any issues with Mr. Magalios.

23   Q.    He worked real hard as a mason Monday through Friday where

24   he worked at Fishkill that others couldn't do?

25   A.    I have no idea.

 1  Q.   You didn't know that he worked Monday through Friday?

 2  A.   I have no idea what he did.

 3  Q.   Okay.  I would like to ask you some questions, now,

 4  Sergeant, about the visiting procedures.  And again, like from

 5  what you said before, if you don't know the answer, just tell

 6  us you don't know.  I'll find out from someone else.

 7  A.   Okay.

 8  Q.   Okay?  But let me just lay a little foundation.

 9       When you studied for the sergeant's exam, you needed to

10  know the procedure for visiting, right?

11  A.   Yes, sir.  That's on the test.

12  Q.   Okay.  And when you say you didn't get a hundred, you

13  don't know where you went wrong, right?

14  A.   It is broken down for us.

15  Q.   Okay.  First of all, when an inmate in 16-2 has a visit on

16  a particular day, how would he be notified?

17  A.   The processing officers would call the housing unit and

18  then the officer on the unit would notify the inmate.

19  Q.   Okay.  And would that be recorded in the logbook for 16-2?

20  A.   Normally it is.

21  Q.   Could you check and see if it was.

22  A.   It appears that 9:05 he was notified of a visit and he

23  left at 9:08, or at -- yeah, he left at 9:08.

24  Q.   Okay.  So, at 9:08 a.m., he went to a visit?

25  A.   Yes, sir.

1  Q.  So your testimony about he could have gone to the yard,

2  that didn't apply to Mr. Magalios for that day, correct?

3  A.  No.  He still could have went to the yard.

4  Q.  Okay, okay?

5  A.  The officer would have called the yard to have him return

6  to the unit.

7  Q.  Got it.  Okay.  But we can agree that, at 9:08, he left

8  16-2 to go to the visiting area?

9  A.  I agree with that, yes.  Yes.  That's part of the

10  document.

11  Q.  Okay.  Now -- and this is important -- the officer in

12  charge of 16-2 is not only required to write down when the

13  inmate leaves for his visit, but he's also required to write

14  down when he returns from his visit, correct?

15  A.  That's not normal practice.

16  Q.  That's not normal practice?

17  A.  No.

18  Q.  All right.  Then let me ask you this if that's not normal

19  practice.

20      If one were to want to know -- if someone is looking for

21  the recording of the time that Mr. Magalios returned back to

22  his housing unit, what would you look at?  What document would

23  you look at?

24  A.  The half-hour check-off.

25  Q.  The what?

1     A.    The half-hour check-off.

2     Q.    What's a half-hour check-off?

3     A.    It's where an officer tracks his inmates for the whole day

4     every half hour.

5     Q.    Are you talking about like a count?

6     A.    It's a half-hour count, yes.

7     Q.    Okay.  So let's talk in language that we all understand.

8           A count happens every half hour on a unit, correct?

9     A.    It's -- it's a tracking system.  It's not -- it's not a

10    legitimate count that's notified to the watch commander, no.

11    Q.    Okay.  But it just basically allows one to record the

12    number of inmates on the unit at the time, right?

13    A.    Correct.

14    Q.    Now, with that said, let me go back to the question I

15    asked you before.

16    A.    Okay.

17    Q.    How does that assist us in determining what time

18    Mr. Magalios got back to 16-2 after his visit?

19    A.    The officer would check him back in instead of being still

20    out on a visit.

21    Q.    But where is his name checked in on this log?

22    A.    It's not in a log.  It's a half-hour count sheet.

23    Q.    Okay.  So let me ask you this.  What time did Mr. Magalios

24    return to 16-2 that day?

25    A.    I have no idea.

1   Q.   Okay.  And you have no idea because there's nothing in the

2   16-2 log to indicate what time he returned, right?

3   A.   That's correct.

4   Q.   And now I'm testing your knowledge of the visiting-room

5   procedure, so just tell me I don't know if you don't know.

6   Isn't it fair to say that when an inmate leaves the visiting

7   area and leaves the frisk area to head back to his housing

8   unit, the time is not recorded, either?

9   A.   No.  I'm sure he had a pass.  A pass system is in place

10  with a time on it.  The officers would write a time on it when

11  he left.

12  Q.   I see.  So this pass, the pass will tell us what time he

13  returned to his unit?

14  A.   No.  That will tell you what time he left the visiting

15  area.

16  Q.   Okay.  Let me try to put a pin on this.

17       Is there any document right now that will tell us what

18  time he returned to his unit?  Yes or no?

19  A.   Yes.

20           MS. ACOSTA-PETTYJOHN:  Objection, your Honor.

21           THE COURT:  Overruled.

22  Q.   Your answer is yes?

23  A.   That is correct.

24  Q.   Okay.  So have you seen that document that will tell us

25  what time Mr. Magalios returned to his unit?

1   A.   Unless you have it in this packet, no.

2   Q.   Well, I don't want to waste your time, but --

3   A.   Okay.

4   Q.   -- I don't think it's there.

5   A.   Okay.

6   Q.   All right?

7   A.   It's a half-hour count sheet that is -- the officer tracks

8   each inmate for every half hour whether they're on the unit or

9   off the unit.

10  Q.   Okay.  Thank you.

11       Now, once Mr. Magalios leaves the unit to go to the

12  visiting area, he enters into a frisk-room area and gets pat

13  frisked, right?

14  A.   Yes.  I believe so.

15  Q.   And we've stipulated, counsel and I, that Officer Blount

16  was assigned to that frisk area.  Okay?

17       I want you to tell the jury what happens when an inmate

18  goes into that frisk area before his visit.

19  A.   I really can't tell you that.

20  Q.   Okay.

21  A.   I -- I -- I haven't worked there when it comes to that

22  situation.  The situation that I worked was on a Saturday night

23  where it's from a different building altogether and those

24  inmates are escorted.

25  Q.   Okay.  So just maybe I will turn a few pages here.  Is it

 1    your testimony, okay, that you cannot give us any direct

 2    knowledge about the process where inmates go for their visits

 3    at Fishkill Correctional Facility?  Is that your testimony?

 4    A.    I can give you some pieces, but I don't know the whole

 5    process, no.

 6    Q.    Okay.

 7              MR. MILLER:  May I confer with counsel, your Honor?

 8              THE COURT:  Yes.

 9              (Counsel conferred)

10              MR. MILLER:  Your Honor, we've agreed to stipulate,

11    which might make this go a little faster.  May I pronounce it?

12              THE COURT:  Sure.

13              MR. MILLER:  Okay.  Members of the jury, we've

14    stipulated -- both sides have stipulated that Corrections

15    Officer Blount was assigned to the frisk processing room on

16    September 3rd, Officer Peralta was assigned to this small

17    visiting room on that day, and Officer Bailey was assigned to a

18    visiting yard on that day.

19              Okay.

20              THE COURT:  Ladies and gentlemen, on those rare

21    occasions when the lawyers can agree on something, it's called

22    a stipulation, and you can accept as true what they've

23    stipulated to.

24    Q.    At some point that day, Sergeant, you arrived at 16-2,

25    correct?

1    A.    Yes, sir.

2    Q.    And that was your regular tour, right?  It was a scheduled

3    arrival at 16-2, right?

4    A.    Scheduled for that day.  Not at that time.

5    Q.    Okay.  Did you sign in?

6    A.    Yes, sir.

7    Q.    Had you signed into 16-2 yet that day?

8    A.    I didn't hear the question.  I'm sorry.

9    Q.    When you arrived at 16-2 at 3:50, that was the first time

10   you signed in, right?

11   A.    Yes, sir.

12   Q.    And what time did your tour begin?

13   A.    At a quarter to 2 I start, and then I had to do check-in

14   and things like that.

15   Q.    Okay.

16   A.    So I probably didn't get down there 'till after 3.

17   Q.    Okay.  And when you got there, were you met by

18   Mr. Magalios or somebody else upon your arrival?

19   A.    My arrival to the building or to the unit?

20   Q.    The unit, 16-2, at 3:50 p.m.

21   A.    The officer.

22   Q.    Okay.  So you went to the officer, right?

23   A.    Absolutely.

24   Q.    And did you sign your name in the log?

25   A.    Yes, sir.

 1   Q.   And that is before you spoke to Mr. Magalios?

 2   A.   Yes, sir.

 3   Q.   And where was Mr. Magalios when you first saw him?

 4   A.   I believe that his cube area was directly across from the

 5   officer's station.

 6   Q.   And is that something that you remember or you wrote it

 7   down somewhere?

 8   A.   It was part of a packet.  It was part of a packet.  Yes, I

 9   wrote it down.

10   Q.   Okay.  So you don't remember that, but something refreshed

11   your recollection?

12   A.   They could move in and out of different spots on that dorm

13   every week.

14   Q.   Let me repeat my question.

15   A.   Okay.

16   Q.   Do you remember where Mr. Magalios was when you first saw

17   him that day?

18   A.   No.

19   Q.   You have no recollection whatsoever?

20   A.   No.

21   Q.   But you do remember having a conversation with him at some

22   point after you arrived at 16-2, correct?

23   A.   Yes.

24   Q.   Okay.  And when you had this conversation with him, would

25   it be fair to say that it was a private conversation between

1    you and him?

2    A.    It was probably near the officers' station.

3    Q.    If you don't remember --

4    A.    I don't remember exactly.

5    Q.    Okay, okay.

6    A.    But I assume -- most of the time when an inmate will

7    approach me, it's near the officers' station.

8             THE COURT:  If you don't remember, that's fine.

9    Don't guess.  The question was was it a private conversation.

10   A.    I assume that it was semi-private.

11   Q.    Semi-private?

12   A.    Yes.  I mean, it's a --

13   Q.    Semi-private, meaning more than you and Mr. Magalios?

14   A.    No.  It was -- there was a dorm area.  People probably

15   could overhear.

16            MR. MILLER:  Move to strike, your Honor.

17            THE COURT:  Well, if I understand what you're saying

18   is the conversation was between the two of you, but there were

19   other people around who might have heard.

20            THE WITNESS:  Yes, ma'am.

21            THE COURT:  Overruled.

22   Q.    Mr. Magalios told you that he was assaulted by three

23   officers, correct?

24   A.    He made an allegation of that, yes.

25   Q.    Okay.  And when he made that allegation, would it be fair

1    to say that you, as sergeant, need to take this allegation, as

2    you call it, seriously, right?

3    A.    At that point, I take him to the regional medical unit,

4    which we call the RMU.  If anybody makes an allegation of any

5    sort, that's what I do, I take them there, and then the medical

6    assesses them.  I don't have anything to do with that at that

7    point.  There -- it's not an investigation by me.  I -- I'm

8    worried about -- I take him from the dorm area to the regional

9    medical unit to get him assessed by medical.  Because if an

10   inmate falls down and scrapes his knee, I'm still going to do

11   that same thing.

12   Q.    Okay.  My question was, when an inmate makes an allegation

13   that he was beaten by three officers, you, as a sergeant, take

14   that allegation seriously.  I'm not asking you about someone

15   who falls and scrapes their knee.

16   A.    Okay.

17   Q.    I'm asking you about an inmate who's making an allegation

18   that, if true, is a criminal act.  Do you take those

19   allegations seriously?

20   A.    Every --

21   Q.    Yes or no?

22             THE COURT:  Well --

23   A.    Yes.

24             THE COURT:  If the witness can answer yes or no, he

25   should, but if it's not that simple, you can say I can't answer

 1    that yes or no.

 2    Q.    Can you answer that yes or no?

 3    A.    No.

 4    Q.    All right.  Then let me rephrase it.

 5          When an inmate makes an allegation of an assault that

 6    could be a criminal assault -- doesn't have to be

 7    Mr. Magalios -- under any circumstance, do you, as the

 8    supervising sergeant, take those allegations seriously?

 9          Could you answer that yes or no?

10    A.    You're trying to say that one thing.  I can't.  I -- I

11    take them all serious.

12    Q.    Okay.  Okay.  I think you've answered the question.

13    A.    Any allegation.  It doesn't have to be an assault

14    allegation.  It can be any allegation.  It can be a verbal

15    allegation.  It could be anything.

16    Q.    Well, would you agree that an assault allegation is more

17    serious and it should be taken more seriously?

18    A.    I would say yes, you're probably correct in that.

19    Q.    Okay.  Thank you.

20          And did you ask him to identify the officers who assaulted

21    him?

22    A.    I did.

23    Q.    Okay.  And at some point, he wrote down on a piece of

24    paper certain identifying features, right?

25    A.    I -- I can't recall, but I'm assuming yes.

1  Q.  Do you recall him writing on a note in the infirmary that

2  Officer P Was assigned to the small visiting room?

3  A.  I believe that is correct.

4  Q.  And when he wrote Officer P, who was assigned to the small

5  visiting room, did you know that was Officer Peralta?

6  A.  No, sir.

7  Q.  Did you make any steps or did you take any steps to

8  determine who was assigned to the small visiting room and

9  whether or not any of those assigned to that room had a name

10  that started with a P?  Did you take any of those steps?  Yes

11  or no?

12  A.  No.

13  Q.  Okay.

14          THE COURT:  Was that your job?

15          THE WITNESS:  No.

16  A.  If I can really answer the question, I will.

17  Q.  Okay.  Well, I'll get to that, and if I don't, your

18  attorney's right there.  They can ask you questions.

19          THE COURT:  Well, these attorneys are representing

20  the defendants.  They don't represent the witness.  But they

21  will have a chance to clarify anything that they think needs

22  clarification.

23          You know what?  This is a good time for us to take a

24  short 10-minute mid-afternoon recess in case anybody needs the

25  restroom.

20214qmargt     Vantassell - Direct - Mr. Miller

 1              Don't discuss the case.  You can leave your pads on
 2    your seats and we'll resume at 3:30.
 3              (In open court; jury not present)
 4              THE COURT:  Sergeant, you can step down.
 5              THE WITNESS:  Thank you.
 6              THE COURT:  All right.  See you back at 3:30.
 7              (Recess)
 8              (Continued on next page)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    (Jury enters.)

 2              THE COURT:  All right, welcome back, ladies and

 3    gentlemen.  We will resume with Plaintiff's direct of Sergeant

 4    Vantassell.

 5              Go ahead, Mr. Miller.

 6    DIRECT EXAMINATION (Continued)

 7    BY MR. MILLER:

 8    Q.   Sergeant, we already went through page 499 and 500 in

 9    evidence as Plaintiff's 8.  I'm just going to ask you to pull

10    out page 501, which is just the next page.

11    A.   Okay.

12    Q.   Do you see that?

13    A.   Yes, sir.

14    Q.   Just -- is that just the continuation of the logbook with

15    further entries from your tour from 16-2?

16    A.   Yes.

17              MR. MILLER:  Okay, your Honor, I should have offered

18    them all together, but I'm going to offer that other page, page

19    501, as part of Plaintiff's 8, so now it's a three-page

20    document.

21              THE COURT:  All right, the record will reflect that

22    Plaintiff's 8 consists of three pages which are bates-numbered

23    499 to 501.

24              MR. MILLER:  Thank you.

25    Q.   Now, that last page, Sergeant, that just shows the
```

1  continuation of your -- of the tour in 16-2, correct?

2  A.  It shows the end of that and then the beginning of the

3  next tour, the stamp.

4  Q.  Correct, right.  So, in other words, there's a stamped

5  template at the very bottom of that page, right?

6  A.  Yes, sir.

7  Q.  And that indicated that a new crew came on, right?

8  A.  Yes, sir.

9  Q.  So the only question I have with regard to this third page

10  is it indicates that you made another tour into 16-2 during

11  your tour that day, right?

12  A.  Yes.

13  Q.  And what time was that?

14  A.  Uh, it appears about 8:15 p.m.

15  Q.  Okay, would it be fair to say that in the normal course of

16  business, you would make two visits into 16-2 during your tour

17  of duty?

18  A.  Yes, sir.

19  Q.  And on this particular day, those two entries were at 3:50

20  and 8:42, right?

21  A.  Uh, 8:15.

22  Q.  Okay.  Okay, thank you.

23  Now, did you take Mr. Magalios to the infirmary by

24  yourself or with another officer?

25  A.  I believe I had an officer with me.

1    Q.   Okay, and that was Officer Rivera?

2    A.   I believe he was the number two officer that day, yes.

3    Q.   So Rivera was one of the two officers assigned to 16-2?

4    A.   Correct.

5    Q.   And so you asked him to come along?

6    A.   As an escort, yes.

7    Q.   Okay.  And when Mr. Magalios arrived at the infirmary, you

8    asked him to write a statement about what happened to him,

9    correct?

10   A.   Yes.

11   Q.   Do you have that statement in front of you or should I

12   direct you to it?

13   A.   I don't have it in front of me.

14   Q.   Can you take a look at page 470 and 471.

15            (Brief pause.)

16   Q.   Let me know when you find it.

17   A.   I have it.

18   Q.   Okay.  Could you --

19            MR. MILLER:  Let me ask a leading question.

20   Q.   Is this a two-page written statement made by Mr. Magalios

21   in the infirmary on September 3rd, 2017, upon your request?

22   A.   Yes.

23   Q.   Okay.  And did you then take this two-page statement from

24   him when he was completed -- when it was completed?

25   A.   Yes.

1    Q.    And what did you do with it?

2    A.    It was placed in a point of information packet and then

3    watch commander was notified.

4    Q.    Are you telling us that after you took this two-page

5    statement from Mr. Magalios, you took no further action with

6    regard to this?

7    A.    At that point I made a point of information packet, and

8    then --

9    Q.    On that day, did you do anything else?

10   A.    I took him to the RMU so he could get attended to

11   his...medical attention.

12   Q.    Right, and then, and then you brought him back to 16-2 at

13   some point, right?

14   A.    Yes.

15            MR. MILLER:    Now, your Honor, I would offer this

16   two-page statement into evidence as Plaintiff's Exhibit 9.

17            THE COURT:    Hearing no objection, it's received.

18            (Plaintiff's Exhibit 9 received in Evidence.)

19   Q.    I'm assuming you read this statement, right, when it was

20   complete?

21   A.    Yes.

22   Q.    And at some point he refers to Officer P, correct?

23   A.    It says that, yes.

24   Q.    Now, I might have asked you this before, but now maybe in

25   context let me ask it again.

1            Did you know who Officer P was --

2    A.   No, sir.

3    Q.   -- when he, when he told you Officer P?

4    A.   No.

5    Q.   And did you make any attempts to determine who Officer P

6    was?

7    A.   I made a point of information packet, gave it to the watch

8    commander, and I assumed that he gave it to the sergeant for

9    the visit room to find out who that was.

10           MR. MILLER:  I would move to strike.

11           THE COURT:  I'll allow it.

12   Q.   Let me ask the question again.  Did you personally make

13   any efforts to determine who Officer P was when you read Mr.

14   Magalios's statement.

15   A.   No.

16   Q.   Okay.  Now, in the infirmary, you took certain photos of

17   Mr. Magalios, correct?

18   A.   Standard photos, yes.  Standard.

19   Q.   You took photos, right?

20   A.   Yes.

21   Q.   To indicate the injuries to his body, right?

22   A.   When an allegation is made, yes.  When there's injuries,

23   yes.

24   Q.   Okay.  Have you seen those photos --

25   A.   I was --

1   Q.   -- since that day?

2   A.   Not since that day, no.  I, I'm -- I mean, I was present

3   for them.

4   Q.   No, I understand that, but, like, in the two or three

5   times that you prepped for this case, did you look at those

6   photos?

7   A.   No.

8   Q.   Okay.

9           MR. MILLER:  These are already in evidence, your

10  Honor.  I'm going to --

11          THE COURT:  Well, I don't know how they could be in

12  evidence.  They haven't been offered and I haven't admitted

13  them.

14          MR. MILLER:  Okay.

15  Q.   These photos were taken by you or Officer Rivera, correct,

16  in the infirmary?

17          THE COURT:  You can't just say 'these photos.'  You

18  gotta talk about an exhibit number.

19  Q.   Take a look at 488 --

20          THE COURT:  No, exhibit number, not Bates number.

21  Q.   This is Plaintiff's 2.

22          THE COURT:  Okay, that's an exhibit number.

23  A.   Am I looking for these?

24  Q.   You can take a look at 488 through four -- I'm sorry.  485

25  through 491.  Tell me when you have those pages.

1    A.    I have 485.  Through 491 did you say?

2    Q.    Yeah, up to 491.

3    A.    Okay.

4    Q.    Are those the photos -- these are -- this is Plaintiff's 2

5    marked for identification.  Are those the photos that were

6    taken at the infirmary on September 3rd, 2017, by either

7    yourself or Officer Rivera?

8    A.    It says Officer Rivera, um...I believe so.  Yes.

9              MR. MILLER:  So, your Honor, I would offer

10   Plaintiff's 2 marked for identification into evidence.

11             MS. ACOSTA-PETTYJOHN:  No objection, your Honor.

12             THE COURT:  They're received.

13             (Plaintiff's Exhibit 2 received in Evidence.)

14   Q.    I'm going to show you Plaintiff's 2e.

15             THE COURT:  Walter, I don't think the monitor's on.

16   Q.    Can you see that photo, Sergeant Vantassell?

17   A.    Not yet.  Yes.

18             THE DEPUTY CLERK:  You can adjust it.

19             THE COURT:  You can zoom out or zoom in if you want

20   us to see the whole thing.

21             MR. MILLER:  Um...got it.

22   Q.    When you took that photo or when you were present for that

23   photo, did you notice the bruises on his left lower flank?

24   A.    On his left lower what?  Flank did you say?

25   Q.    I said flank.  Do you know what a flank is?  I can change

1      the word.

2   A.    Sure.  Change it.

3   Q.    Sorry?

4   A.    What would you say?

5   Q.    His left lower back, near the waist area (indicating).

6   A.    I can see that, yes.

7   Q.    Did you notice that bruise on September 3rd, 2017?

8   A.    I don't recall.

9   Q.    Did Mr. Magalios tell you how he got that bruise?

10  A.    He made allegations on how he got his injuries, yes.

11  Q.    I'm asking you if Mr. Magalios told you how he got that

12      bruise.

13  A.    Yes.

14  Q.    How did he say he got the bruise?

15  A.    He claimed that he was assaulted.

16  Q.    And I'm showing you Plaintiff's 2f in evidence.  Tell me

17      when you see it.

18  A.    I can see it.  I can see it, I'm sorry.

19  Q.    Did Mr. Magalios tell you how he suffered that bruise

20      below his left shoulder?

21  A.    Yes.

22  Q.    What did he tell you?

23  A.    He said he was assaulted.

24  Q.    So at the time the photo was taken, did you notice those

25      injuries?

 1    A.    Yes, I was present when medical staff assessed him, yes.

 2    Q.    Okay.  Mr. Magalios also had abrasions to both knees,

 3    correct?

 4    A.    It appeared, yes.

 5    Q.    And did you ask him how he got those injuries?

 6    A.    He wrote in a statement.  He told me.

 7    Q.    What did he say?

 8    A.    He said he was assaulted.

 9    Q.    Now, your investigation did not conclude on September 3rd,

10    2017, correct?

11    A.    Uh, I believe there was a grievance later on that was part

12    of that, yes.

13    Q.    Let's flesh that out a little bit.

14    A.    Okay.  I don't know what you're asking me.

15    Q.    A couple days later, after Mr. Magalios wrote this

16    two-page statement that's Plaintiff's Number 9, he wrote an

17    official grievance, correct?

18    A.    Yes, sir.

19    Q.    And at that time he named three officers, correct?

20    A.    I don't recall, but I assume.

21    Q.    Tell me what you assume.

22    A.    I assume that you know the answer.  I don't recall who he

23    named.

24    Q.    What role did you play in that grievance?

25    A.    The grievance, I, I assume that I got memos from the

1     staff, and I put the point of information packet from the night

2     of the incident and sent it to the captain.

3  Q.  Take a look at page 9 and 10 in that little pile over

4     there.

5  A.  The same folder?

6  Q.  Yeah, but it's page 9 and 10.

7  A.  Well, it starts on page 452.

8  Q.  Maybe it's in the other Redweld.

9  A.  Page 9 I have.  And page 10.

10  Q.  Okay.  Now, page 9 is what's known as a to/from, correct?

11  A.  That is correct.

12  Q.  And a to/from, it's a term used in DOCCS for when there's

13     a grievance by an inmate against a corrections officer,

14     correct?

15  A.  No.

16  Q.  What is a to/from?

17  A.  It's any form of a memo.

18  Q.  Okay.  And did you receive a to/from Officer Peralta?

19  A.  Yes.

20  Q.  What was the date that you received that to/from?

21  A.  It appears to be 9/29/17.

22  Q.  And that is, that is in reference to Mr. Magalios's

23     allegation of September 3rd, correct?

24          MS. ACOSTA-PETTYJOHN:  Objection, your Honor.  This

25     isn't in evidence yet, your Honor.

 1              THE COURT:  He's not -- if he knows without reading

 2     from it, he can answer.

 3              MR. MILLER:  I'll offer it in in just one moment.

 4     Q.   Is this in reference to Mr. Magalios's September 3rd

 5     allegation?

 6     A.   It's a reference to his grievance.  It's got the grievance

 7     number on it.

 8     Q.   Is in reference to the incident that took place in the

 9     frisk room on September 3rd, 2017?

10     A.   Yes, it appears to be.

11     Q.   That's what I'm asking you.

12     A.   Oh, okay.

13              THE COURT:  Okay, let's...take a breath, Mr. Miller.

14              MR. MILLER:  Okay.

15     Q.   Could you tell us why it took 26 days for Officer Peralta

16     to write this to/from?

17              MS. ACOSTA-PETTYJOHN:  Objection.

18              MR. MILLER:  If he knows.

19              THE COURT:  If the witness doesn't know, he's going

20     to tell us he doesn't know.

21     Q.   Do you know?

22     A.   I do not know.

23              MR. MILLER:  Okay, I would offer this item into

24     evidence as Plaintiff's -- is it 11?

25              THE COURT:  I don't know; you tell me.  You've used

1    up to nine so far.

2            MR. MILLER:  Sorry, 10.  I offer this into evidence

3    as Plaintiff's 10.

4            THE COURT:  This is a statement by the Defendant

5    Peralta?

6            MR. MILLER:  Yes, it is.

7            THE COURT:  It's received.

8            MS. ACOSTA-PETTYJOHN:  No objection, your Honor.

9            (Plaintiff's Exhibit 10 received in Evidence.)

10   Q.   And take a look at page 10.  This is a to/from Officer

11   Bailey, correct?

12   A.   That's correct.

13   Q.   And it is also in reference to Mr. Magalios's allegations

14   from September 3rd, correct?

15           THE COURT:  I'm sorry, did you say page 10?

16           MR. MILLER:  Yes, that's the Bates stamp that he's

17   referring to.

18           THE COURT:  But Plaintiff's 10 is a statement of

19   Defendant Peralta.  What are you looking at now?

20           MR. MILLER:  I'm asking him to look at Bates stamp

21   number 10 in his package right now, and then I'll offer it as

22   Plaintiff's 11.

23           THE COURT:  Okay.

24   Q.   Do you see at the bottom, it says 010?

25   A.   Yes, sir.

 1   Q.   Okay.  And this is a to/from Bailey to yourself regarding

 2   the September 3rd incident as alleged by Mr. Magalios?

 3   A.   Yes, sir.

 4   Q.   And what's the date of this...report?

 5   A.   9/23/17.

 6   Q.   And this is a statement made by Officer Bailey.

 7   A.   It appears that, yes.

 8              MR. MILLER:  Yeah, I offer this item into evidence as

 9   Plaintiff's 11.

10              MS. ACOSTA-PETTYJOHN:  No objection, your Honor.

11              THE COURT:  It's received.

12              (Plaintiff's Exhibit 11 received in Evidence)

13              (Brief pause.)

14   Q.   The reason that these to/froms were written to you is

15   because you were the supervising sergeant on September 3rd,

16   2017, correct?

17   A.   In the main building I was.

18   Q.   Right.  So would it be fair to say that if you received

19   this grievance on September 6th or 7th, you were conducting an

20   investigation into Bailey, Peralta at that time?

21   A.   No.

22   Q.   When did you receive the grievance?

23   A.   I have no idea.  I don't have the grievance in front of

24   me.  I don't know.

25   Q.   What did you do upon receiving the grievance?

1   A.   Upon receiving any grievance, I would --

2   Q.   What did you do upon receiving this grievance.

3   A.   I don't recall.

4   Q.   But would it be fair to say that just from reading these

5   to/froms from Bailey and Peralta, you were involved in the

6   investigation, correct?

7   A.   I was gathering.

8   Q.   Did you feel that you were biased in any way against Mr.

9   Magalios or in favor of your ex-colleagues?

10  A.   No.

11  Q.   Right down the middle?

12  A.   Absolutely.

13  Q.   Even playing field?

14  A.   Absolutely.

15  Q.   At some point after you received these to/froms, did you

16  become aware that Officer Bailey was assigned to 16-2 under

17  your supervision after this incident?

18  A.   No.

19  Q.   You have no recollection of that?

20  A.   No.

21  Q.   If you became aware, this is more of a general question,

22  based on the allegations made by Mr. Magalios, would you allow

23  Officer Bailey to be assigned to 16-2?

24  A.   I don't have any control over that.

25  Q.   Would you make any inquiries, would you make any

1   recommendations?

2   A.   There would be no reason to.

3        MR. MILLER:  I have no further questions.

4        THE COURT:  Ms. Acosta-Pettyjohn, you may

5   cross-examine.

6   CROSS-EXAMINATION

7   BY MS. ACOSTA-PETTYJOHN:

8   Q.   Can you hear me from here, Mr. Vantassell?

9   A.   Yes.

10   Q.   I just want to make sure I'm loud enough to be heard.

11        Now, I just want to clarify a few things that came up

12   during your testimony.

13        You testified that in order to keep track of inmates,

14   there's an inmate count, correct?

15   A.   Yes.

16   Q.   Can you explain what an inmate count is?

17   A.   It's, it's a, uh -- inmate's names are all listed on the

18   count, per bed number, and then there is a square box for each

19   half hour of that tour, so it's -- if it's from six-thirty to

20   two-thirty, the officer would track that inmate for each half

21   hour that he's on the unit or off the unit.

22   Q.   And that's how the officers on the unit would know how

23   many inmates are in that unit at a particular time, correct?

24   A.   That's correct.

25   Q.   And I know you just testified about, I believe,

1    Plaintiff's Exhibit 10 and 11, which were the to/froms from

2    Corrections Officers Bailey and Peralta.

3    A.    I believe it was 9 and 10.

4    Q.    Well, they're pages 9 and 10, correct?

5    A.    Yes.

6    Q.    Okay.  And you had testified that these to/froms were part

7    of a grievance, correct?

8    A.    That's correct.

9    Q.    Can you explain what a to/from as part of a grievance

10   means?

11   A.    When a, when an officer is grieved by, by an inmate,

12   there's a grievance number which is filed with Albany, and then

13   at that point I would, I would tell the officer you need to

14   respond to this allegation, and then they would write a memo.

15   Q.    And how do you know that -- let's go with page 9 first

16   which, I believe, is Plaintiff's Exhibit 10.

17   A.    I can't, I can't hear you, I'm sorry.

18   Q.    Sorry.  We're going to -- looking at Defendant's page 9,

19   the Bates-stamp page 9?

20   A.    Yes.

21   Q.    How do you know that this to/from was part of a grievance?

22   A.    Because it has a grievance number on it.

23   Q.    Okay.  And we're going to go to page 10.  How do you know

24   that this to/from Officer Bailey was part of a grievance?

25   A.    Because it has the grievance number on it.

1          THE COURT:  And just so the record's career, Ms.

2    Acosta-Pettyjohn, you're referring to Plaintiff's 10 and

3    Plaintiff's 11?

4          MS. ACOSTA-PETTYJOHN:  Yes, your Honor.

5          THE COURT:  This is why exhibits should have exhibit

6    numbers and not be using Bates numbers.  Okay.  Go ahead.

7    Q.   And just for clarification, also, to/froms that are part

8    of a grievance are written after a grievance is filed, correct?

9    A.   That's correct.

10   Q.   And do you know when -- withdrawn.

11         Is there any time limit that an inmate should be filing a

12   grievance?

13   A.   I don't know if there's an actual time frame that he has

14   to file a grievance within from when an incident happens or, or

15   occurs or alleges that it's -- that he has a time that he has

16   to file within.  I don't know if there's an actual time.

17   Q.   Do you know if inmates are required to file grievances

18   immediately after an incident occurred?

19   A.   I would assume they should.

20         THE COURT:  But you don't know if there's any

21   regulation or rule that sets a time limit.

22         THE WITNESS:  I do not.

23   Q.   Now, I know you were testifying earlier about a point of

24   interest package.  Can you explain to us what a point of

25   interest package is?

 1  A.    It's a gathering of information, so at that point there's

 2  a -- it's just a cover page that says "Point of Interest," and

 3  the inmate's name would be put on there and the date and all

 4  the gathering that you've gathered, photos, things of this

 5  nature, a memo from the inmate.  All those things would be put

 6  in this packet, and then it would be forwarded to the captain.

 7  Q.    And when do you, I guess, fill out or compile a point of

 8  interest package?

 9  A.    As soon as possible, while you're, while you're doing the

10  investigation or you're taking care of the inmate, taking him

11  to the RMU and things like that, you're gathering all that

12  information right then and there.

13  Q.    And in gathering that information -- withdrawn.

14        After you gather that information, do you then investigate

15  the allegations?

16  A.    It could be any person investigating.  Another sergeant

17  could get it.  It doesn't have to come to me personally.

18  Q.    Can you --

19  A.    That's the whole reason for making that packet, so that

20  another supervisor, if he gets that investigation, would have

21  somewhere to start.

22  Q.    Can you walk us through the procedure that happens after

23  an inmate reports an alleged injury?

24  A.    An alleged what?

25  Q.    Injury.

1   A.    Any injury, if an inmate approaches me and tells me that

2   he has an injury, I'm going to immediately take him to the RMU

3   for medical assessment and medical attention.  At that point,

4   then we would determine what happened, whether he failed to

5   report the injury, if it's old or -- the medical team would

6   tell us that so to speak.

7         If, if we didn't deem anything wrong or, you know, no foul

8   play anywhere, then he would just be taken back to his unit.

9   Q.    And then after the inmate's taken back to his unit, what

10  happens next procedural-wise?

11  A.    Well, once we take the inmate back, then I'm going to do

12  that point of information packet.  If, if there was a fight on

13  the unit or something to that nature, then we would, we would

14  further investigate that right on the unit, but otherwise, it

15  would be just be that point of information packet, and then

16  watch commander would be notified and then that would be that.

17  Q.    Do you know what happens after a watch commander's

18  notified?

19  A.    Uh, I do not.  I assume that he takes my packet

20  and...gives it to the captain.

21  Q.    And do you know who determines if an investigation is to

22  follow?

23  A.    Uh, it would probably be the captain or the dep of

24  security.

25  Q.    And that's -- investigating an alleged injury, is that

1    part of your duties and responsibilities?

2    A.   Well, the injury was investigated, I took him to the RMU.

3    As far as an investigation into his allegation?  That would be

4    from the captain or the dep of security or Albany, OSI.

5              THE COURT:  What's OSI?

6              THE WITNESS:  Office of Special Investigations.  I'm

7    sorry, ma'am.

8    Q.   Now, you testified earlier that Mr. Magalios reported an

9    injury to you, correct?

10   A.   That's correct.

11   Q.   And you also testified as to the procedure that you would

12   follow once an injury's reported to you, correct?

13   A.   Yes.

14   Q.   Is that the same procedure you follow if an inmate alleges

15   an assault?

16   A.   Yes.

17   Q.   And in your experience in conducting a point of interest

18   package, how many -- withdrawn.

19        How many points of interest packages would you say you've

20   done in your career regarding an incident?  Or injury.

21   A.   Um, I would say over a dozen.  My career as a sergeant is

22   the only time I would do that, so it would be five years.  I

23   would say it's numerous.

24              THE COURT:  Numerous five, numerous fifty, numerous

25   five hundred?

1          THE WITNESS:  I would say probably anywheres between,

2    you know, one and twenty-five.

3    Q.    And in those times that you were reported an injury by an

4    inmate, approximately how soon after the injury would an inmate

5    report to you an injury?

6              MR. MILLER:  Objection.

7              THE COURT:  Sustained.

8    Q.    Now, you testified earlier that Mr. Magalios had reported

9    to you that he was assaulted, correct?

10   A.    Yes.

11   Q.    And when he reported to you that he was assaulted, was he

12   able to give you the names of the alleged assailants?

13   A.    He did not give me the names, he gave me a letter.

14   Q.    And when he first reported the injury to you, did you see

15   any physical markings or injuries on his body?

16   A.    I did not.

17   Q.    And you testified earlier that Mr. Magalios reported the

18   injury to you when you did your rounds around 3:50 p.m.,

19   correct?

20   A.    That's correct.

21   Q.    And did Mr. Magalios tell you the time of the alleged

22   assault?

23   A.    He said it was around one.  I believe that's what he wrote

24   in his statement.  I, I don't recall the exact time.  Between

25   one and one-thirty I would say.

1   Q.    And did you ask him why he didn't report the injury

2   sooner?

3   A.    I did.

4   Q.    And what did he say?

5   A.    He said he thought it was no big deal.

6   Q.    Is there any...does an inmate have to report any injury

7   that they have?

8   A.    Yes.

9   Q.    And why must they report it?

10  A.    If they, if they fail to report an injury, it becomes an

11  infraction.  It's -- which they can get a written misbehavior

12  report for.

13  Q.    And why is failing to report an injury an infraction?

14  A.    Uh, because it -- at later on in -- any time that he could

15  have an injury and there could be an altercation or something

16  like that on a housing unit between inmates and it might be

17  assumed that he's involved in that because of his injuries, and

18  then it could be worse than just reporting the injury.

19  Q.    And you testified earlier that you started your shift --

20  withdrawn.

21       At what time did you start your shift on September 3rd,

22  2017?

23  A.    1:45.

24  Q.    And do you know the time that corrections officers change

25  their shift?

1  A.   They change their shift at two-thirty.

2  Q.   And do you know that if an inmate has to report an injury

3  or something to report, are they able to report it to a

4  corrections officer while corrections officers are changing

5  shifts?

6           MR. MILLER:  Objection.

7  A.   Yes.

8           THE COURT:  Overruled.

9  Q.   What happens if an inmate reports an injury to a

10  corrections officer in the middle of a shift change?

11  A.   The officer would call the arsenal and --

12           MR. MILLER:  Objection.

13  A.   -- have a sergeant paged.

14           MR. MILLER:  Objection.

15           THE COURT:  Overruled.  You could continue your

16  answer.

17           THE WITNESS:  The officer would call the arsenal and

18  have the sergeant paged, it could be any supervisor, and then

19  they would take care of that.

20  Q.   And when did you start your career with DOCCS?

21  A.   June 26th, 1989.

22  Q.   And you're familiar with the layout of Fishkill

23  Correctional Facility, correct?

24  A.   I didn't -- the layout?

25  Q.   Yeah, you're familiar with the layout of Fishkill

1    Correctional Facility.

2    A.    Pretty close.  I mean, there's places that I don't go very

3    often, but for the most part.

4    Q.    Can you describe the route that an inmate would take to go

5    from the visiting area to housing 16-2?

6    A.    Uh, yeah.

7    Q.    And what is that route?

8    A.    So if, if he got a package, he would leave the frisk area,

9    he would go to the package room which is probably a few feet

10   away, I don't know how much, but maybe fifty, and get, get his

11   package and he would exit the building, so there would be a

12   couple of officers in there.

13        He could go to -- once he exited the building, there would

14   be a walkway officer, it's called walkway bravo, and then he

15   would proceed left and he would see another walkway officer

16   called walkway alpha.  From there, he would go to the tunnel

17   and see another officer.

18        From the tunnel, he would go up the stairs -- excuse me,

19   he would go up the stairs and there would be a rec officer

20   right there.  He would take a left at that point and then he

21   would go through housing unit 11-1.  There would be an officer

22   there.  Then he would go to the hallway and he would take a

23   left and he would head down towards the north yard and housing

24   unit 3-1.  There's a few officers there.

25        From there he would go through the mess hall.  The mess

1    hall has staff.  Then he would go down the next hallway, which

2    has the south yard, 4-1 and 4-2 units, which has staff.  He

3    would go down that hall to the end.  He would take a left.  He

4    would go through housing unit 12-1, which is another staff

5    member.

6         From there, he would go down be -- just before 14-1 rec,

7    he would take a right and go up the staircase and he would get

8    into 16-1 rec.  At that point, he would go through the rec and

9    he would be in his housing unit.

10   Q.   And once he arrived at his housing unit, is there a

11   corrections officer there?

12   A.   Yes.

13   Q.   And do you know who Corrections Officer Mathew Peralta is?

14   A.   I don't know him personally.  I've heard his name, but

15   other than that, I -- he doesn't work in my area.

16   Q.   Okay.

17             MS. ACOSTA-PETTYJOHN:  I have no further questions.

18             THE COURT:  Any redirect, Mr. Miller?

19             MR. MILLER:  Yes, your Honor, just a few.

20             THE COURT:  Go ahead.

21   REDIRECT EXAMINATION

22   BY MR. MILLER:

23   Q.   Other than Rivera, who was the other officer assigned to

24   16-2 during your tour?

25   A.   I didn't, I didn't hear the first part of your question,

1    I'm sorry.

2    Q.   Other than Rivera, who assisted you in bringing Mr.

3    Magalios to the RMU, who was the other officer assigned to

4    16-2?

5    A.   Uh, if I can look back at that logbook, I'll tell 'ya.

6    Q.   I believe we can stipulate that it was Officer Allen.

7    A.   Okay.

8    Q.   Right?  Does that ring a bell?

9    A.   Sure.

10   Q.   Because Officer Allen wrote you a to/from as well

11   regarding the events of that day, right?

12   A.   Okay.

13   Q.   Didn't Officer Allen tell you that Mr. Magalios only

14   wanted to speak to a sergeant about what happened?

15   A.   I, I don't know.  I don't have that in front of me.

16   Q.   Will Defendant's 00528 refresh your recollection with

17   regard to that question?

18   A.   528?

19   Q.   Are you referring to 528?

20   A.   Yes, sir.

21   Q.   Is that a to/from Officer Allen to yourself?

22   A.   Yes.

23   Q.   And what is the date of that to/from?

24   A.   Uh, the date on the to/from is 9/3/17.

25   Q.   That's the day of the incident, right?

1   A.   That's correct.

2   Q.   And does this item refresh your recollection as to what

3   Officer Allen told you with regard to Mr. Magalios's

4   allegations?

5   A.   This is part of the grievance.  He just dated it wrong.

6   Q.   That wasn't my question.

7            THE COURT:  The question is just look at it.  Don't

8   read it to us.  Does looking at it jog your memory at all.

9   A.   What was your question again, sir?

10  Q.   My question was, did Officer Allen tell you when you

11  arrived at 16-2 that day at around 3:50 that Mr. Magalios would

12  not tell him about what happened, he wanted to speak to a

13  sergeant.

14  A.   Yes.

15  Q.   So based on that, did you infer that Mr. Magalios chose

16  not to speak to a corrections officer, slash, colleague of

17  these Defendants, but he wanted to speak to a supervisor?

18  A.   That's what he told the officer, yes.

19  Q.   Okay.  So let's go back through this...route that you've

20  described to Ms. Acosta, and you made it clear that when he

21  makes a left, he passes this corrections officer, and then when

22  he makes a right, he passes maybe three other corrections

23  officers.

24       That was important testimony in your view, correct?  How

25  many corrections officers he passed on the way from the frisk

 1    area back to 16-2?

 2              THE COURT:  You're asking the witness if he thinks

 3    it's important?

 4    Q.   Did you find that important testimony.

 5              THE COURT:  Sustained.

 6              MS. ACOSTA-PETTYJOHN:  I object.

 7              THE COURT:  He's just here to answer questions.

 8    Q.   Is there any indication that Mr. Magalios passed a

 9    sergeant on the way to 16-2 from the frisk area?

10    A.   It could have happened.

11    Q.   It could have happened.

12    A.   On the walkway.

13    Q.   Yes.  Maybe not, right?

14    A.   But maybe it did.

15    Q.   Okay.

16    A.   I don't know.

17    Q.   Let's leave it at that, that maybe.

18    A.   Okay.

19    Q.   Okay?  We agree?

20              THE COURT:  How about let's leave it at we don't

21    know.

22              THE WITNESS:  I don't know.

23              THE COURT:  And the members of the jury are not to

24    speculate.  If the witness doesn't know, then there's no

25    evidence one way or the other.

1    Q.    But what we do know, which we're not speculating, is that

2    Mr. Magalios clearly and directly asked to speak to a

3    supervisor when he got back to his dorm, correct?

4    A.    I don't know about when he got back to his dorm, but he

5    told Officer Allen, the afternoon shift, that he wanted to

6    speak to a sergeant.

7    Q.    Okay, and you were the first sergeant that he had an

8    opportunity to speak to, right?

9    A.    I believe.

10   Q.    In 16-2?

11   A.    I believe so.

12   Q.    Now, you also said on questioning from Ms. Acosta that you

13   asked Mr. Magalios what took him so long and he said 'no big

14   deal'?

15   A.    Um-hum.

16   Q.    Do you have an independent recollection of that or did you

17   write that down somewhere?

18   A.    It was -- I wrote it down.

19   Q.    That he said no big deal?

20   A.    He said no big deal.

21   Q.    Oh, yeah?

22   A.    Yes.

23   Q.    Was it in your memo?

24   A.    It was in my memo to the lieutenant, yes.

25   Q.    Someone gets beaten up by three corrections officers and

1    he said no big deal?

2    A.   That's what the inmate said.

3    Q.   You remember that?

4    A.   It was written to the lieutenant.

5    Q.   Do you remember him saying that.

6    A.   Yes.

7    Q.   As, as you sit here today, you can hear those words in

8    your ears?

9    A.   Yes.

10   Q.   Okay.  Counsel asked you if you were aware of injuries

11   when he spoke to you at 16-2, and you said no, right, you were

12   not aware of injuries?

13   A.   No.

14   Q.   But you became aware of injuries in the infirmary, right?

15   A.   That's correct.

16   Q.   When you became aware of those injuries, did you take any

17   steps that you would not have taken before knowing about those

18   injuries?

19   A.   No.

20   Q.   Now, you said that these to/froms from Peralta and Bailey

21   were in reference to a grievance, right?

22   A.   That's correct.

23   Q.   Would -- can I infer from that testimony that at some

24   point you received that grievance?

25   A.   That is correct.

 1   Q.   What was the date that Mr. Magalios wrote that grievance?

 2   A.   I don't recall.

 3               MS. ACOSTA-PETTYJOHN:  Objection.

 4   Q.   You can look at page 5 and page 6 in your packet up there.

 5               THE COURT:  Look at it to yourself, and if that jogs

 6   your memory and you now have an independent memory of the date,

 7   you can tell us, but if you're just reading it off the

 8   document, don't, don't do that.

 9               (Brief pause.)

10   A.   Okay, I -- what did you want to know?  I'm sorry.

11               THE COURT:  Does looking at that jog your memory as

12   to the date so that you now have an independent memory of the

13   date that the grievance was filed.

14               THE WITNESS:  Um, no.

15               THE COURT:  Okay.  That's the answer.

16   Q.   Tell me what this item is that you're looking at.  Is this

17   Mr. Magalios's grievance?

18   A.   Yes.

19   Q.   And does it have a date on it?

20   A.   Yes.

21   Q.   And does he talk about what happened to him?

22   A.   Yes.

23               MR. MILLER:  Your Honor, I would offer this item into

24   evidence as Plaintiff's 12.

25               MS. ACOSTA-PETTYJOHN:  Objection, your Honor.

```
 1                 THE COURT:  This is your client's own statement?

 2                 MR. MILLER:  Yes.

 3                 THE COURT:  Sustained.  You might be able to offer it

 4       later on, but...

 5                 MR. MILLER:  Yes, yes.

 6       Q.   Let me just ask you once again.

 7             The item that you're looking at, you said it doesn't

 8       refresh your recollection about when it was written, but you

 9       received this grievance, correct?

10       A.   At some point, yes.

11       Q.   And when you received the grievance, that is when you

12       continued with your investigation, correct?

13       A.   Yes.

14                 MR. MILLER:  Your Honor, I believe the date of the

15       grievance is not hearsay.

16                 THE WITNESS:  Can I elaborate?

17                 THE COURT:  Well, you're offering the entire

18       document.

19                 MR. MILLER:  I can just offer the date of the

20       grievance if that will make things move faster.

21                 THE COURT:  Why don't you see, maybe Counsel will

22       stipulate to the date.  I'm sure they will.

23                 (Brief pause.)

24                 THE COURT:  Is there a date on there and is it the

25       date there was -- is there a date when it was stamped received
```

1   or something like that?

2          MS. ACOSTA-PETTYJOHN:  Yeah, it's only the date in

3   which it's, I guess, typed, but there's no stamp received copy.

4          THE COURT:  Well, the...if the stipulation is the

5   date that appears on the grievance, not necessarily the date it

6   was given to the prison, then I think you're at the same page.

7          What is the date that is on the document?

8          MR. MILLER:  September 7th.

9          THE COURT:  September 7th, 2017.

10          MR. MILLER:  Correct.

11          THE COURT:  All right.

12          So, ladies and gentlemen, you can accept as true that

13   the date that the Plaintiff wrote on the grievance was

14   September 7th, 2017.  What date it was submitted to the prison

15   will have to come from other evidence.

16          MR. MILLER:  Thank you.

17          MS. ACOSTA-PETTYJOHN:  Thank you.

18          MR. MILLER:  Thank you, Sergeant.  No further

19   questions.

20          THE COURT:  Anything else?

21          MS. ACOSTA-PETTYJOHN:  I just have two, maybe three

22   questions, your Honor.

23   RECROSS-EXAMINATION

24   BY MS. ACOSTA-PETTYJOHN:

25   Q.   Now, you just testified that Mr. Magalios or -- withdrawn.

Vantassell - Recross - Acosta-Pettyjohn

1           You had agreed with Mr. Miller that Mr. Magalios

2     specifically wanted to speak to a sergeant, correct?

3     A.    That's what he told Officer Allen, yes.

4     Q.    Could he have --

5     A.    I can't hear you, I'm sorry.

6     Q.    I'm sorry, let me...

7               THE COURT:  Just use the mike where you're standing.

8     It's fine.

9               MS. ACOSTA-PETTYJOHN:  Okay.

10              THE COURT:  Make sure it's on.

11              MS. ACOSTA-PETTYJOHN:  Yeah.

12    Q.    Could Mr. Magalios have reported the incident to any of

13    the correction officers that he passed?

14              MR. MILLER:  Objection.

15    A.    Yes.

16    Q.    And --

17              THE COURT:  Overruled.

18    Q.    Could he have asked any of those correction officers to

19    speak to a sergeant?

20    A.    Yes.

21              MS. ACOSTA-PETTYJOHN:  No further questions, your

22    Honor.

23              MR. MILLER:  One more.  Sorry.  Sorry, Sergeant.  I

24    should have asked you this.

25              THE WITNESS:  It's fine.

 1    REDIRECT EXAMINATION

 2    BY MR. MILLER:

 3    Q.   Look at page 2, 3, and 4.  Same packet, just, like, one

 4    letter before.

 5    A.   Okay.  I have it.

 6    Q.   And that's a grievance that Mr. Magalios wrote on

 7    September 6th, correct?

 8    A.   It appears that, yes.

 9    Q.   And that grievance went to you as well, right?

10    A.   I -- it could be the same grievance.  I don't know.

11    Q.   Well, I want you to assume that this --

12    A.   It is the same grievance.

13    Q.   -- was written on September 6th.

14    A.   It's the same grievance.  It's the same grievance number.

15    Q.   Okay.  Two different letters, right?  Take a look at both

16    of them, one from the 6th, one from the 7th.

17               THE COURT:  The one you're talking about now is

18    Plaintiff's Exhibit what?

19               MR. MILLER:  The one I'm talking about now is not in

20    evidence.

21               THE COURT:  I know, but you still have to mark it as

22    an exhibit if you're going to use it at trial.

23               MR. MILLER:  I'll call this Plaintiff's 13 for ID.

24               THE COURT:  Okay.

25    Q.   Take a look at Plaintiff's 13 for ID, which is pages 2, 3,

1    and 4.

2    A.   Okay.

3    Q.   Now, first, can we agree that this is a different

4    grievance than the one that was dated September 7th?

5              THE COURT:  Well, I think part of the confusion is

6    going to be -- it's a different piece of paper, it's a

7    different document --

8              MR. MILLER:  Correct.

9              THE COURT:  -- but it may all have been filed under

10   the same grievance number, so I think you want to...

11             MR. MILLER:  I can clear that up.

12             THE COURT:  Clarify that.

13   Q.   When you said 'same grievance,' you're talking about the

14   same grievance number, correct?

15   A.   That's correct.

16   Q.   But there's two separate letters, one written on the 6th,

17   one written on the 7th, correct?

18   A.   It does appear that, yes.

19   Q.   Okay, so now we're looking at the one that was written on

20   the 6th, correct?

21   A.   It...yes.

22   Q.   And, in fact, this one you also reviewed before collecting

23   to/froms from Officers Bailey and Officer Peralta, right?

24   A.   Yes.

25   Q.   Okay.  Once again, do you know when DOCCS received this?

1    A.    I do not.

2    Q.    Is there a, is there a date written down when they

3    received it?

4    A.    Uh, that -- I don't know what that date is for.  That

5    doesn't mean that DOCCS received it on that date.

6    Q.    Okay, so it could have been, like -- it could have been on

7    September 6th, right?

8    A.    Can I answer or I just...I mean --

9          THE COURT:  Not if you're guessing.  If you don't

10   know --

11   A.    It's a five-page document.  It's two days that he filed

12   once.

13   Q.    Okay, and, in fact, it's one of five, two of five, three

14   of five --

15   A.    Yes.

16   Q.    -- four of five, five of five.

17   A.    Yes.

18         THE COURT:  So these documents were --

19   Q.    And can we agree --

20         THE COURT:  They were --

21   A.    It's all one grievance.

22         THE COURT:  -- they were received together.

23         THE WITNESS:  Yes, it was all -- it was filed one

24   time as, as one grievance.

25   Q.    And can we agree that the date on the first three pages,

 1    the first letter, is September 6th?

 2    A.    That is the date that's typed there, yes.

 3    Q.    And can we agree that the names Bailey and Peralta are

 4    mentioned in that grievance?

 5    A.    Uh, I will read it quickly.

 6          (Brief pause.)

 7    A.    I do see Peralta and I do see Bailey, yes.  Yes.

 8    Q.    Okay, thank you.

 9                MR. MILLER:  Your Honor, I would once again offer

10    this entire five-page document into evidence.

11                THE COURT:  Isn't it still hearsay?

12                MR. MILLER:  Um --

13                THE COURT:  It's authenticated.  If it becomes -- if

14    you need it later, you'll be able to get it in, but...

15                MR. MILLER:  Okay.

16                THE COURT:  If you want to suggest an exception, I'm

17    all ears.

18                MR. MILLER:  That's all, Sergeant.  No further

19    questions.

20                THE COURT:  All right, you may step down, Sergeant

21    Vantassell.

22                (Witness excused.)

23                THE COURT:  Plaintiff may call his next witness.

24                MR. MILLER:  Your Honor, I'm going to call Mr.

25    Magalios to the stand.

1                     THE COURT:  All right.

2       NICHOLAS MAGALIOS,

3       called as a witness by the Government, having been duly sworn,

4       testified as follows:

5                     THE DEPUTY CLERK:  You can have a seat.  Please state

6       your full name and spell out your last name slowly.

7                     THE WITNESS:  Can I remove this?

8                     THE COURT:  You can take it off.

9                     THE WITNESS:  Nicholas Anthony Magalios.

10                    THE COURT:  Spell your last name, please.

11                    THE WITNESS:  M-a-g-a-l-i-o-s.

12                    THE COURT:  Whenever you're ready, Mr. Miller.

13                    MR. MILLER:  Thank you, Your Honor.  Just...getting

14      organized, and I'm ready.

15      DIRECT EXAMINATION

16      BY MR. MILLER:

17      Q.   Good afternoon, Mr. Magalios.

18      A.   Good afternoon.

19      Q.   Are you a little nervous?

20      A.   Yes.

21      Q.   Okay, deep breath.

22           Where do you currently reside?

23      A.   304 Forest Avenue, Massapequa, Long Island, New York.

24      Q.   And for how long have you resided there?

25      A.   Roughly two years.

Magalios - Direct - Miller

 1   Q.   Do you live alone or with somebody?

 2   A.   I live alone.

 3   Q.   What is your marital status?

 4   A.   Um, divorced.

 5   Q.   And what is the name of your ex-wife?

 6   A.   Lisa Tibaldi.

 7   Q.   Do you have any children?

 8   A.   I have a newborn daughter.

 9   Q.   And is that with someone other than Lisa Tibaldi?

10   A.   Yes, sir.

11   Q.   How old is your daughter?

12   A.   She'll be a year on April 30th.

13   Q.   How old are you?

14   A.   Thirty-three.

15   Q.   And what's your date of birth?

16   A.   July 8th, 1987.

17   Q.   Can you tell us how far you got in school.

18   A.   I got a GED.  While I was incarcerated.

19   Q.   So while you were incarcerated you got your GED?

20   A.   Yes, sir.

21   Q.   Are you currently employed?

22   A.   Yes, sir.

23   Q.   Tell us about your work.

24   A.   I'm a local 52 grip here in New York City.  I build sets

25   for movies and television shows.

 1    Q.    Could you give us an idea of when did you start that job?

 2    A.    I was initiated in 2013, I'm third generation, and upon

 3    release from prison, within seventy-two hours I was back at

 4    work.

 5    Q.    What does a grip do?

 6    A.    There's three phases to a grip in the movie and television

 7    industry.  There's a shooting grip, a rigging grip, and a

 8    construction grip.  I kinda dibbled and dabbled in different

 9    fields, aspects of the grip industry, but mainly construction,

10    building the sets.

11    Q.    At some point in your life, you were incarcerated in the

12    New York State prison system, correct?

13    A.    Yes, sir.

14    Q.    And was the crime for which you were incarcerated

15    attempted burglary in the second degree and criminal possession

16    of stolen property?

17    A.    Yes, sir.

18    Q.    And previous to that, you had an attempted burglary

19    conviction as well?

20    A.    Yes, sir.

21    Q.    In 2008, you were charged with a misdemeanor forgery, and

22    in 2015, did you plead guilty to that misdemeanor and get time

23    served?

24    A.    Yes, sir.

25    Q.    Can you tell us the date that you were released from DOCCS

1    custody?

2    A.    December 6, 2018.

3    Q.    Since your release, have you had any problems whatsoever

4    with your parole?

5    A.    No, sir.

6    Q.    And you've been gainfully employed since then?

7    A.    Yes, sir.

8    Q.    On September 3rd, 2017, where were you located?

9    A.    Housing unit 16-2 at Fishkill Correctional Facility.

10   Q.    Can you just generally describe Fishkill Correctional

11   Facility.

12   A.    A medium-security prison with an up-the-hill, quote,

13   unquote, and a down-the-hill, quote, unquote, building, which

14   is two separate housing units and an RMU, general population.

15   Q.    Okay.  And can you describe the dorm 16-2 in which you

16   were located.

17   A.    Yes, sir.  Roughly 40 inmates on any given day.  About

18   twelve of those beds are dormitory or cubicles and the duration

19   are rooms.  With doors.

20   Q.    When you put your mouth too close to the microphone, we

21   get a little feedback, so let's test on a good distance.

22            THE COURT:  You're probably pretty good right where

23   you are.

24            THE WITNESS:  Okay.

25   A.    Is that all right?

 1   Q.   And if it's not, we'll let you know.

 2           THE COURT:   I'm told six to eight inches is ideal.

 3           MR. MILLER:   Okay.

 4   Q.   How did you get into 16-2?

 5   A.   I was a mason at Fishkill and Sergeant Padgett, who is a

 6   sergeant at Fishkill, had me moved to that housing unit.

 7   Q.   Why?

 8   A.   It's a...in the inmates' eyes deemed an honorary unit, but

 9   in their eyes it's deemed a unit where people that do

10   beneficial things for the facility, it's a more comfortable way

11   of living rather than the animal-like behavior elsewhere.

12   Q.   Can you describe the visiting area of Fishkill?

13   A.   Yes, sir.

14   Q.   Go ahead.

15   A.   The visiting room in Fishkill consists of two areas, a

16   large visiting room, a play area where families can come and

17   gentlemen can play with their children and whatnot.   There's

18   vending machines, ice cream machines, soda machines, things of

19   that nature.

20       There's a little outdoor area where there's, like, tables

21   and, like, picnic chairs where, if it's nice out, you could go

22   out and get some fresh air from time to time.

23       And there's also a small visiting room area that's

24   connected to the big visiting area through a hallway or

25   corridor, and that's where you visit -- it's like one on one,

 1    like, you and your wife or you and your mother or, you know,

 2    just one-on-one visits.

 3    Q.    I'm going to show you what's been marked marked for

 4    identification as Plaintiff's 6, and just first, tell me if

 5    you, if you recognize what I'm going to put up on the screen,

 6    okay?

 7    A.    Yes, sir.

 8              THE COURT:  Well, before you put it up, it has to be

 9    in, so you better show it to the witness first.

10              MR. MILLER:  Okay.

11              THE COURT:  Unless it's stipulated to.

12              MR. MILLER:  May I approach the witness?

13              THE COURT:  Yes, you can show it to him without

14    showing it to the jury.

15              MR. MILLER:  Yes.

16    A.    Yes, sir.  Keep this or --

17    Q.    No, just -- do you recognize it.

18    A.    Yes.

19    Q.    Okay.  What does Plaintiff's 6 depict?

20    A.    The visiting room area at Fishkill.

21    Q.    In addition to the visiting room area, does it also depict

22    what's known as the frisk room area?

23    A.    Yes, and the doors that lead to it.

24    Q.    Okay.

25              MR. MILLER:  Your Honor, I'm going to move

1  Plaintiff's 6 marked for identification into evidence as

2  Plaintiff's 6.

3          THE COURT:  Well, you're going to have to do a little

4  more than 'it's the visiting room.'  Is it a photograph, is it

5  a sketch...

6          MR. MILLER:  Okay.

7          THE COURT:  Is it a floor plan, what is it.

8  Q.   Is this a sketch of the area?

9  A.   It's a sketch of the visiting room, yes.

10  Q.   And I understand it's not drawn to scale, but does it,

11  does it depict the layout of the visiting room area in relation

12  to the frisk room area and the yard?

13  A.   Yes, sir.

14  Q.   Okay.

15          MR. MILLER:  Your Honor, I would now move it into

16  evidence as Plaintiff's 6.

17          THE COURT:  Did you draw this?

18          THE WITNESS:  Um --

19          THE COURT:  Did you make the sketch?

20          THE WITNESS:  I believe that one I did, yeah.  I'm

21  not sure.

22          THE COURT:  Why don't you show it to your client

23  again.

24  Q.   (Showing).

25  A.   That's it.  I didn't draw that, though.

 1                    THE COURT:  Does it --

 2    Q.   I have another leading question --

 3              THE COURT:  Does it fairly and accurately show the...

 4              THE WITNESS:  Yes, ma'am, that's what you have.

 5              THE COURT:  Visiting room area as it appeared on

 6    September 3rd, 2017?

 7              THE WITNESS:  Yes, ma'am.

 8    Q.   Mr. Magalios, did you draw a sketch similar to this with

 9    writing on it and then someone else drew the sketch without the

10    writing on it?

11    A.   Yes, sir.

12    Q.   And does this fairly and accurately depict the layout as

13    it appeared on September 3rd, 2017?

14    A.   To a tee.

15    Q.   Okay.

16              MR. MILLER:  Your Honor, I would offer it into

17    evidence as Plaintiff's 6.

18              MS. ACOSTA-PETTYJOHN:  No objection, your Honor, but

19    I do have a logistical housekeeping.  My clients can't see

20    anything that's being blown up on the TV screen.

21              THE COURT:  Well, don't you have copies of all of the

22    exhibits that you can give to them?

23              MS. ACOSTA-PETTYJOHN:  Uh...yes, we do, actually.

24              THE COURT:  Actually, in fairness, most of the

25    exhibits that Mr. --

 1              MS. ACOSTA-PETTYJOHN:  Yeah, they're not --

 2              THE COURT:  -- Mr. Miller used today were not

 3    previously marked, but this one was, so hopefully you can give

 4    them a copy.

 5              MS. ACOSTA-PETTYJOHN:  Okay.

 6              THE COURT:  Because it is going to be hard for them

 7    to sit anywhere else and maintain the proper distance.

 8              MS. ACOSTA-PETTYJOHN:  Yes.

 9              THE COURT:  But if -- gentlemen, if at any time you

10    do need to get up and see, you can step up, take a look and

11    then go back to where you are.

12              All right, Exhibit 6 is received.

13              (Plaintiff's Exhibit 6 received in Evidence)

14    Q.   Mr. Magalios, I'm going to start where my pen is pointing.

15    Do you see that?

16    A.   Yes, sir.

17    Q.   What does that area -- and this is the right side of the

18    sketch.  What does that area depict?

19    A.   That's the entrance to the frisk area upon entering the

20    visiting area.

21    Q.   So where my pen is now, there would be, like, a door

22    there?

23    A.   Yes, sir.

24    Q.   And where would an inmate be pat-frisked before his visit?

25    Would it be in this area here (pointing)?

1    A.    Right where your pen is, on that line, on the bottom of

2    that pen point, right there on that wall, they would put you

3    against the wall and pat you down and wand you.

4    Q.    Okay.  Now I'm moving over down that corridor, and I see a

5    rectangle with three circles.  What does that depict?

6    A.    That's a desk.  Officers' desk.

7    Q.    Okay.  And there's sort of like a bottom of a U here.

8    What area is right here?

9    A.    For the most part, that's a dead area.  There's a phone on

10   the wall and also cabinets where prior to -- if you have a

11   package or you're expecting a package after a visit you can put

12   your net bags prior to going to see your family members.

13   Q.    Okay.  Now, if you go to the top of that area, you see a

14   bunch of squares at the top of that corridor and a slightly

15   fewer number of squares below it.  What does that depict?

16   A.    Those are benches that you're supposed to wait on after

17   your visit's over upon getting strip-searched.  That's where

18   you wait.

19   Q.    So you wait on those benches and -- before you're called

20   to be strip-searched?

21   A.    Yes, sir.

22   Q.    So let's take a tour of this area upon arrival when you

23   got pat-frisked.  Where would you enter into the visiting area?

24   A.    Um, so it...where would I enter -- going into the visiting

25   room area itself?

1    Q.    Yeah, after you get pat-frisked.

2    A.    So after I get pat-frisked, I'd pass that desk.  A C.O.

3    would write my name down.  I'd put my net bag down in the

4    cubicle, and there's that door to the top left.  That's the

5    door that enters the big visiting room.

6    Q.    Okay, so you would go through this door, correct?

7    A.    Yes, sir.

8    Q.    And what would be the next step after going through that

9    door in order to get to where you're going to have your visit?

10   A.    Upon entering that door into the big visiting room, maybe

11   roughly 20 feet straight ahead of you is a big podium where

12   three to four C.O.'s regularly sit.  You check in with them,

13   you tell them your last name, and they have you already

14   assigned to a specific table and you just follow suit.

15   Q.    Okay.  And is this the area where those officers would be

16   where there's a rectangle with four circles in it?

17   A.    Yes, sir.

18   Q.    Okay.  Now, I want you to take us to the one-on-one visit

19   room or the smaller visit room.

20         Where would you go from this desk with the four circles

21   here?

22   A.    If you're in front of that desk with the four circles, you

23   would veer off to your left, you would make a left right down

24   that corridor, which is a little hallway, and you would

25   immediately walk into the small visiting room.

Magalios - Direct - Miller

1   Q.   So would this be the small visiting room right here?

2   A.   Yes, sir.

3   Q.   Okay.

4            MR. MILLER:  Your Honor, may I put an SVR for 'small

5   visiting' room right here?

6            THE COURT:  Okay.

7   Q.   And what do these squares indicate in the small visiting

8   room?

9   A.   Those are tables with chairs.

10  Q.   For visiting?

11  A.   Yes, sir.

12  Q.   And there's a rectangle here with two circles.  What does

13  that indicate?

14  A.   That's like a little C.O. podium, stand.

15  Q.   And is that where the C.O.'s assigned to the small

16  visiting room would be standing?

17  A.   Yes, sir.

18  Q.   And right below that, there are three little squares going

19  into a corner.  What do those three little squares indicate?

20  A.   Vending machines.

21  Q.   Now, at some point, when the visit is over, take us on a

22  tour back into the frisk area or room.

23  A.   Upon the completion of a visit, if, like, per se, I was to

24  leave or want to end it, I would go the same way I went, back

25  to that big podium with the four corrections officers in the

1  big visiting room.  They would give me my ID.  I would continue

2  to walk into that door, but you have to knock on the door first

3  and wait for them to get -- acknowledge you to let you in.

4      Once you go in, they ask you if you have your net bag.

5  You give them your ID, and you're instructed to sit and wait on

6  that wooden bench that's along the far side with two walls over

7  there, until they want to...strip-search you.

8  Q.   Okay, what happens after you're strip-searched?

9  A.   If you have a package after you're strip-searched, you

10 wait in line, if there's a line, you know, for the package room

11 officer to release your package to you.  If you don't have a

12 package and the walkway's open, you have a pass to go back to

13 your housing unit.

14          THE COURT:  Where does the strip-search take place?

15          THE WITNESS:  So in this, um, picture here, if you

16 look to the top right of the photo, that is the door that goes

17 into the frisk area, that door where his point is.

18          THE COURT:  Okay.

19          THE WITNESS:  And there's maybe, like, a dozen little

20 rooms where -- with curtains where you're strip-searched and

21 whatnot.

22          THE COURT:  And then you would come back out into

23 that hallway where the bench is.

24          THE WITNESS:  No, ma'am, there's actually a separate

25 entrance to...get out of the building.  Like, you -- like, once

 1  you go through there, you get strip-searched, but also in that

 2  same hallway, slash, corridor is the package room.

 3              THE COURT:  I see.

 4              THE WITNESS:  It's all, like, in one conjunction, and

 5  after that point, you could -- there's, like, another doorway

 6  that leads outside and you could go back to your housing unit.

 7              THE COURT:  Got it.  Thank you.

 8  Q.   For how long were you at Fishkill approximately on

 9  September 3rd, 2017?

10  A.   The exact time frame I don't know, but maybe a few months,

11  give or take.

12  Q.   And were you transferred from another facility to

13  Fishkill?

14  A.   Bare Hill Correctional Facility.

15  Q.   Okay.  And how far is that?

16  A.   It's near Canada, seven hours away.

17  Q.   And did you -- approximately with what frequency did you

18  receive visits when you were at Fishkill?

19  A.   Biweekly at Fishkill.

20  Q.   And who typically would you get visits from?

21  A.   My ex-wife.  I had a friend come see me once.  My parents.

22  Q.   Now, from your perspective, could you describe the various

23  officer posts in the visiting room/frisk area complex?

24  A.   Explain the -- their post?

25  Q.   Yeah, just tell us where the officers are stationed

1    throughout that entire complex.

2    A.    The frisk area, like, the visiting room complex...

3    Q.    Yeah.

4    A.    Upon entering, there's maybe two or three.  Upon entering

5    the frisk area.  Like, upon entering a visit, per se, where you

6    get wanded, you know, one guy will have you up on the wall

7    while the other guy, you know, pats you down or watches over,

8    whatever.  Then there's another gentleman at a desk who's the

9    one who, you know, checks you in and logs you in the logbook

10    and instructs you to put your net bag out.

11        Once you go through those doors into the big visiting

12    room, there's, like, four corrections officers at that podium,

13    maybe one or two spread out throughout the visiting room if

14    there's, you know, visitors already, because they gotta --

15    those are their posts, and then there's the small visiting room

16    where there's usually two or three, you know.

17        And then there's the yard, whenever it is open, then it

18    might be one or two.

19    Q.    You know what, let me go back to this sketch and ask you

20    if you recognize the yard or, or the entrance to the yard.

21    This is, again, Plaintiff's 6 in evidence.

22        Where would the yard be?

23    A.    In the hallway that connects the big visiting room to the

24    small visiting room, there's a little door jamb.

25    Q.    Right here (pointing)?

1    A.    Right about there, yes.  And there's a

2    wheelchair-accessible ramp that goes down into the yard from

3    that door.

4    Q.    The rectangle over the little squares here, would this be

5    the yard?

6    A.    Yes, sir.

7    Q.    Let me just leave this here.

8          And would there be an officer or two assigned to the yard

9    as well?

10   A.    Yes, sir.

11   Q.    In September of 2017, were you familiar with any rules

12   regarding physical contact with visitors?

13   A.    Yes, sir.

14   Q.    Could you tell us what your understanding of those rules

15   were?

16   A.    Per DOCCS directive, at the beginning and end of a visit,

17   you're allowed to embrace within reason, and that doesn't mean,

18   like, making out, but a kiss hello, how are you, and a hug is

19   sufficient enough.

20   Q.    And was that actually in a, in a prison handbook that you

21   get?

22   A.    Yes, sir.

23   Q.    And what was your understanding of the consequences if

24   those rules were violated?

25   A.    If those rules were violated, you get a misbehavior

 1    report.

 2    Q.    Did you ever see an inmate get disciplined for violating

 3    any of these contact rules?

 4    A.    No, sir.

 5    Q.    I want to just go back to, like, more general questions.

 6          Do you recall the names of any guards assigned

 7    specifically to 16-2 in September of 2017?

 8    A.    In September of '17, yes.

 9    Q.    What names were you familiar with?

10    A.    McDonald, Officer Bennett, Officer Allen, there was a

11    female Officer Allen, Sergeant Padgett, but he was not a dorm

12    officer, he just was a regular sergeant in that area that I

13    knew of.  That's really it, much it, yeah.

14    Q.    Did you know Sergeant Vantassell before the events of

15    September 3rd?

16    A.    Yes, I've seen him in passing.

17    Q.    Did you ever have any...communication with him or contact

18    with him?

19    A.    We fixed a shelf at work in his office, sergeant's office.

20    Q.    Are you familiar with the three defendants in this case?

21    A.    After the incident, yes.

22    Q.    Did you recognize -- were you familiar with who they were

23    if not their name before the incident?

24    A.    Two of them I was familiar with.  Prior to the incident.

25    Q.    Who were the two that you were familiar with before the

1   incident?

2   A.   Bailey and Blount.

3   Q.   I'm going to go one at a time and ask you how you knew

4   them, if at all, before the incident on September 3rd, 2017,

5   okay?

6   A.   Um-hum.

7   Q.   Let's start with Officer Peralta.  Do you recognize him

8   here in the courtroom today?

9   A.   Absolutely.

10  Q.   Could you point him out?

11  A.   Yes, sir (pointing).

12  Q.   What color mask is he wearing?

13  A.   A black mask.

14  Q.   Okay.

15            MR. MILLER:   For the record, your Honor, indicating

16  Officer Peralta.

17            THE COURT:   The record will so reflect.

18  Q.   Had you ever seen Officer Peralta before September 3rd,

19  2017?

20  A.   No, sir.

21  Q.   When did you learn his name?

22  A.   I only learned of his initial right after the incident,

23  and it was fortunate enough I ran into an inmate who said --

24  who found out what happened, and he said 'I don't know his full

25  name, but I know it starts with a P,' and later that day, after

1    I broke down the description of who this individual was, come

2    to find out his name was Peralta.

3    Q.    Thank you.

4         Defendant Bailey, do you recognize him in the courtroom

5    today?

6    A.    Absolutely.

7    Q.    And could you point him out?

8    A.    Yes, sir.

9    Q.    Is he the furthest from you or second furthest from you?

10   A.    He's the furthest from me.

11   Q.    And did you recognize him from before September 3rd, 2017?

12   A.    Yes, sir.

13   Q.    Tell us the circumstances under which you saw him before

14   September 3rd, 2017.

15   A.    I was a regular biweekly on visits which I see him down

16   there often enough and throughout the facility.  On a regular

17   basis.

18   Q.    Where would you see him throughout the facility?

19   A.    It depends.  Work of the mason, you know, me and my boss,

20   if -- depending where there was work to be done, it could be

21   any part of the facility, I don't know what his post would be

22   for that day, but it could have been a coincidence where I ran

23   past him, but I do recognize him prior to that incident.

24   Q.    And could you describe him physically as he appeared on

25   September 3rd?

 1    A.    Yes, sir.

 2    Q.    Go ahead.

 3    A.    Heavyset male, bald head, clean cut, um...little bit of a

 4    lazy eye, um...that's pretty much it.

 5    Q.    Okay.  Now, let's go to Defendant Blount.  Do you see him

 6    in the courtroom here today?

 7    A.    Absolutely.

 8    Q.    And could you point to him?

 9    A.    Yes, sir (pointing).

10    Q.    Is it the middle or furthest?

11    A.    Oh, he's the gentleman in the middle.

12    Q.    Okay.

13          MR. MILLER:  Indicating Officer Blount.  I don't know

14    if I made a record that he indicated Officer Bailey as well

15    before.

16          THE COURT:  The record will reflect both of the

17    identifications.

18          MR. MILLER:  Thank you.

19          THE COURT:  Officer Blount's wearing the glasses?

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  Okay.

22    Q.    How did you know him or how did you recognize him from

23    before September 3rd, 2017?

24    A.    He's another regular in the visiting room.

25    Q.    So just so we're clear, none of the officers or sergeants

1    assigned to your dorm are defendants in this case?

2    A.    No, sir.

3    Q.    Did you have any problems with any sergeants, corrections

4    officers, in your dorm at all from the time that you arrived at

5    Fishkill?

6    A.    Never.

7    Q.    Can you tell us when you last saw any of the Defendants

8    before today?

9    A.    In the disposition.

10    Q.    Deposition.

11    A.    Yes, sir.

12    Q.    Why don't you just explain to the jury what the deposition

13    was and the circumstances of how you saw them.

14    A.    The deposition was through Skype, which prior to trial it

15    was, you know, a lengthy process of identifying who was who,

16    giving your side of the story, going into -- you know,

17    elaborating on the specifics and details of, you know, the

18    circumstances, and that's --

19              THE COURT:    Maybe I can help with this.

20              In a civil case like this, each side is allowed to

21    take what is called depositions and that is to question

22    witnesses under oath in the presence of a court reporter so

23    they can ask questions in advance of trial and a transcript is

24    made of what is said.  That's a deposition.

25              THE WITNESS:    Thank you, Your Honor.

 1   Q.   And did you identify all three of them at their

 2   depositions?

 3   A.   Absolutely.

 4   Q.   And were you sure it was them three?

 5   A.   Yes, sir.

 6   Q.   When you entered the New York State prison system in 2014,

 7   can you describe your general health?

 8   A.   Healthy.

 9   Q.   Did you have any history of surgery?

10   A.   Never.

11   Q.   Any history of prior hospitalizations?

12   A.   Maybe a hernia when I was younger, but that was really it.

13   Never overnight.

14   Q.   Now, I believe you heard during opening statements from

15   both sides that maybe a week or two or maybe three or four

16   weeks before September 3rd, you had some complaints about your

17   right shoulder, correct?

18   A.   Yes, sir.

19   Q.   And did you go to the infirmary for that?

20   A.   I did go to the infirmary, but it was due to, I guess,

21   yearly in the Department of Corrections they call you for a

22   regular checkup, so I never really, like, complained or

23   documented it, I just brought it up when I went for a regular

24   checkup, that I had underlining {sic} soreness in my right

25   shoulder.

1   Q.   What were your complaints at that time?

2   A.   I just -- they check your health to see -- you know, they

3   take your vitals, your temperature, things of that nature,

4   everything great, and I just said I had a little underlining

5   {sic} soreness in my shoulder and that was roughly it.

6   Q.   Did this soreness keep you from doing anything?

7   A.   No.  No.

8   Q.   Were you able to perform your duties as a mason without

9   any issues of pain or range of motion or anything like that?

10  A.   Perfectly fine.

11  Q.   And approximately two or three days before September 3rd,

12  they X-rayed that shoulder?

13  A.   Yes, sir.

14  Q.   Do you know how those complaints came about?

15  A.   The...

16  Q.   Well, when you went to the infirmary three or four weeks

17  before the incident...

18  A.   Right.

19  Q.   And you complained that there was something with the right

20  shoulder, do you know how that -- those complaints came about?

21  A.   Um, it could be a variety of reasons.  I mean, prisons

22  really don't have the most comfortable of beds, so that could

23  have played a major role, in sleeping on it wrong or things of

24  that nature.  I have no idea, I'm not a medical professional,

25  but um...yeah, I, I have no idea.

1          It wasn't something as serious as, you know, where I would

2      have complained about it if it was serious.  I just rolled with

3      it.

4      Q.  Did you receive any treatment for that shoulder complaint

5      before September 3rd other than the X-ray that was done?

6      A.  No, sir.

7      Q.  A couple of days before?

8      A.  No, sir.

9      Q.  Did you receive any pain injections for the shoulder

10     before September 3rd?

11     A.  No, sir.

12     Q.  Did you ever consult with a surgeon or an orthopaedist for

13     your shoulder before September 3rd, 2017?

14     A.  No, sir.

15              MR. MILLER:  I'm sorry, your Honor.

16              THE COURT:  Yeah, the phones...

17              MR. MILLER:  This is a personal thing that I, I

18     just...I'd rather not say on the record.

19              THE COURT:  Well, the phones should be away.

20              MR. MILLER:  Yeah.  It's on vibrate, but someone who

21     is calling knows how to get through.

22              THE COURT:  Now that jury selection is over, the only

23     purpose for which anybody should be using a phone is for -- if

24     Defense Counsel need to confer with their clients.  Otherwise,

25     the phone should be put away.

1              MR. MILLER:  And I apologize.

2              THE COURT:  Are you at a stopping point?

3              MR. MILLER:  It's a personal thing, I'm going to walk

4     out --

5              THE COURT:  No, I'm asking if you're at a stopping

6     point in your examination.

7              MR. MILLER:  Um...

8              THE COURT:  Are you about to go into another area?

9              MR. MILLER:  I am, I am.

10             THE COURT:  Okay, because it's, you know, three

11    minutes of five.

12             MR. MILLER:  Okay.

13             THE COURT:  So why don't we break for the day, ladies

14    and gentlemen.  We'll resume at nine-thirty tomorrow, but don't

15    come to these seats, come to the jury room, wait for Mr. Clark

16    to escort you in.

17             When you get home, your family's going to say did you

18    get put on a jury, what's it about.  Make sure you don't tell

19    them what it's about.  Make sure you tell them -- you can tell

20    them that you're on a jury and how long you think you'll be

21    here, but don't discuss the case, don't do any research, keep

22    an open mind, drive carefully, and we will resume at

23    nine-thirty tomorrow.

24             Have a good evening.

25             (Jury exits.)

1           THE COURT:  Okay, a couple of things.

2           MR. MILLER:  Your Honor, can I explain this?  I just

3  -- it's something that I -- I apologize to the Court, and it is

4  a private matter, but I feel compelled to tell you what it is.

5           My -- I do, because I can't -- I'm embarrassed, but I

6  have a 93-year-old father who was completely healthy before he

7  got COVID and he survived and, as a result, he suffers from the

8  worst OCD you can imagine.

9           THE COURT:  Heh.

10          MR. MILLER:  And as much as I tell him he can't call

11  me during the day, he just keeps pushing the button until I

12  pick up, and the reason -- and I'm not on vibrate, but the

13  reason it's on is because of our communications, but I'm just

14  going to have to get rid of my phone, because I --

15          THE COURT:  Well, here's a -- first of all, I'm sorry

16  to hear of your father's troubles.

17          MR. MILLER:  Thank you.

18          THE COURT:  But here in the courtroom at counsel

19  table, you see these little old-timey phones?  You can

20  communicate with your client and with your paralegal through

21  these old timey phones, so you pick up -- if you pick it up,

22  you'll see there's a little bar on the handle.  You can hold

23  down the handle and you can whisper very quietly and you'll

24  only be heard together.  Your client might be familiar with

25  these things because they use them in Broadway theaters when,

1  you know, the director has to speak to the lighting people or

2  whatever and it has to be really quiet.

3         So you shouldn't need phones to communicate amongst

4  yourselves because you get these, these...they're essentially

5  walkie-talkies, but they will pick up very quiet whispers.

6         MR. MILLER:  I apologize.  I just --

7         THE COURT:  That's all right.  So just turn off your

8  phone.  Tell your dad the judge is making you turn off your

9  phone.

10        Ms. Pettyjohn, you were on your phone and you weren't

11  talking to any of your clients, so just put your phone away.

12  If you need to communicate with your clients, that's what --

13  that's the only reason for which there should be a phone being

14  used in the courtroom.

15        One thing we can do, I think, if Mr. Peralta wants to

16  move his chair so that he's sitting sort of in front of Mr.

17  Trinidad, he can still maintain his distance and he'll be able

18  to see the...screen and, Mr. Trinidad, if he does do that and

19  you can't see and you want to move into these other seats on

20  the far side, you can do that.

21        MR. TRINIDAD:  Okay.

22        THE COURT:  Mr. -- you can step down, Mr. Magalios,

23  I'm sorry.

24        You're driving me crazy with with the exhibits.  I

25  asked you to pre-mark the exhibits, and almost every exhibit

1  you used today was not pre-marked.  The record is a disaster if

2  you say 'I'm handing you this piece of paper' or 'I'm handing

3  you 499.' Everything you use has to be pre-marked as either a

4  Plaintiff's Exhibit or a Defense Exhibit.  The other side needs

5  a copy.  So, I mean, this was your first witness, I'm sure you

6  knew what exhibits you were going to use and you didn't have

7  them pre-marked, I don't have copies.

8        Let's make sure every exhibit you use is pre-marked

9  as a PX or a DX because otherwise you have the confusion that

10  we have today where it's Exhibit 9, but it's page 10

11  and...there's no reason for it.

12        MR. MILLER:  I understand, and the reason it happened

13  like that and, again, I'll take the blame, I had prepared

14  counsel that I was going to call Sergeant Vantassell to give us

15  the lay of the land, and all of a sudden, to my surprise, he

16  knows nothing about the lay of the land so I had to bring in

17  all these, all these other items which, frankly, I didn't think

18  I would need.

19        THE COURT:  Well, anything that you might need should

20  be pre-marked.

21        I'm also going to add to the charge just a standard

22  charge about meeting with counsel to prepare, which is

23  something that the jury can consider, but they need to know

24  there's nothing wrong with it, and I want to talk about the

25  charge conference we sent you, the proposed charge.  What I

1    like to do is have the lawyers meet with my law clerk off the

2    record, go through the charge, typos, wordsmithing, and things

3    you can agree on, you can take up with him and then anything

4    you can't agree on, we'll have a formal charge conference on

5    the record.

6            We don't have a sense of how long your case is going

7    to take, I guess, Mr. Miller, because it depends on who shows

8    up tomorrow, but I guess there is some possibility we could be

9    finished with the evidence on Wednesday, so I would like to

10   suggest that the lawyers come at nine tomorrow, meet with Mr.

11   Partelow, go over the charge.  Whatever you can agree on,

12   whatever changes you can agree on or mistakes you find

13   hopefully you can take care of with him and then we'll see

14   where we are at the end of the day tomorrow.

15           We may do the formal charge conference after

16   two-thirty tomorrow or maybe we'll do it at nine on Wednesday.

17   We'll just see how far we've gotten, but I don't want to get

18   caught with the jury being ready to charge and we will not have

19   had the conference, so the lawyers should come here at nine,

20   and be prepared to meet informally with Mr. Partelow, and then

21   he'll tell me what the outstanding issues are and we'll talk

22   about those on the record.

23           Anything else before we part for the day?

24           MR. MILLER:  No, your Honor.

25           MS. ACOSTA-PETTYJOHN:  Just to bring up again Lisa

1    Tibaldi, I know we mentioned earlier about her deposition in

2    lieu of her not coming in.

3            I did read a case really quick during our break if

4    you want that.  Sorry, the case number is 2000 WL 236481, which

5    basically states that a requisite before declaring the witness

6    unavailable is a court order asking the witness to come to

7    trial.

8            THE COURT:  Well, is that a subpoena or something

9    different?  A subpoena is a court order saying --

10           MS. ACOSTA-PETTYJOHN:  So I believe it -- from

11   reading -- again, and it was very quick on the break, from

12   reading the case, I believe it needs to be a signed court

13   ordered subpoena and not just a subpoena from Plaintiff's

14   counsel.

15           THE COURT:  So if she doesn't show up tomorrow

16   morning, I can issue an order saying 'you better show up

17   Wednesday or else,' and if you can serve that on her tomorrow,

18   then -- and she doesn't show up Wednesday, then that will be a

19   court order.  All right, well, that's helpful.

20           If either side wants to provide any more authority in

21   the next few hours, you can e-mail it to the chambers' inbox

22   and maybe we'll see Ms. Tibaldi.  If we don't, I can certainly

23   quickly prepare an order that says you were subpoenaed, you

24   have to come; if you don't come, all sorts of terrible things

25   can happen to you.  All right.

Magalios v. Peralta, et al. - Proceedings

1              If there's nothing else, I'll see everybody else in

2    the morning.  Drive carefully.

3              MR. MILLER:  Thank you.

4              MS. ACOSTA-PETTYJOHN:  Thank you, Your Honor.

5              MR. PARTELOW:  So Counsel will meet in here tomorrow

6    at nine for the conference.

7              THE COURT:  Yes.