```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   --------------------------------x

3   NICHOLAS MAGALIOS,

4                    Plaintiff,

5          V.                              19 CV 6188(CS)
                                           TRIAL
6   C.O. MATHEW PERALTA,
7   C.O. TIMOTHY BAILEY,
    C.O. EDWARD BLOUNT,
8
                     Defendants.
9   --------------------------------x

10
                                       United States Courthouse
11                                     White Plains, New York
                                       April 27, 2021
12

13

14

15  Before:  THE HONORABLE CATHY SEIBEL, District Judge

16

17                        APPEARANCES

18  SIVIN & MILLER, LLP
         Attorneys for Plaintiff
19  GLENN D. MILLER

20

21  LETITIA JAMES
         Attorney General for the State of New York
22  JESSICA ACOSTA-PETTYJOHN
    BRUCE J. TURKLE
23       Assistant Attorneys General

24

25
```

Magalios v. Peralta - Jury Trial

```
 1              THE COURT:  I understand you want to take a witness
 2   out of order this morning?
 3              MR. MILLER:  There's a possibility, your Honor.
 4              My next witness will be Dr. Varlotta, and he told me
 5   that his first patient today is at one o'clock, so he needs to
 6   be out of here by twelve-thirty, so after my direct, I'm going
 7   to look at the clock, consult with Counsel.  They've agreed, as
 8   long as it's okay with the Court, to call Dr. Varlotta out of
 9   turn if we feel that time is an issue.
10              THE COURT:  I would imagine the cross of your client
11   is going to be lengthy enough that the doctor should testify
12   before the cross, because otherwise he's not going to get out of
13   here on time.
14              MR. MILLER:  Yeah.  I mean, obviously I'm not --
15   obviously no one's holding Counsel to their prediction, but the
16   prediction was about an hour of cross, but I think to err on the
17   side of caution, maybe we should just agree now, if it's okay
18   with the Court, to call the doctor after the direct.
19              THE COURT:  That's all right with me.  I'll just
20   explain to the jury what's going on.
21              MS. ACOSTA-PETTYJOHN:  That's right.
22              MR. MILLER:  Okay.
23              THE COURT:  And I understand there's really only one
24   controversy about the charge and we can talk about that at the
25   end of the day today, and Mr. Clark will let me know how we're
```

 1  doing with jurors.

 2          (Off-the-record discussion)

 3          THE COURT:  Good morning.  Mr. Magalios is going to

 4  resume the stand just, so, you know, ladies and gentlemen, we're

 5  going to take a witness out of order.  Mr. Miller is going to

 6  finish his direct of Mr. Magalios.  Then Plaintiff's next

 7  witness is a doctor who has some obligation in the early

 8  afternoon, so in order to make sure that the doctor can get

 9  there, after the direct, Mr. Magalios is going to step down,

10  we're going to take the doctor for direct and cross, then when

11  the doctor's finished, Mr. Magalios will be crossed, so just so

12  you know, he will be back after the direct is finished, but

13  we're just going to accommodate the witness who has the

14  obligation.

15          Step back up, Mr. Magalios.  You're still under oath

16  and you can take off your mask...

17          THE WITNESS:  Yes.

18          THE COURT:  And, Mr. Miller, you may continue.

19          MR. MILLER:  Thank you, Your Honor.

20          Good morning, everybody.

21          ALL:  Good morning.

22  DIRECT EXAMINATION

23  BY MR. MILLER:

24  Q.   Good morning.

25  A.   Good morning.

Magalios - Direct - Mr. Miller

1  Q.   I would like to now focus on the events of September 3rd,

2  2017.  Do you remember that day?

3  A.   Very clearly.

4  Q.   Do you remember what day of the week it was?

5  A.   Sunday.

6  Q.   Did you ever go to the yard that day?

7  A.   Absolutely not.

8  Q.   At some point that day, did you leave 16-2?

9  A.   Yes, that morning.

10  Q.   Approximately what time was that?

11  A.   Nine a.m.

12  Q.   Were you expecting a visit?

13  A.   Yes, sir.

14  Q.   Who were you expecting?

15  A.   Lisa Tibaldi.

16  Q.   And at the time, what was your relationship with her?

17  A.   That was my wife at the time.

18  Q.   With what frequency did Lisa visit you when you were at

19  Fishkill?

20  A.   Biweekly.

21          THE COURT:  Does that mean twice a week or every other

22  week?

23          THE WITNESS:  Every other week.

24  Q.   And was it usually on the weekend?

25  A.   Yes, sir.

Magalios - Direct - Mr. Miller

1  Q.   Approximately what was the distance from where she was

2  living at the time to Fishkill?

3  A.   An hour-and-a-half.

4  Q.   What town or city did she live in?

5  A.   North Babylon.  Long Island.

6  Q.   Long Island.  Tell us what, if anything, you remember from

7  that morning before you left your housing unit.

8  A.   I'm an early bird, so I always get up early.  I was

9  anticipating a visit because we talked on the phone and she said

10 she would be coming to see me on Sunday.

11      So I knew she was usually first in line to beat the crowd

12 and I should be expecting a visit relatively early or it would

13 be one of the first, and prior to doing so, I would get ready,

14 you know, I would get dressed, take a shower, brush my teeth,

15 shave, look presentable, and then wait for the call.

16 Q.   How were you dressed?

17 A.   State greens, polo shirt tucked in, belt, boots.

18 Q.   Was there anything about your appearance that morning that

19 would make you stand out from anyone else?

20 A.   No, sir.

21 Q.   Can you describe your mood that morning as you proceeded to

22 the visiting area.

23 A.   Excited.

24 Q.   How were you feeling physically that morning?

25 A.   Perfectly fine.

Magalios - Direct - Mr. Miller

1   Q.   Did you proceed to the frisk area?

2   A.   Yes, sir, after I was called.

3   Q.   How long of a walk is it, Nick, from 16-2 to, there's say,

4   the entrance to the frisk room area?

5   A.   Three to five minutes tops if you're walking slow.  Depends

6   what your pace is.

7   Q.   When you got to the pat-down area, did you recognize any of

8   the officers there?

9   A.   Yes, sir.

10  Q.   Who did you recognize?

11  A.   Blount.

12  Q.   Did anything out of the ordinary occur as you went through

13  the pat-down process?

14  A.   No, sir.

15  Q.   Do you recall who patted you down?

16  A.   Yes, sir.

17  Q.   Who patted you down?

18  A.   That would be Blount.

19  Q.   Now, during your testimony yesterday, we showed everyone a

20  sketch and you talked about a desk towards the end of the frisk

21  area, correct?

22  A.   Yes, sir.

23  Q.   Was there an officer at that desk?

24  A.   Yes, sir.

25  Q.   And from your perspective, what was the duty or the

1  responsibility of that officer at that desk?

2  A.   To log you in his logbook, to check you in.

3  Q.   Do you know the name of the officer who was at the desk?

4  A.   I don't.

5  Q.   Could you describe him?

6  A.   Um, fair-skinned male, mustache, hat, glasses, heavier set,

7  wore a baton, didn't wear a name tag.

8  Q.   Now, when you -- after you were frisked and you went past

9  that desk, did you then enter into the visiting area?

10 A.   Yes, sir.

11 Q.   And you talked about a desk in the large visiting room

12 where a number of officers sit.  Did you go to that desk?

13 A.   Immediately upon entering the visiting room, yes.

14 Q.   And were you assigned a table?

15 A.   After I gave them my identification card, they assigned me,

16 yes.

17 Q.   There were two visiting rooms, right?  There's a large one

18 and a small one, right?

19 A.   Yes, sir.

20 Q.   Which one were you assigned to?

21 A.   The small visiting room.

22 Q.   And were you assigned a particular table?

23 A.   Yes, sir.

24 Q.   For example, each table, like, has a number already on it?

25 A.   Uh, adjacent to the table, not directly on the table, but,

1  like, the wall per se there will be, like, a number, like, H-1,

2  J-2, so on and so forth.

3  Q.   Okay.  When you proceeded to your table, was Lisa already

4  there?

5  A.   Yes, sir.

6  Q.   When you arrived at your table, did you see any corrections

7  officers assigned to that small visiting room?

8  A.   Yes, sir.

9  Q.   How many did you see?

10 A.   Three.

11 Q.   And were they all in the same place or were they in

12 different areas of that room?

13 A.   Two were sitting and one was standing, all next to each

14 other.

15 Q.   I just want to show you Plaintiff's 6 in evidence.

16         (Brief interruption.)

17         MR. MILLER:  I believe we need the TV.

18         (Brief pause.)

19 Q.   Do you see where I wrote "SVR" with a circle around it?

20 A.   Yes, sir.

21 Q.   Right here (pointing)?

22 A.   Yes, sir.

23 Q.   In relation to that, can you tell me where the officers

24 were located when you entered that visiting room?

25 A.   Immediately to the right of that circle with the SVR in the

 1  middle.

 2  Q.   Right here (pointing)?

 3  A.   Yes, sir.

 4  Q.   Now, do you recall which table you were assigned to?

 5  A.   Yes, the -- if you -- immediately to the left of the circle

 6  with the SVR, top left corner.

 7  Q.   Would it be the furthest top left corner?

 8  A.   Yes, sir.

 9  Q.   So before I circle it, would this be it (pointing)?

10  A.   Yes, sir.

11          MR. MILLER:  Your Honor, may I circle that?

12          THE COURT:  Sure.

13  Q.   And could you tell us the direction that you were facing --

14  A.   Yes, sir.

15  Q.   -- at that table?

16  A.   I was at an angle directing the officers, and my ex-wife

17  was -- had her back towards them, facing me.

18  Q.   Okay, just so we're clear, right above your table would be

19  the yard area, correct?

20  A.   Yes, sir.

21  Q.   Was your back facing that yard area?

22  A.   Yes, sir.

23  Q.   And is that a rule for visiting that inmates always have to

24  face the direction of where the guards are stationed?

25  A.   Correct.

1  Q.   Could you name any of the guards who you saw at that

2  station?

3  A.   Absolutely.

4  Q.   Tell me the names of those who you know.

5  A.   First and foremost, Peralta.  Come to find out Officer

6  Crystal, who I now know, and a whiter gentleman, corrections

7  officers.

8  Q.   Was Officer Crystal a female or a male?

9  A.   Female.

10 Q.   Tell us what happened as you approached your table.

11 A.   As I approached my table at the beginning of the visit,

12 it's a Sunday, something that us inmates look forward to, visits

13 from our friends and family, I embraced my ex-wife, gave her a

14 hug and kiss hello, and at that time, I was verbally yelled at

15 at an angle from across the room by Officer Crystal "no fucking

16 kissing."  And I didn't say nothing and I sat down.

17 Q.   Could you describe the volume of her voice when she said

18 that?

19 A.   Loud and obnoxious.

20 Q.   I was going to ask you what was her tone, but I believe you

21 probably answered that question already.

22      Was it your sense that other inmates with their visitors

23 could hear her who were sitting in that area?

24 A.   Yes, sir.

25 Q.   Where was Officer Peralta when Officer Crystal made that

1  comment?

2  A.   Standing next to her.

3  Q.   Other than that comment you just told us about from Officer

4  Crystal, did you ever hear her say anything else to you that you

5  could hear?

6  A.   No, sir.

7  Q.   Tell us what happened next after she made that comment.

8  A.   After she made that comment, I proceeded to sit down and

9  speak to my, my wife, and shortly thereafter, I don't know the

10 exact time frame, Officer Peralta came over to my table and

11 asked me 'is there a fucking problem.'  And I said I wanted to

12 know why I got yelled at indirectly like that for being allowed

13 per DOCCS directive to embrace at the beginning of a visit.  He

14 then stated 'is there a fucking problem,' and I looked at him I

15 said, no, sir, there's no problem, and he walked away.

16      That's what I thought.

17 Q.   Okay, what happened after he walked away?

18 A.   He went back over with Crystal, Officer Crystal, and the

19 other gentleman and it became a staring game.  At me.

20 Q.   What do you mean by 'a staring game'?  Be more specific.

21 A.   I don't know exactly what they were, you know, speaking of,

22 but you could see that they were speaking of something and

23 looking at me consistently in an aggressive manner.

24 Q.   Did you react at all to what you perceived as them talking

25 about you or staring at you?

Magalios - Direct - Mr. Miller

1  A.   I might have threw, like, an eyebrow up or was just, like,

2  wondering why I'm being singled out like that or made a light

3  facial expression, but never nothing verbal or anything like

4  that.

5  Q.   Take us, take us through your visit that day.

6  A.   The visit was uneasy compared to other days.  I just felt

7  like I had to be on my tippy toes because of the aggression that

8  first started my visit off, you know, and you know, as much as

9  I, like, tried to talk about daily life and how everything's

10 going at home and how's the family, in the back of my head I

11 just always would pick my head up and see the constant -- the

12 staring and -- you know, and...I just felt highly uncomfortable.

13      I tried to when they opened the yard go outside and get a

14 little fresh air, just to maybe get away from the small visiting

15 room for a period of time; after the yard, came back to the

16 small visiting room, we might have played cards, talked a little

17 about life in general; and I decided to end the visit early at

18 one o'clock.

19 Q.   Why did you, why did you decide to end the visit early at

20 one o'clock?

21 A.   I felt uncomfortable.

22 Q.   What time would you normally end the visit?

23 A.   Two-thirty, three o'clock.

24 Q.   How did you perceive -- and I'm just asking you about your

25 observations now.  How did you perceive Lisa dealing with some

1  of this tension that you're describing?

2  A.   She was taken back {sic} as I was.

3  Q.   After Officer Peralta left your table, during that brief

4  conversation, did he ever come back to your table during that

5  visit?

6  A.   No, sir.

7  Q.   Do you remember if he remained at that officer's station,

8  like, the entire time, or did you notice if he was walking

9  around or anything?

10  A.   He would come and go.

11  Q.   Did Officer Peralta ever say anything directly to Lisa?

12  A.   No, sir.

13  Q.   Can you describe for us maybe more in detail all the

14  physical contact that you had with Lisa during, during that

15  visit?

16  A.   At the beginning was the hug and the kiss hello.  I

17  followed standard procedure.  Might have held hands on top of

18  the table, played cards, held hands walking in the yard in it

19  was, like, a little circle with park benches and whatnot.

20      That's pretty much it as far as physical contact is

21  concerned.

22  Q.   Did you see any officers when you went to the yard?

23  A.   Yes, sir.

24  Q.   Do you know the name of any officers who you saw in the

25  yard?

1  A.    Yes, sir.

2  Q.    What's the name?

3  A.    Officer Bailey.

4  Q.    And for how long were you in the yard approximately?

5  A.    Maybe fifteen, twenty minutes.

6  Q.    Did you speak or did you have any verbal interaction with

7  Officer Bailey when you were in the yard?

8  A.    None whatsoever.

9  Q.    Did he say anything to you when you were in the yard?

10  A.    No, sir.

11  Q.    Did you make any observations of what he was doing during

12  that time?

13  A.    No, sir.

14  Q.    In your mind, did you violate any contact rules that day

15  during the visit?

16  A.    None whatsoever.

17  Q.    Let me go back to the small visiting room at the table you

18  were at.

19        As you can see on the sketch, there's a whole bunch of

20  tables there.  Were there other inmates at those tables?

21  A.    Yes.

22  Q.    Do you know -- like, as you sit here today, do you know the

23  names of any inmates who were at any of those tables in the same

24  area?

25  A.    Yes, sir.

Magalios - Direct - Mr. Miller

1  Q.   What name are you aware of?

2  A.   Alexander Hall.

3  Q.   And he was an inmate at Fishkill at the time?

4  A.   Yes, sir.

5  Q.   And do you know where he was housed?

6  A.   My housing unit, 16-2.

7  Q.   When you decided to end the visit, did you notice where

8  Officer Peralta was at that point?

9  A.   He was in the small visiting room.

10 Q.   Did he have gloves on when he was in the small visiting

11 room?

12 A.   No, sir.

13 Q.   Could you describe the process of ending a visit?  Where do

14 you go, where does your visitor go?

15 A.   Yes, sir.

16      Upon ending a visit at Fishkill, you -- both parties get up

17 from your table, but at the same token, both parties go up to

18 that big podium which is in the larger visiting room where those

19 four C.O.'s would sit.  They give her a pass to go a different

20 way through the small visit -- you know, through the corridor,

21 through the small visiting room, and then the visitors have a

22 special exit.

23      And then I would go from that podium roughly 20 feet to

24 another door, and I'm instructed to wait on line and give it a

25 knock.  And I'd wait for an officer's direction whether to come

1  in or not, and that's where you check in, you wait on the frisk

2  area bench, and you wait to be strip-searched.

3  Q.   Okay.

4       What I'm going to do now is I'm going to show you some

5  photos that have been previously marked for identification as

6  Defendant's J, and first I'm going to ask you if you recognize

7  the photo, and if you do, I'm going to ask you where on that

8  sketch that photo represents.

9  A.   Yes, sir.

10             THE COURT:  Are these in?

11             MS. ACOSTA-PETTYJOHN:  Yeah, objection.  They're not

12  into evidence.

13             THE COURT:  You have to show it to the witness, get it

14  authenticated, offer it in evidence, and then you can show it to

15  the jury.

16             MR. MILLER:  Okay.

17  Q.   Take a look at all of Defendant's J.  Let us know when

18  you've looked at all of them.

19  A.   Yes, sir.

20             (Brief pause)

21  Q.   Have you looked at all of them?

22  A.   Yes, sir.

23  Q.   Okay, I'm going to approach now and take them back.

24       Do these photos all depict parts of the visiting room area

25  and/or the frisk processing area?

1  A.   Yes, sir.

2  Q.   And do these photos fairly and accurately depict the layout

3  of those areas on September 3rd, 2017?

4  A.   Yes, sir.

5          MR. MILLER:  Your Honor, I would offer Defendant's J1

6  through J9 into evidence.

7          MS. ACOSTA-PETTYJOHN:  No objection, your Honor.

8          THE COURT:  J1 through 9 are received.

9          (Defendant's Exhibits J1 through J9 received in

10 Evidence)

11 Q.   I'm first going to show you J3 in evidence.  Can you tell

12 us what J3 rests?

13 A.   J3 represents the larger podium in the big visiting room

14 where the four corrections officers usually reside or stand or

15 sit, and that is where you check in upon entering and exiting

16 the visiting room floor.

17 Q.   So would this be the area where the officers would be

18 sitting?

19 A.   Yes, sir.

20          MR. MILLER:  I'm going to write "officer station."

21 Q.   Is that correct?

22 A.   Yes, sir.

23 Q.   And the photo right above it is just a further distance of

24 the same thing?

25 A.   Yes, sir.

Magalios - Direct - Mr. Miller

1  Q.   And would that be taken from frisk room area as you

2  approached the officer's station?

3  A.   Yes, sir.

4  Q.   So that photo would be taken from maybe around here?

5  A.   I would say at the door itself, because through the picture

6  you didn't see it, like, a doorway...

7  Q.   Okay.

8  A.   So I would say at the door.

9  Q.   Like, right here (pointing).

10 A.   Yes.

11 Q.   Now I'm going to show you Defendant's J4 in evidence, and

12 tell me what this photo depicts.

13 A.   That's the large visiting room.

14 Q.   So go back to the sketch, would that be, like, this area

15 over here (pointing)?

16 A.   Correct.

17         MR. MILLER:  So I'm going to put an "LVR" here for

18 large visiting room.

19 Q.   Is that correct?

20 A.   Yes, sir.

21 Q.   Now, I'm going to show you J5 in evidence.  Do you

22 recognize this photo?

23 A.   The top photo is still part of the big visiting room, and

24 the bottom photo is the corridor that leads to the big visiting

25 room to the small visiting room.

1  Q.   Okay.  So the corridor that you're referring to would be

2  right here (pointing)?

3  A.   Correct.

4          MR. MILLER:  So I'm going to write down "corridor"

5  here.

6  Q.   Now I'm going to show you J6 in evidence, and what does the

7  photo on top represent?

8  A.   The photo on top and bottom represent the small visiting

9  room.

10 Q.   Okay.  And in these two photos, either the top one or the

11 bottom one, can you determine -- now, we understand these chairs

12 in the photo are up on the table, and I think we can all agree

13 that they were not in that position at the time of the visit,

14 right?

15 A.   Correct.

16 Q.   But other than that, could you determine from that photo or

17 either one of those photos where your table was?

18 A.   I can't because that layout looks different than in 2017.

19 There was more rows.  That only looks like three rows.  I've

20 seen upwards of six to seven rows.

21 Q.   Okay.  Let me just slow you J7.  First the one on top, J7

22 in evidence, do you recognize that photo?

23 A.   The top photo is the small visiting room.

24 Q.   And is it the same thing, that the tables are situated

25 differently than they were on September 3rd, 2017?

1  A.   Yes, sir.

2  Q.   Could you determine from that top photo where the officers

3  were located during the visit?

4  A.   The bottom right corner of the top photo.

5  Q.   Like, around here (pointing)?

6          (Brief pause.)

7  A.   Yes, sir.

8  Q.   Do you know what the bottom photo on J7 in evidence

9  represents?

10 A.   That's a different part of, of the visiting -- I think

11 that's no contact visits.  I never had -- went through there.

12 Q.   Okay.  I'll show you the other photos in a few minutes.

13      I want you now to tell us, Nick, what happened after you

14 approached the door into the frisk area.

15 A.   Upon approaching the door, I gave it a knock, as I was

16 supposed to.  I was waiting for a reply.  Officer Bailey

17 was...awaiting in that area adjacent behind the door, told me to

18 come in.  I stepped in.  The officer that was sitting at the

19 desk asked me my name.  I told him my name.  And the officer

20 asked Bailey 'is that him,' and Bailey replied 'I think so.'

21      He told me to go sit down, and --

22 Q.   Who told you to go sit down?

23 A.   Bailey.  And upon getting my net bag and putting my ID,

24 well, in my pocket at the time, I, um...witnessed as I sat down

25 Peralta coming through the door with gloves on, and, um...I

 1  think Bailey or Blount removed the two inmates that were already

 2  sitting on the frisk area bench to remove themselves.  And once

 3  I seen them leave, I knew something was off.

 4      And at that point, Peralta put me on the wall with my hands

 5  held high, my legs spread far out behind me, gave me a rough

 6  frisk search, took my ID and my net bag, threw it on the floor,

 7  grabbed me by the -- my back of my neck as I was facing the

 8  wall, told me in my ear that he'd kill me, get away with it, he

 9  knows where he live, and I better ask about him.

10      I didn't resist, and at that moment, through my

11  peripherals, I seen other officers coming in.  Bailey was

12  already there, Blount made his presence, a battery exchange

13  officer came through another door and locked it, and the last

14  thing I know I was getting kneed in my tailbone, brought to my

15  knees, and Bailey took my head and slammed it on to my right

16  shoulder on to the floor, and I took an onslaught of kicks and

17  punches.

18      After about thirty to sixty seconds of the assault, they

19  told me I better not report it to medical, to pick my ID and my

20  net bag up, and to 'get the fuck out of here.'

21  Q.  Who told you that?

22  A.  Peralta.

23  Q.  So what happened next?

24  A.  The walkway was closed at the time, so I was forced to sit

25  back on the frisk area bench where I was supposed to be sitting

1  anyway, and I waited for Blount to come and grab the IDs and to

2  strip-search the very few people that were on the frisk bench

3  because visits were still going on.

4        Blount took me into the strip area, strip-searched me,

5  didn't say one word to me.  I just went after I got

6  strip-searched, sat on another bench to wait to be called for

7  the food package room where my, my wife, ex-wife, left me some

8  food.  To eat.

9        After I retrieved my package, I was instructed to sit back

10 on the bench until the walkway was cleared to be open.

11 Q.  All right, let me, let me stop you there for now and I just

12 want to clarify some stuff.

13       You said that when you entered this area, you saw two other

14 inmates.

15 A.  Yes, sir.

16 Q.  Were they, were they sitting together or were they apart

17 or, or -- were they standing or something else?

18 A.  They were both sitting on the bench.

19 Q.  Do you recall if they were sitting together or apart?

20 A.  Near each -- next to each other.

21 Q.  And I want you to take us through exactly what your

22 observations were with regard to these two inmates leaving that

23 area.

24 A.  In shock.  Or very confused.  As to where, where are you

25 bringing us, why do we have to remove ourselves, through their

Magalios - Direct - Mr. Miller

```
 1  facial expressions.
 2  Q.   Who told them -- like, did someone tell them to get up?
 3  A.   The corrections officers.
 4  Q.   Do you know which corrections officers?
 5  A.   Bailey.
 6  Q.   Do you remember what he said to them in general?
 7  A.   He says 'you two get up and come with me.'
 8  Q.   Where -- did you see where they went?
 9  A.   They took them the only other way they could have went
10  'cause they didn't go through the door was where you enter the
11  -- when you first come in and you get pat-frisked, that area.
12  Q.   Let me just go back to Plaintiff's 6 in evidence.  Next
13  time I'll remember to bring my pen with me when I go back there.
14       So this would be the door leading from the visiting room
15  into the frisk area (pointing)?
16  A.   Correct.
17  Q.   And these little squares indicate the benches (pointing)?
18  A.   Yes, sir.
19  Q.   Could you just approximate for us where on those benches
20  those two inmates were?
21  A.   Immediately to the right in the beginning section of those
22  benches.
23  Q.   The bottom part or the top part?
24  A.   The bottom part.
25  Q.   So, like, around here (pointing)?
```

1  A.    Correct.

2  Q.    And when you saw these two inmates leave that bench area,

3  just describe for us the direction they went.  Did they go this

4  way, did they go that way, did they go around the corner, or

5  something else (indicating)?

6  A.    They went around the corner.

7  Q.    Indicating this way (pointing)?

8  A.    Yes, sir.

9  Q.    And where were they when you last could see them with your

10 own eyes?

11 A.    Walking around that corner.  Escorted by Bailey.

12 Q.    Where was Bailey when you first saw him after your visit?

13 A.    Immediately upon entering the frisk area door.

14 Q.    Did he have gloves on at that point?

15 A.    Not at that point, no.

16 Q.    Did you see him put gloves on, or did you see him with

17 gloves on at some point?

18 A.    I can't recall exactly if he had the gloves on or not, a

19 lot of them keep them in their back pocket, but the one that I

20 do know for sure had, had -- was putting gloves on, walking in

21 my direction, was Peralta.

22 Q.    Who did you see first, Peralta or Bailey, when you first

23 went through that door from the visiting room?

24 A.    Officer Bailey.

25 Q.    And when you saw Officer Bailey, did you know at that point

1  where Peralta was?

2  A.   I had no idea.

3  Q.   How much time elapsed from the time that you first saw

4  Officer Bailey in that frisk area until the time that you first

5  saw Peralta?

6  A.   I think a minute's too long.  Forty-five seconds?

7  Q.   I want you to describe for us everything you remember about

8  your observations of Bailey before the assault.

9  A.   In regards to that particular area --

10 Q.   Yeah.

11 A.   -- or the entire visit?

12 Q.   Forget about the yard.  I'm talking about in the frisk

13 area.

14 A.   His back was against the wall.  Obviously he was

15 conversating with the officer at the desk.  When I initially

16 made that knock, I heard 'come in.'  That's when I opened the

17 door.  I already knew as a regular that I had to report to the

18 C.O. at the desk, you know, and that's when they exchanged words

19 like I wasn't even there, like, 'is that him,' and at that

20 moment, he said, he said, 'yeah, I think so.'

21      And I was instructed to go sit down, and literally as soon

22 as I sat down, you know, because through my peripherals you

23 could see the door coming from the visiting room to the frisk

24 area, and I seen Peralta putting gloves on walking through the

25 door.

1  Q.   So just so we're clear, did Officer Peralta enter through

2  the same door that you entered through?

3  A.   Yes, sir.

4  Q.   Does that door have a window?

5  A.   A small, narrow window.  Going vertical.

6  Q.   What's the first thing that you heard Officer Peralta say

7  once he entered into the frisk room area?

8  A.   Once the other inmates were directed to go around the

9  corner, he told me to 'get the fuck up and put your hands

10 against the wall.'

11 Q.   Now, when you say 'the wall,' you're referring to this area

12 here where the benches are, right (pointing)?

13 A.   Correct.

14 Q.   Could you tell us, like, approximately what part of this

15 corridor you were put up against the wall?

16 A.   So if you look at the -- entering the frisk area, there's

17 two benches, the top and the bottom.  Three-quarters down the

18 bottom...length of benches, that's where I was put against the

19 wall.

20 Q.   So three-quarters from the beginning (pointing)?

21 A.   Correct.

22 Q.   Like, around here (pointing)?

23 A.   Yes, sir.

24        MR. MILLER:  I'll just put an X there indicating --

25 the X will indicate where you were put up against the wall.

1  Q.   Okay?

2  A.   Yes, sir.

3  Q.   Is that correct?

4  A.   Yes, sir.

5  Q.   So if we, if we look at the diagram, would it be fair to

6  say that you were leaning over the benches?

7  A.   Yes, sir.

8  Q.   And what was the position of your hands when you were

9  leaning over the benches?

10 A.   Up high, palms flat against the wall.

11 Q.   And what was the position of the rest of your body?

12 A.   My legs were kicked out.  Spread.

13 Q.   Now, you've been frisked before, correct?

14 A.   Yes, sir.

15 Q.   Was that a normal frisk position for your body based on

16 your prior experience being frisked?

17 A.   Absolutely not.

18 Q.   What was the difference between this position compared to

19 others in the past?

20 A.   Standard procedure, standard position per se, keep your

21 hands held high, they pat you down, wand you, send you on your

22 way.

23 Q.   And what was the difference about this particular stance?

24 A.   Hands held high, um...feet kicked backwards and spread,

25 completely not protocol whatsoever.

1          MR. MILLER:  With the Court's permission, your Honor,

2   can Mr. Magalios demonstrate his stance using the wall in the

3   back of the room?

4          THE COURT:  Sure.  As long as the jurors can see him.

5          THE WITNESS:  (Showing).

6          THE COURT:  The record should reflect the witness is

7   leaning at an almost 45-degree angle to the wall with his arms

8   at almost a 90-degree angle against the wall.

9   Q.   Thank you, you can...go back to your seat.

10          Where was Officer Blount, if you know, upon entering the

11   frisk room area after your visit?

12   A.   I did not see Blount immediately due to the fact that I

13   believe he was still in that beginning stage of the frisk area

14   when inmates come in.

15   Q.   Where was he when you first saw him?

16   A.   At the be -- when you first walk in, he was the one -- the

17   officer that greets you and pats you down prior to going to your

18   visit.

19   Q.   Okay, I, I'm sorry.  You answered my question, but that was

20   not my intent.

21   A.   I'm sorry.

22   Q.   What I'm referring to is after your visit, when you

23   re-entered into the frisk room area, where was Blount when you

24   first saw him.

25   A.   Next to the other officer at the desk area.

Magalios - Direct - Mr. Miller

1  Q.   Okay.  And what was happening when you first saw Blount?

2  A.   I, I don't -- I can't really -- I didn't understand what

3  they were saying, but they were conversating.  I don't know

4  about what or, you know, what there -- what they were doing.

5  Q.   But where were you when you first saw Blount, Officer

6  Blount?

7  A.   On the wall.

8  Q.   Did you hear him say anything to anybody?

9  A.   No, sir.

10 Q.   Did you ever hear him say anything to the effect, you know,

11 'guys, don't do that' or anything to that effect?

12 A.   Nothing.

13 Q.   Did you hear him in any way verbally interacting with

14 Officer Bailey or Officer Peralta in that frisk area?

15 A.   Peralta had me on the wall.  He was conversating with

16 Bailey briefly.

17 Q.   I'm talking about Officer Blount; did you hear him speaking

18 to them at all.

19 A.   No, sir.

20 Q.   What did you hear Peralta and Bailey saying to each other?

21 A.   I can't -- I couldn't really see.  You know, my face was

22 against the wall.  They could have been saying or doing anything

23 behind me.  I, I don't know.

24 Q.   Other than Blount, Peralta, and Bailey, how many other

25 officers were in that immediate area of the assault?

1  A.   I would say between -- at any given time between four and

2  five.

3  Q.   And do you know the names of any of those officers?

4  A.   Just Blount.

5  Q.   I'm sorry?

6  A.   Just Blount.

7  Q.   And could you describe any of those other officers?

8  A.   Yes.

9  Q.   How many can you describe?  Just give me a number.

10  A.   Two to three.

11  Q.   Okay, let's go with number one first.  Describe this

12  unknown officer as best you can.

13  A.   Um, Hispanic male, flat-brimmed hat, chin-strap beard,

14  short, a little stockier.  He did battery exchange and was the

15  one who locked the doors.

16  Q.   And when you say 'he did battery exchange,' what do you

17  mean by that?

18  A.   He's the one basically called a rover.  They run around and

19  exchange officers' batteries if they're dying or dead.

20  Q.   So you've seen him do that on prior occasions?

21  A.   Correct.

22  Q.   And when you say you saw him lock the door, first tell us

23  what door you're referring to and then tell us what exactly you

24  saw.

25  A.   If you look at the benches in the screen, to the top left

1  there's a double door that leads to where you get strip-searched

2  and retrieve your packages.  That's the door we came out of and

3  that's the door he locked.

4  Q.   Just so we're clear, are you referring to this door

5  (pointing)?

6  A.   No, sir.

7  Q.   This door (pointing)?

8  A.   Yes, sir.

9  Q.   Okay, and this is the door, as you said yesterday, that

10 leads to the strip-frisk area?

11 A.   Correct.

12 Q.   Did you see this officer do anything else other than what

13 you've already told us?

14 A.   No, sir.

15 Q.   Okay, I'd like you now to describe the second unidentified

16 officer who you saw there.

17 A.   Which would be the officer that was sitting at the desk.  I

18 don't know his name because he doesn't wear a name tag.

19 Q.   Okay, and that's the one you described when you first came

20 in for your visit?

21 A.   Correct.

22 Q.   And is he black, white, Hispanic, something else?

23 A.   Hispanic.

24 Q.   And what, if anything, did you see that officer do after

25 your visit other than have that conversation with Bailey?

1   A.   Nothing.

2   Q.   During the assault, do you know if that officer left that

3   desk?

4   A.   Yes.

5   Q.   Where did he go?

6   A.   In the presence of Blount, near the door.

7   Q.   Okay.  Again, we have a couple of doors, so let's make it

8   clear which door you're referring to.

9        Would it be this door (pointing) or this door (pointing)?

10  A.   The first door that you pointed to.

11  Q.   Right here (pointing)?

12  A.   Correct.

13  Q.   So the officer who normally sat at the desk was standing

14  with Blount around this area here (pointing)?

15  A.   Correct.

16  Q.   Look where I'm pointing; is this about the area?

17  A.   Correct.

18  Q.   And how far is that from the area where you were up against

19  the wall?

20  A.   Ten, fifteen feet?

21  Q.   Is there anything obstructing where they were standing from

22  where you were up against the wall?

23  A.   Clear shot.

24  Q.   And you said there was another officer whose name you don't

25  know who was present, correct?

1  A.   Correct.

2  Q.   Could you describe that officer?

3  A.   I...I don't -- I can't really describe him because it was

4  in that moment, in that type of situation, the only thing I

5  really recognized was the blue shirt and the navy blue pants.

6  Q.   Do you know where that officer was situated during the

7  assault?

8  A.   In the, in the...vicinity of, of Blount and the other

9  officer that's usually at that desk.

10 Q.   Okay.  I want to go back to those two inmates that were

11 sitting on the bench when you first entered that area.

12     At the time, did you know either one of their names?

13 A.   I had no idea who they were.

14 Q.   At the time, did you recognize either one of them?

15 A.   No, sir.

16 Q.   Did you later learn the name of either one of those

17 inmates?

18 A.   Yes, sir.

19 Q.   Before you tell us the name, how did you learn this

20 inmate's name?

21 A.   After the assault took place, I tried to locate --

22 obviously after the assault took place he came back to the frisk

23 area bench, he asked me what in the hell just happened.  I was

24 distraught, I told him what the hell happened, and he says if

25 you need me to be a witness or anything or, or vouch for you,

1  like, what the hell just happened, my name's Nicholas Giannini.

2  Q.   And that's the first time you learned that name?

3  A.   Correct.

4  Q.   Was he in your housing unit?

5  A.   No, sir.

6  Q.   When Mr. Giannini came up to you after the assault, where

7  approximately were you located?

8  A.   Maybe halfway on the bench sitting down now.  After I was

9  putting my belt back on, picking up my ID off the floor, things

10  of that nature, I sat down wherever I stood basically.

11  Q.   How long did the assault last?

12  A.   Between thirty and sixty seconds.

13  Q.   Can you tell us approximately how many times you were

14  kicked?

15  A.   It was like an onslaught.  I don't know a number.

16  Q.   Other than Peralta, do you know if anyone else engaged in

17  kicking you?

18  A.   Being that Bailey had my head pushed to the ground with

19  both his hands and some form of knee or something on my back, I

20  have no idea how many or who -- other than Peralta who was

21  kicking and punching me.

22  Q.   What parts of your body did Officer Peralta kick?

23  A.   Left shoulder and left rib cage.

24  Q.   Would you describe those kicks as being soft, medium,

25  heavy, or something else?

Magalios - Direct - Mr. Miller          166

```
 1  A.    Heavy.
 2  Q.    Can you tell us approximately how many times you were
 3  punched?
 4  A.    Same thing, it was an onslaught.
 5  Q.    And other than Peralta, do you know if anyone else punched
 6  you?
 7  A.    Uh, no, just Bailey, push -- taking my head to the ground.
 8  Q.    What parts of your body were pushed by Peralta?
 9  A.    The side of my head, my left upper back shoulder area, and
10  my ribs.
11  Q.    You said earlier that you were thrown to the ground and you
12  landed on your right shoulder.  Could you tell us or explain to
13  us the mechanism as to how that happened?
14  A.    Yes.  As I had my hands held high getting pat-frisked or
15  searched roughly by Peralta, instantaneously I was kneed in my
16  back, brought to my knees, and then in one swift motion, with
17  Bailey helping him out, grabbed my head and slammed me on to my
18  right shoulder.
19  Q.    And did your right shoulder land on the floor, the bench,
20  or something else?
21  A.    It landed on the floor.
22  Q.    Do you know what material the floor is made of?
23  A.    Tile.
24  Q.    And would you describe the impact of your shoulder to the
25  floor as being light, medium, or heavy?
```

1  A.   Heavy.

2  Q.   I want you to describe for us exactly what you mean when

3  you said that Bailey had your head against the floor.  Try to be

4  as descriptive as possible with that.

5  A.   As I was laying on the floor on my right shoulder, he was

6  kneeing my upper back area and holding my head down

7  (indicating)...like such.

8  Q.   Well, we can't see --

9           MR. MILLER:  Your Honor, could he stand?

10          THE COURT:  Yes.

11 A.   Holding my head down as such with his knee in my upper back

12 (indicating).

13          THE COURT:  Indicating both hands near one another,

14 facing down, parallel to each other.

15 Q.   And what --

16          THE WITNESS:  Yes, ma'am.

17 Q.   -- what part of your body were his two hands pressing down

18 on?

19 A.   The left side of my upper head.

20 Q.   And where was the right side of your head?

21 A.   On the floor.

22 Q.   And were you able to see in that direction?

23 A.   No, because my right eye was obviously on the floor, but

24 due to the peripherals of my left, I could see vaguely, but

25 other than that I was just trying to cover my head.

1   Q.   Why were you trying to cover your head?

2   A.   Because I was getting kicked and punched.

3   Q.   What happened to Bailey when the assault ended?

4   A.   He took off.

5   Q.   Do you know where he went?

6   A.   I have no idea.

7   Q.   What happened to Peralta?

8   A.   He took off as well.

9   Q.   Do you know where he went?

10  A.   I have no idea.

11  Q.   What happened to Blount?

12  A.   I guess he went back to going to the frisk area.

13  Q.   Well, did you see him?

14  A.   No, sir -- uh, yes, when I got strip-searched.

15  Q.   I mean right after the assault.

16  A.   No, sir.

17  Q.   Did any of those three individuals say anything to you when

18  the assault was over?

19  A.   Peralta told me to pick up my ID, my net bag, and get the

20  fuck out of here and if I say anything to medical or report it

21  that I'd be sorry and he knows where I live.

22  Q.   Can you explain as best you can how you felt physically

23  during this assault?

24  A.   A whole lot of emotions going on at once.

25  Q.   Let's talk about physical first.  We'll get to emotional in

1  a second.

2  A.   I was in pain.  I, I was in...physical pain.

3  Q.   Do you recall, like, what parts of your body were in pain?

4  A.   My head from hitting the floor, my upper back from having a

5  knee in it, my tailbone from having a knee in it, my ribs and my

6  upper back from having kicks and punches in it.

7  Q.   How were you feeling emotionally from the moment that you

8  saw Bailey when you entered the frisk area?

9  A.   I felt off.  I felt something wasn't right.

10  Q.   And I want you to now answer that question about how you

11  felt emotionally as the events progressed through the end of the

12  assault.

13  A.   From first walking in and after -- I didn't -- at first I

14  didn't think anything of it until the officer told him 'is that

15  the one,' and he said, 'yeah, I think so.'  It was from that

16  moment, once I heard those words, because I was the only one

17  standing there and I was the only one they could be talking

18  about, got nervous, you know, and I didn't know what to expect.

19       And then 'go fucking sit down,' I went to sit down and

20  that's when I looked to my left and, you know, I see the door

21  and Peralta coming in with gloves, and then it just was, like, a

22  whole 'nother level of nervousness, not knowing...what's going

23  on, because Bailey had already removed those two other inmates,

24  I'm by myself, there's a whole bunch of them...scared.

25  Q.   What did you think was going to happen?

Magalios - Direct - Mr. Miller

1  A.   I have no idea what was going to happen.  I just...I, I --

2  it was, like, I'm not gonna make it home.  I -- you know, I had

3  no idea what was gonna happen.

4  Q.   Could you describe...and I'm really talking generally, I'm

5  not focusing on any individual Defendant here.  Could you just

6  describe generally their demeanor before the assault occurred?

7  A.   Laughing, joking...another day at the office.  It was

8  really, like, aggressive, you know, talking to me

9  disrespectfully, things of that nature.

10 Q.   How were you feeling physically when the assault was over?

11 A.   I was in a lot of pain.  I had a migraine, my ribs hurt,

12 back hurt.  And my shoulder was throbbing.

13 Q.   Who got strip-searched first if you recall?  The two

14 inmates who were already there or you?

15 A.   I believe the two inmates that were there, because it goes

16 in, like, order as, like, first come, first serve.

17 Q.   Could you describe Officer Blount's demeanor when he

18 strip-searched you.

19 A.   Cold.  Didn't say a word to me.  Acted like nothing

20 happened.  Told me to take my pants, my shirt, my underwear, my

21 socks off, my shoes, belt, et cetera, and just walked out after

22 I was gone getting strip-searched.

23 Q.   Did you say anything to him?

24 A.   Not at all.

25 Q.   How were you feeling at that point?

1  A.   Extremely nervous and glad that the frisk...procedure

2  ended.

3  Q.   I want you now -- well, before we do that, let me go back

4  to...some of the exhibits.

5       I'm showing you Defendant's J1 in evidence.  Are you able

6  to tell us what those two photos depict?

7  A.   Yes.

8  Q.   Okay, why don't you start with the one on top, tell us what

9  that shows.

10 A.   The one on top is the door -- the top photo, if you look at

11 the top photo, to the right is a door.  That's where you come

12 and go from the big visiting room into that area.  That's the

13 door that as an inmate you are to knock on and await an officer

14 to tell you to come in.

15      Now, this picture is dated, I think, a lot later than 2017,

16 but on the top photo in the right corner where that grayish

17 square is, there was a desk at one point and that's where that

18 officer was seated.

19 Q.   Are you referring to this area here (pointing)?

20 A.   That is where you put your net bags for your food packages.

21 Q.   Where would the desk have been?

22 A.   Further up to the --

23 Q.   (Pointing).

24 A.   Yeah, right there.

25 Q.   Okay.  And the door over here (pointing), is this the door

1  that goes into the visiting area?

2  A.   Yes, sir.

3  Q.   And that's the door that you entered into the frisk area

4  from the visiting area?

5  A.   Yes, sir.

6  Q.   And is that the same door that Officer Peralta came

7  through?

8  A.   Correct.

9  Q.   Now, the photo on the bottom appears to be just taken from

10 the other side of that corridor, correct?

11 A.   Correct.

12 Q.   So I'm pointing here to that same door that leads to the

13 visiting room (pointing)?

14 A.   Correct.

15 Q.   And the benches would be past this window here (pointing)?

16 A.   Correct.

17 Q.   What does Defendant's J2 in evidence depict?  And let's

18 just start for continuity's sake with the one on the bottom.

19 A.   That is -- the bottom photo is the waiting area waiting to

20 be strip-searched.  Those are the benches on the bottom part of

21 that photo.

22 Q.   And --

23 A.   And that was --

24 Q.   Back here (pointing) there's the door, correct?

25 A.   Correct.

Magalios - Direct - Mr. Miller

1  Q.    And is that the door that leads to the visiting area?

2  A.    Yes, sir.

3  Q.    So if you wanted to go from this area to the entrance area

4  where you get frisked, you would go past this white frame

5  (pointing) and make a left?

6  A.    Correct.

7  Q.    And what does the photo on top of J2 depict?

8  A.    Those are the frisk area benches where you wait to be

9  strip-searched.

10 Q.    And is this photo taken from the door where you enter or

11 from the end of the corridor?

12 A.    The end of the corridor.

13 Q.    And by looking at this picture, can you tell us

14 approximately where you were when you were assaulted?

15 A.    The top photo you see to the left, there's a window sill...

16 Q.    (Pointing).

17 A.    Correct.  I would say maybe ten feet past there on that

18 side of the benches.

19 Q.    Okay.  You're looking at J8 in evidence.  What's on top?

20 A.    Those are the strip-search rooms.

21 Q.    And what's on the bottom?

22 A.    Frisk area rooms.  Package room.

23 Q.    Which is the package room?

24 A.    Those doors all have different names on them, like, one

25 could be a pat-frisk, one could be strip-search, but that is the

1  same exact hallway where the package room is.

2  Q.   Okay.  And just so we're clear, that hallway would be this

3  hallway right here (pointing)?

4  A.   Correct.

5  Q.   And just to complete all the photos, this is J9 in

6  evidence, can you tell me what this photo depicts?

7  A.   The top photo, I believe, is the package room hallway?

8  Q.   And the bottom?  If you don't know, that's fine.

9  A.   I'm not familiar with the bottom photo.

10 Q.   Okay.  Tell us what happened after you got your package

11 after you were strip-searched; what happened next.

12 A.   I sat on the bench in front of the package room.  As more

13 inmates continued to come in and retrieve their packages, we

14 were all waiting for the walkway to be open because the walkway

15 was closed, therefore there's no movement allowed, so I was

16 forced to stay there until the walkway opened.

17     As more inmates got done getting strip-searched and started

18 sitting down, they seen -- a couple people had, you know, took

19 it into consideration seeing that I was a little distraught, a

20 little beside myself, and...just angry and frustrated and in

21 pain, and one gentleman asked me what happened.  I told him what

22 happened.  He says 'who did it?'  And I told him.  And that's

23 when...I didn't know his full name was Peralta at the time, but

24 I got Mr. P out of it.

25     And at that moment, a short while thereafter, I made my way

1  to my -- as quick as I physically possibly can to my housing

2  unit.

3  Q.   When you headed back to your dorm, you heard that

4  description yesterday by Sergeant Vantassell about the route you

5  take?

6  A.   Um-hum.

7  Q.   Was he more or less correct about the route you take?

8  A.   Hundred percent correct.

9  Q.   Do you recall passing corrections officers on the way back

10  to your housing unit?

11  A.   Maybe one or two.

12  Q.   Did you take notice of any of them?

13  A.   Not at all.

14  Q.   Do you recall if you saw any supervisors on the way back to

15  your housing unit?

16  A.   No supervisors.

17  Q.   When you were heading back to your housing unit, did you

18  have, like, an intention -- what was your plan upon returning to

19  the housing unit?

20  A.   Notify my dorm officer and immediately call my wife.

21  Q.   And why did you want to immediately call your wife?

22  A.   It's the only form of help an inmate has is an outside

23  source.

24  Q.   What happened when you arrived back at the housing area?

25  A.   I came up the stairs.  In order to go into my housing unit,

1    I have to pass through a TV room and -- which is in my housing

2    unit, and a few gentlemen seen that I was, uh, distraught, asked

3    me what happened, and I said I would tell them in a minute, I

4    had to put my food down and call my wife.

5    Q.    Okay.  Go on, what happened next.

6    A.    I went over to Officer Bennett who was my housing unit

7    officer at the time, I told him I'd like to speak to an area

8    supervisor and I'd like for him to document that I was assaulted

9    by his, his peers on the visiting room.

10   Q.    What happened next?

11   A.    He told me that I had to wait for a shift change because

12   shift change was coming up and to contact the area supervisor

13   then when he made his rounds.

14   Q.    All right.  Take us up until the point that you spoke to

15   Sergeant Vantassell.

16   A.    Told, told Officer Bennett what happened.  He said that he

17   would log it in his logbook.  There's only two phones and 42

18   inmates.  They're thirty minutes duration a piece.  I seen

19   somebody on the phone, I asked him, I says can I have the phone

20   next, I told him what happened.  He said absolutely.

21       I proceeded to my cubicle, put my food away, and that's

22   when other inmates had a concern and were approaching me,

23   saying -- you know, asking me what happened and I, um...I told

24   them.  What happened.

25   Q.    When you spoke to Lisa, did you tell her what happened?

```
 1  A.    Absolutely.

 2  Q.    And did you tell her what parts of your body were hurting

 3  you?

 4  A.    I can't recall exactly.  It's been four years.

 5  Q.    Um-hum.

 6  A.    But, yes, I told her what happened.

 7  Q.    Can you identify any of the inmates who you saw upon

 8  returning back to 16-2?

 9  A.    Yes, sir.

10  Q.    Who could you identify?

11  A.    Nicholas Ryan.

12  Q.    Was Sergeant Vantassell correct when he said yesterday that

13  he spoke to you when he made his round at the 16-2?

14  A.    Correct.

15  Q.    And did you tell him what happened?

16  A.    Yes, sir.

17  Q.    Can you describe his reaction when you told him?

18  A.    Pissed.

19  Q.    What do you mean?

20  A.    I told him I was assaulted in the visiting room by his

21  officers.  When he said 'who did it' and I said Officer P,

22  Officer Bailey, and Officer Blount, he had a mad face on, he was

23  pissed, and he said 'I'm going to get you to the infirmary.'

24  Q.    How did you get to the infirmary?

25  A.    Sergeant Vantassell.  Officer Rivera escorted me as well.
```

Magalios - Direct - Mr. Miller

1  Q.   Were any injuries visible when you were fully dressed?

2  A.   No, sir.

3  Q.   Take us through what happened in the infirmary.

4  A.   I was escorted down to the infirmary.  I was brought into,

5  like, an emergency room section.  I was instructed by the nurse

6  and the sergeant to strip down to my boxers.  They put a mat on

7  the floor, which I stood on.  They took photos of the

8  lacerations and bruises on my body.

9       And at that point, Sergeant Vantassell instructed me 'I

10 want you to write exactly what happened in a, in a statement.'

11 Q.   And you saw some of those photos yesterday?

12 A.   Yes.

13 Q.   How did you suffer those bruises depicted on your back?

14 A.   From the assault.

15 Q.   Do you know if they were from punches or kicks or it's hard

16 to know?

17 A.   Hard to know.

18 Q.   How did you suffer those abrasions to your knees?

19 A.   When I was kneed in my tailbone and brought down to my

20 knees.

21 Q.   Did any of those bruises or abrasions or other injuries

22 depicted in those photos, did any of those exist before the

23 assault?

24 A.   Absolutely not.

25 Q.   How many times did you speak to Lisa that day?

1  A.   I couldn't recall.

2  Q.   More than one?

3  A.   I would -- that's a safe assumption, correct.

4  Q.   Do you know if she made a formal complaint to OSI?

5  A.   I asked her if she, if she could, and she said she was

6  going to.

7  Q.   And at some point, did you speak to an investigator from

8  OSI?

9  A.   Correct.

10 Q.   And you told him what happened?

11 A.   Correct.

12 Q.   How were you feeling over the next couple of days after the

13 assault?

14 A.   I've never been more nervous in my life.  Honestly.  And

15 the reason I say that is because the fear of retaliation as an

16 inmate is why things of this nature continue to go on, because

17 people are in fear for their lives of reporting such incidents,

18 so I was a nervous wreck.

19 Q.   How were you feeling physically over the next couple of

20 days?

21 A.   Still trying to collect my thoughts, trying to calm down a

22 little, trying to reach out to everybody, anybody I can to help.

23 Q.   Did you return to the infirmary one or two days later?

24 A.   Yes, sir.

25 Q.   What were your complaints when you returned to the

1  infirmary?

2  A.   Not only was my shoulder, my right shoulder, throbbing and

3  in pain, I had shocks in my right lower wrist.

4  Q.   Now, you described yesterday some complaints you had in

5  that right shoulder before the assault, correct?

6  A.   Correct.

7  Q.   Could you compare how the right shoulder felt, let's say,

8  when you went to the infirmary, one or two days later, to how it

9  felt before the assault?

10  A.   It was night and day.  It was excruciating.

11  Q.   What do you mean by night and day?

12  A.   I never experienced that pain prior to being assaulted in

13  my right shoulder like that.

14  Q.   As best you can, could you describe how the right shoulder

15  felt after the assault?

16  A.   Pffff.  It, it -- it's a pain that not only I don't wish

17  upon nobody, but it was completely uncomfortable, difficult to

18  put a shirt on, take a shirt off...I was in pain.  I couldn't

19  sleep, I couldn't sleep on that side.  I never experienced that

20  before prior to the assault.

21  Q.   After you wrote that report on the day of the incident, did

22  you subsequently write other letters and reports?

23  A.   I could have.  Yes.

24  Q.   On September 5th, did you write a letter to the

25  commissioner of DOCCS?

1  A.   Yes, sir.

2  Q.   And what was your reason for writing that letter?

3  A.   Because I was assaulted by his corrections officers.

4  Q.   And on the same day, September 5th, did you write a letter

5  to Eric Schneiderman who was at the time the Attorney General of

6  the State of New York?

7  A.   Correct.

8  Q.   And why did you write that letter?

9  A.   Because I was assaulted by corrections officers.

10 Q.   And on September 6th, did you write a grievance regarding

11 this assault?

12 A.   Yes, sir.

13 Q.   And did you name Bailey and Peralta and Blount in that

14 grievance?

15 A.   I believe so, but I can't recall.

16 Q.   Well, at the time of this grievance, did you know their

17 names?

18 A.   Yes, sir.

19 Q.   And then on September 7th, did you write an addendum to

20 that same grievance?

21 A.   Yes, sir.

22 Q.   And then on September 8th, were you interviewed by an

23 investigator from OSI?

24 A.   Yes, sir.

25 Q.   And did you tell him, Mr. Febus, F-E-B-U-S, what happened

Magalios - Direct - Mr. Miller

1  to you?

2  A.   Yes, sir.

3  Q.   Do you have a recollection as you sit here today when and

4  how you learned Bailey's name?

5  A.   I, I knew of Bailey's name because I was a frequent visitor

6  to the visiting room.

7  Q.   What about Peralta; how and when did you learn his full

8  name, not just P?

9  A.   I only knew him by P, but due to work as a mason in

10 Fishkill, I would go throughout the facility with my boss and

11 patch up holes in walls, fix floors, things of that nature, and

12 I just so happened to see him working in a different part of the

13 facility's hallways at a desk and in passing, I seen Peralta.

14 Q.   And how and when did you learn the name of Officer Blount?

15 A.   Also in -- being a mason, going throughout the facility, he

16 was -- I was a regular in the visiting room, really didn't look

17 for his name then, but he approached me while at work one day

18 after the assault and came up to me, and that's when I realized

19 I seen his name tag, and asked me -- or told me that he wished

20 he would have known what happened, played dumb, and said 'I

21 would have, I would have stopped that, I' -- 'if that, if that

22 happened on my watch.'

23 Q.   What was your response to that?

24 A.   Bro, get the fuck out of here, and I walked away.

25 Q.   You said that to him?

Magalios - Direct - Mr. Miller

1  A.    Yeah.  Like, you gonna insult me with...yeah.

2  Q.    I want you to take us through your treatment after the

3  assault with regard to your shoulder.

4  A.    Pfffff.  From another X-ray afterwards, another -- I had an

5  MRI on my shoulder after the assault, I had two cortisone shots

6  in my right shoulder, twenty sessions, give or take, of physical

7  therapy, and ultimately a surgery.  A distal clavicle excision

8  on my left shoulder.

9  Q.    Did --

10  A.    Due to an impingement.

11  Q.    Did the physical therapy help at all?

12  A.    Not at all.

13  Q.    And did the injection, did the injections hurt at all?  I

14  mean, not hurt, I'm sure they did.  Did they help at all?

15  A.    They hurt, but they helped for, like, minutely, three days

16  tops, four days, and it wore off, the cortisone.

17  Q.    Take us through the day of surgery and how you felt

18  afterward?

19  A.    So the day of surgery, it was nerve-wracking.  I never had

20  a surgery before or surgical procedure, I was healthy, never had

21  any health issues like that, aside from asthma, minute things,

22  and the fact that I was going for surgery, as a prisoner, to an

23  outside hospital by myself, handcuffed and shackled, it kind of

24  upset me in a sense that none of my family, friends, and loved

25  ones were there to support me in going through this agonizing

1  time, so it was very nerve-wracking in the van, handcuffed and

2  shackled, going for a surgical procedure that DOCCS took a year

3  to take care of.

4      And once I made it to the hospital, a normal hospital, not

5  DOCCS hospital, it was standard procedure, professional people,

6  very nice, respectful.  They started the IVs, they brought me up

7  to the surgery room.  The next thing I know I was waking up

8  after the surgery feeling...groggy.

9  Q.   How were you feeling -- by the way, what hospital did you

10 go to?  Do you recall?

11 A.   Um...Mount Vernon?

12 Q.   Okay.  I think we can stipulate that it was Mount Vernon

13 Hospital that is owned by Montefiore.

14 A.   Yes, sir.

15 Q.   Okay.  How did you feel in the, let's say, week, the days

16 after the surgery?

17 A.   After the surgery, they brought me back later that day.

18 They brought me to the RMU unit, to the top floor.  They

19 assigned me a room and I was instructed I had to stay there

20 during the recovering process.

21     I was basically dealing with the after of surgery

22 procedure, just laying around, no form of -- nothing, just

23 recuperating.

24 Q.   How did you feel physically?

25 A.   I was in a lot of pain.

Magalios - Direct - Mr. Miller

1   Q.   Did the pain get progressively better post surgery?

2   A.   Not right away, like, maybe weeks or a month later, yes,

3   you know, but definitely not within the foreseeable few days

4   after the surgery.

5   Q.   Describe -- so let's talk about maybe those weeks.

6        Post surgery, tell us what, if anything, you were able to

7   do with, with the shoulder and what you couldn't do with the

8   shoulder.

9   A.   Couldn't do anything.  I was in a sling.

10  Q.   After that approximate four, four weeks, let's say, after

11  the surgery, did the pain get progressively better?

12  A.   The pain subsided substantially as time went on.

13  Q.   From your perspective or from how you felt, did the surgery

14  alleviate any of the complaints you had after the assault?

15  A.   Absolutely.

16  Q.   Can you sort of in a broad-stroke question take us to the

17  present?  And when I say the present, I don't mean, like, this

18  very moment, but, you know, around this time.  Describe how the

19  shoulder has felt up to the present.

20  A.   It's obviously never been the same.  Obviously the pain

21  subsided substantially after the surgery in time.  I tried

22  applying for more physical therapy after the surgery before

23  being released.  They said that I didn't have enough time left

24  to be approved for such and they recommended that I do home

25  remedies, spiders on the wall, you know, rotating your right

1  hand, you know, in a circular motion, taking, like, a treadmill

2  or bicycle with the arms that go, you know, that go left and

3  right, things of that nature.  Medicine ball...that's really it.

4  And in time, the surgery, the surgical procedure, did help

5  relieve a lot of pain in my right shoulder.

6      It's obviously not the same.  Sometimes I still have

7  discomfort in going to bed, and as odd as it sounds, I have to

8  lay on my right shoulder to this day, depending on, you know,

9  the weather pattern or whatnot, to relieve some pain that I have

10  here and there.

11  Q.   How would you compare the condition or the complaints with

12  your shoulder today compared to how you felt before the assault?

13  A.   I feel like it hurts worser now than it did before the

14  assault.

15  Q.   Like, to what, to what degree?

16  A.   It's very uncomfortable.  Like I said, I have my days when

17  it hurts, it's excruciating, I have to sleep on it because I

18  feel like that's the only way I can relieve the pressure, but I

19  wasn't dealing with any of that, nothing of that nature, prior

20  to the assault.

21  Q.   I know you've already testified how upset you were when the

22  incident occurred.  How have you felt emotionally since then?

23  A.   Being released or after the assault?

24  Q.   After the assault and obviously for part of the time you

25  were still incarcerated and part of the time you have not.

1 A.   I will say this, that after the assault took place, leading

2 up to my release date, every day was nerve-wracking, and I say

3 that to say...the fear of retaliation, the fear of being set up,

4 the fear of going to work and coming back and them putting a

5 knife under your bed and then bringing you to the box, you know,

6 things of that nature consistently play out in environments like

7 that.

8      And for a year-and-a-half, I battled trying to get medical

9 -- proper medical care and the fear of walking around with

10 them...possibly doing something to me like they did after the

11 visit that day.

12 Q.   I take it you felt relieved when you got released?

13 A.   Like you wouldn't believe.

14 Q.   Have either Officer Bailey, Officer Peralta, or Officer

15 Blount ever expressed any remorse or apologized to you on the

16 occasions you saw them after the assault?

17 A.   Bailey and Peralta, absolutely not.  Blount was the only

18 one after the incident took place when in passing like I stated

19 earlier, but other than that, no.

20 Q.   Thank you.

21          MR. MILLER:  Your Honor, I have no further questions.

22          THE COURT:  All right, do you want to call your doctor

23 now?

24          MR. MILLER:  I think that would be a good idea.

25          THE COURT:  All right, Mr. Magalios, you can step

1  down.

2           THE WITNESS:  Thank you.

3           THE COURT:  And the Plaintiff may call its next

4  witness.

5           (Witness excused.)

6  DR. GERARD VARLOTTA,

7       called as a witness by the Government, having been duly

8       sworn, testified as follows:

9           MR. TURKLE:  Your Honor, can we hold up?  Ms.

10 Acosta-Pettyjohn is still out in the hall.  I think somebody

11 went and got her.

12          THE COURT:  I hadn't noticed she left and I don't know

13 why she did that when the trial is still going on, but...I'm

14 sure you'll be able to tell her what she missed.  I'm sure the

15 first few questions are just going to be the doctor's

16 qualifications and the like.

17          Doctor, you could remove your mask in there.  There's

18 a Hepa filter that makes it safe.

19          THE WITNESS:  And no water bottles, right?

20          THE COURT:  No water.  Since I'm not letting the jury

21 take their masks off, I'm not letting them have water and so we

22 all have to suffer without water.

23          THE WITNESS:  Okay.  Thank you.

24          THE DEPUTY CLERK:  Please state your full name for the

25 Court and spell out your last name slowly.

1              THE WITNESS:  My name is Gerard Varlotta,

2   v-a-r-l-o-t-t-a.

3              MR. MILLER:  May I proceed, your Honor?

4              THE COURT:  Yes.

5   DIRECT EXAMINATION

6   BY MR. MILLER:

7   Q.   Good morning, Dr. Varlotta.

8   A.   Good morning.

9   Q.   Are you duly licensed to practice medicine in this state?

10  A.   Yes, I am.

11  Q.   When were you so licensed?

12  A.   1983.

13  Q.   Can you tell us about your education, starting with

14  college, let's say, through your post-doctoral training.

15  A.   Sure.

16       I went to Villanova University for two years and then to

17  Colgate University for two years.  I did a research year after

18  college and it's now called a post-bacc year.

19  Q.   Move away from the microphone just slightly.

20  A.   Okay.

21       And after that year, I then went to osteopathic medical

22  school at New York Institute of Technology called New York

23  College of Osteopathic Medicine.  I then did a rotating

24  internship at Coney Island Hospital in Brooklyn, New York, and

25  then went on to do a research year in orthopaedics and then

1  three years in orthopaedic surgery, followed by a three-year

2  program in physical medicine and rehabilitation.

3      And then I finished my training and went down to University

4  of Miami, started a practice in spinal and sports medicine in

5  the orthopaedic department and then after a year transferred

6  back to New York.  I left out some of my...some of my training,

7  but went to -- after orthopaedics, the physiatry, I did the

8  University of Washington and at New York Institute -- I'm sorry,

9  New York University, Rusk Institute.

10      Then I started a practice in Miami, and then I came back to

11  New York and have been practicing in New York since 1991.

12 Q.   What is physical medicine and rehabilitation?

13 A.   It's a functional approach to the rehabilitation of any

14 type of injuries or problems that occur, so it could be a

15 stroke, it could be a heart attack and a cardiopulmonary rehab,

16 neurological rehab, and in my field and what I do is

17 musculoskeletal rehabilitation.

18      So I take patients and try to avoid surgery, providing them

19 with medications, physical therapy, injections, and see if we

20 can maximize their function, activity modification as well, and

21 then the -- if they need surgery, then I get them back after

22 surgery and do post-surgical rehabilitation to where I then

23 attempt to get them back to full function.

24 Q.   Okay.  Now, can you take us through some of your

25 professional positions over the years.

Varlotta - Direct - Mr. Miller

1   A.   I am one of the founding members of the International

2   Tennis Federation's Anti-Doping Committee.  I've been on that

3   for over fifteen years.  I'm also a ringside physician for MMA

4   and boxing in the State of New York with the New York State

5   Athletic Commission, and that is since March of 1993.

6        I was on faculty at NYU and left about six years ago to go

7   to private practice.  I'm affiliated up here with White Plains

8   Hospital and have been affiliated with multiple medical

9   societies, served on boards.  I'm on the Association of Ringside

10  Physicians board, presently we're putting together and I'm the

11  chief editor of a manual of ringside medicine, and also North

12  American Spine Society where I've been on committees, and I'm a

13  Fellow of the American College of Sports Medicine and have been

14  on committees for the ACSM.

15  Q.   Let me ask you some questions about your role as, I guess

16  in non-medical terms, it would be called like a ringside doctor?

17  For boxing and MMA?

18  A.   Yes.

19  Q.   Would you be called a ringside doctor for both of those?

20  A.   Ringside physician, yes.

21  Q.   Could you describe what you do as a ringside physician for

22  New York State Boxing Association and MMA.

23  A.   Well, for the New York State Athletic Commission, we

24  evaluate the fighters pre-fight, usually 24 hours prior to the

25  fight.  We review all of their medical information.  We then

Varlotta - Direct - Mr. Miller

1  come to the event the day of the event, reevaluate the fighters

2  to make sure that there's no change in their medical status.  We

3  then that evening observe the boxing and/or -- the boxing or the

4  MMA match, and in New York State, we have the ability to stop

5  the fights if we need to, and post-bout there's an evaluation

6  that occurs and documentation of any injuries that may have been

7  sustained during the fight.

8  Q.   What are common injuries that you treat as a ringside MMA

9  physician?

10 A.   Ringside MMA, I mean, it can vary from injuries to

11 knockouts to lacerations to musculoskeletal and orthopaedic

12 injuries, so everything from foot, ankle, knee, hip, elbow,

13 shoulder, hand, fractures, dislocations, strains, a variety of

14 different acute injuries.

15 Q.   And does that differ in any way to common injuries in, in

16 boxing?

17 A.   Well, boxing is less musculoskeletal injuries and more

18 neurological injuries, so there's more head injuries due to the

19 nature of the sport.  The -- some of the severity of the

20 injuries that we see in MMA is far greater musculoskeletal-wise

21 in, in MMA fighters than there is in, in boxers.

22 Q.   In addition to what you've already described, have you also

23 had teaching positions over the years?

24 A.   Yes, I have.  I was on faculty of New York University

25 School of Medicine for twenty-five years, and I've reached the

Varlotta - Direct - Mr. Miller

1  level of associate professor.

2  Q.   In your practice, have you treated patients who have

3  suffered orthopaedic injuries as a result of trauma?

4  A.   Yes.

5  Q.   And in that practice, have you treated patients who have

6  suffered shoulder injuries --

7  A.   Yes.

8  Q.   -- as a result of trauma?

9  A.   Yes.

10  Q.   Just approximately how many over the years?

11  A.   Uh...I mean, hundreds of shoulder injuries, so spinal

12  problems take up approximately sixty percent of my practice, the

13  other forty percent is other, uh, other injuries that occur.

14  Q.   Can you distinguish for us the role of an orthopaedist from

15  your role as a physical medicine and rehabilitation expert or

16  physician in the treatment of various musculoskeletal

17  conditions?

18  A.   Well, the similarities are that we access the

19  musculoskeletal system and determine based on our specialty

20  whether -- for a surgeon, whether surgery's necessary.

21       For me, it would be more where there's functional

22  impairments that are limiting the person's ability to make

23  progress with a physical therapy approach or how they can modify

24  their activities, so I take a more functional approach and try

25  to determine how to avoid surgery and how to get person --

 1  someone to function without re-irritating or injuring a

 2  particular body part.

 3  Q.   Okay.  Now, at some point in the past year or so, has my

 4  office requested your services in reviewing the medical records

 5  of Mr. Magalios, assessing his physical condition, and

 6  determining the cause and prognosis of any findings?

 7  A.   Yes.

 8  Q.   And at some point did you perform a physical examination?

 9  A.   Yes, I did.

10  Q.   Did you bring anything with you to court today?

11  A.   Yes, I brought the records that have been provided to me.

12  Q.   Okay.  And if at any time you need to refresh your

13  recollection with those records, could you let us know?

14  A.   Sure.

15  Q.   Did you also bring your narrative report with you?

16  A.   Uh, yes, I did.

17  Q.   What was the date of your examination?

18  A.   Uh, August 20, 2020.

19  Q.   And before that date, did you review any records?

20  A.   Uh, yes, I did.  I reviewed records from the DOCCS or the

21  prison system, number one; number two is I reviewed the records

22  of Mount Vernon Hospital, which is part of Montefiore; and three

23  is I reviewed MRI scans from a diagnostic imaging in Queens.

24            MR. MILLER:  Your Honor, I believe Counsel and I have

25  agreed to stipulate to the offering of Plaintiff's...1, which is

1  the inmate injury report; 3, which are the DOCCS medical

2  records; 4, which are the hospital records from Mount Vernon

3  Hospital; and, 5, the MRI report by multi-diagnostics.

4          I offer all of those items marked for identification

5  into evidence.

6          MS. ACOSTA-PETTYJOHN:  No objection, your Honor.

7          THE COURT:  Plaintiff's 1, 3, 4, and 5 are received.

8          (Plaintiff's Exhibits 1, 3, 4, and 5 received in

9  Evidence).

10 Q.  Dr. Varlotta, the records I've sort of itemized, did you

11 review them all?

12 A.  I did.

13 Q.  I'm going to ask you, before you talk about your own

14 examination, what aspects of those records I just itemized

15 assisted you in forming your own conclusions about Mr.

16 Magalios's injuries and complaints.

17 A.  One was the DOCCS records for the dates between August 31,

18 2017, and September 28, 2017.

19      The second is the operative report that was performed on

20 October 23, 2018, by Dr. Jonathan Holder; an MRI report from the

21 multi-diagnostic imaging or multi-diagnostic services that was

22 performed on...sorry, January 10, 2018; and X-rays that were

23 part of the DOCCS, uh, uh, chart.

24 Q.  Now, I have Exhibit 3 which is in evidence from DOCCS as

25 page numbers.  I don't know if you have that.

1  A.    Um, I do.

2  Q.    Okay.  So at any time if you refer to the records, you'll

3  see that there will be a page number on the bottom right-hand

4  corner.  Do you see that?

5  A.    Yes.

6  Q.    Just let us know what page you're referring to if you ever

7  do refer to, to that chart, okay?

8  A.    Okay.

9  Q.    Now, did the DOCCS records give you any sort of a baseline

10  with regard to Mr. Magalios's right shoulder prior to the

11  assault of September 3rd, 2 -- well, prior to September 3rd,

12  2017?

13  A.    Yes, it's page 28, and the top box of the three boxes on

14  the page dated August 31, 2017, states that he had a complaint

15  of right shoulder clicking for one month.  There's no indication

16  that there was pain and no indication that there was any

17  impairment in his normal activities of daily living, but he did

18  -- it did state that there was lifting heavy...uh, increased the

19  pain.

20  Q.    Now -- you're on page 28, correct?

21  A.    Yes.

22  Q.    And just for the record, again, this is Plaintiff's 3 in

23  evidence.

24        The next entry on page 28 is what date?

25  A.    September 3, 2017.

Varlotta - Direct - Mr. Miller

```
 1  Q.   Okay.  And does that entry refer to complaints of an
 2  assault that occurred earlier that day?
 3  A.   It does.
 4  Q.   And the next entry after that is what date?
 5  A.   September 5 of 2017.
 6  Q.   And what does that entry indicate?
 7  A.   "Right shoulder pain, front, where joint meets, extreme
 8  pain."  It states "grip weak on right side, inmate has
 9  difficulty raising arm in front of him or raise above head, able
10  to button and unbutton shirt easily."
11  Q.   Does that entry continue on page 29?
12  A.   It does.
13  Q.   And what does that tell us?
14          (Brief pause.)
15  A.   It states "last Sunday had a visit," and then it looks like
16  quotations, um...he was assaulted by five officers, demands MRI,
17  complain of right shoulder pain...able to take shirt off without
18  difficulty...was able to put shirt back on, was able to button
19  the shirt."
20      Diagnosis is "rule out sprain right shoulder, continue with
21  Motrin, does not appear in distress, old injury, X-ray
22  done...9/1/17, results pending, if X-ray negative, will initiate
23  PT."
24  Q.   Now, you don't need to go through all the pages now, but
25  just generally speaking, could you tell us what type of
```

1  treatment, if any, Mr. Magalios went through going forward from

2  that time.

3  A.   He underwent use of medication, physical therapy, and he

4  had a single injection of cortisone into the shoulder, all

5  without relief in his pain.

6  Q.   Now, what is the intended result or the hoped-for result

7  for the injection?

8  A.   To reduce inflammation to then allow the shoulder to

9  function more normally.

10 Q.   Now, earlier you talked about what you do as a physician.

11 Would that be something similar where conservative treatment is

12 tried before there's no choice but to have surgery?

13 A.   Yes, I would evaluate the patient and advise them of

14 situations in their daily life, whether it's recreational

15 activities, sports activities, or daily activities, and what to

16 avoid.  We may try a variety of different medications, some of

17 them being topical and some being oral, both nonsteroidal

18 anti-inflammatories and oral anti-inflammatories for chronic

19 pain are other medications that can be used, and to identify if

20 the physical therapy addressed the significant problems to then

21 take the stress off the region.

22 Q.   And in the case of Mr. Magalios, did the physical therapy

23 in any way help the condition?

24 A.   No.

25 Q.   Based on the records obviously.

1  A.   Uh, no.

2  Q.   And same with the injections.

3  A.   Correct.

4  Q.   Now, did you also review the MRI findings that were done?

5  A.   I did.

6  Q.   Okay, and do you have a copy of the MRI report in front of

7  you?

8  A.   I do.

9  Q.   If not, I can direct you to the page.

10        (Brief pause.)

11 A.   Do you have the page?

12 Q.   Page 77.

13 A.   So it's an MRI scan of the right shoulder dated January 10,

14 2018.

15 Q.   And did you review this MRI report in your analysis of Mr.

16 Magalios?

17 A.   I did.

18 Q.   And did it assist you in your findings?

19 A.   Yes.

20 Q.   Tell us what aspects of this report assisted you in your

21 findings.

22 A.   Well, the negative reports are just as important as the

23 positive, so there was no evidence of rotator cuff tear or

24 labral tear.  There was no swelling within the main shoulder

25 joint.  There was edema in the subacromial bursa, which is

Varlotta - Direct - Mr. Miller

```
 1  between the acromioclavicular joint and the rotator cuff, and
 2  that is when it's swollen creates impingement when the shoulder
 3  is moved.
 4       And there was evidence of narrow edema in the AC joint
 5  indicative of a traumatic event, and the muscles were all
 6  normal.
 7  Q.   Now --
 8            THE COURT:  Edema just means swelling?
 9            THE WITNESS:  Uh, yes.
10            THE COURT:  Thanks.
11  Q.   Now, would an illustration of the shoulder assist you in
12  describing what that MRI showed?
13  A.   It would, but I think that...they may not be able to see
14  the pictures in the picture book because they're too small, so
15  would I be able to put my mask on and show them or...I can
16  describe.
17            THE COURT:  Do you want to use the ELMO?
18            MR. MILLER:  Um...that might, that might work.
19            THE COURT:  If you give the book to Counsel, he can
20  display it on that screen up front, and if you want to step down
21  next to the screen and point to what you want to point to, we
22  can do it that way.
23            THE WITNESS:  And the screen is...
24            THE COURT:  Over there.
25            THE WITNESS:  Over there, okay.
```

Varlotta - Direct - Mr. Miller

1  Q.   Tell us based on -- well, is this a --

2         THE COURT:  First of all, doctor, is this the view you

3  want the jury to have?

4         THE WITNESS:  Yes, I did, um...that should be fine.

5         THE COURT:  All right, and maybe step to this side of

6  the screen.

7         THE WITNESS:  Okay.

8         THE COURT:  Thank you.

9  Q.   Just first tell us what this item is here (pointing).

10  A.   This is the arm, consisting of the shoulder blade that has

11  two processes, coracoid process and the acromion process; this

12  is the clavicle here that meets the shoulder blade or the

13  scapula; the humerus bone, which is the arm bone here connects

14  to the scapula; and then you have the elbow and other stuff down

15  below.

16      The entire arm is held on by one joint to the body, so --

17  what we call the axial skeleton and that's through this joint

18  here called the sternoclavicular joint that I'll show you in

19  another picture.  The arm then is attached through the AC joint

20  here.  There is a space below the acromion called the

21  subacromial space, and then there's the shoulder joint, which is

22  the main shoulder joint, which connects the, the humerus to the

23  scapula.

24      If we look here at this picture...can --

25  Q.   Sorry about that.

Varlotta - Direct - Mr. Miller

1   A.   That's all right.  Startled me a bit.

2        THE COURT:  Do you want to zoom in on that?

3   A.   Okay, so this is the internal structure of the shoulder,

4   and according to the MRI scan and my examination, the internal

5   structure of the shoulder joint was fine.

6        So this is the labrum, this is the capsule, this is the

7   rotator cuff that makes a cuff like your shirt cuff that goes

8   around, the space here is called the subacromial bursa or

9   subacromial space that according to the MRI had some swelling in

10  it, and the AC joint is above that in this area here.  And this

11  is the AC joint here, this is the subacromial space; this view

12  is looking from the side, this is looking from the front.

13       And if you look here, this is what we call a grade one

14  separation where the joint basically stays together, made the

15  injury; and then this is a grade two injury to where, when the

16  joint is stressed, it can sublux, and the ligaments of support

17  to the clavicle are intact; and in grade three, there's a

18  disruption of all the ligaments, and that's where the shoulder

19  can pop up permanently and stay, stay elevated.

20       Could you go to picture 1?

21  Q.   Yeah.

22  A.   The first page.  So this, again, the arm is attached to the

23  scapula which is then attached through the AC joint to the

24  clavicle.

25       In the back of the shoulder, there are postural muscles,

1  the trapezius, that extend all the way up to the base of the

2  skull, come out to the acromion, to the AC joint area, and all

3  the way down to the mid-back, and the deeper muscles are called

4  periscapular, or stabilizing, muscles, and the rotator cuff

5  muscles actually sit on top of the scapula that help to rotate

6  the shoulder, so there's -- these muscles help to stabilize the

7  shoulder to keep it down, to then allow motion to occur within

8  the shoulder by the rotator cuff.

9      If these muscles malfunction, then there is a malfunction

10  of the structures within the rotator cuff and it puts it into an

11  abnormal position by changing the spatial orientation of those

12  muscles.

13      Just go to the next...

14          (Brief pause.)

15  A.  So, again, this is the area where the AC joints is up here,

16  the shoulder is below that, the subacromial space or bursa is in

17  between, and the clavicle connects to the sternum or breastbone

18  and there is a fibrous joint there.

19      And the shoulder blades should sit equally, and in some

20  cases the injuries that occur, the shoulder blade changes its

21  orientation, which then creates additional problems in the

22  shoulder joint itself, in the AC joint, and also in the, in the

23  labrum and the rotator cuff.

24  Q.  See, now, I want to go back to the MRI report, and you

25  indicated that there was indication of trauma.  Tell me which

1  page to go to if we're not on the right page and try to explain

2  through these illustrations what you meant by that.

3  A.   Twenty-five, page 25.

4  Q.   Page 25.

5  A.   So according to the MRI report, all of the internal

6  structures that are mentioned, the labrum, capsule, the rotator

7  cuff, are all perfectly fine.

8      The bursa, which is sitting here and in between the

9  acromion and the shoulder, has some bursitis, or swelling, in

10  it, so when we say 'bursitis,' the bursa is inflamed, so 'itis'

11  means inflammation, and with that inflammation there is

12  swelling, so there's something in the space that's occupying

13  space because it's larger than it is when it's not inflamed, and

14  then there was edema that's found around each side of the bone

15  of the joint, indicative that that joint was injured to create

16  swelling, or edema.

17      The clavicle is viewed only up until here on the MRI scan,

18  but there is important findings on the sternoclavicular joint in

19  my exam.

20  Q.   Okay.  At this point you can go back to your seat, and I'll

21  get to your own exam in a few minutes.

22  A.   Okay.

23  Q.   What was the date of the MRI?

24  A.   January 10, 2018.

25  Q.   One of the impressions in the MRI, and, again, I'm reading

1   from page 77, is severe degenerative changes of the

2   acromioclavicular joint.  Do you see that?

3   A.    Yes.  It says "severe osteoarthritic changes."

4   Q.    Okay.

5   A.    Which you used 'degenerative,' but it says osteo --

6   Q.    That's because I'm not wearing my glasses.

7         Okay, just explain what that means and whether or not it

8   has any significance with regard to your analysis of this case

9   and compare that finding to the X-rays that were taken previous,

10  and we'll get to the X-rays in a sec.

11  A.    So the X-rays, according to the X-rays that were done,

12  showed moderate agree of arthritis.  It takes time for the body

13  to build up bone within a particular joint and therefore an MRI

14  scan may show more changes of the joint which then the

15  radiologist would state would be severe, so the changes that

16  they're noting is marrow edema surrounding the acromioclavicular

17  joint, and the other is the sentence two above that which says

18  "severe osteoarthritic changes of the acromioclavicular joint."

19        So when they talk about that, the acromioclavicular joint

20  is two sides of a joint just like a finger joint or any other

21  joint, has a fibrous connection and there's also cartilage that

22  lines the inside of the joint, and when the joint moves, it can

23  rotate, it can, it can glide, do whatever that joint needs to do

24  in order to provide motion, and when there's arthritic changes,

25  there's swelling and -- arthritic changes in an injury, there's

Varlotta - Direct - Mr. Miller

1  swelling and edema within the bone, there can be swelling above

2  in the capsule here, and there can be spurs that form related to

3  the abnormal motion of that joint.

4      So if the joint is moving in an abnormal way and there's

5  shearing that's occurring, it's like rubbing your hands together

6  and creating friction, and that wears the cartilage, creates

7  inflammation, and causes a wearing and degenerative process to

8  occur within the joint.

9  Q.   Now, I want you to, and I'll give you the pages, take a

10 look at pages 75 and 76.

11         THE COURT:  What exhibit are you on?

12         MR. MILLER:  This is the same exhibit, Plaintiff's 3

13 in evidence.

14 Q.   Do you have those two pages?

15 A.   I do.

16 Q.   Okay.  These are two X-ray reports, correct?

17 A.   Yes.

18 Q.   One X-ray was taken on September 1st, 2017, and that's page

19 75, and the second X-ray was done on September 28th, 2017,

20 correct?

21 A.   No, that's not correct.

22 Q.   Oh, it's -- I'm sorry.

23 A.   September 1st, 2017, is the first one, and then October 3,

24 2017, is the second, not September 28th.

25 Q.   Okay, got it.

Varlotta - Direct - Mr. Miller

1        Now, if you look at page 76, the study mentions "without

2   prior study shows," and then it shows -- it mentions a bunch of

3   findings.  What does without prior study indicate to you?

4   A.   That there was no previous X-ray available to the

5   radiologist.

6   Q.   Now, without having the luxury of a prior study, is there

7   any way to determine if the X-rays show the same thing?  Or if

8   there were changes.

9   A.   There's some variability between the readings of different

10  radiologists, but they're both read by the same radiologist, so

11  I would assume he had both available, so the second one -- or

12  first one available when he was reading the second, and it says

13  "moderate productive articular changes," and -- in the second

14  one, and "moderate narrowing with productive articular changes

15  in the AC joint."

16       So my reading of both of these is they're, they're

17  approximately the same.

18  Q.   Okay.  Now, what's the significance of the MRI showing

19  severe changes a few months later?

20  A.   Well, the significance is that it's a different kind of

21  study and it shows more detail and can pick up things that

22  X-rays don't, so it can look at soft tissue, it can look at, at

23  whether there is swelling.

24       You don't really see swelling on X-ray because X-ray is a

25  bony evaluation, so there are soft tissue changes that did not

Varlotta - Direct - Mr. Miller

1  appear as, as radiographic changes on the X-rays.

2  Q.   Now, did you also review the Mount Vernon Hospital records?

3  A.   I did.

4          THE COURT:  Mr. Miller, it's time for our morning

5  recess and the jurors' lunch has arrived, so if this is a

6  logical stopping place, we'll take a thirty-minute break.

7          MR. MILLER:  That's fine, your Honor.

8          THE COURT:  All right, ladies and gentlemen, we're

9  going to take a thirty-minute break.  You can eat, don't discuss

10 the case, keep an open mind, and we'll resume at 12:15.  See you

11 then.

12          (In open court; jury not present)

13          THE COURT:  You can step down, doctor, and just some

14 housekeeping matters before we break...

15          These demonstratives are just exhibits.  The jury will

16 not have them.

17          MR. MILLER:  Correct.

18          THE COURT:  Unless...you -- I'm just pointing that

19 out.

20          MR. MILLER:  Okay.

21          THE COURT:  Did Ms. Tibaldi show up?

22          MR. MILLER:  I, I don't know, but --

23          MS. ACOSTA-PETTYJOHN:  I can respond to that.

24          She actually did show up.  She asked to speak to me

25 really quick.  I explained to her -- she understands she's here

Varlotta - Direct - Mr. Miller

1  because of a subpoena.  She wanted to know if she's testifying

2  today.  I said I don't know and I kind of just left her because

3  I had to come back in here, but last I know she was in the

4  hallway.  I don't know if she's still there.

5        THE COURT:  All right, well, that's good.  Let me make

6  a suggestion, which is we take her out of order as well --

7        MS. DERN:  Your Honor, I apologize, but I was out in

8  the hallway, and I just told her that I was with the Attorney

9  General and that it's always preferable to have live testimony

10  regardless of what side you're testifying to.

11        She indicated that she was here at ten o'clock because

12  she had to be at to work at one o'clock today, so she was

13  leaving.  She said she would be here tomorrow at ten a.m. or any

14  other time Counsel would like her to be here.  She just needs to

15  let her job know.  She was afraid that she would be docked if

16  she didn't leave and go to work, but she said she will come and

17  give live testimony.

18        THE COURT:  All right, well, I guess we'll have to

19  take her word for it.  If she had not shown up, I was prepared

20  to issue an order saying she needs to show up or else --

21        MR. MILLER:  Can I just go out and speak to her and

22  find out what --

23        THE COURT:  It sounds like -- ma'am, what is your

24  name?

25        MS. DERN:  Hi, I'm Rebecca Dern, and I'm special trial

1  counsel with the Attorney General's Office.

2         I didn't speak to her about her testimony, just when

3  she said she was leaving, I indicated to her that, you know, she

4  was being subpoenaed, and she said she understood that and she

5  would be back tomorrow at ten a.m. or any other day, but she

6  couldn't not go to work.

7         THE COURT:  And she's gone as far as you know?

8         MS. DERN:  Yes.  She said she was leaving because she

9  knew the doctor was testifying and she wouldn't be able to get

10  on the stand and get to work on time.

11        THE COURT:  All right, well, I guess we'll have to

12  take her word for it.

13        Let's -- I take it both sides now have contact

14  information for her.  Both sides, assuming somebody still wants

15  to call her, should let her know that, indeed, she does need to

16  be here at ten o'clock tomorrow.  Unless you're going to run out

17  of witnesses sooner, in which case she'll have to be here at

18  nine-thirty.

19        Do you think ten is okay, Mr. Miller?

20        MR. MILLER:  Um...I, I think it is.

21        THE COURT:  All right, so I'll ask both sides to

22  notify her that I have refrained from entering an order, but I

23  expect her to be here at ten tomorrow.  All right.

24        And just in terms of the exhibits, you know, the --

25  Mr. Miller, you've been using paper exhibits, but we're going to

Varlotta - Direct - Mr. Miller

1  need electronic copies of everything to go back to the jury,

2  including the ones that were not pre-marked, so, everybody, just

3  make sure that Mr. Clark gets electronic copies of everything

4  you want the jury to see --

5          MR. MILLER:  I believe, I believe that's been done

6  already, your Honor.

7          THE COURT:  Including the ones that you just -- that

8  you hadn't pre-marked?

9          MR. MILLER:  The -- yeah.

10          THE COURT:  Because you used a whole bunch of exhibits

11  yesterday that weren't pre-marked.

12          MR. MILLER:  Everything used yesterday is part of the

13  drive now.

14          THE COURT:  All right.  And, you know, we'll check at

15  the end, and if there's anything that for whatever reason

16  doesn't get in, we'll delete it before it goes in --

17          MR. MILLER:  Yeah.

18          THE COURT:  -- and the demonstratives you used that

19  you marked up, if you want them to go back, you need to re-offer

20  them --

21          MR. MILLER:  Yes.

22          THE COURT:  -- with the markings.

23          All right --

24          MR. MILLER:  Your Honor, I was assuming that we can

25  stipulate the marked exhibits at any time.  It doesn't have to

1   be in front of the jury.  I assume?

2           THE COURT:  I don't care, as long as they get offered.

3           (Off-the-record discussion)

4           MR. MILLER:  Yeah.

5           THE COURT:  All right.  If there's nothing else, go

6   get something to eat and we'll resume at 12:15.

7           (Lunch recess)

8           (Continued on the next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      AFTERNOON SESSION

 2                         12:15 p.m.

 3            (In open court; jury not present)

 4            THE COURT:  Everyone can have a seat.

 5   Is the jury ready for us?

 6            THE DEPUTY CLERK:  Yes.

 7            MR. MILLER:  Quick update, your Honor, on scheduling.

 8            THE COURT:  Yes.

 9            MR. MILLER:  First of all, Ms. Tibaldi is indeed gone.

10   I've got two other witnesses, two of the ex-inmates, who are,

11   believe it or not, here, and they can't come back tomorrow, so

12   I'm going to ask that, when we're done with Dr. Varlotta, I call

13   them out of turn before the cross of Mr. Magalios.

14            THE COURT:  That's fine.

15            MR. MILLER:  Okay.  Thank you.

16            THE COURT:  That's fine.

17            (In open court; jury present)

18            THE COURT:  You guys sit first.  We're waiting for

19   you.  All right.

20            Mr. Miller, you may continue your direct of

21   Dr. Varlotta.

22   DIRECT EXAMINATION (Continued)

23   BY MR. MILLER:

24   Q.  Dr. Varlotta, in addition to the DOCCS records and the

25   diagnostic reports that you've already testified about, did you
```

1  also review the operative report from Mount Vernon Hospital?

2  A.   I did.

3  Q.   And do you have that in front of you?

4  A.   Yes, I do.

5  Q.   First, could you tell us the date of the surgery.

6  A.   The date of the surgery was October 23, 2018.

7  Q.   And could you tell us, have you reviewed operative reports

8  before?

9  A.   Yes.

10 Q.   Approximately how many times?

11 A.   Many times.  More than probably 10,000.

12 Q.   Okay.  And what is the purpose of you reading an operative

13 report?

14 A.   Mostly because I wasn't there, so I get a sense of what the

15 surgeon actually did during the surgery.

16 Q.   And will you then treat the patient based on your review of

17 the surgery?

18 A.   Not necessarily in isolation, but in combination with

19 everything that I've reviewed.

20 Q.   Okay.  Tell us about the surgery.  Tell us about the

21 procedure, what was done.

22 A.   The surgery was done specifically for a cleaning of the

23 arthritis within the shoulder and the AC joint.  So in the

24 description of the procedure, as in the MRI, the labrum on the

25 inside the capsule, the rotator cuff were all fine.  He did find

 1  hypertrophic bursitis, meaning that there was a lot of
 2  inflammatory changes within the bursa space right below the AC
 3  joint, and then he described it as a type three acromion and he
 4  converted it to a type one.  So an acromion usually comes
 5  straight across.  So that's a type one.  A type two is where
 6  it's curved and a type three is where it's hooked.  And that's
 7  an anatomical situation that's there.  And he would burr or
 8  clean that area to prevent impingement.
 9          So if I could show, this is the regular shoulder joint.  An
10  impingement is where the arm comes up and squeezes dynamically
11  against the undersurface of the acromion.  So if there's any
12  substances in that undersurface, it's going to act like cheese
13  on a grate.  It's going to cause irritation of the bursa and
14  potentially the rotator cuff.  In this case, there's no rotator
15  cuff problem, but there is bursitis and there is spur formation.
16  He then removed and went into the AC joint from below.  So,
17  again, if this is the AC joint, he went into the subacromial
18  space and then up into the joint itself and he cut away one
19  centimeter of the bone on both sides.  So a centimeter is about
20  a half an inch of bone on both sides in order to then take away
21  the arthritis.
22          In this particular joint, they don't do a replacement like
23  they would a knee joint or a shoulder joint.  It's not a main
24  weight-bearing joint.  So what they do is they leave the entire
25  capsule -- and then, again, this is according to the report --

1  and they just cut the edges of the bone within the capsule.  And

2  he states he removed one centimeter of bone.

3       And nothing else was done.  He closed up everything and

4  finished the surgery.

5  Q.   Now, based on your review of all the DOCCS records that

6  you've already discussed, your review of the X-rays and MRI, did

7  you form an opinion to a reasonable degree of medical certainty

8  whether or not that surgery would have been necessary without

9  the events of September 3rd, 2017?

10  A.   Well, he had clicking in the shoulder, but not severe pain.

11  He had arthritic changes that were deemed to be moderate by the

12  radiologist.  And when you then are subject to an injury where

13  you fall onto the shoulder, whether it's in this situation or

14  football or an MMA, you constrain that joint and create

15  inflammation within the joints and an injury to the arthritic

16  cartilage, which can't hold the injury, or can't hold the forces

17  because of that injury.  So you can get a worsening of

18  inflammation and pain from an incident.

19  Q.   Now, just so we're clear, what is your opinion to a

20  reasonable degree of medical certainty as to whether or not that

21  surgery would have been needed without the events of September

22  3rd?

23  A.   Right.  From the medical records and the information that I

24  have, the injury created the pain and the inflammation that

25  necessitated additional treatment, including the surgery.

1  Q.   And when you say the additional treatment, are you

2  referring to the conservative treatment that preceded the

3  surgery?

4  A.   Yes.  The medication and the physical therapy and the

5  injection.

6  Q.   Okay.  Now, I'm going to ask you about your own examination

7  now of Mr. Magalios on August 20th of 2020.

8            First, what did the visit consist of generally?

9  A.   It consisted of him coming into the office, registering

10  with my secretary, and then being placed in an examination room.

11  In the examination room was myself and a scribe.  And he was

12  asked to take his shirt off so I can evaluate him.  I went

13  through a comprehensive history and physical assessment of

14  Mr. Magalios.

15  Q.   And what is the purpose of taking a history?

16  A.   It's to get from the patient exactly what they're feeling

17  and kind of a time line of the injury and their problem and how

18  it's affecting them.  So I ask them to not only write it down,

19  but also to provide me with details verbally.

20  Q.   What history did you take from him?

21  A.   The history was that, a month prior, he had some minor

22  shoulder discomfort.  He related it to some weight lifting.  And

23  he then states that he was assaulted, thrown to the ground, and

24  the pain in the shoulder became -- in his words, the pain and

25  injury -- ten times worse than it was in the beginning.  And he

20214rmagat2                 Varlotta - Direct - Mr. Miller

1   said that it's been affecting him to where he's not able to

2   perform his usual activities without the creation of pain.

3   Q.   Okay.  Now, tell us about your physical examination and

4   your findings.

5   A.   My physical examination revealed atrophy of the

6   periscapular muscles.  So those are the muscles of the shoulder

7   blade region and the trapezius component of the neck.  He had

8   full range of motion of his neck.  He had an impingement to

9   where he brought the arm up and it created discomfort and a

10  physical block at about 80 degrees.  So he wasn't able to get to

11  90 degrees.  And this is with holding the shoulder down.  So I'm

12  just getting a true sense of how the shoulder moves.  And his

13  rotator cuff was mildly weak, but it was not -- he could sustain

14  it, but when I asked him to hold it for a longer period of time,

15  the right side fatigued and I was able to push down on the

16  shoulder.  So there was what I term fatigue weakness.

17       There were trigger points; in other words, tender spots

18  within the muscles of the shoulder blade and the neck area.  And

19  he also had what I call scapulothoracic dyskinesis.  In other

20  words, standing from behind, the shoulder blade didn't sit

21  directly on the chest, and as he moved his arms in front and to

22  the side, there was desynchronous motion between one side versus

23  the other in how the shoulder blade moved.  So if the shoulder

24  blade is not able to hold down to the chest wall, then that

25  changes the position of the acromion and can create additional

1  aggravation of the shoulder AC joint and create and reproduce

2  the impingement just by ordinary motion of the arm.

3  Q.   What is the significance of the atrophy that you found in

4  the right parascapular muscles?

5  A.   The significance is that there is a change in how those

6  muscles function.  So they don't function the same.  They don't

7  build strength the same.  So they start to become smaller.

8       The other thing that I didn't bring up was his

9  sternoclavicular joint, the only portion of the arm that

10 connects to the body, also was subluxed.  In other words,

11 when I moved his arm, I could feel the motion and there was

12 crunching both here and in the AC joint.

13 Q.   Can that type of subluxation get picked up on an X-ray?

14 A.   No.  Not the type two or even the type two cannot be seen

15 on X-ray, unless you do stress views.

16 Q.   And what's a stress view?

17 A.   A stress view is a regular X-ray.  So you take it of the

18 shoulder initially and then you add a 10-pound or a 15-pound

19 weights or sandbags to the arms that then pull the arm down, and

20 if there is a subluxation, then the clavicle will go up and the

21 acromion will go down to create the subluxation.

22 Q.   And just tell us again precisely how you were able to

23 determine that there was subluxation.

24 A.   By putting my fingers on the AC joint.  And I put one

25 finger on the chromium and one finger on the clavicle and then I

1  go through different ranges of motion of that joint and also

2  pull down on the arm and feel if there is a subluxation, or

3  where the joint will slide.  So there's a little bit of a

4  sliding that happens to the joint and it goes up.  So if there's

5  just crunching and crepitus in the joint, the joint can stay in

6  one position, but if it starts to slide up, that's a grade two

7  type of injury in the sternoclavicular, which was found in the

8  left -- I'm sorry, in the right AC joint.  In the right

9  sternoclavicular joint, it didn't sublux and move, but as I

10 moved his arm and, again, putting one finger on the sternum and

11 one finger on the clavicle, I was able to feel the abnormal

12 motion within that joint, but it did not shift and sublux.

13 Q.   Okay.  Now, after reviewing these medical records in

14 evidence and doing your own examination, did you reach a

15 diagnosis as to his current condition?

16 A.   Yes.

17 Q.   And what was that diagnosis?

18 A.   That he had a right acromioclavicular strain with arthritis

19 and subluxation.  He had a right sternoclavicular subluxation

20 and arthritis.  He had a subacromial decompression and

21 acromioplasty, meaning that they cut out the bone.  And he had

22 periscapular trapezius atrophy and dystonia, meaning that the

23 muscles weren't the same tone as the muscles on the other side.

24 And there was also scapular winging, so the scapula moves

25 differently from the chest.

1  Q.   And what, if any, is the significance of the scapula

2  winging?

3  A.   It just shows that there's a dysfunction to the shoulder

4  that is not able to hold the shoulder blade in position to then

5  allow the shoulder to move.

6       So when you move the arm, if the shoulder blade doesn't

7  move -- or doesn't stabilize the shoulder, then it moves and

8  changes the orientation of the acromion.

9  Q.   Okay.  Now, did you form an opinion based on all the

10 records that you reviewed and your examination on a prognosis

11 for Mr. Magalios' condition?

12 A.   Well, at the point of the evaluation, it was two years

13 after the surgery and two and a half years after -- or more

14 after the injury and there were chronic changes, so I thought

15 that he had some chronic shoulder dysfunction that was

16 contributing to the ongoing shoulder discomfort.

17 Q.   And was that opinion based on a reasonable degree of

18 medical certainty?

19 A.   Yes.

20 Q.   As Mr. Magalios gets older, do you have an opinion based on

21 a reasonable degree of medical certainty as to whether your

22 findings, his conditions that you found, will get better, get

23 worse, remain the same, something else?

24 A.   Well, we don't get younger and, therefore, there's going to

25 be ongoing degeneration within the joint.  And with the abnormal

1   motion, there will be continued pain.  It's anticipated that he

2   will have continued difficulty with that shoulder with excessive

3   physical activities that overload the shoulder or activities

4   that require him to put the arm in an elevated position.

5   Q.   I would like you to assume, based on other testimony and

6   exhibits, that, before September 3rd, 2017, Mr. Magalios' past

7   medical history regarding his shoulder is simply what you found

8   in the DOCCS records.  No issues whatsoever other than what you

9   read in that August 2017 entry and the X-ray report dated

10  September 1.

11          Based on that assumption, your review of the records,

12  your examination, do you have an opinion based on a reasonable

13  degree of medical certainty what the competent-producing cause

14  of your findings are?

15  A.   According to the information that I have and from the

16  documents that were provided to me and from the discussion with

17  the patient, that the injury created an abnormality within the

18  joint that caused pain and continued dysfunction.

19  Q.   Could you tell us what event caused this?

20  A.   Yes.  It was the assault when he was incarcerated to where

21  he landed on the right shoulder.

22  Q.   What could be done medically for him at this point?

23  A.   There's a variety of different treatments that can be

24  tried.  There are different medicines.  So we have nonsteroidal

25  anti-inflammatory medicines, muscle relaxers, antidepressant

1  medicines that help with pain, what we term neuroleptic

2  medicines that can help also take away chronic pain.  So those

3  are the medications that can be used.

4      There are also injected medicines.  So we can do

5  continued injections of both cortisone PRP, which is called

6  platelet-rich plasma, where we draw his own blood out,

7  harvest out the platelets in the plasma and inject them back

8  in, and also Botox to reduce the muscle spasm and try to get

9  the muscles to start functioning in a better way in an

10 attempt to take away the irritation on the AC joint.

11         MR. MILLER:  Thank you, Dr. Varlotta.

12 Your Honor, I have no further questions.

13         THE COURT:  Ms. Acosta-Pettyjohn, you may proceed.

14 CROSS-EXAMINATION

15 BY MS. ACOSTA-PETTYJOHN:

16 Q.   Can you hear me, Dr. Varlotta?

17 A.   Yes, I can.

18 Q.   Okay.  Just for my understanding, can you explain what a

19 subluxation is again.

20 A.   A subluxation is where the joint doesn't function normally.

21 So, again, if I put my fists together and the joint is supposed

22 to stay in this position and when you stress the joint, you then

23 cause the joint to slide.  So the joint slides.  And that's a

24 subluxation where -- it's not a dislocation where it completely

25 is disrupted, but it's an abnormal function of the joint that

1  causes the joint no longer to be congruous.  So congruous means

2  together.  So the joint separates.

3  Q.   Okay.

4         THE COURT:  The record should reflect the doctor put

5  his fists together and was moving each one up and down in the

6  opposite direction.

7  Q.   And there's different grades of subluxation, correct?

8  A.   Correct.

9  Q.   And can you explain what grade one is?

10 A.   Grade one subluxation is where there's a minor shifting

11 within the joint and the joint essentially stays the same.

12 Grade two is where it moves a certain degree.  And grade three

13 is where it moves further.  And grade four is where it becomes a

14 dislocation.

15 Q.   And you examined Mr. Magalios, correct?

16 A.   Yes.

17 Q.   And after reading through the medical records and examining

18 Mr. Magalios, you diagnosed him with a right acromioclavicular

19 strain with arthritis and subluxation and a right

20 sternoclavicular subluxation and arthritis, correct?

21 A.   That's correct.

22 Q.   And I don't know how many times I'm going to be able to say

23 that word correctly, so can we call the acromioclavicular joint

24 an AC joint?

25 A.   Absolutely.

1  Q.   And can we call the sternoclavicular joint a CS joint?

2  A.   SC.

3  Q.   Oh, SC.  Sorry.  Thank you.

4          Now, as you sit here today, do you still believe that

5  he, Mr. Magalios, sustained a significant injury to his SC

6  joint?

7  A.   I can't say it's an injury, but it's a sequelae of the

8  injury to the AC joint to where the sternoclavicular joint does

9  not move.  So typically in an SC joint injury, it would show

10 swelling and a subluxation.  And I examined him well after the

11 injury, failed physical therapy, continued pain, surgery.  So

12 this is a finding that I have on examination and it is -- it may

13 not be directly related, but indirectly related to the

14 abnormality of motion.

15     So, again, if the shoulder doesn't move and the

16 shoulder blade doesn't hold it in place, there's more strain

17 on the only joint that holds the entire arm to the body.

18 The rest of the shoulder is held on by muscles.  So this

19 joint typically now functions in a person who has had a

20 long-standing injury.

21 Q.   And I know you're pointing at I guess where your tie is

22 when you say this joint.  Is that the SC joint?

23 A.   That's the SC joint, yes.  Sorry.

24 Q.   And before you came to this diagnosis, you reviewed

25 plaintiff's full medical records, correct?

1  A.   The full records that were provided to me from DOCCS and

2  Mount Vernon Hospital and the MRI facility.

3  Q.   You also spoke to the plaintiff to get his medical history,

4  correct?

5  A.   Yes, I did.

6  Q.   And you used this information to form your opinion,

7  correct?

8  A.   That's correct.

9  Q.   And anywhere in the medical records did it state that there

10 was a subjective complaint to the SC joint?

11 A.   No.

12 Q.   And did you see any notes from any treating physicians that

13 there was any abnormality to the SC joint?

14 A.   Honestly, there was a lack of an assessment.  So they

15 didn't state one way or another whether it was tender, painful

16 or subluxed in any of the reports.

17 Q.   And did it state anywhere in either the MRI or the X-rays

18 that you reviewed that there was any abnormality to the SC

19 joint?

20 A.   The MRI would not have shown the SC joint.

21 Q.   What about the X-rays?

22 A.   Usually not.  They're usually cut off in the midline.  So

23 they show mid portion of the clavicle, the AC joint and the

24 shoulder joint.  They don't even though a complete view of the

25 scapula.

20214rmagat2          Varlotta - Cross - Ms. Acosta-Pettyjohn 227

1  Q.   And as you sit here today, do you still believe that

2  Mr. Magalios sustained a significant injury to his AC joint?

3  A.   Yes.

4  Q.   And again, can you show us where the AC joint is.

5  A.   It's out here in the tip of the shoulder, on the top.

6  Q.   And in the medical records you reviewed, was there any

7  subjective complaints about the AC joint or pain?

8  A.   Yes, there was.  There was swelling and tenderness in the

9  AC joint and the creation of impingement.  That was found in the

10 medical records.

11 Q.   And in the medical records that describe the AC joint pain,

12 was that before or after his injury?

13 A.   After.

14 Q.   And did it state anywhere in the operative report that

15 there was any complaints of the AC joint?

16 A.   Yes.

17 Q.   And you stated that you came to the conclusion of your

18 diagnosis after reviewing the medical records and examining

19 Mr. Magalios, correct?

20 A.   Correct.

21 Q.   And your examination included him lifting and moving his

22 shoulder, or arm, correct?

23 A.   Correct.

24 Q.   Anywhere in the medical records did it note any

25 subluxation?

1  A.    No.

2  Q.    And in your report you listed multiple medications that you

3  recommended for Mr. Magalios, but it's true that most of those

4  medications aren't necessary for Mr. Magalios, correct?

5  A.    If he has chronic shoulder pain, they're all potential

6  medicines that can be used in an attempt to try to mitigate the

7  pain to then get his shoulder to function better.

8  Q.    And that's if he has chronic pain, correct?

9  A.    Well, at the time of my exam, he did have chronic pain,

10 because he's had pain since the time of the incident.

11 Q.    So the list of about, what is it -- sorry --

12 A.    Six.

13 Q.    The six medications that you recommended that Mr. Magalios

14 take, it was your opinion that, at the time you examined him, he

15 needed all six medications?

16 A.    We try one at a time.  We may use some in combination in

17 order to help to take away some of the pain.  They all can be

18 helpful.  Typically one of the classes of analgesic medicines,

19 or narcotics, would not be used unless it's severe pain or

20 post-op.  So that would only be used in times of severe pain and

21 not an ongoing chronic treatment.  The nonsteroidal

22 anti-inflammatory medicines and the muscle relaxers are usually

23 the first starting point for me.  If someone is helped by those

24 combined with physical therapy, I then have a discussion about

25 injections.  And if the injections are either not wanted by the

1  patient, then I would go on to additional medicines to help

2  control some of the sensitivity of the nerve endings and that

3  would be the neuroleptic medicines and the antidepressant

4  medicines.

5  Q.   Okay.  And before your examination of Mr. Magalios, you

6  were aware that he had prior pain to his right shoulder,

7  correct?

8  A.   Yes.

9  Q.   And through the medical records, were you made aware that

10 the treatment for that pain was physical therapy and Ibuprofen?

11 A.   That's what it stated in the records, yes.

12 Q.   And I know you just stated that, in order to treat an

13 injury, it can be a combination of different types of treatment.

14 Correct?

15 A.   Correct.

16 Q.   So a combination of physical therapy and Ibuprofen, is that

17 an expected combination for treatment for an AC joint?

18 A.   That's the most basic initial treatment that can be given.

19 Q.   And Mr. Magalios didn't start his treatment for his prior

20 pain before the assault, correct?

21 A.   He did not.

22 Q.   Now, you examined Mr. Magalios about three years after the

23 incident, correct?

24 A.   Correct.

25 Q.   And in the two years of medical records that you reviewed,

1  again, it didn't mention anything about subluxation, correct?

2  A.   It didn't confirm or deny that it was there.

3  Q.   And anywhere in the medical records did it state that he

4  had any bleeding or swelling immediately after the incident?

5  A.   According to the nurse's report, or whoever evaluated him,

6  there were circles in numbers one, two, three and four, the

7  knees, the left shoulder.  There was nothing, according to that

8  report, on the right shoulder.

9  Q.   But did you note any bleeding on Mr. Magalios?

10 A.   Did I notice?  No.  It was three years later.

11 Q.   Sorry.  In the medical records, was there any note of any

12 bleeding?

13 A.   Not that was -- that I saw in the records, no.

14 Q.   And in the medical records, were there any notes of any

15 lacerations immediately after the incident?

16 A.   No.

17 Q.   And I know you testified earlier that you reviewed an X-ray

18 that was done before and after the incident.  Correct?

19 A.   Correct.

20 Q.   And it's your testimony that those X-ray results are

21 essentially the same results, correct?

22 A.   Correct.

23         MS. ACOSTA-PETTYJOHN:  No further questions, your

24 Honor.

25         MR. MILLER:  Just one follow-up.

1  REDIRECT EXAMINATION

2  BY MR. MILLER

3  Q.   I just want to address the issue of no/yes, no/no on

4  subluxation.

5       You described during your direct the steps that a

6  skilled doctor needs to take to determine whether or not

7  there's subluxation, correct?

8  A.   Correct.

9  Q.   And is there any indication from the DOCCS records that the

10  nurse, or whomever was in the infirmary, had those skills to do

11  that type of clinical examination?

12  A.   There was no evidence that they performed an assessment of

13  subluxation.

14          MR. MILLER:  Thank you.

15          MS. ACOSTA-PETTYJOHN:  I have just one more question,

16  your Honor.

17          THE COURT:  Go ahead.

18  RECROSS-EXAMINATION

19  BY MS. ACOSTA-PETTYJOHN:

20  Q.   According to your report, you also noted that you diagnosed

21  Mr. Magalios with musculoskeletal and mutagenic pain --

22          MR. MILLER:  Objection, your Honor.

23          THE COURT:  Sounds beyond the scope.

24          MS. ACOSTA-PETTYJOHN:  That's fine, your Honor.

25          THE COURT:  All right.  You may step down, Doctor.

```
 1              THE WITNESS:  Thank you.

 2              (Witness excused)

 3              THE COURT:  Now, ladies and gentlemen, I think we are

 4  going to call out of order to accommodate two other witnesses,

 5  two more of plaintiff's witnesses who can't be here tomorrow, so

 6  we want to get them on and off today, and then we'll resume with

 7  Mr. Magalios' cross.

 8              MR. MILLER:  Thank you, your Honor.

 9  Plaintiff calls Alexander Hall to the stand.

10  ALEXANDER HALL,

11       Called as a witness by the Plaintiff,

12       Having been duly sworn, testified as follows:

13              THE DEPUTY CLERK:  Please have a seat.

14  Please state your full name for the Court and spell out your

15  last name slowly.

16              THE WITNESS:  My name is Alexander Hall.  My last

17  name --

18              THE DEPUTY CLERK:  You can take your mask off.

19              THE WITNESS:  I'm sorry?

20              THE COURT:  You can take your mask off in there.

21  There's a HEPA filter that makes it safe.

22              THE WITNESS:  All right.

23  My name is Alexander Hall.  Last name H-A-L-L.

24              THE COURT:  Go ahead, Mr. Miller.

25  DIRECT EXAMINATION
```

BY MR. MILLER:

Q.   Good afternoon, Mr. Hall.

A.   Good afternoon.

Q.   Other than maybe five minutes ago, have we ever met?

A.   No.

Q.   Where do you currently reside?  And you can just tell us
what county you live in.

A.   I live in Manhattan.

Q.   And are you employed?

A.   I am.

Q.   What type of work do you do?

A.   I do multiple things.  I have two fitness businesses and I
have -- I do some work for the Bard Prison Initiative.

Q.   What exactly do you do for that?

A.   For which?

Q.   Something about the Bard Prison issue.

A.   Prison Initiative, yeah.

     So I'm a housing associate.  So I help people who are
returning home who were in the -- in the college program.  I
help them find housing.  So transitional or permanent
housing.  I do that work remotely, though.  My primary job
is I have a gym and then I also have another smaller fitness
business.

           THE COURT:  So these are people who were in prison in
a college program?

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  Gotcha.

3   Q.   What exactly do you do for them?  What is your job with

4   them?  What's your responsibility?

5   A.   Housing associate is my title.  So I help people who are

6   coming home connect with housing.  So my job is to build

7   relationships in that space, so in the space with transitional

8   housing companies, I would say, and also with like affordable

9   housing companies and other, you know, private landlords, but

10  people who would be willing to take our people or give them a

11  chance at housing.

12  Q.   Okay.  And how old are you?

13  A.   I'm 36.

14  Q.   And how far did you get in school?

15  A.   I have a bachelor's degree.

16  Q.   And the bachelor's degree is in what area?

17  A.   Social studies.

18  Q.   And where did you receive that bachelor's degree?

19  A.   In prison.  I was -- I was in the Bard Prison Initiative.

20  So I got my college degree in prison, my associate's and

21  bachelor's degree.

22  Q.   Okay.  So you got an associate's degree, then a bachelor's

23  degree, all when you were in jail?

24  A.   Yes.

25  Q.   On September 3rd, 2017, you were an inmate at Fishkill

1  Correctional Facility, correct?

2  A.   Yes.

3  Q.   And you were there because you committed a felony, right?

4  A.   Yes.

5  Q.   Now, did you review, before coming here today, an affidavit

6  that you signed back in September of 2017 relating to an

7  incident that occurred in the visiting room at Fishkill on

8  September 3rd?

9  A.   Did I review it?

10  Q.   Yes.

11  A.   No.

12  Q.   Do you have a recollection of an incident that occurred on

13  September 3rd, 2017 in the visiting room?

14  A.   Yes.

15  Q.   What brought you to the visiting room that day?

16  A.   I believe I was on a visit with my -- at the time -- with

17  my wife at the time.

18  Q.   And do you recall how the visiting room is set up at

19  Fishkill?

20  A.   Yes.

21  Q.   Just very briefly -- just take my word for it, we've heard

22  a lot about it -- how is the visiting room set up?

23  A.   There are two different sides to the visiting room.  One is

24  a side where there are -- where multiple people come to visit

25  you and the other is a side if you have a one-on-one visit.

1  Q.   And what part were you in that day?

2  A.   I was in the one-on-one visit.

3  Q.   The one-on-one visit?

4  A.   Yes.

5  Q.   And do you recall seeing Mr. Magalios, Nick Magalios, in

6  that same area with his visit?

7  A.   Yes.

8  Q.   Did you notice anything unusual happening with regard to

9  Mr. Magalios during your visit?

10  A.   Yes, I did.

11  Q.   What did you observe?

12  A.   I observed something that happens frequently, but

13  officer -- an officer -- you want me to tell the whole story

14  or --

15  Q.   Tell us what you remember, yes.

16  A.   I remember an officer coming to his table -- I believe it

17  was a female officer came to his table and said something to

18  him.  I don't know about some of the -- like his conduct about

19  something.  You never know.  And then she left and he's -- I

20  remember him being like, you know, like -- I remember him being

21  like, like, you know, looking around, kind of like questioning.

22       And then, later on, another officer, I think the

23  officer who was -- who this -- who's in question here --

24  came to his table and, you know, said something to him.  But

25  you could tell it was like -- it was like a, you know, a

1  tough-guy kind of like threatening stance.

2  Q.   Well, what do you mean by that?  Just be a little more

3  graphic, if you can.

4  A.   I mean when a person stands over your table and like talks

5  to you in a disrespectful manner and curses and, you know, and

6  so on.

7  Q.   And did you hear any words exchanged?

8  A.   I -- vaguely.  I mean, I didn't hear the whole

9  conversation, but I heard -- I heard words, yes.

10  Q.   And could you describe the tone of the words?

11  A.   Aggressive.

12  Q.   Can you describe the officer who came over to him using the

13  aggressive tone?

14  A.   Yeah.  Light-skinned guy.  Young.  Young light-skinned guy.

15  Q.   Would you recognize him in the courtroom?

16  A.   Yes.

17  Q.   Do you know his name?

18  A.   I don't.

19  Q.   Could you point him out?

20  A.   Yeah.  That's him over there.

21  Q.   There are three gentlemen over there.  Could you tell me

22  which one you're referring to.

23  A.   The light-skinned one with the short haircut.

24          MR. MILLER:  Okay.  Your Honor, could the record

25  reflect that he's identifying Officer Peralta?

```
 1            THE COURT:  It will so reflect.
 2 Q.  How long did this exchange take?
 3 A.  Quick.
 4 Q.  How far were you -- how far was your table from
 5 Mr. Magalios' table?
 6 A.  I don't really recall.
 7 Q.  Do you recall whose visit ended first, yours or
 8 Mr. Magalios'?
 9 A.  I believe mine did.  I think I was back before he was.
10 Q.  Do you recall seeing him later on that day?
11 A.  I do.
12 Q.  What housing unit were you in at that time?
13 A.  16-2 it was called.
14 Q.  Okay.  And was Mr. Magalios in that same unit?
15 A.  Yes.
16 Q.  Tell us what observations you recall, if any, up in 16-2
17 that day.
18 A.  I remember him coming back and, you know, I had -- I
19 overheard him at first saying that something happened to him on
20 the visit floor.  He was all like flustered and, you know,
21 upset.  And then -- you know, I didn't talk to him initially.  I
22 wasn't like in -- I'm not like in Nick's close circle of
23 friends, so I didn't talk to him initially, but I waited about,
24 you know, a half an hour, an hour, and I asked him what
25 happened.  I said what happened?  You all right?  And he said --
```

1  you know, he's like the -- excuse my language, but he's like the

2  cops beat the shit out of me.  And I was like what do you mean.

3  And then, you know, I'm -- I'm looking at him and he's like --

4  you know, he wasn't like beat up, but his -- his -- his face was

5  like red.  Like his face was red, his neck was all red like --

6  he looked like he had definitely had like some kind of an

7  altercation.  And then he's like, man, he's like they got --

8  they slam -- whatever they did, and then he said -- I remember

9  vividly like him showing me his -- he took his shirt off and

10 he's like -- he said look at my back.  And he had like a boot

11 print like in his back.  Like you could see the print of the

12 boot.  I don't know if you've ever seen -- like if you can

13 picture that, but it's like a red print of a boot on his -- like

14 on the back of his neck, like under his shirt line.

15      And I remember thinking, if this is relevant, I just

16 respected him a lot for not responding and not like, you

17 know, acting back out, because you -- you know, you can't --

18 you can't win if you act back out with these people.  Excuse

19 me.  With the correction officers.

20           MR. MILLER:  Mr. Hall, I appreciate your testimony.

21 No further questions.

22           THE COURT:  Mr. Turkle.

23           MR. TURKLE:  Thank you, your Honor.  Just a few

24 questions.

25 CROSS-EXAMINATION

1  BY MR. TURKLE:

2  Q.   Mr. Hall, you were not present in the strip-search frisk

3  area when Mr. Magalios was allegedly assaulted by correction

4  officers; isn't that true?

5  A.   That's true.

6  Q.   And you have no actual knowledge of what occurred in the

7  strip-frisk area where Mr. Magalios claims to have allegedly

8  been assaulted; isn't that correct?

9  A.   Can you clarify what you mean by actual knowledge.

10 Q.   You don't have firsthand knowledge.  You weren't there and

11 you have no information as to what actually occurred on

12 September 3rd, 2017 in the strip-frisk area, correct?

13 A.   That's correct.

14 Q.   So whatever you know about an alleged assault came from

15 Mr. Magalios; isn't that correct?

16 A.   Yes.

17 Q.   Now, you say you saw Officer Peralta in the visiting room

18 that day?

19 A.   Yes.

20 Q.   And approximately what time did you see Officer Peralta

21 interact with Mr. Magalios?

22 A.   I don't recall.

23 Q.   Was it closer to -- was it around 9:00, at the beginning of

24 the visit?

25 A.   I -- I don't recall.  If I had to guess, I would say

1  sometime in the middle, because I don't usually stay late.

2  Q.   What time did your visit begin?

3  A.   I don't recall.

4  Q.   Now, to your knowledge, did Officer Peralta terminate

5  Mr. Magalios' visit at any point?

6  A.   I -- I didn't see that.

7  Q.   Did Officer Peralta remove Mr. Magalios from the visiting

8  room at any point?

9  A.   Not that I know of.

10  Q.   And to your knowledge, did Officer Peralta issue a

11  misbehavior report to Mr. Magalios?

12          MR. MILLER:  Objection.

13          THE COURT:  Sustained.

14  Q.   Now, isn't it a fact that you don't recall anything in

15  particular that Correction Officer Peralta said to Mr. Magalios

16  on September 3rd, 2017?  Correct?

17  A.   That's correct.

18  Q.   Now, how many inmates were in the visiting room at the time

19  Officer Peralta interacted with Mr. Magalios?

20  A.   I have no idea.

21  Q.   Can you give us an approximation?

22  A.   Not really.

23  Q.   Did you see Officer Peralta interact with any other inmates

24  in the visiting room that day?

25  A.   Not that day.

```
 1   Q.    Now, you spoke at some length under questioning by
 2   Mr. Miller as to your interaction with Mr. Peralta -- with
 3   Mr. Magalios later in the afternoon, correct?
 4   A.    Correct.
 5   Q.    And that was in housing unit 16-2?
 6   A.    Correct.
 7   Q.    Now, you prepared an affidavit in this case; isn't that
 8   true?
 9   A.    Correct.
10            MR. TURKLE:  May I approach the witness?
11            THE COURT:  Mask on.  Put your mask on.  Sorry.  Once
12   you leave the --
13            MR. TURKLE:  I always think I have it on.
14   (Pause)
15   Q.    Mr. Hall, I'm showing you what we've marked for
16   identification as Defendants' Exhibit K.  Do you recognize this
17   document?
18   A.    Yes.
19   Q.    Can you tell us what it is?
20   A.    It's an affidavit.
21   Q.    Do you see your signature anywhere on this document?
22   A.    I do.
23   Q.    And where is your signature?
24   A.    On the bottom right.
25   Q.    And when did you sign this affidavit?
```

1   A.    I don't remember.

2   Q.    Well, do you see --

3   A.    Oh, sworn.  I'm sorry.  The 25th of September, then.

4   Q.    So it was approximately three weeks after the alleged

5   incident, correct?

6   A.    Yes.

7          MR. TURKLE:  Your Honor, I would like to move into

8   evidence Defendants' Exhibit K.

9          THE COURT:  On what theory?

10          MR. MILLER:  No objection.

11          THE COURT:  Well, all right.  If there's no hearsay

12   objection, it will be received.

13          MR. MILLER:  No objection.

14          (Defendants' Exhibit K received in evidence)

15   Q.    Now, Mr. Hall, in your affidavit, you state that you

16   witnessed Officer Peralta, as I now know him, go over to inmate

17   Nicholas Magalios' table and speak to him in a disrespectful

18   manner while his wife was present.  Is that what it says?

19   A.    Yes.

20   Q.    So you didn't know Officer Peralta by name as of September

21   3rd, 2017, correct?

22   A.    Yes.

23   Q.    But you knew his name by September 25th, 2017, correct?

24   A.    Yes.

25   Q.    How did you learn Officer Peralta's name?

1  A.   Um, I asked around.

2  Q.   Did you ask Mr. Magalios?

3  A.   Um, I don't know if he told me or someone else told me,

4  but -- another -- another inmate told me.

5  Q.   Isn't it a fact that Mr. Magalios told you that the person

6  who approached him was Officer Peralta?

7  A.   I can't say that's a fact.

8  Q.   Now, you testified as to Mr. Magalios' appearance when you

9  saw him later in the day in housing unit 16-2, correct?

10 A.   Yes.

11 Q.   And you talked about how he removed his shirt, correct?

12 A.   Yes.

13 Q.   You talked about some blemishes you saw on his body,

14 correct?

15 A.   Yes.

16 Q.   You talked about the condition of his face, correct?

17 A.   Yes.

18 Q.   But there's none of that in this affidavit; isn't that

19 true?

20 A.   Yes.

21          MR. MILLER:  Objection.  Objection, your Honor.

22          THE COURT:  Overruled.  The affidavit's in evidence.

23          MR. MILLER:  Okay.

24 Q.   Now, I believe you testified under questioning by

25 Mr. Miller that you were in Fishkill Correctional Facility as of

1 September 3rd, 2017 because you had been convicted of a felony.

2 Correct?

3 A.   Yes.  That's true.

4 Q.   And you were serving a sentence of five to fifteen years?

5 A.   Fifteen years.

6          MR. TURKLE:  I have nothing further, your Honor.

7          MR. MILLER:  Just one follow-up.

8          THE COURT:  Yes.

9 REDIRECT EXAMINATION

10 BY MR. MILLER:

11 Q.   Had you seen Officer Peralta before the date of this

12 incident without knowing his name?

13 A.   Yes.

14 Q.   Where did you see him?

15 A.   Saw him all the time.  All around the prison.

16 Q.   Approximately how many times had you seen him before

17 September 3rd?

18 A.   I would be guessing.  A hundred.

19 Q.   Oh, okay, okay.  So you knew what he looked like, but you

20 just didn't know his name until later?

21 A.   Yeah.

22          MR. MILLER:  Thank you.

23 No further questions.

24          THE COURT:  You may step down, Mr. Hall.

25 (Witness excused)

```
 1              THE COURT:  Plaintiff may call his next witness.

 2              MR. MILLER:  Ready.

 3              THE COURT:  Who's next?

 4              MR. MILLER:  Plaintiff calls Nicholas Ryan to the

 5   stand.

 6   NICHOLAS RYAN,

 7        Called as a witness by the Plaintiff,

 8        Having been duly sworn, testified as follows:

 9              THE DEPUTY CLERK:  Please have a seat.

10   You can take your mask off.

11   Please state your full name for the Court and spell out your

12   last name slowly.

13              THE WITNESS:  Nicholas Ryan, R-Y-A-N.

14   DIRECT EXAMINATION

15   BY MR. MILLER:

16   Q.   Good afternoon, Mr. Ryan.

17   A.   Good afternoon.

18   Q.   Other than five minutes ago, have we ever met?

19   A.   No.

20   Q.   Okay.  Where do you currently reside?  What county?

21   A.   Staten Island.  Richmond.

22   Q.   And how old are you?

23   A.   Going to be 37 in two days.  Thirty-six.

24   Q.   How far did you get in school?

25   A.   Some college.
```

1   Q.   Where did you take college courses?

2   A.   CSR in Staten Island.

3   Q.   What did you study?

4   A.   I really didn't study.  I only gave like six months and

5   quit, went to the carpenter's union, went right to work.

6   Q.   Could you lean forward just a little bit.

7   A.   I was only there for about six months.  I really didn't

8   study anything.  I went right to work in the union.

9   Q.   What type of work do you do?

10  A.   I'm a union carpenter.

11  Q.   And for how long have you been a union carpenter?

12  A.   2004 I got initiated and, you know, other than my five-year

13  hiatus, pretty solid throughout those years.

14  Q.   And when you refer to a five-year hiatus, you had a felony

15  conviction for possession of a weapon for which you got five

16  years?

17  A.   Yes, sir.

18  Q.   And you had a previous conviction for possession of a

19  weapon as well?

20  A.   Yes.

21  Q.   When did you get out?

22  A.   Oh, I was out on work release September 10th, but

23  officially onto parole was New Year's Eve of 2018.

24  Q.   So just so we're clear, in September of 2018, you were

25  released to work release?

1  A.   Correct.

2  Q.   And then in December of 2018, you returned home?

3  A.   Yes.

4  Q.   Do you live alone, with your parents?

5  A.   I live in a two-family.  My parents live upstairs.

6  Q.   Now, on September 3rd, 2017, were you an inmate

7  incarcerated at Fishkill?

8  A.   Yes, I was.

9  Q.   And do you remember the name of the housing unit that you

10 were housed in at that time?

11 A.   16-2.

12 Q.   Did you have like a job at Fishkill?

13 A.   Yes.  I was a mason, facility mason.

14 Q.   And how many days a week did you work as a mason?

15 A.   Five days a week.

16 Q.   And do you know Mr. Magalios?

17 A.   Yes, I do.

18 Q.   He was a mason as well?

19 A.   Yes.

20 Q.   Is that how you guys met?

21 A.   Yeah.  Well, prior to that, we met, you know, and then we

22 worked together every day.

23 Q.   Now, at some point on September 3rd, 2017, did you see

24 Mr. Magalios?

25 A.   Yes.

Q.   Do you remember approximately the time that you saw him
that day?

A.   Afternoon.

Q.   Could you approximate the time or --

A.   I'm going to say between 1 and 2:30, 1 and 3:00.

Q.   Okay.  And when you saw him at that time, where were you?

A.   I don't know exactly where I was.  I was either on the
telephone or I was sitting playing cards.  But I was on the
left -- like 16-2 was an L shape.  I was on the left wing facing
where the visiting room is, on that side.

Q.   Okay.  And when you saw Mr. Magalios, did you know where he
was coming from?

A.   Yes.

Q.   Tell us about your observations.

A.   When he walked in, he -- he walked in, he was all
distraught and all upset and everything, and I asked him, I
said, what happened, what's wrong with you, and he said the
C.O.s beat me up, the C.O.s beat me up, I gotta call my wife, I
gotta call Lisa, I gotta call Lisa.  And then he went -- I think
he had a package.  He put his package down and then he went I
guess on the phone.  I don't know exactly -- you know, from that
point on, I don't know exactly what he did, but I'm pretty sure
he called his wife like he said he would.

Q.   Did you see him again after he made that phone call?

A.   Yes.

1  Q.   And when was that?

2  A.   I would say later on.  He -- later on that day, roughly.  I

3  don't remember -- I don't remember the exact time.

4  Q.   And what observations, if any, did you make at that time?

5  A.   At that time, he took me to the bathroom.  He showed me

6  bruises, bruises and stuff like that on his shoulder and

7  whatnot, and marks, markings.

8  Q.   Now, when you say he took you to the bathroom, do you know

9  why he took you to the bathroom?

10 A.   Yeah.  He wanted to show me.  He wanted to show me that.

11 Q.   At some point, did you sign an affidavit regarding your

12 observations of that day?

13 A.   Yes, I have.

14 Q.   And at some point later on after that, did you speak to an

15 investigator from OSI?

16 A.   Yes.

17          MR. MILLER:  Thank you.  I have no further questions.

18          THE COURT:  Mr. Turkle.

19          MR. TURKLE:  Thank you, your Honor.

20 CROSS-EXAMINATION

21 BY MR. TURKLE:

22 Q.   Good afternoon, Mr. Ryan.

23 A.   Good afternoon.

24 Q.   Now, you were not in the strip-search area on September

25 3rd, 2017 when Mr. Magalios was allegedly assaulted by

1  correction officers, correct?

2  A.   No; I was not.

3  Q.   And so you have no firsthand knowledge of what actually

4  occurred in the strip-search area on September 3rd, 2017?

5  A.   That is correct.

6  Q.   Now, you testified on direct that you had signed an

7  affidavit with regard to certain observations you might have

8  made on September 3rd, 2017.

9  A.   Yes.

10        MR. TURKLE:  Your Honor, may I approach the witness?

11        THE COURT:  Yes.

12  Q.   I would like to show you a document that we premarked as

13  Defendants' Exhibit -- for identification as Defendants' Exhibit

14  M.

15        MR. MILLER:  Do you have a copy?

16  (Pause)

17  Q.   Have you ever seen this document before?

18  A.   Yes, I have.

19  Q.   Do you see your signature anywhere on this document?

20  A.   Yes, I do.

21  Q.   And did you sign this document on September 25th, 2017?

22  A.   Yes.

23        MR. TURKLE:  Your Honor, I ask that Defendants'

24  Exhibit M be admitted into evidence.

25        MR. MILLER:  No objection.

```
 1              THE COURT:  All right.  If there's no objection, it

 2   will be received.

 3              (Defendants' Exhibit M received in evidence)

 4   Q.   Now, you state in your affidavit that, on September 3rd,

 5   2017, at approximately 1:45, you witnessed Mr. Magalios upon his

 6   immediate return to our housing unit from a visit in extreme

 7   distress.

 8        How did you know he had just come from a visit?

 9   A.   He was carrying a package, so that's -- you usually get the

10   package on the visit.

11   Q.   Do you know, as of 1:45 p.m., whether Mr. Magalios had

12   reported to a correction officer that he had allegedly been

13   assaulted?

14   A.   No.

15   Q.   Do you know whether, as of 1:45 p.m., Mr. Magalios had

16   reported to anyone from DOCCS that he had allegedly been

17   assaulted?

18   A.   No, I don't.

19   Q.   Do you have any knowledge as to whether Mr. Magalios

20   reported at any time on September 3rd, 2017 to a correction

21   officer that he had allegedly been assaulted?

22   A.   I -- I do recall something about -- I think the sergeant

23   took him off.  The sergeant took him off the floor.  But, other

24   than that, I -- it's a long time ago.  I really can't recall

25   exactly, but I remember that he spoke to a sergeant.  I'm pretty
```

1   sure.

2   Q.   Do you know what time he spoke to the sergeant?

3   A.   No, I don't.

4   Q.   Now, when you saw Mr. Magalios in housing unit 16-2 on

5   September 3rd, was he bleeding?

6   A.   Say again.

7   Q.   When you saw Mr. Magalios at approximately 1:45 p.m. in

8   housing unit 16-2, was he bleeding?

9   A.   I don't recall.

10  Q.   Was he able to walk?

11  A.   Yes.

12  Q.   He was able to speak to you, correct?

13  A.   Yes.

14  Q.   And you could understand what he was saying?

15  A.   Yes.

16  Q.   Now, to your knowledge, had anyone assisted Mr. Magalios in

17  returning to housing unit 16-2?

18  A.   Not to my knowledge.

19  Q.   And to your knowledge, did Mr. Magalios request any medical

20  assistance at any time prior to returning to 16-2?

21  A.   Not to my knowledge.

22  Q.   Now, when you saw Mr. Magalios, did you suggest to him that

23  he seek medical attention?

24  A.   I don't recall, to be honest with you, if I said it, but

25  I -- you know, I would definitely have advised him to do so, but

1  I can't recall for sure if I said it at that -- that particular

2  moment in time.

3  Q.   There's nothing in your affidavit, however, that says you

4  advised him to seek medical attention?

5  A.   Yes.  So I didn't.

6  Q.   And there was nothing in your affidavit that said that it

7  was your impression that he needed medical attention; isn't that

8  correct?

9  A.   That's correct.

10 Q.   And there's nothing in your affidavit that says that

11 Mr. Magalios had reported to a correction officer that he had

12 been assaulted, correct?

13 A.   Correct.

14 Q.   Did Mr. Magalios say to you help me, I need to see a

15 doctor?

16 A.   No.

17 Q.   Now, you say that Mr. Magalios had a package with him,

18 correct?

19 A.   Yes.

20 Q.   Can you describe the package?

21 A.   I don't know exactly what was in the package, but the

22 package come in net bags.  So I recall like two large net bags

23 that he was carrying.

24 Q.   I see.

25      Was he carrying one in each arm or one in both arms?

1  A.    That, I don't recall.

2  Q.    Did Mr. Magalios, to your knowledge, carry these packages

3  from the package room to housing unit 16-2?

4  A.    I --

5             MR. MILLER:  Objection.

6             THE COURT:  I thought the witness said he didn't see

7  Mr. Magalios until they were back in unit 16-2, so he can

8  testify about what he saw there.

9  Q.    How heavy were these packages?

10  A.    Weights vary.  Depends on what your family or your friends

11  brought to you.

12  Q.    Well, when you saw Mr. Magalios, did you have an impression

13  about how heavy the packages were that he had carried?

14  A.    It was probably like a regular-size package.  Like I don't

15  know the exact weight.

16  Q.    Five pounds?

17  A.    Probably heavier than five pounds.

18  Q.    And that's per package, correct?

19  A.    Yes.

20  Q.    How long a walk is it from the package room to housing unit

21  16-2?

22  A.    I would say quarter of a mile.

23  Q.    Now, can you tell us, at approximately 1:45 or so on

24  September 3rd, 2017, how many correction officers an inmate

25  would encounter in a walk from the package room to housing unit

1  16-2?

2          MR. MILLER:  Objection.

3          THE COURT:  Overruled.

4          THE WITNESS:  I answer that question?

5          THE COURT:  Yes.  That means you can answer.

6          THE WITNESS:  Okay.

7  A.   Anywhere between five to ten possibly.  It varies if

8  anyone's -- you know, if anyone's walking across, things like

9  that, you know, as you're walking through the cafeteria, you

10 know, but roughly they're stationed -- there's -- you have your

11 housing unit officer, possible rec officer, no other officer

12 until you get to the -- the exit of the main building in

13 Fishkill, so that's three.  Four.  And then when you go into the

14 visiting room.  So five, roughly.

15 Q.   Now, prior to September 3rd, 2017, had Mr. Magalios ever

16 discussed with you any pain he was experiencing in his right

17 shoulder?

18 A.   No.

19 Q.   Do you know whether or not Mr. Magalios had gone to the

20 Fishkill infirmary approximately August 3rd, 2017?

21 A.   No.

22 Q.   Do you know whether Mr. Magalios went to the Fishkill

23 infirmary at any time prior to September 3rd complaining about

24 pain in the right shoulder?

25 A.   No, I don't.

1  Q.   Do you know whether an X-ray was taken of Mr. Magalios'

2  shoulder prior to September 3rd, 2017?

3           MR. MILLER:   Objection, your Honor.

4           THE COURT:   Sustained.   I mean, do we have any reason

5  to believe this witness knows any of these things?

6           MR. TURKLE:   He lived in the same housing unit.   He

7  encountered him.

8           THE COURT:   He said he never discussed -- I think he

9  said he never discussed with Mr. Magalios whether there was

10 anything wrong with his shoulder, so I assume that encompasses

11 whether he had treatment or X-rays or whatever.

12           MR. TURKLE:   I have nothing further.

13 Thank you, Mr. Ryan.

14           MR. MILLER:   Just one question.

15 REDIRECT EXAMINATION

16 BY MR. MILLER:

17 Q.   Mr. Ryan, when you filled out this affidavit that was shown

18 to you, no one was asking you questions; you just wrote down

19 what you remember?

20 A.   Correct.

21           MR. MILLER:   Your Honor, may I just read it to the

22 jury?

23           THE COURT:   It's in evidence.   Go ahead.

24           MR. MILLER:   This is dated September 25th, 2017.   It's

25 Defendants' Exhibit M, as in Miller.

 1               I, Nicholas Ryan, being duly sworn, deposes and states

 2    that -- and I'm going to skip down to the narrative -- on

 3    September 3rd, 2017, at approximately 1:45 p.m., I witnessed

 4    Inmate Nicholas Magalios upon his immediate return to our

 5    housing unit from a visit in extreme distress.  I had asked him,

 6    "What's wrong?"  He replied, "The C.O.s just beat me up for no

 7    reason."  He then stated, "Hold on a second.  I need to put my

 8    package down and call my wife."  Signed Nicholas Ryan.

 9    Thank you, Mr. Ryan.  I have no further questions.

10               THE COURT:  You may step down.

11    Oh, did you have more, Mr. Turkle?

12               MR. TURKLE:  Very briefly.

13    RECROSS-EXAMINATION

14    BY MR. TURKLE:

15    Q.   Now that that narrative was read into the record, do you

16    know whether Mr. Magalios called his wife that afternoon, on

17    September 3rd, 2017?

18    A.   I don't recall.  I don't recall exactly.

19    Q.   Did you observe Mr. Magalios putting away any of the

20    belongings that were in the package?

21               MR. MILLER:  Objection.  Scope.

22               THE COURT:  I'll allow it.

23    Q.   Did somebody ask you to write the affidavit?

24    A.   No.

25               MR. TURKLE:  Nothing further.

1          THE COURT:  Now you may step down, Mr. Ryan.

2          (Witness excused)

3          THE COURT:  And now we will resume Mr. Magalios'

4  testimony.  So why don't you come back up.

5          (Nicholas Magalios resumed the witness stand)

6          THE COURT:  You're still under oath.

7  Whoever's going to be doing the cross may proceed.

8          MS. ACOSTA-PETTYJOHN:  Were you done, Mr. Miller?

9          THE COURT:  It's time for cross.

10          MS. ACOSTA-PETTYJOHN:  Okay.  Sorry.

11  CROSS-EXAMINATION

12  BY MS. ACOSTA-PETTYJOHN:

13  Q.  Mr. Magalios, at the time of the incident, you were an

14  inmate at Fishkill, correct?

15  A.  Correct.

16  Q.  And I just want to clarify some of your testimony from your

17  direct, so I'm going to have you take a look at what's been

18  entered into evidence as Plaintiff's Exhibit 6.

19          Well, Mr. Magalios, you tell me, which is the best way

20  to --

21  A.  Whatever works for you.

22          THE COURT:  Why don't you put it up the way we've been

23  looking at it all along.

24          MS. ACOSTA-PETTYJOHN:  Which is --

25          THE COURT:  Well, you've been here.

```
 1  (Pause)

 2          THE COURT:  Yes.

 3  Q.   So, Mr. Magalios, I understand that this, as you testified,

 4  is the large visiting room.  Correct?

 5  A.   Correct.

 6  Q.   And this over here is the small visiting room?

 7  A.   Correct.

 8  Q.   Can you tell me what this is over here?

 9  A.   That's still part of the large visiting room.

10  Q.   Okay.  So the large visiting room goes from this corner I

11  guess down this hallway to this corner, also?

12  A.   Correct.

13  Q.   And these arrows that are on I guess facing towards what

14  you described as the door, can you describe what those arrows

15  are for?

16  A.   Yes.  There's a line you have to wait behind upon knocking

17  on the door to go back to your housing unit to get strip

18  searched.

19  Q.   Okay.  And when you say knocking on the door, I'm assuming

20  this door right here is closed?

21  A.   Correct.

22  Q.   And you testified that right here is the yard, correct?

23  A.   Correct.

24          MS. ACOSTA-PETTYJOHN:  Your Honor, would I be able to

25  write yard on this?
```

```
 1                THE COURT:  Well, this is plaintiff's exhibit, but --
 2                MR. MILLER:  I have no objection.
 3                THE COURT:  If you want to share it, sure.
 4                MR. MILLER:  Happy to share it, your Honor.
 5   Q.   And the circle here indicates where you were sitting that
 6   day, correct?
 7   A.   Correct.
 8   Q.   And can you tell us again where you were facing?
 9   A.   Absolutely.  My back was towards the yard and my face was
10   towards the officers at an angel.
11   Q.   So your back was facing where it says yard and your face
12   was facing here?
13   A.   In the front direction, correct.
14   Q.   And you had mentioned that this area is kind of the frisk
15   area, correct?
16   A.   Only frisk, pat frisk, when you enter the visiting room,
17   correct.
18   Q.   Pat-frisk area.
19        So can you explain again what this area is?
20   A.   That's an area -- when you first walk in, you get pat
21   searched.  That's an area where C.O.s eat donuts and drink
22   coffee and consult.  And there's also a desk where there's an
23   officer.
24   Q.   This desk, correct?
25   A.   Correct.
```

20214rmagat2          Magalios - Cross - Acosta-Pettyjohn          262

1  Q.   And there's three circles there.  Does that indicate three

2  officers?

3  A.   No.  There could be three chairs there, but only one

4  officer.

5  Q.   And right in front of the desk, so I guess down this

6  hallway, is there some type of wall or door that's supposed to

7  be there?

8  A.   Nothing.

9  Q.   And when you come down here, this area you described,

10 again, as the strip-frisk area, correct?

11 A.   Correct.

12 Q.   Is there a -- is this a door?

13 A.   A double door.

14 Q.   Okay.  And is that door open or closed?

15 A.   Closed.

16         MR. MILLER:  Objection.  Form.  When?

17         THE COURT:  Overruled.

18         I assume she means ordinarily.  Obviously, it's a

19 door.  Sometimes it opens for people to go in and out.

20         MS. ACOSTA-PETTYJOHN:  Yes, your Honor.  Thank you.

21 Q.   And I'm assuming this corner over here means that that's

22 the end of the corner.  There's no way in or out from that

23 corner?

24 A.   Just a window.

25 Q.   And where would the window be?

1  A.   I think there's two windows on that far wall to the right,

2  which would be there, correct.

3  Q.   And can you describe what this is?

4  A.   It's another area where correction officers eat donuts and

5  drink coffee.

6  Q.   This is a line.  Is there a door there?

7  A.   Yes, ma'am.

8  Q.   And again, ordinarily, is that door open or closed?

9  A.   It depends.  I don't really pay attention.

10 Q.   Okay.  And when you say that's where the officers go, I'm

11 assuming no inmates are allowed to go there.

12 A.   No, ma'am.

13 Q.   And then back here you have three little squares.  Can you

14 describe what those are?

15 A.   Vending machines.

16 Q.   And this big square in the large visiting room, what is

17 that?

18 A.   Child's area.

19 Q.   And I'm assuming these small -- like medium-size squares

20 would be tables.

21 A.   Correct.

22 Q.   And there's -- I don't know if this is a door or a window

23 in the small visiting room.  What would that be?

24 A.   That's where visitors come and go, enter and exit.

25 Q.   Oh, so that's a door, correct?

1  A.   A hallway that leads to I don't know.

2  Q.   Okay.  And when you say visitors come in and out, that

3  means, at the beginning of their visit, visitors would come in

4  here?

5  A.   Visitors enter and exit the facility through that door.

6  Q.   Okay.  And do you know if, when visitors are entering or

7  exiting the facility, if they need to give I guess an I.D. or

8  pass to somebody?

9  A.   Yes.  An officer on the way out.

10  Q.   Okay.  And where -- the officer that they would give their

11  pass to on their way out, is that indicated here on this

12  diagram?

13  A.   I have no idea where that officer would be, but that is

14  protocol, correct.

15  Q.   Okay.  And earlier today you testified that you didn't go

16  to the yard, but then you also testified that you went outside

17  for fresh air.  Can you clarify which is -- if you went outside

18  or didn't go outside to the yard?

19  A.   I didn't go outside to the yard prior to my visit.  I went

20  to the yard during my visit.  They are two completely different

21  yards.

22  Q.   Do you remember what time you went to the yard during your

23  visit?

24  A.   Could have been like 10 or 11 a.m.

25  Q.   Do you know how long you were in the yard during your

1  visit?

2  A.   Maybe 15, 20 minutes.

3  Q.   Do you know if Lisa went with you to the yard?

4  A.   Yes, ma'am.

5  Q.   And where did you go once you entered the yard?

6  A.   It's not really much -- many places to go.  You're in the

7  yard and you walk in a circle.

8  Q.   Are there benches or chairs in the yard?

9  A.   Benches and chairs.

10  Q.   Did you and Lisa sit on one of the benches and chairs?

11  A.   Correct.

12  Q.   And again, you're claiming that you were assaulted on

13  September 3rd, 2017, correct?

14  A.   Absolutely.

15  Q.   And you were assaulted by Officer Peralta and Officer

16  Bailey?

17  A.   Yes, ma'am.

18  Q.   And you're claiming that Officer Blount sat in the area and

19  watched, correct?

20  A.   That is correct.

21  Q.   And according to you, on this day, September 3rd, a female

22  officer aggressively told you no kissing as soon as you entered

23  the visiting room, correct?

24  A.   Let me rephrase that.  No fucking kissing.  Yes.

25  Q.   And she said that immediately upon you entering the

1  visiting room?

2  A.   Upon entering the visiting room, I embraced my wife, which

3  you're allowed to per DOCCS directive, kissed, hugged, and then

4  I got screamed at, yes.

5  Q.   And after that comment from the female officer, you had no

6  other interaction with her, correct?

7  A.   No, ma'am.

8  Q.   And Peralta was seated right next to the female officer,

9  correct?

10  A.   I believe he was standing at the moment, until the other

11  officer got up, and then he was seated later on, yes.

12  Q.   But he was standing right next to the female officer?

13  A.   I believe initially, yes.

14  Q.   And according to you, about 30 minutes after the female

15  officer said something, that's when Peralta approached your

16  table, correct?

17  A.   Give or take.  I don't know the exact time frame, but yes.

18  Q.   And the visit you had with your wife was before the assault

19  occurred, correct?

20  A.   Correct.

21  Q.   And before September 3rd, 2017, you and your wife had had

22  multiple visits at Fishkill, correct?

23  A.   Absolutely.

24  Q.   And I know you stated that it's allowed for a quick embrace

25  and kiss, but, on those prior visits with your wife, did you

1  greet each other with an embrace and a kiss?

2  A.   It's just another weekend visit.  Kiss and hug, hello.

3  Q.   And in those prior visits before this incident, you were

4  never written up for kissing or embracing your wife, correct?

5  A.   No, ma'am.

6  Q.   And before the alleged assault, you never had an issue with

7  Officer Peralta, correct?

8  A.   No, ma'am.

9  Q.   And before the alleged assault, you never had an issue with

10 Officer Bailey, correct?

11 A.   No, ma'am.

12 Q.   And before the alleged assault, you never had an issue with

13 Officer Blount, correct?

14 A.   No, ma'am.

15 Q.   So you never had an issue with any of the officers here

16 before the alleged assault, correct?

17 A.   No, ma'am.

18 Q.   And after the alleged assault, did you have any issue with

19 Officer Peralta?

20 A.   After the assault?

21 Q.   Yes.

22 A.   Oh, of course.  In passing, you know, the tough-guy look

23 continued.  Yes.

24 Q.   Did you have any verbal interaction with Officer Peralta

25 after the incident?

1  A.   No.  No, ma'am.

2  Q.   Did you have any verbal interaction with Officer Bailey

3  after the incident?

4  A.   Yes, ma'am.

5  Q.   How many times did you have a verbal interaction with

6  Officer Bailey after the incident?

7  A.   It wasn't verbal.  It was more of a physical presence in

8  passing, so to speak.

9  Q.   So after the incident, Officer Bailey never said anything

10 to you, correct?

11 A.   No, ma'am.

12 Q.   And I know you testified earlier that, after the incident,

13 Officer Blount had mentioned to you that he wished he would have

14 known what happened, correct?

15 A.   Yes, ma'am.

16 Q.   Other than that interaction with Officer Blount, did you

17 have any other interaction with Officer Blount?

18 A.   No, ma'am.

19 Q.   And I know you testified earlier that you basically told

20 him get the fuck out of here, right?

21 A.   Basically.

22 Q.   Did he respond to you?

23 A.   He couldn't.  He had to walk away.  He knew he was wrong.

24 Q.   Who were you with when you had this interaction with

25 Officer Blount?

1    A.    I was by myself.  I was also with Nicholas Ryan, but he was

2    a short distance away, going into like a mechanics shop, like a

3    fabricating shop.

4    Q.    And where did you have this interaction with Officer

5    Blount?

6    A.    In the middle of the courtyard, which is where Blount's

7    stationed, in industries.  In between industries and the

8    mechanics shop, there like a little cul-de-sac court area and,

9    in walking, that's where he approached me.

10   Q.    And how long did that interaction last?

11   A.    I didn't let it last longer than it had to.  He asked me,

12   you know, play dumb, and I said get the fuck out of here, and I

13   walked away.

14   Q.    Did he walk away or did you walk away first?

15   A.    Oh, I walked away.

16   Q.    Now, you had testified earlier that there were about four

17   to five correction officers in the frisk area, including Officer

18   Bailey and Officer Blount, correct?

19   A.    Correct.

20   Q.    And you found out the names of the defendants in this case,

21   so Officer Peralta, Officer Bailey, Officer Blount, but you

22   didn't find out the names of the other officers in the frisk

23   area, correct?

24   A.    Correct.

25   Q.    But you were able to clearly describe them, correct?

1  A.   To the best of my knowledge, yes.

2  Q.   And it's your testimony, also, that Officer Bailey told two

3  inmates that were in the frisk area to leave that area,

4  including Nicholas Giannini, correct?

5  A.   Yes, ma'am.

6  Q.   And it was your testimony that he escorted them around the

7  corner, correct?

8  A.   Correct.

9  Q.   And it's your testimony that he had them return after the

10 assault?

11 A.   Correct.

12 Q.   Again, I'm going to show you Plaintiff's Exhibit 6.

13      So it's your testimony that these two inmates,

14 including Giannini, were in this area, correct?

15 A.   They were seated, yes.

16 Q.   Okay.  And then they were escorted around the corner, which

17 means they were escorted around here?

18 A.   Correct.

19 Q.   And at this time, do you know if they went anywhere else

20 after being escorted around the corner?

21 A.   I can't see behind the corner.

22 Q.   But you do know that, after the alleged assault, they came

23 back into the frisk area, correct?

24 A.   Correct.

25 Q.   Did you ever have a conversation with these two inmates

1  before the incident?

2  A.   Before the incident, no.

3  Q.   And it was your testimony earlier that the desk officer

4  left his desk, correct?

5       I'll rephrase that.  Sorry.

6       So it's your testimony earlier that the desk officer at

7  the frisk area left his desk during the assault, correct?

8  A.   Correct.

9  Q.   And after the assault, you were strip frisked, correct?

10 A.   Correct.

11 Q.   And after you were strip frisked, you picked up your

12 packages from a package correction officer, correct?

13 A.   Yes.  A short time after, yes.

14 Q.   And you stated, also, that the two inmates that were in the

15 frisk area were frisked before you, correct?

16 A.   Correct.

17 Q.   And after picking up your packages, you went to the housing

18 unit 16-2 unescorted, correct?

19 A.   Pass in hand, yes.

20 Q.   And between the package area -- withdrawn.

21       Between the visiting room and the housing unit 16-2,

22 you passed multiple correction officers, correct?

23 A.   Absolutely.

24 Q.   And it's your testimony that there was a correction officer

25 every hundred feet or so?

1  A.   Honestly, it's a weekend, so they're really not playing

2  their post like they should be.  They go watch TV, listen to

3  music, consult with each other, you know.  So the posts are

4  mostly vacant on a weekend.

5  Q.   But you absolutely pass multiple correction officers?

6  A.   Maybe a few, correct.

7  Q.   And you also indicated that you -- withdrawn.

8            Between picking up your package and returning to your

9  housing unit, you didn't report the incident to any of the

10 correction officers you passed, correct?

11 A.   Correct.

12 Q.   And before arriving to your cell, you spoke to multiple

13 inmates, correct?

14            MR. MILLER:  Objection.  There's no cell.

15            THE COURT:  You mean his housing unit, right?

16            MS. ACOSTA-PETTYJOHN:  Yes.

17 A.   Could you specify as to --

18 Q.   Sure.

19 A.   -- where or who?

20 Q.   So once you arrived at your housing unit, you spoke to

21 multiple inmates, correct?

22 A.   Correct.

23 Q.   And you spoke to these inmates before you reported

24 anything, correct?

25 A.   I was in passing, like literally my package in my hand.

1  They seen I was distressed, you know, distraught.  I told them

2  what happened.  I says I got to put my package down, I got to

3  call my wife, I got to tell her what's going on, I need help.

4  And then that's what -- that's what transpired.

5  Q.   And before reporting this to any DOCCS official, you called

6  your wife, correct?

7  A.   That's false.

8  Q.   You called your wife after the incident, correct?

9  A.   Correct.

10  Q.   Do you remember what time you called your wife?

11  A.   I do not.

12  Q.   And you called your wife before reporting this incident,

13  correct?

14  A.   Again, that's false.

15  Q.   Who did you report this incident to before you called your

16  wife?

17  A.   Officer Bennett.

18  Q.   And when you reported this incident to Officer Bennett, you

19  told Officer Bennett that you were assaulted?

20  A.   Absolutely.

21  Q.   And according to you, officer Bennett did nothing?

22  A.   He said he was going to log it and never logged it.

23  Q.   How do you know he never logged it?

24  A.   Because I found out later on in the investigation process

25  that it was never logged and he lied.

1  Q.   When you say the investigation process, you mean

2  investigation process within DOCCS or discovery because of this

3  lawsuit?

4  A.   OSI.

5          THE COURT:  So that's Office of Special

6  Investigations, which is part of Department of Corrections and

7  Community Supervision?

8          THE WITNESS:  Correct.

9  Q.   You reported this incident to Sergeant Vantassell, correct?

10 A.   Correct.

11 Q.   And you reported this incident to Sergeant Vantassell

12 around 3:50, 4:00?

13 A.   I was instructed to do so, correct.

14 Q.   And you're claiming that this incident happened around 1

15 p.m., correct?

16 A.   Correct.

17 Q.   And when you first reported this incident, you didn't know

18 who the officers you were alleging assaulted you were, correct?

19 A.   I knew two of them at the moment, yes.

20 Q.   So at the moment that you reported this, which two officers

21 did you know?

22 A.   Bailey and Blount.

23 Q.   But you didn't tell Sergeant Vantassell that Bailey and

24 Blount assaulted you, correct?

25 A.   When you get assaulted and you're in that type of mind-set

1   and distraught and being a prisoner with no form of help,

2   friends, family, loved ones, there's a lot going through your

3   mind when they're the enemies, not me or the inmates.

4   Q.   So you didn't tell Sergeant Vantassell that Bailey and

5   Blount were the officers who assaulted you, correct?

6   A.   I told him -- yes, I did, absolutely.  Maybe not like by a

7   full name, but I told him Bailey and -- and somebody -- you

8   know, Blount and a P in the visiting room.  He asked me where

9   and I instructed him where it happened, where it took place.

10  Q.   So it's your testimony that you told Officer Vantassell

11  that Bailey and Blount were involved in your assault?

12  A.   Five officers.  It's four years ago.  I don't remember what

13  I specifically wrote word for word out of two pages, but I

14  specified that five corrections officers, one with the initial

15  P, had assaulted me in the visiting room prior to me coming back

16  to my housing unit.

17  Q.   And you had testified that you had two packages when you

18  picked up packages from the packaging room, right?

19  A.   Correct.

20  Q.   And you went back to your housing unit and put those

21  packages away, correct?

22  A.   Correct.

23  Q.   Where did you put those packages away?  Do you have a

24  locker, a refrigerator or something else?

25  A.   Locker.

1  Q.   And where is that locker located?

2  A.   In my cubical.

3  Q.   Can you describe that locker?  How big is it?  How tall is

4  it?

5  A.   Four feet by four feet.  Maybe two and a half feet deep.

6  Q.   And do you know if there's a medical unit attached to the

7  frisk area?

8  A.   No, there's no medical unit attached to the frisk area.

9  Q.   Now, you stated earlier that you ended your visit around 1

10 p.m. because you were uncomfortable, correct?

11 A.   Yes, ma'am.

12 Q.   And your visit started around 9 a.m.?

13 A.   Roughly, give or take, yeah, a few minutes, yes.

14 Q.   And inmates can end their visit whenever they choose to,

15 correct?

16 A.   Correct.

17 Q.   And regardless of the time that the inmate ends their

18 visit, they go through the same process of going through the

19 frisk area, correct?

20 A.   I'm sorry.  Could you repeat that.

21 Q.   Regardless of the time that an inmate ends their visit, you

22 still go through the same process of going through the frisk

23 area to exit your visit, correct?

24 A.   It's a totally different process.  Like entering a visit,

25 you just get patted down or wanded down.  That's really it.

1  Upon exiting, you're -- you wait on a bench and then you get

2  strip searched.

3  Q.   Okay.  So, again, my question is, when you end a visit and

4  you're leaving the visiting area, leaving the visiting area is

5  the same procedure regardless of what time you leave the

6  visiting area?

7  A.   For the most part, yes.

8  Q.   And there's no set time on when certain inmates have to end

9  their visit, correct?

10 A.   Unless it's the end of the day, like 3:30 or whatever time

11 they end it.  That's mandatory.  They shut it down.  But, other

12 than that, any time between 9 and that time, you could leave as

13 you like.

14 Q.   And prior to this incident, you were diagnosed with

15 arthritis to your right shoulder, correct?

16          MR. MILLER:  Objection.

17          THE COURT:  Overruled.  If it's not right, he'll say

18 so.

19 A.   From the medical professionals' standpoint, yes.

20 Q.   And that was about a month before this incident, correct?

21 A.   Can't recall.  I believe so.

22          MR. MILLER:  Objection, your Honor.

23          THE COURT:  Overruled.

24          MR. MILLER:  The X-ray was -- okay.

25 Q.   And after this incident, you had medical treatment to your

1  right shoulder, correct?

2  A.   I don't think an X-ray is considered like medical

3  treatment.

4  Q.   After this incident, did you seek any medical -- seek any

5  medical help for your right shoulder injury?

6  A.   After the incident, absolutely.

7  Q.   And that was within DOCCS, correct?

8  A.   Correct.

9  Q.   And once you were released from DOCCS, you no longer sought

10 any medical treatment for your right shoulder, correct?

11 A.   No need to.  I had surgery.

12 Q.   Now, you testified earlier that after Peralta assaulted

13 you, he began to threaten you, correct?

14 A.   Correct.

15 Q.   And this is the first time you've ever stated that,

16 correct?

17           MR. MILLER:  Objection.

18           THE COURT:  Overruled.

19 A.   I don't believe so.  No.  I can't recall.

20 Q.   Sorry.  You can't recall not saying that before?

21 A.   No.  I know I've said it before, but I can't recall in what

22 type of format or what document or what exhibit or anything of

23 that nature.

24 Q.   And you remember taking a deposition in this matter,

25 correct?

1  A.    Correct.

2  Q.    And that deposition was held August 17th, 2020?

3  A.    I believe that was the date.

4  Q.    And in that deposition, you swore under oath to tell the

5  truth during your questions and answers, correct?

6  A.    Always tell the truth, yes.

7  Q.    And in that deposition, you were asked --

8           THE COURT:  Page and line.

9           MS. ACOSTA-PETTYJOHN:  Yes.  Page 93.  Actually, I'll

10  start on page 92, your Honor.

11          THE COURT:  Hold on a second.

12  (Pause)

13          MR. MILLER:  Line, please.

14  (Pause)

15          MR. MILLER:  Can I have a page and line, please.

16          MS. ACOSTA-PETTYJOHN:  Sure.  Page 92, line 25.

17          MR. MILLER:  Through where?

18          MS. ACOSTA-PETTYJOHN:  To page 93, line 10.

19          MR. MILLER:  Thank you.

20          THE COURT:  All right.  Go ahead.

21  Q.    So in that deposition, you were asked:

22  "Q.   Okay.  So, after, I believe it was Officer Peralta who

23  told you to get up, correct?

24  "A.Yes, ma'am.

25  "Q.After Officer Peralta told you to get up, what immediately

1  happened next?

2  "A.I picked up my I.D. from the floor and my net bags and I sat

3  on the frisk-area bench and waited for them to strip frisk me --

4  strip search me."

5       So, again, Mr. Magalios, when you were asked immediately

6  what happened after the assault and you were told to get up --

7            MR. MILLER:  Objection to form.

8            THE COURT:  Yes.  That's not how you impeach.

9  A.   You asked what happened, not what I said.  That's why I

10 said what I said.

11 Q.   So today's the first time that you've told anybody

12 during --

13           MS. ACOSTA-PETTYJOHN:  I'll withdraw it, I'll withdraw

14 it.

15           THE COURT:  Good.

16 Q.   Mr. Magalios, once you were released from DOCCS custody,

17 you worked with Local 52 building sets for movies and TV shows,

18 correct?

19           MR. MILLER:  Your Honor, sorry to interrupt, but I

20 don't think she's completed her foundation for those questions

21 she read.

22           THE COURT:  You'll have a chance on redirect.

23           MR. MILLER:  Okay.

24           THE COURT:  Put in whatever you like.  The witness

25 gave an explanation.

1   Q.   After you were released from DOCCS, you worked at Local 52

2   building sets for movies and TV shows, right?

3   A.   Correct.

4   Q.   Okay.  And you worked a minimum of 10 hours a day, correct?

5   A.   Correct.

6   Q.   And prior to the incident, you used to work out about five

7   times a week, correct?

8   A.   Give or take, yes.

9            MS. ACOSTA-PETTYJOHN:  If you can just give me a

10  minute, your Honor.

11           THE COURT:  Yes.

12           (Pause)

13  Q.   So, Mr. Magalios, I know you testified that, after being

14  released from DOCCS, you didn't seek any medical treatment for

15  your right shoulder.  Correct?

16  A.   Correct.

17  Q.   Did you take any medication for your right shoulder?

18  A.   Upon release?

19  Q.   Yes, upon release.

20  A.   No, ma'am.

21  Q.   So it's your testimony that, after you received the

22  surgery, you didn't need any medical attention for your right

23  shoulder, correct?

24  A.   Per DOCCS, per Albany, I wasn't approved for any type of

25  physical therapy or anything of that nature after the surgery up

1  until -- because I was so short to being released.  But they

2  gave me a remedy.  The nurses suggested -- the healthcare

3  professionals, the Department of Corrections, said I could

4  continue on with what I used -- was accustomed to prior to the

5  surgery and physical therapy.

6  Q.   And once you were released from DOCCS, you didn't seek any

7  medical attention or take any medication for your right

8  shoulder, correct?

9  A.   No.  I just adhered to the medical advice that DOCCS gave

10  me.

11            MS. ACOSTA-PETTYJOHN:  I have no further questions

12  right now, your Honor.

13            THE COURT:  Redirect, Mr. Miller.

14            MR. MILLER:  Just a couple questions.

15  REDIRECT EXAMINATION

16  BY MR. MILLER:

17  Q.   Mr. Magalios, I believe the term yard has been used, but

18  different locations, during your testimony.  Correct?

19  A.   Correct.

20  Q.   Okay.  So let's talk about the two different yards.

21        Earlier I asked you, before your visit, did you go to

22  the yard.  What yard did you say that you did not go to

23  before the visit?

24  A.   The one that's in my building where I resided, in my

25  housing unit.  Well, not in my housing unit, but near my housing

1   unit that everybody in that building goes to.

2   Q.   So it's sort of like a rec yard?

3   A.   Correct.

4   Q.   It's where people can go and, whatever, play basketball?

5   A.   Basketball, handball, so on.

6   Q.   Okay.  And so that's the yard that you said you didn't go

7   to before your visit?

8   A.   Correct.

9   Q.   Now, there's another yard that's adjacent to the small

10  visiting room, correct?

11  A.   Small visiting room corridor, yes.

12  Q.   Now, could you just, using items in this courtroom, let us

13  know how large that yard is, the one outside the visiting room.

14  A.   I would say the size of the courtroom, give or take, as a

15  square.

16  Q.   And that's the yard that you said that you did go with Lisa

17  at some point during the visit, right?

18  A.   Correct.

19  Q.   I also -- counsel asked you about subsequent interactions

20  with Officer Bailey.  Could you tell us the circumstances of --

21  and I believe you said there were no words, but there was

22  chemistry.  Could you tell me where that occurred?

23  A.   After the assault took place, a specific amount of time

24  later, I forgot where -- I can't recall where I was coming back

25  from, but he was sitting in my TV room, coincidently, with his

1  feet up on the desk and giving me a smart-ass look, and I just

2  kept on walking.

3  Q.   So he was in 16-2?

4  A.   The rec area.

5  Q.   And was he an assigned officer in 16-2?

6  A.   As long as I was there, he was never there prior to the

7  incident.

8  Q.   And did you know why he was there?

9           MS. ACOSTA-PETTYJOHN:  Objection.

10          THE COURT:  Sustained.

11  Q.   How did you feel when you saw him?

12  A.   Intimidated.

13          MR. MILLER:  Thank you.

14          MS. ACOSTA-PETTYJOHN:  Just one question, your Honor.

15  RECROSS-EXAMINATION

16  BY MS. ACOSTA-PETTYJOHN:

17  Q.   That interaction that you had with Officer Bailey, was that

18  a verbal interaction?

19  A.   Again, he had his feet up on the desk, sitting in a chair,

20  and gave me an aggressive look.

21  Q.   So he didn't say anything to you?

22  A.   No, ma'am.

23          MS. ACOSTA-PETTYJOHN:  No further questions, your

24  Honor.

25          THE COURT:  You may step down, Mr. Magalios.

```
 1                THE WITNESS:  Thank you.

 2                (Witness excused)

 3                THE COURT:  Plaintiff may call his next witness.

 4                MR. MILLER:  Thank you.

 5   Plaintiff calls Crystal Pumarejo.

 6   CRYSTAL PUMAREJO,

 7        Called as a witness by the Plaintiff,

 8        Having been duly sworn, testified as follows:

 9                THE DEPUTY CLERK:  Please have a seat.

10   And you can take your mask off.

11   Please state your full name for the Court and spell it out

12   slowly.

13                THE WITNESS:  Crystal Pumarejo, P-U-M-A-R-E-J-O.

14   First name C-R-Y-S-T-A-L.

15                THE COURT:  Go ahead, Mr. Miller.

16                MR. MILLER:  Thank you.

17   DIRECT EXAMINATION

18   BY MR. MILLER:

19   Q.   Good afternoon, Officer Pumarejo.  How are you?

20   A.   Good afternoon.  How are you?

21   Q.   My office subpoenaed you to come to court here today?

22   A.   Correct.

23   Q.   Are you still assigned to Fishkill Correctional Facility?

24   A.   Yes.

25   Q.   When did you start there?
```

1   A.   At Fishkill?

2   Q.   At Fishkill.

3   A.   2016.

4   Q.   And you've been a correction officer through that time?

5   A.   Since 2015, yes.

6   Q.   At Fishkill, you've always been assigned as a corrections

7   officer?

8   A.   Correct.

9   Q.   Do you have a current bid?

10  A.   I do not.

11  Q.   In September of 2017, did you have a bid?

12  A.   No.

13  Q.   And is that because of seniority?

14  A.   No.

15  Q.   Were you called a resource officer?

16  A.   Yes.

17  Q.   And a resource officer is someone who gets different

18  assignments on every tour of duty?

19  A.   You get different assignments on your tour, correct.

20  Q.   Okay.

21       Would you be kind enough to move slightly closer to the

22  microphone.  Not too close.

23            THE COURT:  You could pull it toward you if that's

24  easier.

25            THE WITNESS:  Oh, okay.  Makes sense.

1   Q.   Okay.  I'm sorry.  Let me ask it again.

2            As a resource officer, you get assigned a different

3   post on every tour, correct?

4   A.   You get assigned a different post on your tour, correct.

5   Q.   So when you report to duty, they -- the captain or the

6   sergeant or the supervisor instructs you where to go?

7   A.   Correct.

8   Q.   And on September 3rd, 2017, you were instructed to the

9   visiting room, correct?

10  A.   Correct.

11  Q.   And approximately how many times had you been assigned to

12  the visiting room before that day?

13  A.   I couldn't tell you.

14  Q.   Could you approximate?

15  A.   No.

16  Q.   Had you ever been assigned to the visiting room before that

17  day?

18  A.   Yes.

19  Q.   And had you ever been assigned to the visiting room 2, or

20  the smaller visiting room, before that day?

21  A.   Have I been assigned?

22  Q.   Yes.  That was my question.

23  A.   Yes.  Yes.

24  Q.   Now, in fact, you were assigned to the visiting area

25  usually on weekends, right?

```
 1  A.   Correct.
 2  Q.   And was it mostly every weekend that you were assigned to
 3  the visiting room?
 4  A.   Not every weekend.
 5  Q.   But some weekends?
 6  A.   Some weekends.
 7  Q.   And you were familiar with Officer Peralta on September
 8  3rd, 2017?
 9  A.   He's my co-worker.
10  Q.   Sorry?
11  A.   Yes.  He's my co-worker.
12  Q.   Co-worker?
13  A.   Yes.
14  Q.   Okay.  And he was also assigned to the visiting room on
15  occasion, right?
16  A.   I believe so.
17  Q.   Well, had you ever worked with him in the visiting room
18  before?
19  A.   I couldn't tell you.
20  Q.   Were you friends at work?
21  A.   No.
22  Q.   You were not friends at work?
23  A.   No.
24  Q.   But you knew him?
25  A.   Correct.  He's my co-worker.
```

1  Q.   Okay.

2       Did you know Officer Bailey before September 3rd, 2017?

3  A.   I don't know the date I met Officer Bailey.  I know Officer

4  Bailey.

5  Q.   Well, what about Officer Blount?  Did you know him before

6  September 3rd, 2017?

7  A.   Again, I don't know what date I met him, but I do know who

8  Officer Blount is.

9  Q.   Okay.

10          Now, do you recall anything about your tour of

11 September 3rd, 2017?

12 A.   No.

13 Q.   At some point, did you become aware that Mr. Magalios was

14 making allegations about something that happened in the visiting

15 room?

16 A.   I was asked to write a to-from.

17 Q.   Sorry?

18 A.   I was asked to write a to-from.

19 Q.   Okay.  And who asked you to write a to-from?

20 A.   It had to be the supervisor that day, from the supervisor

21 that day.

22 Q.   Okay.  So a supervisor from that day asked you to write a

23 to-from, correct?

24 A.   Correct.

25          THE COURT:  And that's just a memo, to-from?

 1              THE WITNESS:  Yes, a memo.

 2   Q.   And this to-from was not in response to a grievance,

 3   correct?

 4              MS. ACOSTA-PETTYJOHN:  Objection, your Honor.

 5   A.   I don't know anything about that.

 6              THE COURT:  Well, overruled.  If the witness knows,

 7   she'll answer.  If she doesn't know, she'll say she doesn't

 8   know.

 9              MR. MILLER:  I can rephrase it.

10   Q.   Did you write a to-from?

11   A.   I wrote a to-from.

12   Q.   And when you wrote that to-from, did you know if it was in

13   response to a grievance or something else?

14   A.   I don't know.

15   Q.   Who did you write the to-from to?

16   A.   The supervisor.

17   Q.   What is this person's name?

18   A.   I believe it was Sergeant Bonano.

19   Q.   And Sergeant Bonano was a supervisor in the visiting room

20   on that day, correct?

21   A.   Correct.

22   Q.   And you wrote that to-from, or that memo, on September 4th,

23   2017, correct?

24   A.   I don't know the date of the to-from.

25   Q.   Well, before coming here to testify, did you prepare for

1 your testimony in any way?

2 A.   Did I prepare for my testimony?

3 Q.   Yes.

4 A.   What do you mean?

5 Q.   Well, I can rephrase it if you don't understand the

6 question.

7 A.   Please.

8 Q.   Okay.  You knew you were coming here today to testify about

9 allegations made by Mr. Magalios, correct?

10 A.   Correct.

11 Q.   And before taking the witness stand, did you prepare for

12 your testimony?  Did you review any documents?  Did you speak to

13 counsel?  Did you do anything in preparation for your testimony

14 here today?

15 A.   Yes.

16 Q.   Okay.  Let's start with did you review any documents.

17 A.   My deposition.

18 Q.   Okay.  Anything else?

19 A.   No.

20 Q.   So did you review your to-from that you wrote to Sergeant

21 Bonano?

22 A.   No.

23 Q.   Do you have any recollection of ever having reviewed this

24 to-from?

25 A.   When it was shown to me prior to my deposition, yes.

1  Q.   Okay.  And that was about a year ago?

2  A.   I don't even know.

3  Q.   Okay.  If I showed it to you, would it refresh your

4  recollection?

5  A.   Yeah.

6        MR. MILLER:  May I approach?

7        THE COURT:  Yes.

8  Q.   Take your time.

9  A.   Thank you.

10  (Pause)

11  A.   Okay.

12  Q.   Can I have it back?

13  A.   Sure.

14        MR. MILLER:  Your Honor, I would like to have this

15  item marked for identification as a plaintiff's exhibit marked

16  for identification.

17  Q.   You just reviewed Plaintiff's 14 marked for identification,

18  correct?

19  A.   Correct.

20  Q.   Is it your testimony, Officer, that the last time you

21  looked at your to-from was before your deposition dated

22  September 8th, 2020?

23  A.   Correct.

24  Q.   And in reviewing it now, does it refresh your recollection

25  about what you wrote and the circumstances under which you wrote

1  it?

2  A.   I see what I wrote.  There's no circumstances for it.  If

3  you read it, it says there was nothing.

4  Q.   Okay.  When Sergeant Bonano asked you on September 4th to

5  write this to-from, what was your understanding of that request?

6  A.   My understanding was there was an allegation made.  I was

7  asked if anything happened and I said no.  And that was my

8  response.  That's all there was, nothing else.

9  Q.   But did you specify in your to-from a denial of what you

10 were accused of doing?

11 A.   Did I specify it?

12 Q.   Yes.

13 A.   It says what I wrote on the paper.

14      I don't understand what you're asking me.

15 Q.   Okay.  In other words, there's two ways to respond to

16 something.  You can say I know nothing or you can deny certain

17 allegations that are made against you.

18 A.   No.  So there was nothing because I don't remember anything

19 happening on that date.  I don't remember that date

20 specifically.

21 Q.   But my question --

22          THE COURT:  But right now you're being asked about

23 what you wrote in the memo the day of.  You're not being asked

24 about what you remember now.  You're being asked about what you

25 wrote in the memo.

1              THE WITNESS:  Right.  That's what I'm saying.  When I

2  was asked to write the memo, I didn't have any remembrance of

3  that day that the inmate is saying something happened.

4              MR. MILLER:  I can follow up, your Honor.

5  Q.    Let me go back to the example I gave you before.  Okay?

6  A.    Mm-hm.

7  Q.    There are I'm sure a number of ways to make a denial.

8  Okay?  One way to make a denial is to say, Sergeant Bonano, I

9  know nothing.  Right?  That's one choice.  Another choice is,

10 Sergeant Bonano, what you're telling me I'm accused of is not

11 true.  Okay?

12             Which of those, if either, is the way that you wrote

13 your to-from?

14 A.    Okay.  Once again, everything is stated in my to-from.

15 Q.    Okay.  I'm sorry to --

16 A.    When I --

17 Q.    -- interrupt.

18      Do you understand my question?

19 A.    I'm trying to answer you, so -- do you not understand my

20 answer?

21             THE COURT:  Go ahead.  You can answer.

22             THE WITNESS:  Okay.

23 A.    So, as a correction officer, when we write a to-from, I

24 just can't say this didn't happen.  I have to say, okay, if they

25 said I worked that day, okay, I worked that day.  So on that

1  day, I have no recollection of what I'm being accused of, which

2  is what the to-from says.

3      Understood?

4          THE COURT:  Well, let me try.

5  Let's say tomorrow somebody accuses you of punching the judge in

6  the nose.  You could answer that by saying I don't remember

7  anything happening or you could say I didn't punch the judge in

8  the nose.

9          THE WITNESS:  Okay.

10         THE COURT:  Okay.  So I think what Mr. Miller is

11 getting at is, in this instance, there was supposedly some words

12 that you exchanged with Mr. Magalios.  At that time, if I

13 understand correctly, you said in your memo I don't remember

14 anything about yesterday.

15         THE WITNESS:  Right.  Correct.

16         THE COURT:  And you didn't say that conversation

17 didn't happen.

18         THE WITNESS:  Right.  I just -- I had no recollection

19 of that day, period.

20         THE COURT:  So you didn't know --

21         THE WITNESS:  I don't remember no conversation.  I

22 don't remember our conversation.  I don't remember a dispute,

23 argument, nothing.  That's what I'm saying.

24         THE COURT:  So you didn't remember one way or the

25 other?

```
 1              THE WITNESS:  Correct.
 2              THE COURT:  Okay.  I think I understand.
 3   Q.   Did you understand the allegation against you at that time?
 4   Whether it was true or not, did you understand that there was an
 5   allegation against you?
 6   A.   Correct.
 7   Q.   And what was the allegation against you?
 8   A.   It was said that I made a comment about the inmate and his
 9   wife kissing.
10   Q.   So Sergeant Bonano told you that's what the allegation was,
11   right?
12   A.   Correct.
13   Q.   And on September 4th, one day later, you were able to look
14   back on the day before and retrace that day, correct?  Right?
15   A.   Okay.
16   Q.   It was just one day later that you wrote this, right?
17   A.   Okay.
18   Q.   I'm asking you for you to agree or disagree.
19   A.   If it was one day later?
20   Q.   Officer, the next day, September 4th, you became aware of
21   these allegations, correct?
22   A.   Correct.
23   Q.   And because it was just one day later, you were better
24   equipped than if it was a year later to look back on yesterday
25   and retrace what happened yesterday, right?
```

1  A.    Yes.

2  Q.    And so when you looked back on the day before, did you

3  remember that you were working with Officer Peralta that day?

4  A.    I can't tell you if I was working with Officer Peralta that

5  day.

6  Q.    Did you know on September 4th if you were working with

7  Officer Peralta on September 3rd?

8  A.    I wasn't asked that.

9  Q.    I'm sorry?

10 A.    I was not asked that.  Whatever I was asked is in my

11 to-from.

12 Q.    Well, then, I'm asking you now.

13 A.    I said I don't know.  That's what I said.

14 Q.    Okay.  So on September 4th, you didn't know who you were

15 working with?

16 A.    I don't know.  I don't know what happened on September 4th.

17 Q.    September 3rd?

18 A.    No, September 4th, when you said I wrote the to-from.

19 That's the date on the to-from, correct?

20 Q.    Okay.

21           THE COURT:  Well, you can't testify, but you can ask

22 the witness the date of the to-from.

23           MR. MILLER:  Sorry.

24           THE COURT:  I said you can't testify as to the date of

25 the to-from, but you can show it to the witness and ask her if

 1  that refreshes her memory.

 2          MR. MILLER:  Okay.

 3          THE COURT:  It's not in evidence, so nobody can read

 4  off it.

 5          MR. MILLER:  Okay.  I would like to offer Plaintiff's

 6  13 into evidence.

 7          THE COURT:  I think it was 14.

 8          MR. MILLER:  14.  I'm sorry.

 9          MS. ACOSTA-PETTYJOHN:  No objection, your Honor.

10          THE COURT:  14 is received.

11          (Plaintiff's Exhibit 14 received in evidence)

12          THE COURT:  Now it's in.  You can do whatever you want

13  with it.

14  Q.   Would it be fair to say that you wrote this to-from on

15  September 4th, 2017?

16  A.   That's the date, correct.

17  Q.   And on September 4th, 2017, did you know on that day that

18  you worked with Officer Peralta the day before?

19  A.   I cannot tell you that, sir.

20  Q.   Let me read the to-from to you.

21  A.   Okay.

22  Q.   It's to Sergeant Bonano from C.O. Pumarejo.  Subject:

23  Inmate Magalios.  Date:  September 4th, 2017.

24          On the above date, I, C.O. Pumarejo -- Pumarejo -- I'm

25  sorry if I'm messing up your name.

1  A.   That's okay.

2  Q.   -- was assigned to work visit room 2.  At no point did I

3  approach Inmate Magalios and tell him to stop kissing his

4  visitor.  At no time did I witness any staff mistreat inmate.

5  I, C.O. Pumarejo, comport myself in a professional manner at all

6  times.

7            Now, that completed your to-from, correct?

8  A.   Correct.

9  Q.   Now, I gather from reading this to-from that Sergeant

10 Bonano at least informed you of what you were being accused of.

11 Correct?

12 A.   Correct.

13 Q.   And at that time, did you know who you were working with

14 the day before, on September 3rd?

15 A.   No.

16 Q.   Did you think back to the day before to determine if any of

17 these accusations were true?

18 A.   The accusation, again, was that I told the inmate to stop

19 kissing his wife.  That was the accusation.

20 Q.   And my question is, on September 4th, when you wrote this

21 memo, did you look back to the day before and try to remember if

22 something like that happened?

23 A.   No.  I don't remember anything like that happening.

24            THE COURT:  No, the question is not do you remember it

25 happening.  The question is, before you wrote the to-from on

1  September 4th, did you think back to September 3rd so that you

2  would know what to write.

3          THE WITNESS:  Okay.  Then, yes.  Of course I would

4  think back to the day before.

5  Q.  Okay.  And you would also think back to who you were

6  working with, right?

7  A.  I don't know who I worked with that day.

8  Q.  Okay.  Let me try again.

9          When you wrote the memo, as the Judge just asked you,

10  you think back to that day.  When you thought back to that day,

11  did you think back and ask yourself who was I working with?

12  Who's my witness?

13  A.  No.

14  Q.  As you sit here today, do you know who you were working

15  with in the visiting room on September 3rd?

16  A.  I do because I went to the deposition and you had the

17  logbook.  So, yes, I do.

18  Q.  Okay.  Thank you.

19          So other than looking at the logbook, you have no

20  independent recollection of working with Officer Peralta that

21  day, right?

22  A.  No.

23  Q.  Have you ever discussed these accusations with Officer

24  Peralta?

25  A.  No.

1  Q.   As you sit here today, are you aware of what Officer

2  Peralta is accused of?

3  A.   Yes.

4  Q.   And you never discussed this with him?

5  A.   No.

6  Q.   Have you discussed these accusations with either Officer

7  Bailey or Officer Blount?

8  A.   No.

9           MR. MILLER:  Thank you.

10          THE WITNESS:  Okay.

11  CROSS-EXAMINATION

12  BY MS. ACOSTA-PETTYJOHN:

13  Q.   Good afternoon, Officer Pumarejo.

14          Just for clarification, on the to-from that you wrote,

15  was it your understanding -- what was your understanding as to

16  the allegations as to why you wrote that to-from?

17  A.   Um, that I made a comment to the inmate regarding him

18  kissing his wife; therefore, he got beat up.  That's what I was

19  told.

20  Q.   Okay.  And you stated earlier that you were a resource

21  officer in 2017, correct?

22  A.   Yes.

23  Q.   Can you explain what a resource officer is.

24  A.   Yes.  A resource officer means you go into the facility and

25  you are at the sergeant's request.  So whatever post they need

1  filled that day, they put you in it.

2  Q.   And so does that mean that your post can be different every

3  shift?

4  A.   Yes.

5  Q.   And how long have you been assigned as a resource officer?

6  A.   I've always been a resource officer, so since 2016 that

7  I've been in Fishkill.

8  Q.   Now, you stated that your title is currently a correction

9  officer.  Did you receive any training prior to becoming a

10  correction officer?

11  A.   Yes, I have received training.

12        MR. MILLER:  Objection.  Scope.

13        THE COURT:  I'll allow it.

14  Q.   And again, I want to turn your attention to September 3rd,

15  2017.

16      Did you have a specific post that day?

17  A.   Um, now, like I said, after the deposition, yes.  I was

18  working visiting room 2.

19  Q.   And can you describe the duties and responsibilities for a

20  correction officer who's assigned to visiting room 2.

21  A.   The duties of a correction officer is care, custody and

22  control of the inmates.  So, now, if you're doing that in the

23  visiting room, it's also for the visitors, and that just means

24  you know their location at all times, you know that they're safe

25  and that they're following the department rules and regulations.

1   Q.   And approximately how many correction officers are assigned

2   to visiting room 2?

3   A.   At least two.

4   Q.   And I know you testified earlier that you don't remember if

5   you worked with Officer Peralta.  Do you remember who you worked

6   with that day?

7   A.   No.

8   Q.   Now, can you just describe a general -- the layout of

9   visiting room 2?

10  A.   Visiting room 2 is for inmates with one visitor only, so

11  it's a chair -- I'm sorry, it's one table and two chairs for the

12  visitors and then there's two chairs for the officers to sit.

13  Q.   And do you know where the officers sit in visiting room 2?

14  A.   Um, toward the back by the vending machines.

15  Q.   And do you remember, back in September 2017, the hours for

16  the visiting room?

17  A.   The hours are approximately from 8:30 a.m. to 3 p.m.

18  Q.   And is there any limit on how long a visit can last?

19  A.   There is no limits unless the visiting room is full.  Then

20  they would start asking inmates to leave as they came in,

21  whoever came in first.

22  Q.   And do you know if there's any rules or regulations

23  regarding physical touching between inmates and their visitors?

24  A.   Yeah, there are rules and regulations.

25  Q.   What are those rules and regulations?

1  A.   So, basically, anything that you would do in a public park

2  in front of children is allowed.

3  Q.   Which would include what?

4  A.   Hugging, greeting each other, a quick kiss, a tap kiss.

5  All of that is allowed.

6  Q.   And can an inmate be disciplined for doing something that

7  isn't allowed in the visiting area?

8  A.   Yes.

9  Q.   Would an inmate be able to be disciplined for kissing a

10 visitor?

11 A.   An inmate can be written up a misbehavior report for

12 kissing a visitor; however, it's very uncommon.  I mean, they

13 kiss all the time.  It's not something that they're ever written

14 up for.

15 Q.   And why don't you write up an inmate -- withdrawn.

16      Why don't you issue a misbehavior report for an inmate

17 regarding kissing?

18      MR. MILLER:  Objection.

19      THE COURT:  Sustained as to relevance.

20 Q.   Prior to September 3rd, 2017, did you have any interaction

21 with Mr. Magalios?

22 A.   Not that I know of.

23 Q.   And so, to your knowledge, prior to September 3rd, 2017, do

24 you know if there was any issues between you and Mr. Magalios?

25 A.   Not that I know of.

1  Q.   Do you remember if you had any interaction with

2  Mr. Magalios on September 3rd, 2017?

3  A.   No.  I have no recollection.

4  Q.   And do you recall exchanging any words with Mr. Magalios

5  that day?

6  A.   No, I don't.

7  Q.   Do you recall if you ever complained to a supervisor about

8  Mr. Magalios?

9  A.   No.

10 Q.   Do you even know if Mr. Magalios had a visit that day?

11 A.   Prior to the deposition, no.

12 Q.   I know you stated earlier that you know Officer Peralta as

13 a co-worker.  Correct?

14 A.   Correct.

15 Q.   Do you socialize with Officer Peralta?

16 A.   No.

17 Q.   And again, you testified earlier that you know Officer

18 Bailey as a co-worker?

19 A.   Correct.

20 Q.   Do you socialize with Officer Bailey?

21 A.   No.

22 Q.   And same thing.  I know you testified earlier that you know

23 Officer Blount as a co-worker.  Do you socialize with Officer

24 Blount?

25 A.   No.

```
 1  Q.   On September 3rd, 2017, did you see Officer Peralta have

 2  any interaction with Magalios?

 3            MR. MILLER:  Objection.

 4            THE COURT:  On September 3rd, did she see Officer

 5  Magalios having -- excuse me -- Officer Peralta having

 6  interaction with --

 7            MR. MILLER:  I withdraw the objection.

 8            THE COURT:  -- Mr. Magalios?

 9            MR. MILLER:  I withdraw it.

10            THE COURT:  Okay.

11  A.   Can you repeat the question.

12  Q.   Sure.

13       On September 3rd, 2017, did you see Officer Peralta

14  have any interaction with Mr. Magalios?

15  A.   I didn't see any.

16  Q.   On September 3rd, 2017, did you see Officer Bailey have any

17  interaction with Mr. Magalios?

18  A.   Not that I can recall.

19  Q.   On September 3rd, 2017, did you see Officer Blount have any

20  interaction with Mr. Magalios?

21  A.   Not that I can recall.

22  Q.   On September 3rd, 2017, did you see Officer Peralta and

23  Officer Bailey speak to each other?

24  A.   Not that I can recall.

25  Q.   Again, on September 3rd, 2017, did you observe any DOCCS
```

1  employee threaten Mr. Magalios?

2  A.   Not that I can recall.

3  Q.   And on September 3rd, 2017, did you observe any DOCCS

4  employee assault Mr. Magalios?

5  A.   No.

6            MS. ACOSTA-PETTYJOHN:  No further questions.

7            MR. MILLER:  No questions.

8            THE COURT:  You may step down, Officer Pumarejo.

9            THE WITNESS:  Thank you.

10           (Witness excused)

11           THE COURT:  It is time to break for the day.  We will

12  resume at 9:30 tomorrow.

13           Same instructions.  Don't talk about the case.  Don't

14  do any research.  Keep an open mind.  Drive safely.  And we'll

15  see you in the morning.

16           (In open court; jury not present)

17           THE COURT:  Who else do you have, if anyone,

18  Mr. Miller?

19           MR. MILLER:  Well, forgive me if I'm thinking out

20  loud.  I am hoping that Mr. Giannini will be showing up

21  tomorrow.  And the thinking out loud part is I'm not sure I even

22  need Ms. Magalios at this point because she was a witness in the

23  visiting room, that's her role, and I believe I got testimony

24  from Mr. Hall on that.  I will think about it more.  I'll

25  consult with counsel.  And if both of us decide not to call her,

1  we'll make sure that she knows that.

2          THE COURT:  All right.

3  So tomorrow it's possibly those two.  Anybody else?

4          MR. MILLER:  No.  I'm going to let -- I'm going to let

5  them call the defendants.

6          THE COURT:  All right.  So we'll get to the defense

7  case probably --

8  Everyone can sit.  I'm sorry.

9  So we're going to get to the defense case tomorrow morning.

10  What are you planning?  I assume you're going to call the

11  defendants, but tell me if I'm wrong, or who else you might

12  call.

13          MS. ACOSTA-PETTYJOHN:  Yes.  So if we begin tomorrow,

14  your Honor, I will clearly call all three defendants.  And

15  again, I'll speak to Mr. Miller to see if we're going to call

16  Mrs. Tibaldi or not in tomorrow.  And I believe our expert is

17  set to come in on Thursday because we didn't know how this was

18  going to -- timing.

19          THE COURT:  Well, we may have time for your expert

20  tomorrow.

21          MS. ACOSTA-PETTYJOHN:  Okay.

22          THE COURT:  We likely will.

23  Are you calling anybody besides the expert?

24          MS. ACOSTA-PETTYJOHN:  Well, we still have the

25  investigator, which I don't know if Mr. Miller was going to call

```
1  him or not, but we might be calling him tomorrow, also.
2          THE COURT:  Well, anyone you're calling besides the
3  doctor, make sure it's tomorrow.
4          MS. ACOSTA-PETTYJOHN:  Yes, your Honor.
5          THE COURT:  If need be, if the doctor can come first
6  thing Thursday, then we would go right into closing arguments.
7  Let's do the formal charge conference tomorrow at 9.  I gather,
8  really, the only issue is about the verdict form.
9          MS. ACOSTA-PETTYJOHN:  Yes, your Honor.  My issue is
10 just to the wording of the verdict form.
11         THE COURT:  All right.  Well, let's do it at 9:15
12 tomorrow because I'm hungry, and I bet you are, too.  So we'll
13 do the charge conference at 9:15.
14         Hopefully Mr. Giannini will show up.  If he doesn't,
15 then we'll have some down time between 9:30 and 10 if
16 Ms. Tibaldi is going to testify, so defendants should be
17 prepared to fill that time.  And just do me a favor.  Let
18 Mr. Clark and Mr. Partelow know what you decide about
19 Ms. Tibaldi.  And if she's not coming and Mr. Giannini shows up,
20 we'll go with him.  If he doesn't, plaintiff will rest and we'll
21 go with the defense case.  And if we finish early tomorrow, I
22 guess it's not the end of the world as long as the doctor comes
23 first thing Thursday, and then we'll go right into closing
24 arguments.
25         MS. ACOSTA-PETTYJOHN:  Yes, your Honor.
```

1                THE COURT:  All right.  Have a good evening.

2             MR. MILLER:  Thank you, your Honor.

3             MS. ACOSTA-PETTYJOHN:  Thank you.

4             MR. TURKLE:  Thank you.

5  (Adjourned to Wednesday, April 28, 2021 at 9:15 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20214rmagat2                    Magalios v. Peralta              311

```
 1                    I N D E X

 2                   EXAMINATION

 3  NICHOLAS MAGALIOS

 4  Direct by Mr. Miller . . . . . . . . . . . . 134
    Cross by Ms. Acosta-Pettyjohn . . . . . . . 259
 5  Redirect by Mr. Miller . . . . . . . . . . . 282
    Recross by Ms. Acosta-Pettyjohn . . . . . . 284

 6

 7  DR. GERARD VARLOTTA

 8  Direct by Mr. Miller . . . . . . . . . . . . 189
    Cross by Ms. Acosta-Pettyjohn . . . . . . . 223
 9  Redirect by Mr. Miller. . . . . . . . . . . 231
    Recross by Ms. Acosta-Pettyjohn . . . . . . 231

10

11  ALEXANDER HALL

12  Direct by Mr. Miller. . . . . . . . . . . . 233
    Cross by Mr. Turkle . . . . . . . . . . . . 240
13  Redirect by Mr. Miller. . . . . . . . . . . 245

14

    NICHOLAS RYAN
15
    Direct by Mr. Miller. . . . . . . . . . . . 246
16  Cross by Mr. Turkle . . . . . . . . . . . . 250
    Redirect By Mr. Miller. . . . . . . . . . . 257
17  Recross by Mr. Turkle . . . . . . . . . . . 258

18

    CRYSTAL PUMAREJO
19
    Direct By Mr. Miller. . . . . . . . . . . . 285
20  Cross By Ms. Acosta-Pettyjohn . . . . . . . 301

21

22

23

24

25
```

CHRISTINA ARENDS-DIECK, RPR, RMR, CMR
(914) 390-4027

```
 1                     E X H I B I T S

 2

 3                       DEFENDANTS'

 4
     J1-J9. . . . . . . . . . . . . . . . . . 148
 5    K  . . . . . . . . . . . . . . . . . . .244
      M  . . . . . . . . . . . . . . . . . . .253
 6

 7

 8                      PLAINTIFF'S

 9    1 . . . . . . . . . . . . . . . . . . . 195
      3 . . . . . . . . . . . . . . . . . . . 195
10    4 . . . . . . . . . . . . . . . . . . . 195
      5 . . . . . . . . . . . . . . . . . . . 195
11    14 . . . . . . . . . . . . . . . . . . . 299

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```