```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    --------------------------------x

 3    NICHOLAS MAGALIOS,

 4                   Plaintiff,

 5              V.                              19 CV 6188(CS)

 6                                              TRIAL

 7    C.O. MATHEW PERALTA,
      C.O. TIMOTHY BAILEY,
 8    C.O. EDWARD BLOUNT,

 9                   Defendants.

10    --------------------------------x

11                                         United States Courthouse
                                           White Plains, New York
12                                         April 28, 2021

13

14

15    Before:   THE HONORABLE CATHY SEIBEL, District Judge

16

17                             APPEARANCES

18    SIVIN & MILLER, LLP
           Attorneys for Plaintiff
19    GLENN D. MILLER

20

21    LETITIA JAMES
           Attorney General for the State of New York
22    JESSICA ACOSTA-PETTYJOHN
      BRUCE J. TURKLE
23         Assistant Attorneys General

24

25
```

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

```
 1                    (Trial resumed)

 2                    (In open court; jury not present)

 3                    THE COURT:  Good morning, everyone.  You can all have

 4    a seat.

 5                    MR. MILLER:  Good morning, your Honor.

 6                    MS. ACOSTA-PETTYJOHN:  Good morning, your Honor.

 7                    THE COURT:  So Mr. Miller sent us an e-mail last

 8    night.  I guess I should read it into the record, and then I'll

 9    ask where we are on the state of play.  It's addressed to my

10    law clerk.  It says:

11                    "As instructed, here is an update on the Lisa Tibaldi

12    issue.  Ms. Acosta-Pettyjohn, Mr. Turkle and I spoke before

13    leaving the building today.  I informed them that, because of

14    the testimony of Alexander Hall, which covers the same portion

15    of the events of September 3rd, and the hostility of Tibaldi

16    toward the plaintiff, we have decided not to call her as a

17    witness in our case.  Counsel informed me that they would like

18    to call her as their witness.  I informed them that I would ask

19    Ms. Sinise to contact Tibaldi to let her know that she will be

20    called as a witness for the defense.

21                    "Since that discussion, Tibaldi telephoned my

22    partner, Ed Sivin, and left a voice mail message asking that he

23    call her back.  Mr. Sivin returned the call, whereupon Tibaldi

24    expressed her annoyance at not being called to testify at the

25    time set forth in the subpoena and again expressed her
```

1   reluctance to testify at all during these proceedings.  At that

2   point, Mr. Sivin did not know that I had decided not to call

3   Tibaldi on my case.

4          "Upon learning of this conversation from Mr. Sivin, I

5   immediately telephoned Ms. Acosta-Pettyjohn to provide her with

6   this update.  Ms. Acosta-Pettyjohn has continued to express an

7   interest in calling Tibaldi as a witness.  I provided her with

8   Tibaldi's phone number and suggested that she serve Tibaldi

9   with her own subpoena as I doubt that Tibaldi is required to

10  appear for the defense on plaintiff's subpoena.

11          "Mr. Sivin has again reached out to Tibaldi and left

12  a message on her voice mail stating that plaintiff will not be

13  calling her as a witness, but that defense counsel wishes to

14  call her and likely will be contacting her by telephone.

15          "At this point, this e-mail is just another heads up

16  for the Court; however, I would like to address this issue in

17  the morning, once I get a better sense from defense counsel

18  what their intentions are."

19          All right.  And that was sent last evening.  Any news

20  since?

21          MS. ACOSTA-PETTYJOHN:  Yes.  I was beginning to tell

22  Mr. Miller Ms. Tibaldi called me late last night.  We spoke for

23  about 10 minutes.  She does understand that plaintiff's counsel

24  is no longer calling her, but she does understand that we would

25  like her to testify for us.  She told me that she would be here

1    around 9:30, 10:00.  I just got a text message from her a few

2    minutes ago that she's on her say.  I'm expecting her to be

3    here, again, around 9:30, 10:00.

4              And just to tell you, again, I haven't had a chance

5    to speak to Mr. Miller, but in our brief conversation we had

6    yesterday, she did represent that she is going to testify that

7    the assault did not occur at all.  So I wanted to let the Court

8    know that the parties know that that's --

9              THE COURT:  Well, this will be interesting.  I assume

10   there's a deposition that says otherwise.

11             MR. MILLER:  Your Honor, first of all, she wasn't

12   there at the time of the assault.  She was in the visiting room

13   and that's the extent --

14             THE COURT:  I mean, all she can testify to is what

15   Mr. Magalios did or did not tell her about the assault.

16             MR. MILLER:  Okay.

17             THE COURT:  I mean, I assume she was not in the frisk

18   area.

19             MR. MILLER:  Correct.  They parted ways in the

20   visiting room and, at that point, the only -- the only activity

21   that occurred at that point was the interaction with Officer

22   Peralta.

23             She obviously is out to sabotage the case, and I

24   expressed my concerns about that before the trial began.  My

25   concerns, obviously, are heightened now.

1              THE COURT:  There is a deposition, correct?

2              MR. MILLER:  I'm sorry?

3              THE COURT:  There is a deposition?

4              MR. MILLER:  There is a deposition.  There is.

5    And --

6              THE COURT:  And in the deposition, does she

7    corroborate your client?

8              MR. MILLER:  One-hundred percent.

9              THE COURT:  So that's why God invented impeachment.

10             MR. MILLER:  Well, I agree with that.  I just -- my

11   concern -- well, let me try to lay it out a little further and

12   more in-depth.

13             Yesterday's conversation with my partner and

14   Ms. Tibaldi was really a three-party conversation.

15   Ms. Tibaldi's new boyfriend, who was just released from DOCCS

16   about two months ago, was the third party, and his tone and the

17   volume of his voice indicated to my partner that they are out

18   to do really anything to sabotage this case.  And this is

19   something that is out of the ordinary, frankly, at least in my

20   experience, and I think it does call for an instruction to the

21   witness before she testifies that she should be only answering

22   questions and if there's an objection, she needs to wait for a

23   ruling.

24             Again, this is -- I'm just making suggestions, but

25   this is an extraordinary situation.  And we know what her

1    intentions are.  My guess is her boyfriend will be in the

2    courtroom.  He and my client are bitter enemies.  He sat in the

3    courtroom yesterday during Mr. Magalios' testimony.  I don't

4    know if your Honor saw this.

5           THE COURT:  Somebody on my staff observed somebody

6    glaring at Mr. Magalios during his testimony.

7           MR. MILLER:  Correct.

8           And so this is the situation we're dealing with, and

9    I'm concerned that somehow this trial will not go smoothly

10   unless there is some type of instruction to her.

11          THE COURT:  Well, you know, it sort of depends on

12   what happens.  It also depends on what she's told defense

13   counsel she's going to say.  If her position is I lied in my

14   deposition because Mr. Magalios and I were in a conspiracy to

15   fabricate this whole thing, that's one set of troubles for her.

16   If she says I lied in my deposition because I was afraid of

17   Mr. Magalios because he's violent, that is probably admissible.

18   If she says I didn't say what my deposition says it says, the

19   jury will have to figure out what it makes of this.

20          Obviously, defense counsel can't call a witness who

21   they don't believe is telling the truth, ethically, so I assume

22   Ms. Acosta-Pettyjohn and Mr. Turkle believe that this witness

23   lied in her deposition and is going to tell the truth now.  I

24   don't know what their basis for that conclusion is, but I don't

25   think I can -- obviously, the witness is going to testify.

1    You'll be able to impeach her.  Her prior sworn testimony will

2    be affirmative evidence that you can argue because it's sworn,

3    and the jury's going to sort it out.

4            The first time she goes too far in answering a

5    question, I will instruct her to only answer the question.  But

6    if what's really going on here is either she or her new

7    boyfriend are making stuff up to torpedo your client's case,

8    I'm sure, on your cross, you'll be able to get that across to

9    the jury.

10            I don't know what more I can do.  If it looks like

11    she's not confining herself to the questions, I'll direct her

12    to confine herself to the questions.

13            What was the other thing you wanted me to instruct

14    her, besides just answer the question?

15            MR. MILLER:  That really should do it.

16            THE COURT:  All right.  Well, I mean, look, if I

17    think she's incriminating herself, at some point, I have to

18    tell her about her Fifth Amendment rights.  I don't know when

19    we'll get to that point, but I assume she's going to have to

20    have some explanation.

21            Ms. Acosta-Pettyjohn, do you know what her

22    explanation is going to be for why she will be contradicting

23    her deposition?

24            MS. ACOSTA-PETTYJOHN:  Again, in the brief

25    conversation I had with her yesterday, it was about 10 minutes,

1   your Honor, I did ask her how come she would be testifying to

2   this today and not at her deposition.  She did inform me that

3   she is, in fact, afraid of Mr. Magalios, she was afraid of

4   Mr. Magalios at that time, she's still afraid of Mr. Magalios

5   now, and that's why she testified the way she did at her

6   deposition.

7            THE COURT:  Okay.  Well, it's times like this where I

8   miss being a trial lawyer because I can think of a lot of

9   questions I would ask.

10           Maybe that's true, and if it's true, then the jury

11   will evaluate it, or if it's not true, the jury will evaluate

12   that.  And I'm sure there's some interesting questions you can

13   ask about the new boyfriend.

14           It's going to be an interesting morning.

15           MS. ACOSTA-PETTYJOHN:  With that said, your Honor, I

16   know that she's on her way.  Would we be able to take her out

17   of turn?

18           THE COURT:  Well, as I understand it, Mr. Miller's

19   going to rest this morning.

20           Am I right?

21           MR. MILLER:  I have one witness.

22           THE COURT:  Okay.

23           MR. MILLER:  And I'm going to offer just the sketch

24   with the drawings on it and then I'm going to rest.

25           THE COURT:  All right.

1           Well, it sounds like if she's going to arrive at
2    9:30, 10:00, she'll be next in line, but I don't mind
3    accommodating her since she did come yesterday.  So if you call
4    your doctor -- no, you're not calling your doctor.  If you call
5    one of the defendants and she arrives and you want to break and
6    call her, that's all right with me.

7           MS. ACOSTA-PETTYJOHN:  Thank you, your Honor.

8           THE COURT:  But something's going to happen here.
9    She's going to -- it sounds like she's represented to you that
10   she's going to admit to perjury and, at that point, I think I
11   have to alert her.  And I think I should do it outside the
12   presence of the jury.  So maybe the right thing to do is to
13   have her come in and for me to have that conversation with her
14   before she testifies.  I mean, I don't want to discourage her
15   from testifying, but if she's going to incriminate herself, she
16   needs to know that she's going to incriminate herself and that
17   she has a right to consult with counsel before she does that.
18   So maybe I'll have that conversation with her outside the
19   presence of the jury before she takes the stand.  As I said, I
20   don't want to discourage her from testifying, but it sounds
21   like you expect her to say she perjured herself, although she's
22   going to say it was under duress.

23          MR. MILLER:  The only question I would raise is
24   whether counsel has suggested to her that she consult with a
25   criminal lawyer before she comes to court today.

1          MS. ACOSTA-PETTYJOHN:  Again, I did not give any

2    legal advice to Ms. Tibaldi.  I did not suggest anything.  Our

3    conversation was very brief yesterday.  Most of it was the

4    logistics of her being here and the logistics of her no longer

5    being under the subpoena, your Honor.

6          THE COURT:  And is it your understanding that she's

7    going to say -- well, even by plaintiff's account, she

8    obviously didn't see the assault.  Is she going to say the

9    events in the visiting room never happened and that

10   Mr. Magalios never told her that he was -- is she going to say

11   she was in a conspiracy with him to fabricate this whole thing?

12         MS. ACOSTA-PETTYJOHN:  So from what I'm

13   understanding, your Honor, she is saying that she did visit him

14   that day in the visiting room.  Everyone -- all the officers

15   there were usually nice; she's visited them before.  She can't

16   remember if, on this day, they were more aggressive than usual;

17   however, when she left the visiting room, she received a call

18   from Mr. Magalios stating that he was not assaulted by our

19   three clients, or two specifically, but, in fact, was assaulted

20   by another inmate and was going to blame it on our three

21   clients.

22         THE COURT:  All right.

23         MS. ACOSTA-PETTYJOHN:  And that that's what he told

24   her, your Honor.

25         THE COURT:  All right.  Well, we'll see what happens.

1          You guys should be using the phones.  You guys should

2     be using the phones.

3               MR. MILLER:  Yes.  We only have two.

4               THE COURT:  Oh.  I thought there were three there.

5               (Pause)

6               MR. MILLER:  Your Honor, I have one thing to add.

7     Hot off the presses.

8          Mr. Giannini, who is my next witness, is out in the

9     hallway.  He just spoke to Ms. Sinise, and he told Ms. Sinise

10    that Ms. Tibaldi's boyfriend just approached him and said I'm

11    going to kill you if you testify for Mr. Magalios and I'm going

12    to kill anyone else who testifies for Mr. Magalios.

13          I believe this has now been heightened to an

14    extraordinary situation, and I'm going to ask defense counsel

15    to think real hard about what their next step is going to be,

16    because I know what my next step would be if I were in their

17    shoes.  I don't like anyone being threatened like that, nor

18    does anyone else in this courtroom.  And that --

19               THE COURT:  No.  Well --

20               MR. MILLER:  -- could be a crime that he just

21    committed.

22               THE COURT:  Oh, if it's true, it's a crime.

23               So let me suggest a couple of things.

24               First of all, obviously, it's fair game for you to

25    ask your client on the stand if that happened.

```
 1              MR. MILLER:  Not my client.

 2              THE COURT:  Excuse me.  Your witness, your witness.

 3              Second, we'll get some security up here and, third,

 4    there's a U.S. Attorney's Office on the third floor.

 5              I would encourage your witness to report that

 6    conduct.

 7              In fact, why don't you see, Walter, if Ronnie can

 8    come up.

 9              THE DEPUTY CLERK:  Okay.

10              THE COURT:  That's our marshal.

11              I'm not saying -- I have no opinion on the facts

12    because I wasn't there, but I certainly don't like the notion

13    that somebody's making threats.

14              MR. MILLER:  Your Honor --

15              THE COURT:  But if it's true, it's going to help your

16    case, so let's -- we're just going to have to see how this

17    plays out.  Again, the defense lawyers have to make a decision

18    as to what they ethically are comfortable with.

19              (Pause)

20              MR. MILLER:  Your Honor, can I have two minutes just

21    to speak to this witness, Mr. Giannini, to get more detail?

22              THE COURT:  Yes.

23              MS. ACOSTA-PETTYJOHN:  And, your Honor, Ms. Tibaldi

24    is here, and I know you wanted to speak to her outside the

25    presence of the jury.  If you want, I guess, when we reconvene,
```

1    we can have her come in.

2             THE COURT:  Yes.  Let's do that before 9:30, if we

3    can.

4             (Recess)

5             THE COURT:  Mr. Miller, what is the update?

6             MR. MILLER:  The update is that everything that I

7    represented to you is true.  It's more detailed.  There were

8    actual threats of death against this witness, Mr. Giannini, and

9    my client.

10            Number two, the witness is a young kid.  He's 24

11   years old.  And he lives in Wappingers Falls.  And it took a

12   lot of discussions with his father to even allow him to come

13   here to testify.  He had to get permission from his parole

14   officer to come here.  His father is now on the phone like just

15   blowing a gasket, like any father would, and he made me promise

16   him that his son will be protected, number one; that his parole

17   officer is going to be informed of this; and that he get

18   escorted out of here in a safe way because -- I've never heard

19   a father as angry as I just heard his father on the phone.

20            THE COURT:  Well, I think we can -- we're going to --

21   security is on its way up and there's going to be somebody in

22   the courtroom, there's going to be somebody in the hallway, and

23   we have a marshal here now who, after this morning's

24   proceedings, is going to have a chat with -- what's the name of

25   the gentleman who allegedly made the threats, the new

1    boyfriend?

2          MR. MILLER:  His name is Justin Zamani.  That's

3    Z-A-M-A-N-I.

4          THE COURT:  Whether he finds himself in handcuffs or

5    not is not up to me, but the marshals are aware of the

6    allegation that he's engaged in witness tampering and they will

7    decide what do do.

8          I think, under the circumstances, I should speak to

9    Ms. Tibaldi now and then Mr. Giannini should testify.  Let's

10   get him on and off.  And I will ask that a security officer get

11   him out of the building with Mr. Zamani remaining here on the

12   sixth floor so that we don't have any further interactions

13   between them.

14         MR. MILLER:  The other thing I would suggest is, he

15   doesn't know their names, and in order for him to testify

16   completely, he needs to identify them, and so we can do it, in

17   my opinion, one of two ways.  We can stipulate that it was

18   Mr. Zamani who made those comments or we can have Mr. Zamani in

19   the courtroom just for identification purposes during his

20   testimony.

21         THE COURT:  Well, I can't make the guy come in the

22   courtroom, but your witness can describe him and testify as to

23   his understanding of who he is.  And you can give Mr. Zamani a

24   subpoena, I suppose, to make him show up.

25         MR. MILLER:  Okay.

1           THE COURT: All right. Let me speak to Ms. Tibaldi.

2           (Lisa Tibaldi entered the courtroom)

3           THE COURT: Come on up, Ms. Tibaldi.

4           THE DEPUTY CLERK: Just watch your step on the

5   carpet.

6           I just wanted to talk to you for a moment -- you can

7   sit if you like -- before you testify because it's been brought

8   to my attention that --

9           MS. TIBALDI: Can I take this off?

10          THE COURT: Yes. You can take it off in there.

11          The lawyers are expecting you to testify contrary to

12  what you've previously testified to under oath, and if that is

13  going to be your testimony, you need to be aware that falsely

14  testifying under oath is a crime for which you could, in

15  theory, be prosecuted, and that, under the Fifth Amendment, you

16  have a right to refuse to testify if your testimony would tend

17  to incriminate you. And it is probably -- I shouldn't say it

18  is probably. It is a good idea to consult with a lawyer before

19  you testify to something that would incriminate you.

20          I'm not suggesting that any prosecutor would have any

21  interest in your case or that any prosecutor would prosecute

22  you for lying under oath, but you need to be informed that it

23  is a possibility that it is -- that lying under oath is illegal

24  and that if your testimony would be that you previously lied

25  under oath, you would be incriminating yourself and you have a

1    right under the Fifth Amendment not to do that.  And I

2    encourage you to consult with counsel before you testify on

3    that subject.

4              That's all I wanted to tell you

5              MS. TIBALDI:  Okay.

6              THE COURT:  All right.

7              And the subpoena, by the way, compels you to come to

8    court.  And I know you came yesterday and you've been

9    inconvenienced, and I'm sorry about that.  The subpoena compels

10   you to come to court.  It doesn't compel you to testify to

11   anything that would incriminate yourself.

12             If there is anybody who is threatening you or

13   coercing you or putting you in an uncomfortable position with

14   respect to your testimony, you should tell me about that, too.

15             All right.  Thank you.

16             We have one brief witness ahead of you and then I

17   believe the defendants are going to call you as a witness.  And

18   I do encourage you to consult with counsel if you're at all

19   concerned.

20             (Ms. Tibaldi left the courtroom)

21             THE COURT:  All right.  We'll talk about the charge

22   later.  I don't think we'll be summing up today anyway, so

23   maybe we can do it at the end of the day.  Right now, I guess

24   we are --

25             Oh, and, Ms. Tibaldi, witnesses can't be present when

1   other witnesses are testifying, so if you wouldn't mind

2   stepping out.

3           We're ready for Mr. Giannini.

4           MR. MILLER:  Yes.

5           THE COURT:  Okay.

6           The security officer asked whether Mr. Zamani could

7   be in the courtroom and I said yes, since I don't think either

8   side's planning on calling him.

9           MR. MILLER:  Your Honor, I didn't hear what you just

10  said.

11          THE COURT:  The security officer asked if Mr. Zamani

12  was allowed in the courtroom and I said yes because I don't

13  think either side is planning on calling him.

14          (In open court; jury present)

15          THE COURT:  You all should be seated.

16          Good morning, everyone.  I apologize for keeping you

17  waiting.  The lawyers and I had some issues to sort out.  We

18  met at 9, but we didn't quite complete our discussions on time,

19  but now we're squared away and plaintiff may call his next

20  witness.

21          MR. MILLER:  Thank you.

22          Good morning, everybody.

23          JUROR NO. 3S:  Good morning.

24          MR. MILLER:  Before I call my next witness, your

25  Honor, on consent, I'm going to offer into evidence what was

1   previously marked as Plaintiff's 6 and offer it as Plaintiff's

2   6A, which is the sketch with the notes that were taken during

3   testimony by both counsel.  So this is now offered as 6A.

4              THE COURT:  That's received.

5              (Plaintiff's Exhibit 6A received in evidence)

6              MR. MILLER:  Plaintiff calls Nicholas Giannini to the

7   stand.

8   NICHOLAS GIANNINI, called as a witness by the Plaintiff,

9   having been duly sworn, testified as follows:

10             THE DEPUTY CLERK:  Please have a seat.  And you can

11  take your mask off.

12             THE COURT:  There's a filter in there that makes it

13  safe.

14             THE DEPUTY CLERK:  Please state your full name for

15  the Court and spell out your last name slowly.

16             THE WITNESS:  Nicholas Giannini.  G-I-A-N-N-I-N-I.

17             THE COURT:  Go ahead, Mr. Miller.

18             MR. MILLER:  Thank you.

19  DIRECT EXAMINATION

20  BY MR. MILLER:

21  Q.   Good morning, Nick.

22  A.   Good morning.

23  Q.   Are you a little nervous?

24  A.   A little bit, yes, sir.

25  Q.   I'm going to be asking you some questions about an

 1    occurrence at Fishkill on September 3rd, 2017.

 2         You were an inmate at that time?

 3    A.    Yes, sir.

 4    Q.    But before I ask you about that day, I want to ask you

 5    about an incident that took place maybe five, ten minutes ago

 6    out in the hallway.

 7    A.    Yes.

 8    Q.    Were you out in the hallway about five, ten minutes ago?

 9    A.    Yes, sir.

10    Q.    And the incident that occurred, are you a little shaken up

11    by it?

12    A.    A little bit, yes, sir.

13    Q.    Okay.  Do you want to just like take a deep breath.

14         Were you approached by a man and a woman out in the

15    hallway?

16    A.    Yes, sir.  Yes.

17    Q.    And could you describe first the woman.

18    A.    She was about five-eight, five-seven, skinny, blonde hair.

19    She had a corona mask on, so --

20    Q.    I'm sorry?

21    A.    She had a corona mask on.  She had like a gray suit,

22    pantsuit.

23    Q.    Okay.  Are you aware that that woman who you just

24    described is named Lisa Tibaldi and is the ex-wife of

25    Mr. Magalios?

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    A.    I am now.

2    Q.    And are you aware that the man that was with her is named

3    Justin Zamani and he is her current boyfriend?  Were you aware

4    of that?

5    A.    I am now.

6    Q.    And what causes you to be so nervous right now about that

7    encounter?

8    A.    He threatened my life as well as Nicholas Mag -- Mag --

9    I'm not sure how to pronounce the last name.

10    Q.    He threatened your life and he threatened --

11    A.    Yes.

12    Q.    -- Nicholas Magalios' life?

13    A.    Yes.

14         The encounter began outside of the courthouse when he

15    heard me state I was coming to courtroom 520.  He said who am I

16    here for.  I said I do not want to speak.  He said all right.

17    Then he stepped forward towards me and continued to like mean

18    mug me -- he like took a step towards me like in an aggressive

19    manner and says, all right.  I think he said thank you, I

20    respect that, thank you.  And then like he mean mugged me is

21    what I would say, giving me an intimidating look --

22              THE COURT:  I'm sorry to interrupt you.

23              THE WITNESS:  I'm sorry, your Honor.

24              THE COURT:  I'm sorry to interrupt you.

25              You said mean mug?

1                  THE WITNESS:  Intimidate.  Like looking in an

2    intimidating manner.

3                  THE COURT:  Okay.  Like a mean face you mean?

4                  THE WITNESS:  Yes, a mean face, yes.

5                  THE COURT:  Okay.  Thanks.

6    A.    Then I went through security.  I came to the fifth floor.

7    I sat down on the bench.  Sat, you know, to the side.  They

8    came up after me.  They came up.  They sat to the other side.

9    And then he stepped -- he got up and he walked towards me and

10   he's just like who are you here for?  Are you testifying on

11   Nicholas' behalf?  Because I'm here to murder him and if you're

12   on the same -- and you if you're on his side, if you're on the

13   same page.

14        And I don't remember the exact words, but I'm sure that

15   was recorded out there and could easily be pulled.

16   Q.    Did that shake you up?

17   A.    Absolutely.  Why would it not?

18   Q.    Did you call your dad?

19   A.    Absolutely.

20   Q.    Was he upset?

21   A.    Yes.  Very much so.

22        So I'm here to do what's right and now I'm getting my life

23   threatened.

24   Q.    Are you aware that there's security here now?

25   A.    Yes, but it's not what goes on in this building that I'm

1    concerned with, it's what may lead beyond this.

2    Q.   I assured you before you entered this courtroom that

3    everyone involved is going to do everything they can to protect

4    you.

5    A.   Right.

6    Q.   You understand that?

7    A.   I understand that.

8    Q.   And did I also tell you that you will be safely taken out

9    of this courthouse and that any steps that need to be taken

10   will be taken?  Do you understand that?

11   A.   I understand that.  It's some reassurance for me.

12   Q.   Do you have a parole officer?

13   A.   Yes.

14   Q.   Are you going to tell your parole officer about this

15   incident?

16   A.   If -- yeah, I suppose so.

17   Q.   Yeah.  All right.

18        I'm going to ask you now some questions about September

19   3rd, but I need for you to assure all of us that you're okay.

20   A.   I'm all right.  It's just I got anxiety, so I'm a little

21   nervous, but I'm all right.

22   Q.   Okay.

23        Were you subpoenaed to come here to court today?

24   A.   Yes, sir.

25   Q.   You live up in Wappingers Falls?

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    A.   Yes, sir.

2    Q.   With your dad?

3    A.   Yes, sir.

4    Q.   And you work?

5    A.   Yes, sir.

6    Q.   What type of work do you do?

7    A.   I'm a -- I work in a lumberyard, forklift operator, and I

8    do porter work throughout the yard.

9    Q.   The reason that you were in Fishkill back in September of

10   2017 is because you pled guilty to a robbery in the second

11   degree, correct?

12   A.   Correct.

13   Q.   How far did you get in school?

14   A.   I -- the beginning of tenth grade and -- or the end of

15   ninth grade.  And that was when I was incarcerated.  But during

16   my incarceration, I -- my first two months, I got my high

17   school equivalency and I obtained 33 college credits while

18   incarcerated as well as a couple -- a few trades.  I did

19   general business, I did custodial maintenance, and I did

20   some -- I didn't finish with the electrician course.

21   Q.   Okay.  Nice.  Congratulations.

22   A.   Thank you.

23   Q.   Before meeting with me just outside the courtroom five,

24   ten minutes ago, had we ever met before?

25   A.   No.

1    Q.   Do you remember September 3rd, 2017 at Fishkill?

2    A.   After receiving -- yes, after receiving the subpoena and

3    refreshing my memory, yes.  It's vivid, yes.

4    Q.   Did you have a visit that day?

5    A.   Yes.

6    Q.   Do you remember who you were visiting with?

7    A.   It was my mother.

8    Q.   Do you remember where the visit was?

9    A.   My particular visit was in the single-visit -- there's two

10   separate visit rooms.  There's one with multiple visitors and

11   there's one with just one-on-ones.  I was with the one-on-one

12   visitors because it was just me and my mother.

13   Q.   Okay.  And when your visit was done, could you tell the

14   jury like where you went when your visit with your mom was

15   over?

16   A.   Yes.  I entered the frisk -- I go towards the frisk area,

17   and that's when I -- when I -- as you leave, you have to hand

18   the officer your I.D. and the -- and they direct you to sit on

19   the benches, which was as usual every day, but, on this

20   particular day, like when --

21   Q.   I'll get to what happened after.

22   A.   Sorry.

23   Q.   I just want to ask you did you follow that procedure of --

24   A.   Yes.  Of course.

25   Q.   -- exiting the visiting room and entering into the frisk

 1    area?

 2    A.   Yes.

 3    Q.   And the jury has already seen photos of that area.

 4         Do you recall if there are benches on both sides of that

 5    corridor?

 6    A.   Yes, there is.

 7    Q.   And did you sit down on one of those benches?

 8    A.   Yes.  The bench to the left.  When you enter the frisk

 9    area, I sat to the bench to the left like I usually do.

10    Q.   And when you sat down on that bench, your expectation was

11    that you would be strip frisked at some point?

12    A.   Yes.

13    Q.   Were you sitting down on that bench by yourself or were

14    you with someone else?

15    A.   There was three other people with me.

16    Q.   And do you remember the names of those other people?

17    A.   Not until I was given the paperwork and I seen -- I

18    believe that's him right there, that individual's name.

19    Q.   Okay.  Now --

20              THE COURT:   Indicating the plaintiff.

21              MR. MILLER:   Indicating Mr. Magalios.

22    Q.   How long were you seated on the bench before something

23    else happened?

24    A.   Two minutes.

25    Q.   And what happened after that two minutes that you were

1    sitting on the bench?

2    A.    A few officers rushed in with Mr. Magalios and they rushed

3    him to the back and they were like screaming orders and stuff

4    to like -- excuse my language -- like get the -- you know, a

5    lot of profanity, get the fuck back there and let's go, what do

6    you got or something like that.  It was just like a whole bunch

7    of screaming going on.  And they had him like -- they were

8    grabbing him and pulling him and bringing him to the back of

9    the search room.

10   Q.    Where did they bring you?

11   A.    They told everybody to get the fuck out and step into like

12   the hallway.  Like when you first enter the frisk area, the

13   door that separates it and there's like a little waiting area

14   where they collect the IDs, and that's where they told us to --

15   when they said get the fuck out, that's where they wanted us to

16   go wait.

17   Q.    I'm going to show you a photo in a second, but I just want

18   you to describe in your words, if you're sitting on the bench

19   on the left and they told you to, as you said, get the fuck

20   out, tell us the route that you took, just in your own words.

21   A.    I got up and I just walked -- I walked to the -- right out

22   to the room, where the little waiting area is.

23   Q.    Okay.  Could you -- where they brought you to, could you

24   see the benches?

25   A.    No.  They made us stand against the wall so we couldn't

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    see anything.  Your face is against the wall.

2    Q.   Could you describe in any way the officers who told you to

3    get the fuck out of here?

4    A.   I believe I recognize -- I believe I recognize a few.

5    Q.   You recognize them here in the court?

6    A.   Yes.

7    Q.   Tell us who you recognize.

8    A.   The pretty boy, the pretty Spanish kid over there.  I

9    definitely recognize him from his aggression.  He was the -- he

10   was like the most aggressive.  He's always in -- like I don't

11   know how to explain it.

12             THE COURT:  Indicating Mr. Peralta.

13   A.   The individual in the brown -- the one in the brown suit,

14   he was there, but he wasn't -- he -- he was not aggressive

15   during that day.  He was not -- I never seen him as aggressive.

16             THE COURT:  Indicating Mr. Blount.

17   A.   The other one, as well, he was there.

18   Q.   And what actions did you see him take?

19        Well, first of all, the gentleman sitting in the middle,

20   is that the one who you said wasn't that aggressive that day?

21   A.   Yes.  I -- nah, he was not -- he was not one of the

22   individuals I remember as slamming him against the wall and

23   stuff like that as they were escorting him.

24             MR. MILLER:  For the record, that's Officer Blount.

25   Q.   Now, the fellow the farthest from you, describe what his

1  actions were from --

2  A.    Just yelling, a lot of yelling and, you know, assisting

3  the escort, I guess we'll term it, the escort.

4         MR. MILLER:   Indicating Officer Bailey.

5  Q.    When they said to face the wall, were you literally like

6  facing a wall?

7  A.    Yes.  My face -- my nose is pressed against the wall, yes,

8  yes.

9  Q.    And for how long were you in that position?

10  A.    Five, ten minutes.  Probably closer to five.  It felt like

11  ten.

12  Q.    Okay.  And after that period of time, whether it was five

13  minutes or ten minutes or whatever it was, what happened next?

14  A.    Just heard a lot of banging and screaming.  Sounded like,

15  you know, just like a scuffle was going on I guess we'll say.

16         You know, we knew -- I knew it was in the back of like

17  where we get searched because like these wood cabinet things

18  that divide -- the dividers for the strip rooms, so you heard

19  that like getting banged against, you know, like the radiator

20  hitting.

21  Q.    And, at some point, did you leave that area against the

22  wall?

23  A.    When everything was done with, it like quiet down, like

24  five, ten minutes, they told us to go sit back down.

25  Q.    And when they told you to go sit back down, was that in

1   the area of the benches?

2   A.   Yes.

3   Q.   And did you make any observations when you returned to the

4   benches?

5   A.   Yeah.  Mr. Magalios was sitting in the corner like balled

6   up.

7   Q.   What do you mean by balled up?

8   A.   Like keeled over like his stomach, like this, like, you

9   know, head down.

10  Q.   And did you speak to him?  Did you hear anyone else --

11  A.   I asked him what happened.  I think I said -- I just asked

12  him like what happened, like are you all right, like what

13  happened to you.  And he just like -- he didn't really want to

14  talk.  He was like they fucked me up, they fucked me up.  And I

15  could see like he was hurting, he was in pain.  He had like red

16  marks on him and stuff like that.  It was obvious what

17  happened.

18  Q.   At some point after that conversation, did you get strip

19  searched?

20  A.   Yes.

21  Q.   And you went back to your housing unit?

22  A.   Yes.

23  Q.   What was your housing unit?

24  A.   I believe I was in J dorm at the time.

25  Q.   J dorm?

20214smaga1          Giannini - Direct - Mr. Miller

 1    A.    Yes.

 2    Q.    So you didn't live where Mr. Magalios lived?

 3    A.    I don't know where he lived.

 4    Q.    Okay.  At some point a few days later, you signed an

 5    affidavit?

 6    A.    Yes.  I wrote up an affidavit, yes.

 7    Q.    And then a few months later, did you speak to an

 8    investigator about this?

 9    A.    OSI, yes.

10    Q.    OSI?

11    A.    I believe twice I spoke with them.

12               MR. MILLER:  Okay.  Thank you, Nick.  I think someone

13    else is going to ask you some questions now.

14               THE WITNESS:  Okay.

15               THE COURT:  Ms. Acosta-Pettyjohn.

16    CROSS-EXAMINATION

17    BY MS. ACOSTA-PETTYJOHN:

18    Q.    Good morning, Mr. Giannini.  Can you hear me?

19    A.    Yes.

20    Q.    Okay.  Good.  I feel like I'm yelling, so --

21               Now, you stated earlier that you were threatened this

22    morning, correct?

23    A.    Yes.

24    Q.    Were you threatened by any of my three clients; Officer

25    Peralta, Officer Bailey, Officer Blount?

1    A.    No.

2    Q.    And the gentleman who threatened you, have you ever seen

3    him before today?

4    A.    No.

5    Q.    And I know you stated you were nervous.  Were you nervous

6    before coming to the courthouse at all?

7    A.    No.

8    Q.    And what was your understanding about being subpoenaed to

9    testify today?

10   A.    My understanding is that I would come and I would have to

11   state what had happened that day.

12   Q.    Now, this incident occurred on September 3rd, 2017.  You

13   were incarcerated at Fishkill at that time, correct?

14   A.    Yes.

15   Q.    And you were incarcerated for the crime of robbery to the

16   second degree?

17   A.    Yes.

18   Q.    And when were you released from Fishkill?

19   A.    From Fishkill?

20   Q.    Yes.

21   A.    I believe it was December 31st, 20 -- I wasn't released

22   from Fishkill.  I was moved to another facility is what you

23   mean?

24   Q.    What facility were you moved to?

25   A.    I was moved to Clinton.

1    Q.    Were are you released from Clinton or moved to another

2    facility?

3    A.    I was moved to another facility.

4    Q.    Which facility were you moved to?

5    A.    I moved from Clinton to Gouverneur, from Gouverneur to

6    Coxsackie, Coxsackie to Eastern.

7    Q.    So was Eastern the last facility before you were released?

8    A.    Yes.

9    Q.    And when were you released from Eastern?

10   A.    September 13th, 2020.

11   Q.    I'm going to bring your attention to September 3rd, 2017.

12   You remember having a visit, correct?

13   A.    Yes.

14   Q.    And you testified earlier it was with your mother?

15   A.    Yes.

16   Q.    Do you remember the time that visit started?

17   A.    No.

18   Q.    Do you remember the time that visit ended?

19   A.    Approximately -- I want to say around -- hmm.  No, I can't

20   say the exact time.  It was -- it was -- it would be past

21   noontime, though.

22   Q.    And before September 3rd, 2017, how many times would you

23   say you've had a visit at Fishkill Correctional Facility?

24   A.    Could you repeat that.  I'm sorry.

25   Q.    Sure.

1     Before September 3rd, 2017, how many times would you say

2   you had visits while in Fishkill Correctional Facility?

3          MR. MILLER:  Objection.  Relevance.

4          THE COURT:  I'll allow it.

5   A.   Every weekend.

6   Q.   And I know you testified earlier that when you end the

7   visit, you go through a certain procedure.  Correct?

8   A.   Yes.

9   Q.   And that procedure includes you going through a pat-frisk

10   area and a strip-frisk area, correct?

11   A.   We go through the frisk -- we don't get pat frisked on the

12   way out.

13   Q.   So you go just to get strip frisked?

14   A.   Yes.

15   Q.   And that strip-frisk area, it's located next to the

16   visiting room, correct?

17   A.   It's attached in the building, yes.  It's in the building.

18   Q.   Can you describe the frisk area for me.

19   A.   The -- the -- like the benches included?  Like the waiting

20   area or just the frisk area where we get strip searched?

21   Q.   The whole entire frisk area.

22   A.   Well, I'm just going to start at the door when you enter

23   the frisk area.  It says frisk area on the door.  You go in and

24   there's like a little table to the right of you along with a

25   desk, and that desk is where an officer normally seats -- is

1   seated with a little -- where they hold the IDs.  The IDs are

2   held there as well.  And there's a -- there's a door, like a

3   doorway -- there's no actual door there -- with benches like

4   silting behind these like cinderblock walls.  And then you go

5   back through there and you make a left and then there's like a

6   strip-frisk area.  There's wooden dividers that separate all

7   the strip areas.  And then there's the package room window to

8   the left, the doorway that goes to the walkway, and then the

9   other side, you come out and there's like a bathroom, and

10  that's where we come in for our visits.

11  Q.   Okay.  And when you were waiting at the frisk area at the

12  end of your visit, how many inmates were with you?

13  A.   About three.  I'm not sure the exact number.

14  Q.   Do you remember the names of any of these inmates?

15  A.   No.

16  Q.   Did anybody --

17  A.   Other than -- other than who I know now.

18  Q.   Mr. Magalios?

19  A.   Yeah.

20  Q.   When did you come to find out Mr. Magalios' name?

21  A.   During the investigation.

22  Q.   And when you say investigation, is that the OSI?

23  A.   OSI investigation, yes.

24  Q.   Do you remember when that investigation started?

25           MR. MILLER:  Objection.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1          THE COURT:  Yes.  Relevance.

2     Q.   When you say you found out his name through the

3     investigation, did somebody from OSI speak to you?

4     A.   Say that again.

5     Q.   When you said you found out his name through the

6     investigation, from OSI, did somebody from OSI speak to you?

7     A.   The OSI investigator, yes.

8     Q.   Do you know how long after the incident the OSI

9     investigator spoke to you?

10    A.   I can't give you the exact date, no.

11    Q.   Now, when Mr. Magalios entered the waiting area, were you

12    already there?

13    A.   I was seated, yes.

14    Q.   And you testified earlier that officers had told you to

15    leave that area, correct?

16    A.   Not in those words, but yes.

17    Q.   How many officers told you to leave that area?

18    A.   Like four, five.

19         That stated -- like how many officers used them words to

20    get the fuck out?

21    Q.   Yes.

22    A.   There was so much yelling, but it was like four or five

23    officers there.

24    Q.   And were you actually escorted to leave that area?

25    A.   Was I escorted?

1    Q.    Yes.

2    A.    No.

3    Q.    Did you actually leave that area?

4    A.    We were told -- we got right by behind the wall and faced

5    the wall.

6    Q.    Okay.  Was there any officer with you when you left that

7    area to face the wall?

8    A.    I believe there were -- yeah.  There was one officer there

9    blocking the doorway.

10   Q.    Do you remember that officer's name?

11   A.    No.

12   Q.    Was it either -- was it Officer Peralta?

13   A.    I can't -- no, I can't state.

14   Q.    So you don't know if it was Officer Bailey, either?

15   A.    Which one is Officer -- was it any of those three that

16   were blocking the doorway?

17   Q.    Yes.  Was it any of these three that --

18   A.    No, they were not blocking the doorway.

19   Q.    Okay.  I'm going to show you what's been marked as

20   Plaintiff's Exhibit 6A.

21         Give me a second.  It takes a while to get the mask on.

22             (Pause)

23   Q.    Okay, Mr. Giannini, can you hear me now?

24   A.    Yes.

25   Q.    Okay.  So it's my understanding that -- well, withdrawn.

20214smaga1      Giannini - Cross - Ms. Acosta-Pettyjohn

1        Does this diagram look familiar to you?

2  A.   Terrible artistic work, but, yes, vaguely.

3  Q.   What does this diagram look like to you?  What is it

4  representing?

5  A.   It looks like a poor depiction of the visit room.

6  Q.   Okay.  And do you see the frisk area in this diagram?

7  A.   Could you point out the -- are you -- may you point out

8  the desk in which -- in the visit area --

9  Q.   Sure.

10  A.   -- so I can get a general idea of where things are.

11  Q.   So it's my understanding that this right here is the desk

12  the officers --

13  A.   Okay.  Yes.  The arrows you're pointing to is the frisk

14  area.

15  Q.   So this is the pointing to the frisk area?

16  A.   Yes.

17  Q.   So would this be the frisk area?

18  A.   Yes.  That's the waiting area.  That's where the benches

19  are.

20  Q.   When you say that, this is where the benches are?

21  A.   Yeah, those two, those square things, those are the

22  benches, yes.

23  Q.   Can you tell me where you were standing when

24  Mr. Magalios --

25  A.   I was seated on the left side.  Other left.  Yeah.  Left.

20214smaga1      Giannini - Cross - Ms. Acosta-Pettyjohn

1    Sorry. Excuse me.

2    Q.   Sorry. Our lefts and rights are all wrong.

3    A.   Yeah, I know, I understand.

4    Q.   So this side?

5    A.   Yes.

6    Q.   And when you were told to move to the other side, you said

7    that you went down to like a hallway or something?

8         Can you just tell me where you went.

9    A.   Go closer to the doorway.

10   Q.   Here?

11   A.   Yeah. A little down towards the wall. Yeah. Like facing

12   like on the corner right where the wall is. No, the other

13   side. The other corner. The other corner towards the benches.

14   Q.   You were facing this wall?

15   A.   Yeah. I was right there against that wall.

16   Q.   Okay. And I know you said there were about three our

17   inmates. Were all the other inmates with you?

18   A.   They were -- we were all in that little -- when they told

19   us to get the fuck out, we were all in that little room right

20   there.

21   Q.   This area?

22   A.   I was facing the wall. I'm not exactly sure. There might

23   have been one right next to me, but -- we were all in that

24   little -- it's a small room.

25   Q.   Okay.

1   A.   We were all facing the wall, as is, you know, common

2   knowledge.  You do that.

3   Q.   And did you have to go through a door or anything to get

4   to this area?

5   A.   There's no like door like a -- I'm -- a doorway, I suppose

6   we'll say, but not a door.

7   Q.   Okay.  Now, you had stated that you wrote a statement,

8   correct?

9   A.   Yes.

10  Q.   And do you remember when you wrote that statement?

11  A.   The exact date, no.

12  Q.   Do you know how soon after the incident you wrote a

13  statement?

14  A.   Right away.  I -- I believe it was right as soon as I got

15  the -- the witness -- the call in for the witness, the OSI,

16  when they called on behalf of -- like once I got all the names

17  and stuff like that, that's when I went for the affidavit.

18  Q.   And did anybody from OSI give you the names of any of the

19  parties for this allegation?

20  A.   Yeah.  It was on the tier 3 ticket.

21  Q.   And do you remember the exact names that are on the tier 3

22  ticket?

23  A.   I said tier 3.  I meant the investigation report.  Excuse

24  me.  I'm sorry.  I don't know why -- investigation report.

25  Q.   That's okay.

1       Do you remember the names that were on the investigation

2   report?

3   A.   Magalios, Anthony something or something like that.  The

4   Spanish fellow right there.  I know that.  That's the only name

5   I really remembered.

6   Q.   Do you remember his name?

7   A.   Anthony -- Anthony something.

8        I'm sorry.  I just --

9   Q.   No, it's -- don't worry about it.

10       When you wrote this statement, did you write it for --

11  withdrawn.

12       Why did you write the statement?

13  A.   Because it's what happened and it's going to continue

14  happening if nothing's done about it.

15  Q.   Did somebody tell you to write the statement?

16  A.   Absolutely not.

17  Q.   Did Mr. Magalios tell you to write a statement for his

18  attorneys?

19  A.   No.

20  Q.   Now, I know you stated earlier that you saw Mr. Magalios

21  when you returned to the waiting area at the benches, correct?

22  A.   Yes.

23  Q.   And you testified that he was all balled up, correct?

24  A.   Yeah.  I wasn't sure which corner he was in, but, yes, he

25  was balled up in a corner with benches.

20214smaga1    Giannini - Cross - Ms. Acosta-Pettyjohn

1   Q.   Did you see any blood on him?

2   A.   Maybe on the jacket, but no, not -- not like on his skin.

3   I just remember seeing like red -- I just remembering seeing

4   the red marks on his face.  I don't see -- I don't remember

5   seeing blood like that, no.

6   Q.   When you say maybe on his jacket, was he wearing a jacket

7   that day?

8   A.   Yes.  I believe so, yes.

9   Q.   And did you notice any cuts on him?

10  A.   Not -- not that I can remember, no.

11  Q.   Did you notice if his clothes were disheveled?

12  A.   Like -- yes.  Yeah.  Like -- yes.

13  Q.   Can you explain what his clothes looked like when you saw

14  him.

15  A.   Sorry.  Like -- like what were they like?  Sorry.

16  Q.   Sorry.

17       So you said that his clothes look disheveled, correct?

18  A.   Yes.

19  Q.   Can you describe his physical appearance with his clothes?

20  A.   Like they weren't ironed and pressed no more.  They were

21  like -- it was evident he was tossed around or something, you

22  know.  Like it wasn't -- it wasn't visit clothes.  Everybody

23  goes down there with visit clothes all pressed and stuff.  It

24  wasn't visit-room attire no more.

25  Q.   And you testified that you heard screaming, correct?

1    A.   Yes.

2    Q.   Did you note that anywhere in your affidavit?

3    A.   Not -- no.  Screaming.  I just remember yelling, yes.

4    Q.   When you say you remember yelling, was that yelling from

5    the officers who told you to move?

6    A.   A little bit of both, yes.  More like ah.  That's what I

7    remember from -- like, other than the officers' words, I just

8    remember like ah.  You know what I mean?

9    Q.   And do you know who was saying ah?

10   A.   Evidently it would be Nicholas because he's the only one

11   back there.  We were in the waiting area.

12   Q.   Did you witness Nicholas be assaulted?

13   A.   No.

14   Q.   When you were brought back around the corner, who brought

15   you back around the corner?

16   A.   They didn't bring us around the corner.  They just said go

17   sit the fuck down, go sit back down.

18   Q.   Do you remember who told you to go sit back down?

19   A.   One of the officers.  It was -- it was an officer that

20   said it.  I know that much.

21   Q.   Do you know if it was any of these three officers here

22   today?

23   A.   I can't say for certain, no.  I can't say for certain.

24              MS. ACOSTA-PETTYJOHN:  Give me one minute, your

25   Honor.

20214smaga1    Giannini - Cross - Ms. Acosta-Pettyjohn

1        THE COURT:  Sure.

2            (Pause)

3    Q.   After you observed Mr. Magalios balled in up in the

4    corner, did you report what you saw or heard to any correction

5    officer?

6    A.   You don't do that, no.  You don't do that.

7    Q.   Did you report what you saw or heard to anyone?

8    A.   Like as far as like authority, staff?

9    Q.   Yes.

10   A.   Not right until I went to see OSI, no.

11   Q.   How soon after --

12   A.   I believe I spoke with my mother on the phone, but -- you

13   said authority.  Excuse me.  I'm sorry.

14   Q.   Did you report it to anybody who wasn't a DOCCS employee

15   or staff?

16   A.   Yeah.  I spoke about it with my mother.

17   Q.   And what did you tell your mother?

18   A.   I told her what happened.

19   Q.   And how soon after the incident did you first speak to

20   Mr. Magalios?

21   A.   Did I speak with Mr. Magalios?

22        MR. MILLER:  Objection.  No foundation for that

23   question.

24        THE COURT:  Sustained.  No foundation.

25   Q.   After the incident, did you ever have a conversation with

1     Mr. Magalios?

2   A.   No.

3   Q.   So when you wrote this statement, did you give it to

4   Mr. Magalios or you gave it to somebody else?

5   A.   I went to the law library and gave it to the -- he helped

6   me write it because I don't really speak legalese very well.

7   So he helped me put it in better words, the law library -- I

8   wrote it out in my words and he helped me know how to put it so

9   it's proper, like the affidavit format.

10            THE COURT:  The law librarian helped you?

11            THE WITNESS:  Yeah.

12            THE COURT:  Is that an inmate or a DOCCS employee?

13            THE WITNESS:  Yeah, an inmate.  And it's also a

14   civilian there as well, a notary public, a notary.  She was

15   there, yeah.

16            THE COURT:  Okay.  So somebody helped you -- somebody

17   in the law library helped you with the statement.

18            THE WITNESS:  Like, yes.

19            Wait.  Say that one more time

20            THE COURT:  I'm sorry.  I just wanted to clarify that

21   somebody in the law library helped you write the statement.

22            THE WITNESS:  Not help me write the statement, like

23   they helped me re-- get the words to -- in the format, you

24   know.

25            THE COURT:  It was your observations.

20214smaga1    Giannini - Cross - Ms. Acosta-Pettyjohn

1          THE WITNESS:  Yes, yes.  I want to make sure it's

2     clear.  I don't want this to get misconstrued.

3          THE COURT:  So nobody was putting words in your

4     mouth.

5          THE WITNESS:  No, no one's putting words in my mouth.

6     They just helped me, you know, format it correctly.

7          THE COURT:  Got it.

8     Q.   And after you made this affidavit, who did you give it to?

9     A.   I gave to I believe OSI and I believe I mailed it to a law

10    office.

11    Q.   Do you know what law office you mailed it to?

12    A.   No.

13    Q.   Do you know why you mailed it to a law office?

14    A.   I believe because it -- no, I don't know.

15    Q.   Did somebody tell you to mail it to a law office?

16    A.   No.

17       I'm trying -- I'm confused by this question right here.

18    Did somebody tell me to mail it to an office?

19    Q.   Yes.

20          THE COURT:  How did you know that you should mail it

21    to a lawyer?

22          THE WITNESS:  Like they gave me advice that that's

23    what you do with the stuff.  You don't put it in the system so

24    you don't have retaliation is what I'm trying to say.

25    Q.   I understand that, but who told you to give it to the

20214smaga1    Giannini - Redirect - Mr. Miller

```
1    lawyer?

2    A.    I'm not sure.  I believe the law library clerks.

3          THE COURT:  I'm sorry.  How did you know what lawyer

4    to send it to?

5          THE WITNESS:  It was the law library, the law

6    library.

7    Q.    Sorry, Mr. Giannini.  Just about one or two more

8    questions.

9          When you saw Mr. Magalios in the waiting room, did you

10   think he needed medical attention?

11   A.    Yes.

12   Q.    Did you tell Mr. Magalios that he should seek medical

13   attention?

14         MR. MILLER:  Objection.

15         THE COURT:  Sustained.

16         MS. ACOSTA-PETTYJOHN:  No further questions,

17   Mr. Giannini.

18   REDIRECT EXAMINATION

19   BY MR. MILLER:

20   Q.    Just a quick follow-up on the affidavit.

21         When you say legalese, like you don't know legalese, are

22   you referring to terms like I, Nicholas Giannini --

23   A.    Yes.

24   Q.    -- being duly sworn --

25   A.    Yes.  Exactly.
```

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    Q.    -- deposes and states that --

2    A.    Yes.  Exactly.

3    Q.    Those aren't your words, right?

4    A.    No.

5    Q.    Is that what you mean by legalese?

6    A.    Yes, sir.

7              MR. MILLER:  No further questions.

8              You're free to sit in this courtroom now.

9              THE WITNESS:  In this courtroom?

10             MR. MILLER:  Yes.

11             THE COURT:  Or you're free to go home.

12             MR. MILLER:  Or you're free to leave, but I'm not

13   sure --

14             THE COURT:  Well, there will be -- am I right that

15   there will be somebody to --

16             THE WITNESS:  Escort me?

17             THE COURT:  Take you out, yes.

18             Thank you, Mr. Giannini.

19             THE WITNESS:  Yes.  Of course, your Honor.

20             (Witness excused)

21             THE COURT:  Anything else, Mr. Miller?

22             MR. MILLER:  No, your Honor.  At this time, the

23   plaintiff rests.

24             THE COURT:  Ms. Acosta-Pettyjohn.

25             MS. ACOSTA-PETTYJOHN:  Your Honor, I would just like

20214smaga1

1    to make my Rule 50(b) motion.

2            THE COURT:  All right.  Why don't we -- you've made

3    it and we'll argue it at the break.

4            MS. ACOSTA-PETTYJOHN:  Sure.

5            THE COURT:  And do you want to call witnesses?

6            MS. ACOSTA-PETTYJOHN:  Yes, your Honor.  I would like

7    to call Lisa Tibaldi.

8            THE COURT:  All right.

9            (Pause)

10           MS. ACOSTA-PETTYJOHN:  Sorry, your Honor.

11   Ms. Tibaldi had a question about the issue that you raised

12   earlier outside the presentation of the jury.  Would I be able

13   to have a one-minute break to talk to her?  Or I don't know

14   how --

15           THE COURT:  All right.  You know the ground rules.

16           MS. ACOSTA-PETTYJOHN:  Yes, your Honor.

17           THE COURT:  All right.

18           MR. MILLER:  Your Honor, I object to this.  She's

19   already been instructed and --

20           THE COURT:  Hold on.  Let's not have this

21   conversation in front of the jury.

22           I'm sorry, ladies and gentlemen, but I'm going to

23   have to ask you if you could go back into the jury room for a

24   couple of minutes.  I thought we had taken care of all our

25   complications this morning, but apparently we haven't, so we'll

```
 1      take a short recess and Mr. Clark will come get you when we're
 2      done.  Sorry about that.
 3                 (In open court; jury not present)
 4                 THE COURT:  Look, she's allowed to talk to whoever
 5      she wants to.  I don't think I can tell her, you know, that she
 6      can't talk to Ms. Acosta-Pettyjohn or that you have to be
 7      present, Mr. Miller.
 8                 MR. MILLER:  I understand that, but she's already
 9      been instructed on her legal rights and if that's something
10      that she wants to learn more about, I don't think
11      Ms. Acosta-Pettyjohn is the one qualified to answer any legal
12      questions like that.
13                 THE COURT:  I think Ms. Acosta-Pettyjohn understands
14      that, but let's let them have the conversation and see what the
15      question is.  If the witness starts asking for legal advice,
16      then Ms. Acosta-Pettyjohn knows she can't give that.  Maybe the
17      witness just wants to know what she's going to be asked.  I
18      don't know.  Maybe the witness wants to ask if
19      Ms. Acosta-Pettyjohn has ever heard of a witness in a civil
20      case being prosecuted for perjury.  I have no idea.
21                 But certainly, Ms. Acosta-Pettyjohn, you're not going
22      to be giving her any legal advice.
23                 MS. ACOSTA-PETTYJOHN:  Of course not, your Honor.
24                 THE COURT:  All right.  And if I were you, for your
25      own sake, I wouldn't have this be a one-on-one conversation.
```

1            MS. ACOSTA-PETTYJOHN:  Of course, your Honor.

2            THE COURT:  All right.  You may go speak to the

3    witness if she wants to speak to you.

4            MS. ACOSTA-PETTYJOHN:  Thank you, your Honor.

5            (Recess)

6            MS. ACOSTA-PETTYJOHN:  We just spoke to Ms. Tibaldi.

7    She is no longer going to testify.  She is scared for her

8    safety and would rather not testify because she doesn't know

9    what the consequences of testifying against Mr. Magalios will

10   be.

11           THE COURT:  She's not concerned about her Fifth

12   Amendment?  She's concerned about her safety?  Well, that's

13   interesting.

14           You can still call her.  She's here.  But if you're

15   not going to, then that raises the question of what, if

16   anything, we do about the testimony that's already been

17   elicited in anticipation of her testimony.

18           I should let you know that one of the jurors, number

19   3, said something to Mr. Clark about whether the jury would

20   have an escort of some sort and Mr. Clark said I can't answer

21   that; if you have a concern, send a note to the Judge.

22           I guess I'm thinking out loud.  Obviously, I'll hear

23   whatever you suggest.  One thing I can do is say that testimony

24   about the threat was elicited in anticipation that Ms. Tibaldi

25   was going to testify.  It's now been determined she's not going

1  to.  It has no -- therefore, I'm going to strike it.  And there
2  was no association between that testimony and either the
3  plaintiff or the defendants, so the jurors should put it out of
4  their minds.  And I guess can I also say the gentleman has left
5  the courthouse, if he has.

6          Did they go home?

7          MS. ACOSTA-PETTYJOHN:  I believe -- I just saw -- I
8  believe they just left, your Honor.

9          THE COURT:  Any thoughts on that?

10          MR. MILLER:  I have some thoughts.  I'm not about to
11  disagree.  I just want to sort of maybe think out loud, as your
12  Honor is.

13          The reason why maybe you shouldn't strike that part
14  of Mr. Giannini's testimony is because I think it's important
15  for the jury to know the risk that this kid took.

16          THE COURT:  Well, I guess what I could do is I could
17  say it's only to be considered for whatever effect it might
18  have had on his state of mind and his testimony because he --
19  although he warmed up as he went along, he clearly was nervous
20  at first.  So I think you're right.  I think it's perhaps
21  relevant to explain why he was a little freaked out at first,
22  but I'll make sure that the jury understands that there's
23  nothing about that threat that they should be holding against
24  either side.  Seem fair?

25          MR. MILLER:  I think that's a fair compromise.

                CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                          (914)390-4103

```
 1              THE COURT:  All right.

 2              MS. ACOSTA-PETTYJOHN:  Thank you, your Honor.

 3              THE COURT:  Thank you.

 4              All right.  Let's get the jury.

 5              (Pause)

 6              THE COURT:  The juror did write me a note.  A note

 7    from juror number 3, Mike Ciraldo.

 8              "I am now a little concerned about the events that

 9    occurred prior to our entry to the court this morning.  If it

10    is accurate that Mr. Giannini's life and Mr. Magalios' life was

11    threatened, can we be sure that the possibility of jury

12    tampering is out of the question?  And I am surprised that,

13    given this prior incident directed at Mr. Giannini and

14    Mr. Magalios, that the ex-wife is still in the building and

15    able to testify.

16              "P.S. I did not discuss this note with any of the

17    other jurors."

18              Well, hopefully my instruction to them as a group

19    will put his mind at rest.  And I think I won't mention to the

20    other jurors that we got a note.

21              Can we be sure the possibility of jury tampering is

22    out of the question.  Well, I think the fact that this

23    individual is gone and isn't associated with either party

24    should put their minds at rest.

25              MS. ACOSTA-PETTYJOHN:  Your Honor, I would just like
```

1      to make an objection and just ask for a mistrial for prejudice

2      from juror number 3.  He's clearly very concerned about any

3      events alleged or did not happen this morning and he's clearly

4      going to be concerned throughout the rest of deliberation and

5      trial, your Honor.

6               THE COURT:  I mean, the concern I think he has is

7      that if he returns a verdict for plaintiff, he might be in

8      trouble with this boyfriend, so I would expect the application

9      to come from plaintiff, if anyone.  But I don't -- what I'll do

10     is I'll give my instruction and if, at the break, anybody wants

11     me to speak individually to him, I'll do that.

12               MS. ACOSTA-PETTYJOHN:  Thank you, your Honor.

13               THE COURT:  And I certainly wouldn't -- a mistrial

14     certainly wouldn't be the remedy.  It would be excusing juror

15     number 3.  But let's see what happens.

16               We'll mark this note -- I guess the voir dire form

17     will be Court Exhibit 1 and this will be Court Exhibit 2.

18               (In open court; jury present)

19               THE COURT:  Welcome back, ladies and gentlemen.

20     Sorry about that interruption.

21               You heard some testimony from Mr. Giannini about a

22     threat that was made to him by someone he understands to be

23     Mr. Magalios' ex-wife's new boyfriend.  That testimony was

24     brought out in the expectation that the ex-wife was going to

25     testify.  It now turns out she's not going to testify.  You're

1    to use that testimony only for a very limited purpose, which is

2    for whatever effect it might have had on the witness' state of

3    mind.

4              You also need to keep in mind that the individual

5    who's alleged to have made the threat is not associated with

6    any of the parties.  He's not associated with the defendants.

7    He's not associated with the plaintiff.  So any misconduct by

8    such a person should not affect your views of any of the

9    parties either way, and the only purpose for which that

10   evidence should be considered by you is for how it may have

11   affected Mr. Giannini in his manner of testifying.

12             So, with that, we will continue.

13             Oh, and I am told that both Ms. Tibaldi, the

14   plaintiff's ex-wife, and the new boyfriend have left the

15   building.

16             All right.  Defendants may call their next witness.

17             MS. ACOSTA-PETTYJOHN:  We would like to call Officer

18   Peralta to the stand.

19   MATHEW PERALTA, called as a witness in his own behalf,

20   having been duly sworn, testified as follows:

21             THE DEPUTY CLERK:  Please have a seat.

22             You can take your mask off.

23             Please state your full name for the Court and spell

24   out your last name slowly.

25             THE WITNESS:  Mathew Peralta, P-E-R-A-L-T-A.

20214smaga1    Peralta - Direct - Ms. Acosta-Pettyjohn

1    DIRECT EXAMINATION

2    BY MS. ACOSTA-PETTYJOHN:

3    Q.    Good morning, Officer Peralta.

4          Are you currently employed?

5    A.    Yes.

6    Q.    And who are you employed by?

7    A.    New York State DOCCS, Department of Corrections and

8    Community Supervision.

9    Q.    And when did you begin working for DOCCS?

10   A.    2015.

11   Q.    And what is your current title with DOCCS?

12   A.    Correction officer.

13   Q.    And has that always been your title since 2015?

14   A.    Yes.

15   Q.    And can you describe the duties and responsibilities of a

16   correction officer.

17   A.    So motto of the department is care, custody and control.

18   We basically maintain -- maintain that for the inmates.

19   That's -- that's the basic -- that's like the basic grounds of

20   the job, make sure they report to their programs; make sure we

21   have live, breathing bodies; make sure for their care, you

22   know; make sure, if anything happens to them, we -- we respond

23   in an appropriate manner.

24   Q.    And where are you currently assigned to?  What facility?

25   A.    Fishkill Correctional Facility.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20214smaga1    Peralta - Direct - Ms. Acosta-Pettyjohn

1    Q.   And what type of facility is Fishkill?

2    A.   It's a medium.

3    Q.   And approximately how many inmates does Fishkill hold?

4    A.   I don't -- off the top of my head, I couldn't give you an

5    exact number, but I could say probably more than a thousand,

6    less than two thousand.

7    Q.   And were you employed at Fishkill on September 3rd, 2017?

8    A.   Yes.

9    Q.   And at that time, did you have any specific bid or post?

10   A.   No.  I was resource at the time.

11   Q.   And can you explain what resource means.

12   A.   So resource is generally you're at the leisure of the

13   chart sergeant.  So wherever the department needs you is where

14   they fit you, wherever there's empty space, where they need an

15   officer.

16   Q.   And are you currently assigned as a resource officer?

17   A.   No.  I currently have a bid.

18   Q.   And what is a bid?

19   A.   So a bid is -- you generally come in as a resource

20   officer.  As time goes on, you could put in a bid, which is a

21   set post.  So, you know, you -- from that day on, once you're

22   awarded that bid -- it usually goes by seniority.  Once you're

23   awarded that bid, that's the post that you report to every day

24   until your bid changes.  So you no longer would be going from

25   one place to another or you're no longer at the leisure of the

1   sergeant to say today you're over here and tomorrow you have a
2   different location.
3   Q.   And can you generally describe a day in the life of an
4   inmate at Fishkill.
5   A.   So from an officer's standpoint, our shift starts at 6:30,
6   so we come in.  That's when inmates have a count.  They have to
7   stand up and make sure they're alive and breathing and make
8   sure everything's all right with them.  From 6:30 to about 7,
9   that's when the count usually clears, which they're approved to
10  go to chow, which is the mess all.  They walk off the unit.
11  They go to mess all.  From the mess hall, they return back to
12  the unit.  This is all escorted.  From the mess hall, they come
13  back to the unit.  Around 8:00, the walkway opens.  The inmates
14  at that time report to their programs.  If they don't have a
15  program, they're allowed to report to the yard.  Once -- once
16  the program mod is over --
17          MR. MILLER:  Your Honor, I would just object because
18  I believe he's referring to Monday through Friday, which I
19  think is irrelevant here.
20          THE COURT:  Yes.  I'm not clear on the relevance.
21          THE WITNESS:  No, there's mods Monday through Sunday.
22  A.   Mods is basically -- a mod is basically a --
23          THE COURT:  Well, I'm still not clear on the
24  relevance.  Why don't we talk about visits and how they work or
25  specific aspects that relate to what happened in this case.

1          MS. ACOSTA-PETTYJOHN:  Sure, your Honor.

2     Q.   I'm going to turn your attention to September 3rd, 2017.

3          Did you have a specific post or assignment that day?

4     A.   That day -- I didn't have a bid at that time, I was

5     resource, but I'm sure I had -- I was assigned to -- after the

6     deposition, I know I was assigned to visiting room 2.

7     Q.   And before September 3rd, 2017, have you ever worked in

8     visiting room 2 before?

9     A.   Pretty sure I have.

10    Q.   And can you describe the duties and responsibilities of an

11    officer assigned to visiting room 2.

12    A.   Okay.  So visiting room 2 you have generally two officers.

13    Sometimes three.  I'm not too familiar with the visit room, so

14    I don't know when they have three or two.  But your basic

15    responsibility is to make sure there's no contraband being

16    passed, make sure visitors and visit -- and inmates are doing

17    what they're supposed to do, make sure conduct is maintained.

18    That's pretty much it.

19    Q.   And do you recall who worked with you in visiting room 2

20    on September 3rd, 2017?

21    A.   No, I don't.

22    Q.   And can you describe the layout of visiting room 2?

23    A.   So -- I haven't worked there in such a long time.

24    Visiting room 2, as soon as you walk in, there's -- there's a

25    desk lined up that generally has one table with two chairs.

1    The officers usually sit in the back left.  There's a little

2    podium with a chair on it.  There's vending machines back

3    there.

4    Q.   Do you know approximately how many inmates and visitors

5    can sit in that area?

6    A.   No.  I have no idea.

7    Q.   Do you know if there's a limit on how long a visit can

8    last?

9    A.   I don't think -- I believe there's not -- there's no limit

10   on the time frame of the visit.

11   Q.   Are inmates and visitors free to start or end their visit

12   at any time?

13   A.   Yes, as long as it's within the parameters of the visit

14   hours.

15   Q.   Are there any rules or regulations regarding physical

16   touching between inmates and their visitors?

17   A.   They're very basic.  No prolonged kissing, touching.

18   Basically, you don't -- you can give a quick grasp, kiss, upon

19   your visit, upon arriving and leaving.  Other than that, I'm

20   not too familiar with anything else.

21   Q.   So a quick kiss is fine, correct?

22   A.   Yes.

23   Q.   And can an inmate be disciplined for kissing their

24   visitor?

25   A.   They're generally told to -- if they're prolonged kissing,

 1  to stop.  The next step from that would be a misbehavior

 2  report.

 3  Q.  Have you ever issued a misbehavior report for prolonged

 4  kissing?

 5  A.  No.

 6  Q.  Now, can you walk me through the process of how a

 7  visitor -- sorry.

 8      Can you walk me through the process of how an inmate

 9  enters the visiting room.

10  A.  Okay.  So there's two sides to the frisk and strip area.

11  So when you first walk in as an inmate, when you're walking in

12  from the walkway, there's generally an officer there that wands

13  you with a hand scanner for metal and pats you down.  There's

14  another officer sitting at the desk.  Once that officer pats

15  you down and hand scans you with the wand for metal, you

16  approach the desk and, at that point, you would give that

17  officer your I.D.  They'll log you in their book.  From there,

18  you make a right down the hall, you make a left out the door,

19  walk up to the officers' station.

20  Q.  And can you walk us through the process on how an inmate

21  would exit the visiting area.

22  A.  So I don't remember a hundred percent.  Like I said, I

23  haven't worked there in a long time.

24      When they're leaving the visit, they go through that door.

25  They would have to go to the officers' desk with the visitor

1    and make sure that the visitor -- the visitor gets their pass,

2    I believe.  They go through that door.  Once they get to that

3    door, the officer in there has them have a seat and they have

4    to wait 'till their visitor leaves the premises.  Once the

5    visitor leaves the premises, then they're allowed to continue

6    to be frisked, strip frisked.  So they'll sit down on a bench

7    and wait until the officer tells them, hey, come up, basically,

8    because they can't -- they can't leave unless the visitor

9    leaves first.  Once that happens, they'll go to the back --

10   they'll go down to the waiting area, make a left, and there's a

11   strip-frisk area.  That's where they get strip frisked.

12   Q.   And what happens after the inmate gets strip frisked?

13   A.   If they have a package, they'll go to the package room.

14   Sometimes there's inmates there waiting for their packages as

15   well.  So they continue out that -- that same -- they keep

16   going that same route.  If they have a package, they'll sit

17   there and wait for a package; if they don't, they will pass

18   another officer.  That officer will let them go through.  They

19   come out the -- they'll make a right to leave the building and

20   walk onto the walkway.  Once they get to the walkway, that's

21   where, if they live in the main building, they would make a

22   left and go down, or if they live like in 21 building, which is

23   another side of the jail, they would make a right and walk up

24   towards that way.

25   Q.   And as they're walking through the walkway and going to

1    their housing unit, are they escorted by anybody?

2    A.    No.

3    Q.    And as part of your duties as an officer in visiting room

4    2, are you also responsible for frisking inmates who exit the

5    visiting area?

6    A.    No.

7    Q.    On September 3rd, 2017, do you know if you conducted any

8    frisk or strip frisk at all?

9    A.    I wouldn't have.  I wouldn't be in a strip-frisk area.

10    Q.    Why would you not be in the strip-frisk area?

11    A.    Not my post.  My post is the visiting room.  Can't leave

12    the post unattended.

13    Q.    What happens if you do leave the visiting room?

14    A.    I could get written up by a sergeant and get what they

15    call an NOD, a notice of discipline.  If anything happens in

16    the visiting room, I would be in big trouble as well.

17    Q.    Do you recall on September 3rd, 2017 ever leaving your

18    post in visiting room 2?

19    A.    No.

20            MR. MILLER:  Objection.  No foundation.  He said he

21    didn't remember until the deposition that he was even assigned

22    there.

23            THE COURT:  Well, that's a good question you can ask

24    on cross.

25    Q.    Now, how many visiting rooms are there in Fishkill?

1   A.    There are two visit rooms.  There's a third visit room for

2   SHU inmates.  It would be noncontact visits.

3   Q.    Are the visiting rooms connected in any way?

4   A.    Yes.  There's a little hall connecting visiting room 1 and

5   2.

6   Q.    Can you describe the frisk area that the inmates go

7   through to enter and exit the visiting area.

8   A.    Repeat that.  I'm sorry.

9   Q.    Sure.

10        Can you describe the frisk area, the layout of the frisk

11  area where the inmates go to enter and exit the visiting area.

12  A.    The frisk area where they go to enter and visit -- the --

13  I'm sorry.  The waiting area you want to know or --

14  Q.    Sure.  Describe the waiting area for me.

15  A.    As soon as you walk through that door from the visit room

16  1, you have the benches to the left and to the right.  If you

17  go to the right, there's a desk there with an officer, and if

18  you keep going down that hall where there's the waiting area,

19  you go to the -- all the way at the end of the hall, you make a

20  left, that's the strip-frisk area.

21  Q.    When you go down the hall, I know you said you make a left

22  to the frisk area.  Is there anything to the right of that

23  hall?

24  A.    No.  Nothing.

25  Q.    I'm going to show you what's been marked -- or is in

1    evidence as Defendants' Exhibits J1 through J9.

2        Officer Peralta, can you describe what we're seeing in

3    this picture?

4    A.   So that right there is the -- all the way on the far back

5    corner where that gray door is at --

6    Q.   Here?

7    A.   Yes.  Right there in front of it, it's really hard to see,

8    there's a desk there.  That's where I believe a processing

9    officer would sit.  If you make a left, there's -- there's a

10   doorway there with a door.

11   Q.   Here?

12   A.   Yes.  If you make a left, that's where the inmates come in

13   from when they're coming from their unit to a visit.  That's

14   where they would get pat frisked, wand with a metal detector.

15   That door to the right, very beginning of the picture, would be

16   the visit room, visit room 1.  That's the entrance to it.

17   Q.   Can you describe what this is, this white --

18   A.   Those are -- they're like cubbies for net bags for

19   visitors.

20   Q.   For?

21   A.   For inmates.  I'm sorry.

22   Q.   I'm going to show you the second picture.  Can you

23   describe what we're looking at here?

24   A.   That is -- so where that desk was in that first picture,

25   that's just the opposite.

1    Q.   So it's this desk, correct?

2    A.   Yes.  That's just looking the opposite way towards that

3    door.  You could see the door is on the left.

4    Q.   So those would be the cubbies that you just described in

5    the first picture, correct?

6    A.   Yes.

7    Q.   And this door would be the door to exit or enter the

8    visiting area?

9    A.   Yes.  To exit -- to enter the visiting room 1.

10    Q.   Okay.  And what are we looking at here, Mr. Peralta?

11    A.   That is the waiting area.  The benches on the right and

12    the left, I believe.

13    Q.   And what is this door to all the way back here?

14    A.   I can't see.  It's kind of a glare on the glass.

15    Q.   Okay.

16    A.   That looks like --

17    Q.   Is that better?

18    A.   Yes.  That looks like the -- that's all -- that looks like

19    it's all the way at the end of the hall where the strip

20    frisk -- where it would go -- like on the opposite side of that

21    picture would be the strip frisk to the right, but you're

22    looking at the visit room door, visit room 1 door.

23    Q.   So this would be the door that we saw in the first two

24    pictures?

25    A.   Yes.

20214smaga1   Peralta - Direct - Ms. Acosta-Pettyjohn

1   Q.   And to the visiting room?

2   A.   Yes.

3   Q.   And this you said was a waiting area, correct?

4   A.   Yes, that's the waiting area.

5   Q.   And then this would be what?  What are we looking at in

6   this picture?

7   A.   That's that same corridor.  That's just all the way up in

8   the front of it.  That's the visit room door.

9   Q.   So, again, this picture is a just a closeup of the picture

10  we just saw before?

11  A.   Yes.

12  Q.   And what are we looking at here, Officer Peralta?

13  A.   That is -- you would be standing in front of that door on

14  the opposite side.  You're looking at the officers' station.

15  Q.   Can you describe what this purple door is?

16  A.   That's a kids' section.  That's where the kids would

17  generally be from the visitors.

18  Q.   And again, you said this desk?  Is that the officers'

19  station?

20  A.   Yes.  That's the station where two officers sit.

21  Q.   And again, this is the view you have when -- as soon as

22  you're on the other side of that visiting room door, correct?

23  A.   Yes.

24  Q.   Do you know -- over here seems to be like a little

25  hallway.  Do you know what's down here?

1   A.   Before that wall or after it?

2   Q.   I guess after the kids' play area.  There's like a

3   little --

4   A.   I believe vending machines.  To the left, there's vending

5   machines.

6   Q.   This picture, what are we looking at here?

7   A.   That's a close-up of that picture, the officers' station.

8   Q.   Okay.  So this would be the officers' desk, right?

9   A.   Yes.  And in the background, that's the visiting room 1.

10  Q.   Do you know how many officers sit at that desk?

11  A.   I would imagine only two.  It's not a big podium.

12  Q.   And what are we looking at here, Mr. Peralta?

13  A.   That's somebody standing on the podium taking a picture --

14  Q.   And again, that --

15  A.   -- of visit room 1.

16  Q.   And that's the podium we just saw in the two previous

17  pictures, correct?

18  A.   Yes.

19  Q.   And this is, sorry, visiting room 1?

20  A.   Visiting room 1, yes.

21  Q.   Okay.  What is this that we're looking at?

22  A.   That looks like all the way in the back of visit room 1.

23  That's -- that's all the way in the back of visit room 1 facing

24  towards where that desk that -- the photo before just showed.

25  Q.   Okay.  So this is a view of somebody standing all the way

1    in the back of the visiting room?

2    A.    1, yes.

3    Q.    Okay.  What are we looking at here?

4    A.    That I believe is visiting room 1 still.  I can't see it

5    so clear.

6    Q.    Sorry.

7    A.    That's fine like that.  I'm just trying to think of how it

8    looks.  I haven't worked there in a long time, so -- yeah, I

9    think that's the visiting room 1.  On the left would be the

10   podium, but I don't think you can see it because of the pole.

11   You don't see it much.  And on the right side would be that

12   corridor going to visiting room 2.

13   Q.    When you say right side, you mean over here?

14   A.    No.  On the opposite side.  Yeah, that side.  That's where

15   the entrance --

16   Q.    To my right?

17   A.    Yeah.

18   Q.    Okay.  So this would be the hallway going to the visiting

19   room 2 over here somewhere?

20   A.    Yeah.  There's an entrance with a door there and that

21   would be the entrance to visiting room 2.

22   Q.    So do you have to go through the visiting room 1 to go to

23   visiting room 2?

24   A.    Yes.

25   Q.    And what is this?

20214smaga1    Peralta - Direct - Ms. Acosta-Pettyjohn

1    A.    That's that corridor that would be on the right side of

2    that picture going into visiting room 2.

3    Q.    Do you know how long that hallway is?

4    A.    Approximately 30, 40 feet.

5    Q.    And I know it says visiting room 2 there.  Once you get to

6    the other side of this hallway, is that the only way to go into

7    visiting room 2?

8    A.    Yes.  As an inmate, that would be the only way to come

9    into visiting room 2.

10   Q.    And do you know what we're looking at here?

11   A.    That is a photo of visiting room 2.  That's all the way in

12   the back side of it.

13   Q.    So this angle, is that the angle from the entrance that we

14   just saw in the picture before?

15   A.    I believe so.

16   Q.    Okay.  So this would be the angle -- once you go through

17   the hallway, this would be the first thing you see?

18   A.    Yes.  As soon as you walk through that hallway, you look

19   back -- if you're looking down the hall, that -- that --

20   there's vending machines on the left.

21   Q.    Over here?

22   A.    Yeah.  In the back corner.  Then there's restrooms in the

23   back for visitors, I believe, behind that wall.

24   Q.    Behind this wall?

25   A.    Yes.

1    Q.    What are we looking at here, Officer?

2    A.    That's the same view, but just on the other side of the

3    room, to the left side of the room.

4    Q.    So we're still looking at the back of visiting room 2?

5    A.    Yes, we're still looking at the back of visiting room 2.

6    Q.    Can you describe what we're looking at here?

7    A.    I can't even see the picture that clear.

8    Q.    Sorry.  Should I make it bigger or -- what would help?

9          If it would help, Officer Peralta, I believe next to you

10   is a binder that has exhibits in it.  It's probably more

11   closeup pictures.  You can go to Exhibit J and J7.

12   A.    J7.

13   Q.    Are you looking at what everyone is looking at on the

14   screen?

15   A.    Yes.

16   Q.    Okay.  Can you describe what that picture is?

17   A.    That looks like visiting room 2 still.  On the left side

18   is the corridor to go back into visiting room 1.

19   Q.    And when you say that, you mean this right here?

20   A.    Yes.

21   Q.    Okay.  Can you describe what we're looking at now?

22   A.    That is the noncontact visit.  That would be where the

23   inmates with noncontact would go in there.

24   Q.    Can you explain what that means.

25   A.    They would have no contact with the visitor.  So one

1  inmate would be on -- the inmate would be on one side, the

2  visitor would be on the opposite side with the Plexiglass in

3  between them.

4  Q.   And again, can you describe what we're looking at here?

5  A.   That would be the strip-frisk area.  So those -- those

6  booths on the right, that's where you would take an inmate to

7  get strip frisked.

8  Q.   And can you describe -- I think it's like a little gate on

9  the left-hand side.  Can you describe what that is?

10 A.   Yes.  That's the exit from the strip-frisk area.  Right

11 before that there's a desk to the left.  That's a package room.

12 That's where -- if a visitor brings a package in, that's where

13 the inmate would retrieve the package from.  But that gate

14 right there is where a -- that's another post where the inmate

15 has to leave from.  And if I'm not hundred percent -- I'm not

16 hundred percent sure.  I believe the inmate would have to see

17 the officer there to leave.

18 Q.   Past that gate?

19 A.   Yes.

20 Q.   And what are we looking at now, Officer Peralta?

21 A.   That is that same corridor looking to the left side, those

22 are also strip-frisk room.  Some days, if there is enough

23 officers and there's a large number of inmates, they would open

24 up those rooms and utilize them.

25 Q.   And on this side, what would this be?

1    A.    That right side would be those strip-frisk booths.

2    Q.    And those are the booths we just saw in the picture

3    before, correct?

4    A.    Yes.

5    Q.    Do you know what this is depicting?

6    A.    That picture, I have no idea, to be honest.

7    Q.    What about this picture here?

8    A.    That's the strip-frisk area.  That's the -- the opposite

9    side from where the gate is at.  Those benches on the left

10   would be where the inmates would sit and wait for their

11   package.  And the package room is on the right.  Those doors on

12   the right side.

13   Q.    So by the time an inmate got here, they would have already

14   passed the strip-frisk area?

15   A.    Yes.  Absolutely.

16   Q.    I'm going to show you Plaintiff's Exhibit 6A.

17         Can you describe on this picture where the strip-frisk

18   waiting area would be.

19   A.    Strip-frisk waiting area?

20         Can I just point out something wrong on the photo?

21   They're missing a desk and stuff.

22   Q.    Well, let me rephrase my question.

23         Is this photo an accurate depiction of the layout of the

24   visiting room and the frisk area?

25   A.    No.  There's a couple things missing.

20214smaga1    Peralta - Direct - Ms. Acosta-Pettyjohn

1    Q.    So please tell me what's missing.

2    A.    There's a desk as soon as you walk -- it's in the photos

3    as well.  As soon as you walk from the officers' station in

4    visit room 1, you walk through the door --

5    Q.    Walk this way?

6    A.    Yes.

7    Q.    Okay.

8    A.    On the right side, over to the right -- no, to the right

9    wall.  In that same corridor on the right wall down.

10   Q.    Here?

11   A.    No.  That same wall, but on the opposite side.

12   Q.    This way?

13   A.    No, no.  That wall.  Just go up on that wall.

14            THE COURT:  Where the benches are?

15            THE WITNESS:  No.

16   A.    Right on the -- you see where that corridor is at?

17   Q.    This door?

18   A.    No.  I'm sorry.

19            THE COURT:  Why doesn't the witness step down.

20   Q.    Officer Peralta, can you please step down.

21            THE COURT:  Step down and tell us what you're talking

22   about.

23            MS. ACOSTA-PETTYJOHN:  Yes.

24   Q.    And just please speak a little louder because we don't

25   have a microphone over there.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20214smaga1     Peralta - Direct - Ms. Acosta-Pettyjohn

1    A.    Okay.  So this wall right here --

2    Q.    Sorry.  Can you step to the side a little bit so the jury

3    can see.

4    A.    Sorry.

5          So this wall right here, there's a desk here with a phone.

6    This officer doesn't have a phone, so this is the phone they

7    utilize.  So there's a desk and a phone here.  So there would

8    be -- should be a square like that here.

9                THE COURT:  All right.  So the witness is indicating

10   the same hallway as the desk with three circles closer down

11   where the hallway turns into the wooden benches on the opposite

12   wall.  That's where he's indicating there's a phone.

13               THE WITNESS:  There's a table with a phone.

14               THE COURT:  Okay.

15               THE WITNESS:  I don't know what size.  The size of

16   a -- a table there with a phone.

17   A.    And that's the phone that the processing officer utilizes

18   when a visitor exits the visit room.

19               THE COURT:  Keep your voice up.

20               THE WITNESS:  Okay.

21   Q.    And other than that, is there anything else missing from

22   this diagram?

23   A.    I'm not -- I'm not too familiar with everything in the

24   visit room.  But these are the bathrooms here.

25   Q.    So the square right here is a bathroom?

1    A.    There would be a bathroom here.  This is -- if this is

2    showing how many officers, there's no way four can sit on that

3    desk.

4    Q.    Sorry.  Officer, can you speak a little louder.

5    A.    If the circles indicate officers, there's no way four

6    officers can sit on that desk.  This podium is the size of a

7    school chair.  There's only one chair there.  If there's

8    another officer, they have to stand.  That's about -- there's

9    no chairs here.  As soon as you walk out this door, there's the

10   kids' section here.  There's no chairs here.  And I don't know

11   what this is, but I know there's no chairs here.  That's the

12   area that you saw in the photos with the kids' section.  And

13   then there's a walk-in.  That's visit room 1.

14   Q.    And so visiting room 1, would that be here?

15   A.    That would be this whole area right here.

16         THE COURT:  Indicating the upper left.

17   Q.    And right in front of the processing officer, is there a

18   door or a wall or is that an open hallway?

19   A.    That's an open hallway.

20   Q.    Okay.  Officer, you can have a seat.

21         And, Officer Peralta, on a weekend, how many inmates would

22   be in the waiting area of the frisk room at any time?

23         MR. MILLER:  Objection.

24         THE COURT:  Yes, sustained.

25   Q.    Officer Peralta, when an inmate exits the visiting room,

 1   are they required to sit in a waiting room?

 2   A.   Yes.

 3   Q.   And in that waiting room, is it one inmate at a time, more

 4   than one, or how does that process go with the waiting area?

 5   A.   No, those benches could be full.

 6            MR. MILLER:  Objection to form.

 7            THE COURT:  Overruled.

 8   Q.   And when you say full, approximately how many inmates can

 9   sit there -- would sit there?

10   A.   I mean, it's a pretty long bench, depending on how many

11   inmates leave -- decide to leave.  They come and go as they

12   please.  It's not -- they're never told that you have to leave

13   at this moment.  So sometimes there's a lot of inmates back

14   there.

15   Q.   And approximately how many correction officers would be in

16   that area?

17   A.   I'm not too familiar with that area as far as staff-wise,

18   how many staff members would be there.

19   Q.   Are you familiar with the route that an inmate would take

20   to go from the visiting area to housing unit 16-2?

21   A.   Pretty familiar.

22   Q.   Can you describe to us the route an inmate would take to

23   go from the visiting area to housing unit 16-2?

24   A.   So --

25            MR. MILLER:  Your Honor, the only reason I would

1    object is I believe we've been through this a couple of times.
2    It's repetitive.

3         THE COURT:  Yes, we have, but I think
4    Ms. Acosta-Pettyjohn can do it with at least one of her
5    clients.  I'm not sure we need to hear it too many more times.
6    A.   So when you exit the visit -- from the frisk area, the
7    strip frisk, or you want to know as soon as you walk out the
8    building.

9    Q.   From the strip-frisk area.

10   A.   So from the strip-frisk area, there's a post there manned
11   by an officer.  That's where that gate was at in that photo.
12   They would pass that officer, exit the building.  As soon as
13   they exit the building, there's another officer directly across
14   from the -- from the building.  That would be walkway bravo.
15   That would be manned with an officer.  If they're going down to
16   the main building, they would make a left.  They would walk
17   down that walkway and there's -- down that walkway, there's
18   another walkway post.  That would be walkway alpha.  That's
19   manned by another officer.  As soon as they get to the
20   building, there's a door to get into the building.  You make a
21   left and there's an officer sitting right there.  That's
22   another post.  That's called walkway tunnel.  Once they get
23   inside the building, I'm not familiar with that building
24   whatsoever unit-wise.  I do know that they have to walk through
25   multiple housing units and to get to their units depending on

1    what side of the building they're on.  Every single one of

2    those posts are always manned.  There's no way to not man those

3    posts because they have inmates on them.  So they -- I mean,

4    unless everybody's neglecting their duty, they have to be

5    manned.

6              MR. MILLER:  Objection.  Move to strike.

7              THE COURT:  Overruled.

8    Q.    Now, prior to September 3rd, 2017, did you have any

9    interactions with Mr. Magalios?

10   A.    No.

11   Q.    And to your knowledge, prior to September 3rd, 2017, do

12   you know if there was any issues between you and Mr. Magalios?

13   A.    No.

14   Q.    And on September 3rd, 2017, did you have any interaction

15   with Mr. Magalios?

16   A.    No.

17   Q.    Do you recall exchanging any words with Mr. Magalios?

18   A.    No.

19   Q.    Do you recall if you ever complained to any DOCCS staff or

20   supervisor about Mr. Magalios?

21   A.    No.

22   Q.    Do you recall if Mr. Magalios was having a visit that day?

23   A.    I don't -- I only know because of this deposition and

24   lawsuit.  Other than that, I didn't even know.

25   Q.    Do you know if you had any interaction -- withdrawn.

1          Do you know who Officer Bailey is?

2   A.   Yes.

3   Q.   Who's Officer Bailey?

4   A.   He's a co-worker.

5   Q.   Do you know who Officer Blount is?

6   A.   Yes.

7   Q.   Who's Officer Blount?

8   A.   Co-worker as well.

9   Q.   And did you see Officer Bailey have any interaction with

10  Mr. Magalios on September 3rd, 2017?

11  A.   No.  I don't -- no.

12  Q.   Did you see Officer Blount have any interaction with

13  Mr. Magalios on September 3rd, 2017?

14  A.   No.  Wouldn't know.

15  Q.   Do you know -- or did you know where Officer Bailey was

16  posted that day?

17  A.   Nope.

18  Q.   Did you know where Officer Blount was posted that day?

19  A.   Nope.

20  Q.   Did you participate in any strip frisk that day?

21  A.   No.

22  Q.   And to your knowledge, did anything out of the ordinary

23  occur in the visiting room on September 3rd, 2017?

24  A.   No.  If anything would have occurred, there would have

25  been either a --

1          MR. MILLER:  Objection.

2     A.    -- misbehavior report or a response.

3          THE COURT:  Hold on.  There's an objection.

4          What are the grounds?

5          MR. MILLER:  I believe the question asked for a yes

6     or no and I move to strike anything after no.

7          THE COURT:  Well, the question was did anything out

8     of the ordinary occur, so, yes, I guess the answer would be yes

9     or no.  But if a witness' answer is not responsive, that's

10    really the objection of the questioner, not the other side.  So

11    overruled.

12    Q.    Sorry, Officer Peralta.

13    A.    Can you repeat the question.  I'm sorry.

14    Q.    Sure.

15         Do you know if anything out of the ordinary occurred in the

16    visiting room on September 3rd, 2017?

17    A.    No.  And I only say that because if something out of the

18    ordinary would have occurred, there would have been a

19    misbehavior report following either that or a response and, at

20    that point, I would have done further paperwork and then a

21    to-from, which is what I did, and there was none, so no.

22         MR. MILLER:  I move -- same.  Move to strike that

23    last part of the answer.

24         THE COURT:  Overruled.  You can inquire when it's

25    your turn.

1              MR. MILLER:  Thank you.

2     Q.    And, Officer Peralta, on what occasion would you be

3     required to write a to-from?

4     A.    To-from is many things.  It's just a basic form of

5     communication between you and a supervisor either responding to

6     something or requesting something.

7     Q.    And on September 3rd, 2017, did you observe any DOCCS

8     employee threaten Mr. Magalios?

9     A.    No.

10    Q.    And on September 3rd, 2017, did you observe any DOCCS

11    employee become aggressive towards Mr. Magalios?

12    A.    No.

13    Q.    And on September 3rd, 2017, did you observe any DOCCS

14    employee assault Mr. Magalios?

15    A.    No.

16    Q.    Now, Mr. Peralta, did you know how housing units are

17    assigned to inmates?

18    A.    Based on their programs.  Every inmate is programmed.  So

19    based on their program is where they'll be housed.  So --

20    Q.    And Officer Peralta, do you know if there's a clinic or

21    medical unit near the frisk area?

22    A.    As soon as you leave the visit-room building, you make a

23    right.  The medical unit's right there.  So instead of making a

24    left on the walkway, you make a right.  The medical unit's

25    pretty close.

1    Q.    And do you know, if an inmate asks a correction officer to

2    speak to a sergeant, what does the correction officer have to

3    do?

4    A.    Request a sergeant.

5                MR. MILLER:  Objection to the form.

6                THE COURT:  Try it again, Ms. Acosta-Pettyjohn.

7                MS. ACOSTA-PETTYJOHN:  Sure.

8    Q.    If an inmate had -- wants to speak to a sergeant and they

9    approach a correction officer, what would the procedure be?

10               MR. MILLER:  Same objection.

11               THE COURT:  What's the procedure?

12               Is there a particular procedure if an inmate

13   approaches an officer and says I want to speak to a sergeant?

14               THE WITNESS:  Yes, there is.

15               THE COURT:  Okay.  What is it?

16               THE WITNESS:  You hold the inmate there, you request

17   a sergeant, and you would wait until the sergeant arrives and

18   explain to the sergeant the situation.

19               MS. ACOSTA-PETTYJOHN:  I have no further questions at

20   this time, your Honor.

21               THE COURT:  Whenever you're ready, Mr. Miller.

22               MR. MILLER:  Thank you.

23   CROSS-EXAMINATION

24   BY MR. MILLER:

25   Q.    Good morning, Officer Peralta.

1    A.    Good morning.

2    Q.    Care, custody and control.  That's a term you used during

3    your direct exam, right?

4    A.    Yes.

5    Q.    It's a term also used by Officer Pumarejo yesterday,

6    correct?

7    A.    I believe so.

8    Q.    That's a common term that correction officers use.  It's

9    sort of like a term.  It's terminology that's used.  It's a

10   slogan, right?

11   A.    The department's model; care, custody and control.

12   Q.    Right.

13         Those words, the individual words, care, custody and

14   control, each one of those words have a real meaning to it,

15   right?

16   A.    Yes.

17   Q.    So let's talk about the word care.

18         Care means that you, as a corrections officer, have a duty

19   to ensure the safety of every inmate in a facility, correct?

20   A.    Yes.

21   Q.    And the word care means that you have a duty as a

22   corrections officer to ensure that an inmate is not assaulted

23   or abused by a fellow officer, correct?

24   A.    Do you know the actual definition of it, though?  I don't

25   know.  I'm just asking.

1    Q.    If you don't understand my question, let me know.

2    A.    You can repeat it.

3    Q.    You understood all the questions asked of your counsel,

4    right?

5    A.    Yes.

6    Q.    You didn't understand that last question?

7    A.    No.

8    Q.    Okay.  Let's focus on that word, care.

9    A.    Okay.

10   Q.    Under that category, are you, as a corrections officer,

11   required -- is it your duty to protect an inmate when you see

12   him being assaulted or abused by a fellow officer?

13   A.    Yes.

14   Q.    You are required, as a corrections officer, to intervene

15   even if it's your buddy beating an inmate, correct?

16   A.    If you could repeat that question.

17   Q.    You are required to intervene when a correction officer is

18   beating an inmate even if that corrections officer is a friend

19   or a buddy?

20   A.    Yes.

21   Q.    Because prisons, unlike other places, don't have the

22   general population to witness what goes on in there, correct?

23   A.    I don't understand what you're asking me.

24   Q.    Let me break that down.

25         Inmates are not allowed to have i-Phones inside a prison,

1   correct?  That's obvious.

2   A.   Okay.

3   Q.   Right?

4   A.   Yes.  They're not allowed.

5   Q.   And so, therefore, unless there's cameras on the wall,

6   there is nothing to record what's going on inside the prison,

7   right?

8   A.   There's cameras.

9   Q.   I said if there are no cameras on the wall.

10      No one has access to videotape a corrections officer's

11  activity, right?

12  A.   No, no.

13  Q.   And you, as a correction officer, is aware -- you are

14  aware that whatever you do, whether it's right or wrong or

15  indifferent, no inmate, no civilian will have access to a phone

16  to videotape what you're doing, correct?

17  A.   Could you rephrase that question.  I don't understand what

18  you're asking me.

19  Q.   You, as a corrections officer, know, you have knowledge,

20  that whatever you do inside that prison, whether it's right,

21  wrong or indifferent, no one can videotape what you're doing?

22  A.   I don't think about that because I conduct myself in a

23  professional manner, so --

24  Q.   I see.  Now could you answer my question.

25  A.   I'm -- I'm trying to.  I need you to explain yourself.

1    Q.   Should I repeat it?

2    A.   Yes.

3    Q.   You know, as a corrections officer, that whatever you do,

4    whether right, wrong or indifferent, an inmate or no one else

5    can pull out their phone and videotape your activity.  You know

6    that, right?

7    A.   If you're asking if I can be --

8    Q.   You know that, right?  Yes or no?

9              MS. ACOSTA-PETTYJOHN:  Objection, your Honor.

10   A.   I'm trying to answer your question.

11             THE COURT:  Let the witness answer.

12   A.   If you're asking me if anybody can record anything in

13   there, the answer is no.

14             THE COURT:  The question is -- and I think this is

15   implicit, but he wants you to answer explicitly -- when you're

16   in the prison, you're aware that nobody can record you; are you

17   not?

18             THE WITNESS:  I'm pretty sure everybody's aware of

19   that.

20             THE COURT:  And including you?

21             THE WITNESS:  Yeah.  There's no phones.  You can't

22   record anything.

23   Q.   I'm sorry?

24   A.   There's no phones.  You can't record anything.

25   Q.   And so no matter what you do, right, wrong or indifferent,

1    if there are no inmates around, other than one, then there's no

2    civilian witnesses to whatever you're doing, whether it's

3    right, wrong or indifferent, correct?

4    A.    I still don't understand your question.

5              THE COURT:    The question is if there's an interaction

6    between inmates and correction officers and nobody else is

7    present, then there's no outside witness to what's happening,

8    which I think --

9              THE WITNESS:    There's generally --

10             THE COURT:    -- is sort of obvious from the question,

11   but --

12             THE WITNESS:    But there's no -- there's no -- there's

13   generally no way of seeing when somebody's going to pop up, so

14   I can't generally answer that question.  Somebody can always

15   walk around the facility.  There's free walking and escorted.

16   An officer could be going to his post.  So I can't answer that

17   question generally because I --

18             THE COURT:    No, but the question is if there's an

19   interaction between an officer and an inmate, there's no member

20   of the public who's present, correct?

21             THE WITNESS:    There's no member -- there's no public

22   inside the facility.  It's only inmates and officers.

23             THE COURT:    I think we get it, Mr. Miller.

24             MR. MILLER:    I think we get it as well.

25             THE COURT:    And you can save the rest for your

1   closing argument it.

2            MR. MILLER:  Thank you.

3   Q.   Now, the waiting area in the frisk room where those

4   benches are lined up opposite each other --

5   A.   Okay.

6   Q.   You know what I'm talking about, right?

7   A.   Yes.

8   Q.   There are no cameras in that area, are there?

9   A.   I'm not too familiar with the area, but I believe not.

10  Q.   And if an inmate -- I'm going to -- I'm showing you what's

11  in evidence as Plaintiff's 6A.  We've looked at this before.

12  And you understand that this is the door heading into the frisk

13  area, right?

14  A.   Yes.

15  Q.   And you understand that this is --

16  A.   That's the frisk waiting area.

17  Q.   Yes.  The strip-frisk waiting area.

18  A.   Okay.

19  Q.   But this is also the door that you enter into the visiting

20  area, right?

21  A.   Yes.

22  Q.   In other words, there's one door that leads into and out

23  of the visiting area and that's this door right here?

24  A.   No.

25       Into the visiting area?

1   Q.   Yes.

2   A.   Where the visitors are?  Because there's multiple doors to

3   enter the visit area, the visit frisk area.

4   Q.   Okay.  What is this door here?

5   A.   To go into visit room 1.

6   Q.   Okay.  And to exit visiting 1 into the waiting area,

7   right?

8   A.   Yes.

9   Q.   So my question is, this area here where there are benches,

10  there were no cameras on the wall in this area, were there?

11  A.   Like I said, I'm not a hundred percent sure of that area.

12  I don't believe so, but I don't know.

13  Q.   Okay.  And if one were to turn this corner and stand along

14  this wall over here, they cannot see the area of the benches,

15  correct?

16  A.   You're asking me or are you telling me?

17       I've never stood on that corner.

18  Q.   I'm asking you if that's correct.

19  A.   I've never stood on that corner, so I couldn't tell you.

20  Q.   So just so we understand your testimony, you can't tell us

21  whether or not, if someone is standing here, you don't know if

22  they could see in the area let's say where this X is over here?

23  A.   I would assume not by the photo, but I've never -- I

24  personally can't answer that because I've never stood there.

25  Q.   You can't tell me for sure that a person standing along

1   that wall --

2   A.   I've never stood there.

3   Q.   -- can't see the area where the X is or where the benches

4   are?

5        MS. ACOSTA-PETTYJOHN:  Objection, your Honor.

6        THE COURT:  Sustained.

7   Q.   Okay.  Now, you said that you can't leave your post when

8   you're assigned to visiting room 2 because you'll get in

9   trouble from a sergeant, right?

10  A.   Correct.

11  Q.   And would it be fair to say that there were three officers

12  assigned to visiting 2 on September 3rd, 2017?

13  A.   Don't remember.

14  Q.   Do you remember if there were more than one?

15  A.   Don't remember.  I would assume there's more than one

16  officer in the visit room.

17  Q.   Well, you heard the testimony yesterday of Officer Crystal

18  Pumarejo, right?

19  A.   Yes.

20  Q.   She admitted that she was assigned to visiting room 2 on

21  September 3rd.  Did that refresh your recollection that she was

22  assigned to visiting 2 along with you?

23  A.   No.

24  Q.   And do you know if there was even a third officer assigned

25  to visiting 2?

20214smaga1    Peralta - Cross - Mr. Miller

1    A.    Don't remember.

2    Q.    In preparation for your deposition, as you've described,

3    you learned for the first time that you were assigned to

4    visiting room 2, correct?

5    A.    Okay.

6    Q.    That's your testimony, right?

7    A.    That's what I said earlier, yes.

8    Q.    Okay.  Now, your deposition was on March 29th, 2021,

9    right?

10   A.    Okay.

11   Q.    Before that day, you didn't know that you were assigned to

12   visiting room 2?

13   A.    Before that day?

14   Q.    Before the deposition, you didn't know you were assigned

15   to visiting room 2?

16   A.    I had to write a to-from based on that day.

17   Q.    Okay.  Did you answer my question?

18   A.    When I was told to write the to-from, I -- I obviously was

19   notified that I was there that day.

20   Q.    Okay.  Now, you were notified of the incident on September

21   4th, right?

22   A.    Okay.

23   Q.    So, on September 4th, 2017, you knew you were assigned to

24   visiting room 2, correct?

25   A.    I couldn't tell you what I remember on September 4th.

1   Q.   Well, weren't you informed of the incident or the

2   allegations on September 4th, 2017?

3   A.   Ask that question again.

4   Q.   When did you first learn about these allegations against

5   you?

6   A.   When I was asked to write a to-from.

7   Q.   And when was that?

8   A.   I don't remember off the top of my head.

9              THE COURT:  Did you write the to-from on the same day

10  you were asked?

11             THE WITNESS:  I don't know off the top of my head,

12  either.  That doesn't work that way.

13             THE COURT:  Maybe you can refresh the witness'

14  recollection.

15             MR. MILLER:  Yes.

16             Got the glasses issue again.

17  Q.   Do you have your deposition in front of you?

18  A.   Where would it be located?

19  Q.   If you can turn to page 9.

20             THE COURT:  I don't know if he has it.

21             MR. MILLER:  Oh.  It's right there.

22             THE WITNESS:  Thank you.

23  Q.   Why don't you start at the bottom of page 8 and continue

24  on to the top of page 9 up until line 8.  And just tell us if

25  that refreshes your recollection.

20214smaga1      Peralta - Cross - Mr. Miller

1    A.    I need you to give me a minute.  Can I find it first?

2          THE COURT:  Just read it to yourself.

3    A.    All right, but I need a minute before you start mentioning

4    numbers.

5    Q.    Go ahead.  Take your time.

6          (Pause)

7    A.    Okay.  What page was that?

8    Q.    Why don't you turn to page 8.

9    A.    8?

10   Q.    Yes.

11   A.    Okay.

12   Q.    Start at line 23 and go on to page 9, line 8.  Read it to

13   yourself and look up when you're done, please.

14   A.    23 to line 8 on page 9?

15   Q.    Page 8.

16         THE COURT:  Page 8, line 23.  Start there and keep

17   reading 'till the next page at line 8.

18         THE WITNESS:  Line 8.  Okay.

19         (Pause)

20   A.    Okay.

21   Q.    Does this refresh your recollection as to when you were

22   informed about the allegations made by Mr. Magalios?

23   A.    This is -- give me a -- ask your question again.

24         THE COURT:  Does reading that refresh your memory as

25   to when you were notified of the allegations that Mr. Magalios

1    made against you?  Does it jog your memory?

2              THE WITNESS:  Okay.  Yes.

3    Q.   Okay.  Why don't you tell us now when you were informed

4    about the allegations that Mr. Magalios made against you.

5    A.   I was told to write a to-from on September 4th.

6    Q.   What?

7    A.   On September 4th.

8    Q.   What year?

9    A.   2017.

10   Q.   Okay.  So let's just get organized.

11   A.   Okay.

12   Q.   On your direct examination, you said you learned about

13   your assignment at your deposition, which was four years later.

14   That was not true, correct?  The truth is that you learned the

15   next day what the allegation was against you, right?

16   A.   You just asked two different questions.

17             THE COURT:  Yes.  Why don't you --

18   A.   You mentioned allegation and then you mentioned something

19   else.  You asked two different questions.

20             THE COURT:  Why don't you break that down,

21   Mr. Miller.

22             MR. MILLER:  Okay.

23   Q.   When you said that you learned where you were assigned at

24   the deposition in 2020, you said that's the first time you

25   learned that you were assigned to visiting room 2, right?

1   A.   On a deposition?  I was -- that's when I was notified

2   of -- I was notified must have been the day after or the next

3   day, so -- to write a to-from.  So I don't understand your

4   question.  We're told to write to-froms in the facility.

5   Q.   Okay.  Let's focus on the next day.  You were informed --

6   A.   What day?

7   Q.   Correct?

8   A.   Next day from what day?

9   Q.   September 4th, 2017.

10  A.   Okay.

11  Q.   You were informed that Mr. Magalios made an allegation

12  against you, correct?

13  A.   Okay.

14  Q.   I'm asking you if that's correct.

15  A.   I would assume so.

16  Q.   So the allegation that you learned against you was pretty

17  serious, right, in your eyes?

18  A.   I would assume so.

19  Q.   Would you assume that assaulting an inmate would be a

20  pretty serious allegation?

21  A.   Yes.

22  Q.   Would you also assume so that that is something that can

23  cause you to be criminally prosecuted?

24  A.   Yes.

25  Q.   And you would assume so that that is something that can

1    get you disciplined or fired from your job?

2    A.    Yes.

3    Q.    So when you learned about these allegations on September

4    4th, 2017, didn't you then say, wait, what happened yesterday?

5    Who was I working with?  Who are my witnesses?  Did you ask

6    yourself any of those types of questions on September 4th,

7    2017?

8    A.    No.

9    Q.    Did you go to Officer Pumarejo and say, hey, you know, I

10   was just accused of assaulting somebody yesterday, like did you

11   hear about this or did you discuss it with her?

12   A.    No.  I -- I -- no.

13   Q.    You didn't?

14         And, in fact, there was a third officer assigned to

15   visiting 2 on September 3rd, 2017, correct?

16   A.    I don't know.

17            MR. MILLER:  I'm going to mark this item as

18   Plaintiff's 15 for identification.

19            May I approach the witness?

20            THE COURT:  Yes.

21   Q.    Take a look at 15 for identification and look up after

22   you've reviewed it.

23            (Pause)

24   A.    Okay.

25   Q.    Have you reviewed Plaintiff's 15 for identification?

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1     A.    That's what this is, yes.

2     Q.    And does that item refresh your recollection with regard

3     to who was assigned to visiting room 2 on September 3rd, 2017?

4     A.    No.

5     Q.    Okay.  Is that a logbook for the visiting room for

6     September 3rd, 2017?

7     A.    It's a logbook.  I don't know what it's for.  I -- it's a

8     logbook entry.

9     Q.    For what date?

10    A.    For September 3rd, 2017.

11    Q.    And for what area?

12    A.    It doesn't state the area.

13    Q.    Well, look at it more carefully.  Do you see your name

14    there?

15               THE COURT:  Well, it's not in evidence, so the

16    witness can't read from it.

17    Q.    Tell me if you see your name.

18    A.    Yes.

19    Q.    And does it say what you're assigned to?

20    A.    Yes.

21    Q.    So is that the logbook for the visiting room for September

22    3rd, 2017?

23    A.    I don't know what logbook this is.

24               MR. MILLER:  Your Honor, I move it into evidence as

25    Plaintiff's 15.

1          MS. ACOSTA-PETTYJOHN:  I object, your Honor.

2          MR. MILLER:  It was provided in discovery.

3          MS. ACOSTA-PETTYJOHN:  I understand that, but this

4    witness can't testify as to what logbook this is coming from.

5    He didn't write -- he didn't testify as to him entering any

6    entries in this logbook or where this logbook came from, who

7    wrote those entries.

8          THE COURT:  Counsel should confer because if this is

9    something that the State produced, I don't know why we're

10   having this difficulty.

11         This witness can't authenticate it, that's true, so

12   you should confer at the break, and if you need to get a

13   custodian of records from DOCCS to come in and authenticate it,

14   I'm sure Ms. Acosta-Pettyjohn will supply someone.

15         MR. MILLER:  May I confer with Ms. Acosta-Pettyjohn

16   for just five seconds?

17         THE COURT:  Yes.

18         (Counsel conferred)

19         MR. MILLER:  She said we'll talk during a break.

20         May I approach and take that item?

21         THE COURT:  Yes.

22         (Pause)

23   Q.   Just so we're clear, Officer, Plaintiff's 15 for I.D. that

24   you've just looked at does not refresh your recollection with

25   regard to your assignment and others who were assigned to

 1    visiting room 2 on September 3rd; is that correct?

 2    A.    No.  You asked -- you're asking me two different questions

 3    again.

 4              THE COURT:  No.  The question is does looking at that

 5    exhibit refresh your memory -- does it jog your memory as to

 6    who might have had the same assignment as you on that date.

 7              THE WITNESS:  No.

 8              THE COURT:  That's the answer, then.

 9    Q.    And it's your testimony that you don't know what this item

10    is?

11    A.    I stated I know it's a logbook.  I stated I don't know

12    what logbook it is.

13    Q.    And in reading what's written here, you don't know what

14    logbook this is?

15    A.    No.

16    Q.    Okay.

17          Do you know an Officer Buckley?

18    A.    Yes.

19    Q.    And isn't it a fact that Officer Buckley and Officer

20    Pumarejo and Officer Peralta were all three of you assigned to

21    visiting room 2 on September 3rd, 2017?

22    A.    Can't answer that question.

23    Q.    Okay.  Now what I want you to do is I want you to assume

24    that there will be testimony later in this trial stating that

25    those three individuals, Buckley, Pumarejo and yourself,

1   Peralta, were all assigned to visiting room 2.  I want you to

2   assume that.  Okay?

3   A.    Okay.

4   Q.    Now --

5   A.    So you want me to assume something?  So you want me to

6   imagine something?  I'm trying to figure out what you want me

7   to do here.

8              THE COURT:  He wants you to assume that you and those

9   two other officers were on duty in visiting room 2 on September

10  3rd.  Just assume that.

11             THE WITNESS:  Okay.

12             THE COURT:  The jury obviously will not --

13             THE WITNESS:  So this is not --

14             THE COURT:  -- take it into account unless there is

15  in fact evidence to support it, but for purposes of the

16  question, you should assume that you were on duty with those

17  two other officers in that place on that date.

18  Q.    Do you understand?

19  A.    Okay.

20  Q.    Okay.  Now, with that assumption, wouldn't it be fair to

21  say that if you left your post, left that area over here,

22  visiting room 2 would still be attended to by those other two

23  officers?

24  A.    You're asking me if it would be -- it would be attended to

25  by two other officers.  I can't leave my post, so I don't

 1    understand your question.

 2             THE COURT:  The question is if you did leave your

 3    post, even though you weren't supposed to, wouldn't there be

 4    two other officers still at that place.

 5             THE WITNESS:  If somebody was to leave that post when

 6    there was three officers there, there would be two officers

 7    there, yes.

 8             THE COURT:  So three minus one equals two.

 9             THE WITNESS:  Yes.  The math --

10             THE COURT:  I think we got the point.

11    Q.   Okay.  So earlier you said you can't leave your post

12    because it would be unattended.  That's not true if there are

13    two other officers there, right?

14    A.   It's absolutely true.  Every officer --

15    Q.   I'll move on.

16         Now, you said that if you left your post, which would be

17    here --

18    A.   Okay.

19    Q.   -- you would get in trouble by a sergeant, right?

20    A.   Yes.

21    Q.   But there was no sergeant assigned to the visiting room

22    that day, was there?

23    A.   There's always a sergeant assigned.

24    Q.   Who was the sergeant?

25    A.   I don't remember.

1    Q.    Was there a sergeant assigned to the visiting room?

2    A.    Yes.    There's always a sergeant assigned to the visiting

3    room.

4    Q.    Would that assignment be in the logbook?

5    A.    I don't know.

6    Q.    Who was the sergeant assigned to the visiting room that

7    day?

8    A.    You asked me that.    I said no, I don't know.

9                MS. ACOSTA-PETTYJOHN:    Objection, your Honor.

10                THE COURT:    I'm told that the jurors' lunches have

11    arrived and it is that time, so let us take our morning break.

12                I know you guys already had a short, unexpected

13    break, but the court reporter and the lawyers have been going

14    since 9, so let's take our break and we will resume at 12:15.

15                Don't discuss the case.    Keep an open mind.

16                And can I ask juror number 3 to stay behind for just

17    one second.

18                THE COURT:    Mr. Ciraldo, can you stand by.    You can

19    stay in your seat.

20                (In open court; Juror No. 3 present)

21                THE COURT:    Hi.    I just wanted to ask you about your

22    note.

23                As I told the whole jury, that little event had

24    nothing to do with any of the parties.    The individual is gone.

25    From what I can tell, this is a personal beef among the

1   ex-husband and the new boyfriend, and I don't have any reason

2   to think that it would or should have any effect on a jury.

3   But I want to be sure that you can still be fair.  Do you --

4              JUROR NO. 3:  That I'm still what?  Excuse me.

5              THE COURT:  That you can still be fair.

6              JUROR NO. 3:  Oh, be fair.  Yeah.

7              THE COURT:  Do you have concerns about your own

8   security that will affect you one way or the other?

9              JUROR NO. 3:  I'm just connecting dots.  Two people's

10  lives who were threatened.  The boyfriend was, in my view,

11  obviously siding with the defendants, so --

12             THE COURT:  I think it's probably more fair to say he

13  was siding against the plaintiff.

14             JUROR NO. 3:  Okay.  All right, all right.  Fair

15  enough.

16             THE COURT:  We don't have any reason to believe the

17  defendants had anything to do with this.

18             JUROR NO. 3:  Fair enough.  Well, if he's deciding

19  for one, then he's --

20             THE COURT:  Right, right.

21             JUROR NO. 3:  By deduction.

22             THE COURT:  Yes.

23             JUROR NO. 3:  You know.

24             THE COURT:  So what are the dots that you've

25  connected?

1      JUROR NO. 3:  Lives were threatened and I'm part of a

2   jury and I don't know that this cuckoo guy is not going to try

3   and tamper with the jury.

4      THE COURT:  Well, I guess there's no absolutes in

5   life.  I don't have any reason to think that that would happen.

6      JUROR NO. 3S:  That's why I wrote the note.

7      THE COURT:  But if you think that you're worries

8   about that situation are going to cause you to pull your

9   punches or to -- if it's going to affect how you view the

10   evidence or how you vote when the jury comes to deliberate, we

11   need to know that.

12      JUROR NO. 3:  I have no thoughts about changing or

13   having that -- there are two things going on.  There's security

14   and there's my fairness.  I can still be absolutely fair;

15   however, given the circumstances of this morning, the security

16   component of my two -- two whatever -- narratives here is the

17   one that I'm concerned about.  I'm not concerned about my

18   fairness quotient, if you will.  I just hear stuff that's

19   really weird and scary and I have all of our security in mind.

20      That's my answer.

21      THE COURT:  Well, all right.  So if I understand you,

22   you're not going to let it enter into your thinking as to what

23   the verdict should be.

24      JUROR NO. 3:  I am devoted to the evidence.

25      THE COURT:  You're not going to say, oh, I better

1    vote this way because, if I don't, this crazy guy will come

2    after me or anything like that.

3              JUROR NO. 3:  No, no.  I'm devoted to the evidence

4    and the facts.

5              THE COURT:  All right.  Very good.

6              In terms of making you feel more secure here, I can

7    think of a couple of things I can do.  One is have the court

8    security officers make sure, when it's time for you guys to

9    depart, that that couple has in fact left.  And if you would

10   like somebody to escort you out, I can do that.

11             If you can think of anything else I could do to put

12   your mind at rest, I'm all ears.

13             I wish I could say I promise you nothing's going to

14   happen, but, you know, that doesn't happen in life, but I will

15   tell you from what I know about this situation, it is a

16   personal beef between the plaintiff and the new boyfriend and

17   the wife, you know, transferring her affections, and I don't

18   have any reason to think that this person would do anything.

19   But I've asked the marshal to look into it, and if I learn

20   anything more, I will take more steps.

21             JUROR NO. 3:  Sure.  You know, I reacted as a

22   concerned individual and for all of our safety.  That was my

23   motive, and I'm satisfied with your explanation.

24             THE COURT:  All right.  Very good.

25             And I do appreciate that, as you noted in your note,

20214smaga1      Peralta - Cross - Mr. Miller

1    you didn't share your thoughts with the others.

2              JUROR NO. 3:  I did not.

3              THE COURT:  And when you go back, if they say, oh,

4    what was that about, just say nothing, can't talk about.

5              JUROR NO. 3:  I'll say it's my lunch.  Walter ordered

6    me the right lunch today.

7              THE COURT:  You got a special lunch.  Okay.

8              Thank you, sir.

9              JUROR NO. 3:  Thank you.

10             THE COURT:  We'll see you at 12:15.

11             JUROR NO. 3:  Okay.

12             (Juror No. 3 left the courtroom)

13             (In open court; jury not present)

14             THE COURT:  All right.  Let's resume at 12:15.

15             (Luncheon recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

Magalios v. Peralta - Jury Trial

```
 1                          AFTERNOON SESSION

 2                              12:15 p.m.

 3                 (Open court; jury not present)

 4              THE COURT:  While Mr. Clark is getting the jury,

 5    maybe, Ms. Acosta-Pettyjohn, we'll handle your motion.

 6              Do you want to elaborate at all?

 7              MS. ACOSTA-PETTYJOHN:  Yes.  Sorry, give me one

 8    second, your Honor.

 9              I would just like to make my Rule 50B motion, and

10    Defendants move on all claims with respect to all the

11    Defendants as there has been no evidence from which a

12    reasonable jury can conclude that Officer Bailey and Peralta

13    assaulted Mr. Magalios and that Officer Blount, Bailey, and

14    Peralta failed to intervene in this assault.

15              THE COURT:  That motion's denied.  The Plaintiff's

16    testimony alone would suffice, but there's been ample

17    corroboration as part of Plaintiff's case.

18              All right, let's get the jury and let's deal with the

19    charge at the end of the day today.  It should only take a few

20    minutes since I think you only had one real dispute.

21              (In open court; jury present)

22              THE COURT:  All right, welcome back, ladies and

23    gentlemen.

24              Mr. Peralta, you can resume the stand, and we can

25    continue with Mr. Miller's cross-examination.
```

 1              MR. MILLER:  Good afternoon, everybody.

 2    CROSS-EXAMINATION (cont.)

 3    BY MR. MILLER:

 4    Q.   Good afternoon, Officer Peralta.

 5    A.   Good afternoon.

 6              MR. MILLER:  Your Honor, at this time I offer

 7    Plaintiff's 15 marked for identification into evidence as

 8    Plaintiff's 15.

 9              THE COURT:  Any objection?

10              MS. ACOSTA-PETTYJOHN:  No objection, your Honor.

11              THE COURT:  Plaintiff's 15 is received.

12              (Plaintiff's Exhibit 15 received in Evidence)

13              MR. MILLER:  I believe there's going to be no

14    objection to Plaintiff's 16 going into evidence as well.

15              MS. ACOSTA-PETTYJOHN:  No objection, your Honor.

16              THE COURT:  Plaintiff's 16, whatever it may be, is

17    received.

18              (Plaintiff's Exhibit 16 received in Evidence)

19              MR. MILLER:  It's a logbook, your Honor.

20              THE COURT:  All right.

21    Q.   Officer Peralta, the logbook page that you said you didn't

22    recognize, it's now in evidence, so I'm going to read it.

23    A.   Okay.

24    Q.   Okay?

25              THE COURT:  You know, you could also put it on the

1    screen so we could read along.

2              MR. MILLER:  Okay.

3    Q.   Now, I asked you this morning if this logbook refreshes

4    your recollection with regard to who else besides yourself was

5    assigned to visiting room 2 on September 3rd, and you said that

6    it didn't refresh your recollection, correct?

7    A.   Yes.

8              THE COURT:  Just so it's clear, is this 15 or 16?

9              MR. MILLER:  This is 15, your Honor.

10             THE COURT:  Okay.

11   Q.   Do you see on this log where it says "tour 2, 9/3/2017"?

12   A.   Yes, I do.

13   Q.   And do you see where it says "visiting room number 2"?

14   A.   I'm sorry, can -- do I have a copy of that?  I can't see

15   that far.

16             THE COURT:  Do you have a copy of it for the witness?

17             MR. MILLER:  How's that?

18             THE COURT:  All right.

19   A.   Yes, I see visiting room 2.

20   Q.   Okay.  And could you state the three names assigned to

21   visiting room 2?

22   A.   It looks like Buckley, Pumarejo, and Peralta.

23   Q.   And Peralta refers to you, right?

24   A.   Yes, I'm Peralta.

25   Q.   And Pumarejo refers to the officer who testified

1    yesterday, correct?

2    A.   Yes.

3    Q.   And Buckley refers to another correction officer assigned

4    to Fishkill, correct?

5    A.   Yes.

6    Q.   And Buckley is a male, correct?

7    A.   Yes, Buckley's a male.

8    Q.   Do you see anywhere on this log where there's a sergeant

9    -- oops?  There we go.

10        Do you see anywhere on this log...where a sergeant was

11   assigned to the visiting room that day?

12             MS. ACOSTA-PETTYJOHN:  Objection, your Honor.

13             THE COURT:  Well, there's no foundation that a

14   sergeant's assignment would necessarily be in that document, so

15   --

16             MR. MILLER:  Okay.

17             THE COURT:  -- if you have such a foundation, you

18   should lay it.

19             MR. MILLER:  Okay, thank you.

20   Q.   Let's start --

21             MR. MILLER:  Let me withdraw that question and ask

22   another one.

23   Q.   Do you see over here at 9:45, Lt. Sawyer made his rounds

24   into the visiting area?

25             MS. ACOSTA-PETTYJOHN:  Objection, your Honor.

```
 1                    THE COURT:  I mean...

 2              MR. MILLER:  I'm just asking if he sees it.

 3              THE COURT:  You're just asking if he sees that the

 4    document says that?

 5              MR. MILLER:  Yes, that's correct.

 6              THE COURT:  Yes, go ahead.

 7    A.    I can see a lieutenant's signature.  I don't know what

 8    lieutenant that is.

 9    Q.    Okay, that's fine.

10    And would it be normal procedure for a supervisor to make rounds in

11    the visiting room, but not remain there during the entire tour?

12    A.    I don't -- I can't tell you a supervisor's exact job.

13    Q.    I'm sorry?

14    A.    I can't tell you a supervisor's exact job description

15    because I'm not a supervisor, but a sergeant does make rounds

16    in the visiting room.  Whether he stays there or not I couldn't

17    tell you.  I don't know his job description.

18    Q.    Okay.  I, I think, I think what you're saying is a

19    supervisor makes rounds, but doesn't get assigned to that area

20    for the entire tour.

21              MS. ACOSTA-PETTYJOHN:  Objection, your Honor.

22              THE COURT:  If that's not what the witness is saying,

23    he'll say so.

24    A.    I still don't understand your question.  Does a sergeant

25    assigned to the visit room...so I'm not understanding.
```

1           THE COURT:  Is the sergeant who's assigned to the

2     visiting room...you're saying there is a sergeant assigned to

3     the visiting room?

4           THE WITNESS:  Yes, there's a sergeant assigned to the

5     visit room.

6           THE COURT:  And does he or she stay there all day, or

7     do they make rounds to various locations and come in and out?

8           THE WITNESS:  I don't, I don't know what their job

9     description is, so I couldn't tell if you they're supposed to

10    make rounds or if they're supposed to stay there.  I couldn't

11    tell you.  I don't -- I don't have that knowledge.  I'm not

12    privious {sic} to that knowledge.

13    Q.    So earlier today, you took us on a tour of the entire

14    process of the visiting room and the frisk process and the

15    strip-frisk process and where inmates go and where they sit.

16    You had that down pretty good, right?

17    A.    Yes.

18    Q.    But you can't tell us if a supervisor is assigned to that

19    tour?

20    A.    I answered your question; I said a supervisor is assigned

21    to that visit room.  I don't understand your question, though.

22    You're asking me if a supervisor's assigned; I said yes.

23    Q.    You understand there's a difference between someone making

24    rounds and someone being assigned, right?

25    A.    In our type of work, somebody's assigned a post.  That

 1   post is...whatever that job description is, so I don't under --

 2   what you want to ask me is something totally different, so I

 3   don't understand what you're trying to ask me.  That's what I'm

 4   trying to explain to you.

 5   Q.   Okay.  Okay.  Let's go to Plaintiff's 16 in evidence.

 6            MR. MILLER:  And, actually, your Honor, before I put

 7   it on the screen, just to make it easier maybe for the witness,

 8   I'm going to let him take a look at it close first?

 9            THE COURT:  That's fine.

10   Q.   Just take a look at Plaintiff's 16 and let us know when

11   you're done (handing).

12            (Brief pause)

13   A.   Okay.

14   Q.   Now, Plaintiff's 16 is a logbook for the processing area,

15   correct?

16   A.   That, that's what it says, yes.

17   Q.   Okay, and as we here today this morning, you're very

18   familiar with the visiting room and the frisk room.   The

19   processing area is where visitors come and go, correct?

20   A.   The process area is where -- yes, where visitors come and

21   go.

22   Q.   Okay.  Now, that logbook is for the processing area,

23   correct?

24   A.   Yes, that's what it says.

25   Q.   And it has the name of the officers assigned to the

1    processing area for tour 2 on September 3rd, 2017, correct?

2    A.    Yes.

3    Q.    And it also has the name of a sergeant assigned to the

4    processing area on September 3rd, 2017, correct?

5    A.    It says "supervisor."  Sergeant Buonato.

6    Q.    Right.

7    A.    Okay.

8    Q.    So Sergeant Buonato was assigned to the processing area on

9    September 3rd, 2017; is that correct?  According to the logbook

10   of course.

11   A.    Like I said, I can't, I can't...you're asking me a

12   question that I can't answer because I don't think they're

13   assigned to a specific location.  They're assigned per

14   building.  As far as where they go, I don't know.  I can't --

15   you asking me specifically if he was assigned to this specific

16   location.  I, I don't know where he was assigned to.

17   Q.    Okay.

18             MR. MILLER:  May I approach and take the, the item?

19             THE COURT:  Yes.

20   Q.    This here is sort of a stamped template, right, where

21   someone fills in the assignments, right?

22   A.    Yes.

23   Q.    And right here, it says "supervisor," right?

24   A.    Yes, it says "supervisor."

25   Q.    And that's Sergeant Buonato?

1    A.    Yes, Sergeant Buonato.

2    Q.    And could you tell us from your experience that this

3    indicates that Sergeant Buonato was assigned to the processing

4    area on September 3rd?

5    A.    I...again, I don't -- I'm not -- I'm really not

6    understanding your question, so the sergeant is assigned a

7    building so he's the sergeant for that processing area, but

8    he's also sergeant for other locations.

9              THE COURT:  When you say 'that building,' what do you

10    mean?

11             THE WITNESS:  So the visit has multiple areas in it,

12    so you got visiting room 1, 2, 3.  They all have -- they have a

13    sergeant that take -- that covers that building, so he's the

14    one that watches over that building.

15             THE COURT:  So is it fair to say that he makes the

16    rounds within that building, he's not always in one room?

17             THE WITNESS:  Yeah.

18             THE COURT:  Okay.

19    Q.    So, in other words, I believe there's been a description

20    earlier in this case that visitors need to walk from the

21    processing area all the way into the visiting room area,

22    correct?

23    A.    Yes.

24    Q.    And that's a long walk, right?

25    A.    I've never done the walk; I couldn't tell you.

1    Q.    Do you know -- I mean, if you don't know, just let us

2    know.

3    Do you know if the processing supervisor, in this case Buonato, was

4    also assigned to cover the visiting room as well?

5    A.    I don't know.

6    Q.    Okay.  Okay.  And you don't recall seeing Sergeant Buonato

7    on September 3rd, 2017, right?

8    A.    I don't recall.

9    Q.    And so if you went from the visiting room 2 into the frisk

10   area, it's, it's likely that there was no sergeant there to see

11   you do that, right?

12   A.    I don't understand your question.

13         THE COURT:  It's another hypothetical.

14   A.    I can't hypothetically answer that question because I did

15   not leave my post, so I don't, I don't understand your

16   question.

17         THE COURT:  Well, the question is, if you had left

18   your post, would a sergeant necessarily have seen it, but I

19   think --

20         MR. MILLER:  I can move on.

21         THE COURT:  -- I think this is more argument and you

22   should save it for your closing argument.

23         MR. MILLER:  Good.

24   Q.    Now, you already said that you learned about this

25   allegation the next day, right?  We already went through that

1    before the break.

2    A.    Okay.

3    Q.    And you -- as a result of learning about this allegation

4    against you, you were required to write a to/from memo, right?

5    A.    Yes, I was.

6    Q.    And you wrote a memo to Sergeant Vantassell, right?

7    A.    If that's what -- I don't...recall off the top of my head,

8    but if that's what the to/from was written to, then...

9    Q.    Okay --

10   A.    That's who I responded to.

11              (Off-the-record discussion)

12   Q.    I'm going to show you Plaintiff's 10 that's in evidence,

13   and since it's in evidence, I'm going to put it right on the

14   screen, okay?

15   A.    Okay.

16   Q.    Do you recognize this item?

17   A.    Yes.

18   Q.    This is a to/from to Sergeant Vantassell from yourself,

19   right?

20   A.    Yes, it is.

21   Q.    And despite learning of these allegations on September

22   4th, the date of this memo appears to be September 29th.   Is

23   that correct?

24   A.    Yes, it is.

25   Q.    So more than three weeks passed from the time that you

1    first learned of these allegations until the time you wrote

2    this memo; is that correct?

3    A.    Yes.

4    Q.    And during that period of time, that was...nearly

5    twenty-four days, did you speak to anybody about these serious

6    allegations?

7    A.    No.  The supervisor asked me to write a to/from and I

8    wrote a to/from.

9    Q.    Right, but the to/from was on September 29th.  That wasn't

10   my question.  My question was, between September 4th and

11   September 29th, did you speak to anybody about these serious

12   allegations.

13   A.    I don't recall that time frame, but I would assume not.  I

14   mean...I didn't --

15   Q.    So somebody is accusing you of committing a crime.  It

16   takes you twenty some-odd days to write your to/from and it's

17   your testimony that you didn't speak to anybody about it?

18              MS. ACOSTA-PETTYJOHN:  Objection, your Honor.

19              THE COURT:  Overruled.

20   A.    So --

21   Q.    Yes or no.  Is that your testimony?

22   A.    Repeat your question.  I'm trying --

23              THE COURT:  The question was somebody accused you of

24   submitting a crime, it takes you twenty-something days to write

25   your to/from, are you saying that you didn't speak to anybody

1  about it in the interim.

2          THE WITNESS:  From what I could recall, no.  I don't,

3  I don't think I did.

4  Q.  Did you speak to Officer Bailey about it?

5  A.  I just said I don't know, I don't recall.  I don't think I

6  did.

7  Q.  You assume --

8          THE COURT:  Just so it's clear, ladies and gentlemen,

9  you know, the word 'crime' has been thrown around, just so it's

10  clear, this is not about whether a crime has been committed.

11  This is a civil lawsuit, this is about whether the Plaintiff is

12  entitled to money damages.

13          MR. MILLER:  Right, that's clear.

14  Q.  In your mind, the allegations were serious enough where

15  there was a potential criminal prosecution, correct?

16          MS. ACOSTA-PETTYJOHN:  Objection.

17  Q.  And we stipulate that there was not.  Is that correct,

18  sir?

19          THE WITNESS:  Answer?

20          THE COURT:  Yes, you can answer.

21  A.  So as corrections officers we get accused of a lot of

22  things, so when we do these things like to/froms, I mean,

23  especially when it's something we didn't do...we write --

24  Q.  It doesn't bother you.

25  A.  I mean, I was accused of doing something I didn't do.

1   Q.   I want you to assume that Officer Bailey will testify that

2   he did speak to you during that period of time.  Does that

3   refresh your recollection about whether or not you discussed

4   these allegations with Officer Bailey?

5   A.   I don't recall that time frame; I couldn't tell you.

6             THE COURT:  Again, ladies and gentlemen, there have

7   been some assumptions, some hypotheticals.  I've told you that

8   the lawyers' questions aren't evidence.  You'll need to wait

9   and see if there will be evidence of the facts that are

10  embedded in the question or the hypothetical.

11  Q.   You were aware of the allegation on September 4th that you

12  assaulted Mr. Magalios, right?

13  A.   I was aware of I was accused of doing something, yes.

14  Q.   Of assaulting him, right?

15  A.   I can't remember off the top of my head, but I know I was

16  accused of doing something.

17  Q.   Let me, let me read part of your to/from.  "At no time did

18  I search or assault the inmate in question."

19  When you wrote that, were aware that you were accused of assaulting

20  him?

21  A.   Yes.

22  Q.   Were you also aware that you were accused of saying to him

23  'I would kill you and get away with it, I get around, I know

24  where you live'?  Were you aware of that accusation against you

25  by Mr. Magalios?

1           THE COURT:  At the time he wrote the to/from?

2    Q.    At the time you wrote the to/from.

3    A.    At the time I wrote the to/from, yes.

4           MR. MILLER:  Officer Peralta, I appreciate your time.

5           THE COURT:  Any redirect, Ms. Acosta?

6           MS. ACOSTA-PETTYJOHN:  Yes, your Honor.

7    REDIRECT EXAMINATION

8    BY MS. ACOSTA-PETTYJOHN:

9    Q.    Officer Peralta, you testified that if your post was

10   unattended, you would get in trouble and that even if there

11   were two correction officers on your post, if you unattended a

12   post, it's still considered unattended, correct?

13   A.    Yes.

14   Q.    Can you explain that?

15   A.    Okay, so the way, the way the facility works it's called

16   job descriptions and the post is a individual post, so even

17   though you may work a location, there's posts for that

18   location, so there will be a number 1 officer, a number 2

19   officer, so if you still leave your number -- if you're number

20   2 officer and you walk off your post, you're still abandoning

21   your post because there's supposed to be two officers there.

22   Q.    And I know there was some questions about superior

23   supervisors' assignments and sergeants' assignments.  Do you

24   know how supervisors are assigned to any post or location?

25   A.    No, I do not.

1  Q.   And you also testified about the date on your to/from.

2  Would there be any reason why a to/from is not written on the

3  day of an incident?

4           MR. MILLER:  Objection as to form.

5           THE COURT:  Well, why don't you ask about this

6  particular to/from and if he knows.

7           MS. ACOSTA-PETTYJOHN:  Sure.

8  Q.   You were shown your to/from which is dated, I believe,

9  September 29th, 2017 -- and do you happen to have it in front

10  of you?

11  A.   Uh, no, I do not.

12  Q.   One second.

13           (Brief pause.)

14           MS. ACOSTA-PETTYJOHN:  May I approach the witness,

15  your Honor?

16           THE COURT:  Yes.

17  Q.   Okay, Officer Peralta, so the to/from that you wrote

18  regarding this case was dated 9/29/2017, correct?

19  A.   Yes.

20  Q.   And you testified that you were informed of the

21  allegations against you around September 4th, correct?

22  A.   Yes.

23  Q.   Would there be any reason why you wouldn't have written a

24  to -- this to/from on the day that you were informed?

25           MR. MILLER:  Same objection.

 1              THE COURT:  I think the objection is to would there

 2    be any reason.  How about what was the reason.

 3              THE WITNESS:  Okay, so when we're asked to write a

 4    to/from, we bring it in the next day we come into work, so I

 5    may have been on vacation, I may have been out sick for a

 6    couple of days, I don't know the actual logistics of it, but

 7    those are all possible reasons.

 8              THE COURT:  So you don't remember specifically why

 9    there was the delay for this one?

10              THE WITNESS:  No, I do not, but there's -- there

11    could be multiple reasons.  I just don't know why.

12              THE COURT:  Oh.

13              MS. ACOSTA-PETTYJOHN:  Okay, I have no further

14    questions, Officer.

15              THE COURT:  Anything else --

16              MR. MILLER:  Nothing further.  Thank you.

17              THE COURT:  -- Mr. Miller.

18              You may step down, Officer Peralta.

19              (Witness excused)

20              THE COURT:  Defendants may call their next witness.

21    Who's next?

22              MR. TURKLE:  Your Honor, we'd like to call Reuben

23    Febus.

24              THE COURT:  All right.

25    REUBEN FEBUS, called as a witness by the Defendants, having

1   been duly sworn, testified as follows:

2               THE DEPUTY CLERK:  Please have a seat.  Please state

3   your full name for the Court and spell it out slowly.

4               THE WITNESS:  My name is Reuben Febus.  That's

5   R-E-U-B-E-N, last name is F-E-B-U-S.

6               THE COURT:  Go ahead, Mr. Turkle.

7               MR. TURKLE:  Thank you, Your Honor.

8   DIRECT EXAMINATION

9   BY MR. TURKLE:

10  Q.   Mr. Febus, good afternoon.  Are you currently employed?

11  A.   Yes, I am.

12  Q.   And by whom are you employed?

13  A.   I am employed by the New York State Department of

14  Corrections & Community Supervision's Office of Special

15  Investigations.

16  Q.   And how long have you been employed by DOCCS?

17  A.   By DOCCS?  Since 2010.

18  Q.   And how long have you been assigned to the Office of

19  Special Investigations?

20  A.   Since late 2015.

21  Q.   You were assigned to the Office of Special Investigations

22  in September of 2017?

23  A.   Yes, that's correct.

24  Q.   Now, please explain for the jury what the responsibilities

25  are for the OSI investigator?

1    A.    So the Office of Special Investigation is tasked with

2    conducting fair fact-finding investigations to address

3    allegations that are received.  The allegations can be various

4    types of allegations in nature.

5    The unit that I worked for is the Internal Affairs Division, and we do

6    pretty much everything from anything that's not narcotics or a

7    relationship, although we sometimes help with that.  A large majority

8    of the cases that we do involve allegations of excessive force or uses

9    of force.

10   Q.    Thank you.

11         Now, in 2017, what percentage of your caseload was an

12   investigation of allegations of inmate assaults?

13   A.    Um, it's hard to say.  If I had to guess, I'd say

14   somewhere between 60 and 70 percent.

15   Q.    When I say inmate assaults, I mean assaults by corrections

16   officers on inmates.  Is that --

17         MR. MILLER:  Objection; it's irrelevant.

18   A.    I would say at least --

19         THE COURT:  I'll allow it.

20   A.    -- 50 percent of my caseload.

21   Q.    Now, how do you determine which allegations to

22   investigate?

23         MR. MILLER:  Objection.

24         THE COURT:  Yeah, now I think we're...getting a

25   little far afield.  Let's hear about this case.

1            MR. TURKLE:  Okay.

2   Q.   Did there come a time where you were tasked to investigate

3   allegations concerning an alleged assault that took place at

4   Fishkill Correctional Facility on September 3rd, 2017?

5   A.   Uh -- this particular case, yes.

6   Q.   And describe the circumstances under which you came to be

7   assigned to that investigation.

8   A.   It came to me as any investigation does.  We get assigned

9   a case from Albany and told what the allegation is, given the

10  basics of what has been reported, whether it be a complaint

11  letter or a loose transcript from a phone call, and then we're

12  told to investigate.

13  Q.   Now, did your investigation include interviewing

14  witnesses?

15  A.   Yes, it did.

16  Q.   And did that include corrections officers?

17  A.   Yes, it did.

18  Q.   Did that include inmates as well?

19  A.   Yes, it did.

20  Q.   Did it include any civilians?

21  A.   No, I don't believe so.

22  Q.   Now, in your investigation, how many individuals did you

23  speak to who claimed to have actually witnessed an assault on

24  Mr. Magalios on September 3rd, 2017?

25  A.   None.

1              MR. MILLER:  Objection; hearsay.

2              THE COURT:  Well, did you interview Mr. Magalios?

3              THE WITNESS:  Oh.  Yes.  But he --

4              THE COURT:  So that would be one.

5              THE WITNESS:  Uh, when he said 'witness,' I thought

6    that the indictment unrelated, but, yes, Magalios would be one.

7              THE COURT:  Did you interview anybody who witnessed

8    the assault I think was how he put it.

9              THE WITNESS:  To witness, no.

10             THE COURT:  Well...the complainant says he observed

11   it, right?

12             THE WITNESS:  He said he was the victim of it, but

13   yes.

14             THE COURT:  Okay, nobody else is what you're saying.

15   Q.   Well, did you interview anyone who could corroborate what

16   Mr. Magalios has said with regard an alleged assault on

17   September 3rd, 2017?

18   A.   No.

19             MR. MILLER:  Objection.

20             THE COURT:  Yeah, sustained.  The question and answer

21   are stricken.

22   Q.   Did you interview anyone who claimed to have --

23             MR. MILLER:  Same objection, your Honor.

24             THE COURT:  Yeah, same ruling.

25             What's relevant is what evidence is presented in this

1    courtroom at this trial.  It doesn't matter if the OSI

2    investigation...was different.

3    Q.   Mr. Febus, at the conclusion of your investigation, was

4    there a finding with regard to the allegations?

5              MR. MILLER:  Your Honor, I would either ask for a

6    sidebar or just make a standard objection.

7              THE COURT:  Yeah, it's not a hearsay problem, it's a

8    relevance problem, so I'm going to sustain the objection.

9              As I said, it doesn't -- what's relevant is what this

10   jury thinks of the evidence that's being presented here in

11   court.  What other people might think about other things, at

12   least under 401 and 403, I'm going to exclude.

13   Q.   Mr. Febus, do you recall with regard to your investigation

14   an allegation as to what time the alleged assault occurred?

15             MR. MILLER:  Your Honor, same, same objection.

16             THE COURT:  Well, if you're asking about prior

17   statements of Mr. Magalios, that's fair game, but you need to

18   make clear whether or not that's what you're asking.

19   Q.   Mr. Febus, was there an allegation by Mr. Magalios as to

20   what time the alleged assaulted occurred?

21   A.   Yes.

22   Q.   And was there an allegation by Mr. Magalios that he spoke

23   to his wife some time on September --

24             MR. MILLER:  Objection to form.

25   Q.   -- 3rd, 2017?

1              MR. MILLER:  It's his witness.

2              THE COURT:  Yeah, don't lead.

3   Q.   What allegations, if any, were made by Mr. Magalios as to

4   whether or not he had spoke to his wife after the alleged

5   assault?

6              MR. MILLER:  Objection to form.

7              THE COURT:  Overruled.  Let's just get there.

8              THE WITNESS:  I'm sorry, am I answering that?

9              THE COURT:  Yes.

10             THE WITNESS:  Okay.

11  A.   There was an allegation that a phone call was made after

12  the fact.

13  Q.   And --

14             THE COURT:  I want to be careful about the passive

15  voice here.  We're talking about what Mr. Magalios said to you,

16  so tell us what he said, not, you know -- I think I know what

17  you mean, but when you say 'there was an allegation,' you gotta

18  make it clear by whom, so what you're being asked for is what

19  did Mr. Magalios say to you on that subject.

20  A.   I don't remember the specifics of what was said and how it

21  was said, but in general, it was that after the alleged

22  assault, there was a --

23             MR. MILLER:  Objection.

24  A.   -- he called his wife.

25             THE COURT:  Overruled.

1  Q.   As part of your investigation, were you able to confirm

2  what time Mr. Magalios spoke to his wife?

3            MR. MILLER:  Objection.

4            THE COURT:  Sustained.  Let's just -- if there's

5  evidence on that subject, let's hear the evidence.

6  Q.   Did you review any -- as part of your investigation, what

7  phone logs, if any, did you review concerning communications

8  between Mr. Magalios and his wife on September 3rd, 2017?

9  A.   I reviewed phone records, I found there was a phone call

10  that was made approximately --

11            MR. MILLER:  Judge, same objection.

12            THE COURT:  Yeah, if there are documents, let's see

13  them; if there...but you can't get in through a witness the

14  contents of an out-of-court statement that's not in evidence.

15  Q.   Now, I --

16            THE COURT:  Unless you can point me to something in

17  801, 803, or 804.

18  Q.   Mr. Febus, as part of your investigation, what timelines,

19  if any, did you create?

20            MR. MILLER:  Your Honor --

21            THE COURT:  Same --

22            MR. MILLER:  -- this is all the same.

23            THE COURT:  -- same ruling.

24            You're welcome to put in the underlying evidence, but

25  you can't elicit through this witness the contents of documents

1    that are not in evidence unless you've got a basis under 801

2    through 804.

3    Q.   Mr. Febus, what allegations, if any, did Mr. Magalios make

4    to you in the course of your investigation with regard to his

5    having reported the alleged assault to a DOCCS sufficiently?

6    A.   He stated that he reported it when he got back to the

7    housing unit, to the officer that was working there, I don't

8    remember who the officer was off the top of my head, and then

9    he stated that he followed up with the sergeant on the

10   following shift.

11   Q.   And approximately what time did he follow up with the

12   sergeant?

13             THE COURT:  According to him --

14             MR. MILLER:  What time did he say?  Objection.

15             THE COURT:  According to him what time did he say.

16             THE WITNESS:  I don't remember what time he

17   specifically said.  I remember the approximate time that was

18   documented by the sergeant.

19             THE COURT:  Well, then...you don't know is the

20   answer.

21   Q.   Did your investigation include any allegations by Mr.

22   Magalios's then wife --

23             MR. MILLER:  Your Honor --

24   Q.   -- concerning --

25             MR. MILLER:  -- at this point, I don't want to sound

1    annoying, but it's the same objection.

2              THE COURT:  This question itself is not -- doesn't

3    call for hearsay, but the -- heh, the next one will,

4    so...sustained.

5              MR. TURKLE:  I'll withdraw the question, and I have

6    nothing further for this witness.

7              THE COURT:  Any cross-examination?

8              MR. MILLER:  No.

9              THE COURT:  You may step down, Mr. Febus.

10             (Witness excused)

11             MR. TURKLE:  At this point, your Honor, I'd like to

12   call Correction Officer Bailey.

13             (Brief pause.)

14   TIMOTHY BAILEY, called as a witness by the Defendants, having

15   been duly sworn, testified as follows:

16             THE DEPUTY CLERK:  Please state your full name for

17   the Court and spell out your last name slowly.

18             THE WITNESS:  Timothy Bailey, B-A-I-L-E-Y.

19             THE COURT:  Go ahead, Mr. Turkle.

20             MR. TURKLE:  Thank you, Your Honor.

21   DIRECT EXAMINATION

22   BY MR. TURKLE:

23   Q.   Good afternoon, Officer Bailey.

24   A.   Good afternoon.

25   Q.   Are you presently employed?

1   A.   I can't hear you.

2   Q.   Are you presently employed.

3   A.   Yes.

4   Q.   And by whom are you employed?

5   A.   New York State DOCCS.

6   Q.   And when did you first begin your employment with DOCCS?

7   A.   8/96.

8   Q.   And do the math for me; how long have you been a

9   corrections officer for DOCCS?

10  A.   Twenty-five years.

11  Q.   And you're currently a correction officer, correct?

12  A.   Say that again?

13  Q.   You're currently a correction officer, correct?

14  A.   Yes.

15  Q.   And describe for the jury your duties and responsibilities

16  as a correction officer.

17  A.   Care, custody, and control basically.

18  Q.   And what do you mean by that?

19  A.   The health and well-being of the inmates.  It's oriented

20  towards the inmates, whatever they need, basically in terms of

21  health, medical, dental, vision...

22  Q.   Now --

23  A.   Well-being.

24  Q.   Sorry.  Let's turn your attention towards September 3rd,

25  2017.  Did you work that day?

1   A.   Yes.

2   Q.   And what was your assignment that day?

3   A.   Visiting room yard.

4   Q.   And what are your responsibilities in visiting room yard?

5   A.   To make sure that everyone's playing well with each other,

6   not fondling each other, hands are in appropriate places, hands

7   need to be seen.  There's standing side by side, no standing in

8   front of each other.  To that nature.

9   Q.   What shift did you work that day?

10  A.   My, my original shift is ten-thirty at night to six-thirty

11  a.m.

12  Q.   And what shift did you work in the visiting room yard that

13  day?

14  A.   Six-thirty to two-thirty.

15  Q.   Now, prior to September 3rd, 2017, had you previously been

16  assigned to the visiting room yard?

17  A.   Yes.

18  Q.   Can you briefly describe for the Court the general layout

19  of the visiting room yard and the adjacent visiting rooms.

20  A.   It's inside the L shape of the visiting room.  It's, like,

21  maybe 300 by 200 feet.  It has benches and it has picnic

22  tables.  It has a big tree in the far left corner.

23  Q.   Now, in September of 2017, were there rules and

24  regulations regarding physical touching between inmates and

25  their visitors?

1    A.    Yes.

2    Q.    And what were those regulations?

3    A.    The rules and regulations are posted up on the bulletin

4    board before they walk out into the yard, but, but they all

5    have them on their units on the bulletin board as well.

6              THE COURT:  The question was what are the

7    regulations, what's the content of them.

8              THE WITNESS:  There's, there's no...you know, there's

9    no fondling, you know, hands have to be seen, you know...basic

10   things like you cannot touch certain areas, you know...to that

11   point.

12   Q.    When you say 'certain areas,' you mean certain bodily

13   areas, correct?

14   A.    Certain body parts, yes.

15   Q.    Now, when an inmate acts in an inappropriate manner during

16   a visit, is he disciplined?

17             MR. MILLER:  Objection as to form.

18             THE COURT:  Well, I'll allow it.

19             Ordinarily if somebody goes a little too far in the

20   kissing and hugging, what usually happens?

21             THE WITNESS:  They're just given a warning.

22   Q.    Have you ever issued a misbehavior report for somebody who

23   you felt was engaged in inappropriate touching?

24   A.    No.

25   Q.    Now, on September 3rd, 2017, did you go inside either of

1    the visiting rooms?

2    A.   No.   I didn't even know they were working.

3    Q.   Were you stationed --

4         MR. MILLER:   Your Honor, can I just get a

5    clarification on who 'they' would be?

6    A.   I did not know Peralta was working.

7    Q.   My question was, did you go inside either of the visiting

8    rooms on September 3rd, 2017.

9    A.   I walked through visit, I walked through visit room 1 to

10   get to the yard.

11   Q.   Okay.   And for any other reason would you be inside the

12   visiting rooms?

13   A.   If I go to the restroom or something like that.

14   Q.   Now, in the visiting room yard, would you be stationed in

15   one place?

16   A.   We're stationed under a overhang.   It's two chairs there

17   and there's a ramp leading down the right side.   To the left

18   side, there's four steps.

19   Q.   Now, in performance of your responsibilities in the

20   visiting room yard, would you have occasion to walk around the

21   yard?

22   A.   We make periodic rounds also depending on -- it's all

23   visible, but depending on how busy it is.

24   Q.   Now, as of September 3rd, 2017, did you know Mr. Magalios

25   by name?

1   A.   No.  No.

2   Q.   How did you come to learn his name?

3   A.   About this to/from.

4   Q.   Well, can you elaborate for us how you came to learn Mr.

5   Magalios's name?

6   A.   We had to write a to/from stating -- you know, he said

7   that -- it was allegations made, so we wrote a to/from.  At

8   that time I wrote to to/from, I still didn't know who he was.

9   Q.   Well, did there come a time where somebody identified the

10  Plaintiff as Mr. Magalios?

11  A.   This is, this is months, heh, months afterwards.

12             THE COURT:  So you were asked to write the to/from

13  and you were told that an inmate had made an allegation, but

14  you didn't know who it was?

15             THE WITNESS:  Um-um.

16             THE COURT:  You have to say yes or no.

17             THE WITNESS:  No.

18             THE COURT:  So what -- sorry, I --

19             THE WITNESS:  I didn't know.

20             THE COURT:  What I said was correct?

21             THE WITNESS:  Yes.

22             THE COURT:  Okay.  Sorry, I, I made that confusing.

23  Q.   Now, looking back on September 3rd, 2017, do you recall

24  interacting with an individual who you later came to know as

25  Mr. Magalios?

1    A.    Say that one more time.

2    Q.    Yeah.  On September 3rd, 2017, did you interact with an

3    individual whom you later came to learn was Mr. Magalios.

4    A.    Yes.

5              MR. MILLER:  Objection.

6              THE COURT:  Overruled.

7    Q.    And describe what occurred.

8    A.    He was in the yard in the smoking section with his

9    ex-wife, and his ex-wife was standing in front of him, in front

10   of his -- leaning on his private area.  He was draped over her,

11   hands in the crotch area, and I called over to him to separate,

12   side by side, watch your hands.

13   Q.    How far from Mr. Magalios were you when you called out to

14   him to watch his hands?

15   A.    Maybe 75 feet?  Eighty feet?

16   Q.    Now, after you called out to this individual whom you

17   later came to learn was Mr. Magalios, what was Mr. Magalios's

18   response?

19   A.    They, they separated and they stood side by side.

20   Q.    Now, what's the next thing you recall Mr. Magalios doing

21   on September 3rd, 2017?

22   A.    If I'm not mistaken, um...I don't know, a little while

23   later he left.

24   Q.    Did you have any further interaction with him on September

25   3rd, 2017?

1   A.   No.

2   Q.   Now, we've heard testimony that when an inmate leaves the

3   visit that they have to be strip-frisked and they go to the

4   strip-frisk area.

5        Have you heard that testimony while you've been in the

6   courtroom?

7   A.   Yes.

8   Q.   Now, as part of your duties on September 3rd, 2017, were

9   you responsible for strip-frisking inmates?

10  A.   No.

11  Q.   Did you conduct any strip-frisk on September 3rd, 2017?

12  A.   No.

13  Q.   Were you in the strip-frisk area on September 3rd, 2017?

14  A.   No.

15  Q.   Did you assist any correction officers in strip-frisking

16  any inmates on September 3rd, 2017?

17  A.   No.

18  Q.   Were you allowed into the strip-frisk area, into the area

19  where strip-frisks were conducted, on September 3rd, 2017?

20  A.   Say that again?

21  Q.   Were you allowed into the area --

22            MR. MILLER:  Objection as to the word 'allowed.'

23  Q.   -- where strip frisks were being conducted on September

24  3rd, 2017.

25            MR. MILLER:  Objection.

1              THE COURT:  Sustained.

2              MR. TURKLE:  I'll rephrase it.

3              THE COURT:  If you could lay a foundation.

4              MR. TURKLE:  Yeah.

5   Q.   Was it part of your responsibilities as one of the

6   officers in the visiting room -- in the visiting yard on

7   September 3rd, 2017, to go into the area where strip-frisks

8   were performed?

9   A.   No.

10  Q.   And why not?

11             MR. MILLER:  Objection.

12             THE COURT:  I'll allow it.

13  A.   It's not my job.

14  Q.   And what consequences might there be if you were to have

15  left your post?

16  A.   Um, I get yelled at, disciplined, NOD, um...by Sergeant

17  Buonato.

18  Q.   Now, prior to September 3rd, 2017, how well did you know

19  Mr. Magalios?

20  A.   I didn't know him.

21  Q.   Do you recall any interactions with Mr. Magalios prior to

22  September 3rd, 2017?

23  A.   No.

24  Q.   Did you ever exchange harsh words with Mr. Magalios?

25  A.   No.

 1   Q.   Did you ever issue a misbehavior report to Mr. Magalios

 2   prior to September 3rd, 2017?

 3   A.   No.

 4   Q.   Did Mr. Magalios ever curse at you?

 5   A.   No.

 6   Q.   Did Mr. Magalios ever threaten you?

 7   A.   No.

 8   Q.   To your knowledge, prior to September 3rd, 2017, did Mr.

 9   Magalios ever issue a grievance against you?

10   A.   Before that, no.

11   Q.   Now, on September 3rd, 2017, do you know what assignment

12   Officer Blount had?

13   A.   He's back there in frisk.  I don't know what he does, but

14   he's, he's back there.

15   Q.   In which frisk area?

16   A.   I don't know.  Heh, heh.

17   Q.   Did you interact with Officer Blount at Fishkill on

18   September 3rd, 2017?

19   A.   I don't recall, but I gotta walk by him and maybe he was

20   there.  I gotta walk in through there.  I don't, I don't know.

21   Q.   To your knowledge, did Officer Blount interact with Mr.

22   Magalios on September 3rd --

23            MR. MILLER:  Objection.

24   Q.   -- 2017?

25            THE COURT:  Did you witness any such interaction?

```
 1              THE WITNESS:  No.
 2    Q.   Do you know what assignment Officer Peralta had on
 3    September 3rd, 2017?
 4    A.   No, I did not see him on 2017.
 5    Q.   So --
 6    A.   September.
 7    Q.   So would it be fair to say that you didn't see Officer
 8    Peralta anywhere at Fishkill on September 3rd, 2017?
 9    A.   I didn't know him.  I didn't know him at all.  But I
10    didn't see him, either.  I didn't see Puma and normally I say
11    hi to Puma.  I didn't see her, either.
12    Q.   And when you say 'Puma,' who are you referring to?
13    A.   I don't, Puma...something.
14    Q.   Are you referring to the --
15    A.   The other officer.
16              THE COURT:  The one who testified yesterday.
17              THE WITNESS:  Yesterday, the one who testified
18    yesterday.
19    Q.   Do you know what time Mr. Magalios's visit ended on
20    September 3rd, 2017?
21    A.   No, I don't.
22    Q.   Did you see Mr. Magalios after his visit ended?
23    A.   Say that again?
24    Q.   Did you see Mr. Magalios after his visit ended on
25    September 3rd, 2017.
```

1   A.   No.

2   Q.   Did you see any DOCCS official interact with Mr. Magalios

3   after his visit ended?

4   A.   No.

5   Q.   To your knowledge, did Mr. Magalios undergo a strip-search

6   after his visit ended?

7   A.   Every inmate goes through a strip-search period when

8   leaving the visit room.

9   Q.   And were you in the strip-search area --

10  A.   No.

11  Q.   Did you participate in any strip-search of Mr. Magalios?

12           MR. MILLER:   Your Honor, this is getting --

13  A.   No.

14           MR. MILLER:   -- repetitive, I object.

15           THE COURT:   Yeah, I think we have been over this.

16  Q.   To your knowledge, did anything out of the ordinary occur

17  in the strip-frisk area of Fishkill on September 3rd, 2017?

18  A.   I did not hear anything over the radio.   No.

19  Q.   Did you observe -- did you witness Officer Blount in the

20  strip-frisk area on September 3rd, 2017?

21  A.   No.

22  Q.   Did you observe Mr. Magalios being punched by Officer

23  Peralta on September --

24           MR. MILLER:   Again --

25  Q.   -- 3rd, 2017?

1            MR. MILLER:  -- getting a little repetitive, your

2    Honor.  I object.

3            THE COURT:  You didn't...I think the witness said he

4    didn't know of anything out of the ordinary, so that covers a

5    lot, but I'll allow that question.

6            Go ahead.

7            THE WITNESS:  No.

8    Q.   Did you observe Mr. Magalios being punched by any DOCCS

9    employee on September --

10   A.   No.

11   Q.   -- 3rd, 2017?

12   A.   No.

13   Q.   Did you witness any DOCCS employee threaten Mr. Magalios

14   on September 3rd, 2017?

15   A.   No.

16           THE COURT:  Let me see if I can short-circuit this.

17           MR. TURKLE:  I'm done, your Honor.

18           THE COURT:  Did you see Mr. Magalios anywhere but in

19   the yard that day?

20           THE WITNESS:  No.

21           THE COURT:  Okay.

22           MR. TURKLE:  I have nothing further.

23   Thank you, Officer Bailey.

24           THE COURT:  Okay.

25           Mr. Miller.

Bailey - Cross - Miller

1    CROSS-EXAMINATION

2    BY MR. MILLER:

3    Q.   Good afternoon, Officer Bailey.

4    A.   Good afternoon.

5    Q.   You've been assigned to Fishkill since 1996?

6    A.   Yes.

7    Q.   Would it be fair to say that you and Sergeant Vantassell

8    have known each other for many years?

9    A.   No.

10   Q.   No?  Did you hear his testimony yesterday about him

11   knowing you when he was a corrections officers?

12   A.   Yes.

13   Q.   So how many years were you guys co-corrections officers at

14   Fishkill?

15   A.   I work nights, he works days; I never seen him.

16   Q.   So you don't know the answer to my question?

17   A.   No.

18   Q.   Okay.  Now, at some point, then Sergeant Vantassell

19   informed you of an allegation against you, right?

20   A.   Yes.

21   Q.   And you heard me ask these similar questions to Officer

22   Peralta.  That was a day or two after September 3rd, correct?

23   A.   I don't recall what day it was.  I don't re, I don't

24   recall the day I wrote the...the to/from, either.

25   Q.   Well, the to/from is in evidence.

1     A.    Okay.
2     Q.    As Plaintiff's 11, and it states that you wrote the memo
3     to Sergeant Vantassell on September 23rd.
4     A.    Hmm.
5     Q.    Does that ring a bell?
6     A.    It could be.
7     Q.    Does it refresh your recollection?
8     A.    Heh, heh, not at all.
9     Q.    Okay.  But in the interim, between the time that you were
10    informed of these allegations and the time that you wrote your
11    to/from memo, you spoke to Officer Peralta about these
12    allegations, right?  Yes or no.
13    A.    I didn't, no.
14    Q.    Yes or no, did you speak to Officer Blount about these
15    allegations?
16    A.    No.
17    Q.    Do you have your deposition in front of you there?
18    A.    No, I don't.
19                THE COURT:  Do you have a binder that has a bunch of
20    tabs in it that says A through G?  Do you have a binder with a
21    bunch of tabs in it, A through G?
22                THE WITNESS:  Yeah.
23    Q.    You were deposed --
24                THE COURT:  There's two binders there.  I think.  One
25    of them says "Depositions" on the front?

Bailey - Cross - Miller

```
1                THE WITNESS:  Yeah.

2                THE COURT:  Okay.  Can you find...at least in my copy

3     it's tab C.

4                THE WITNESS:  I'm the second name, so I'm assuming

5     it's number two?

6                MS. ACOSTA-PETTYJOHN:  No.

7                THE COURT:  Just look at each tab and look at the

8     front cover and see whose name is on it.

9                THE WITNESS:  Okay.

10    Q.   Are you on your deposition?

11    A.   Yes.

12    Q.   You were deposed under oath on March 29th, 2021?

13               THE COURT:  No, it can't be '21, can it?

14               MR. MILLER:  Oops.  Oh, I'm sorry, August 18th, 2020.

15    A.   That's what it says, yes.

16    Q.   Okay.  I want you to just go to page 61 and read it to

17    yourself, and you can start at line 4.

18               (Brief pause.)

19    A.   Okay.

20    Q.   Did you read page 61?

21    A.   Can I read it?  The whole thing.

22    Q.   Did you read it.

23    A.   Oh.

24               THE COURT:  Read it to yourself.

25               (Witness complies)
```

1    Q.    Just look up when you're done.

2              (Brief pause.)

3    A.    Okay.

4    Q.    Does page 61 refresh your recollection about whether or

5    not you spoke to Officer Peralta about these accusations?  That

6    calls for a yes --

7    A.    Yes.

8    Q.    -- or no.

9    A.    Yes.

10   Q.    Okay, and is your recollection refreshed now that you did,

11   indeed, speak to Officer Peralta about these allegations when

12   you had to write your to/from memo?

13   A.    A month later.

14              THE COURT:  A month after the to/from or a month

15   after the accusation --

16              THE WITNESS:  This is --

17              THE COURT:  Hold on, we can't talk over each other

18   because of the court reporter.

19              THE WITNESS:  Um-hum.

20              THE COURT:  When you say 'a month later,' do you mean

21   a month after the accusation or a month after you wrote the

22   to/from?  Or something else.

23              THE WITNESS:  A month after I wrote the to/from.  I

24   didn't know who he was.

25              THE COURT:  No, the question is, the conversation you

```
 1    had with Officer Peralta, whatever it was, when was that in
 2    relation to when you wrote the to/from.
 3              THE WITNESS:  About a month after.
 4    Q.   After the to/from.
 5    A.   Yeah.
 6    Q.   So if your to/from was written on September 23rd...
 7    A.   Um-hum.
 8    Q.   It's your testimony that you spoke to Peralta some time in
 9    October of 2017?
10    A.   Around, around there.  I, I'm...vaguely -- yes.
11              MR. MILLER:  Your Honor, may I read page 61?
12              THE COURT:  Yeah, but I think you need to go through
13    page 62, line 4.
14              MR. MILLER:  Yes.
15    Q.   Officer Bailey, did you give these answers to the
16    following questions at your deposition dated August 18th, 2020?
17    And you were under oath when you gave this testimony, right?
18    A.   Yes.
19    Q.   And you were represented by Ms. Acosta-Pettyjohn at the
20    time?
21    A.   Yes.
22    Q.   Page 61, line 4:
23         "Question, have you discussed this case at all with
24    Officer Peralta?
25         "Answer, no, in the beginning I did.
```

1           "Question, okay, when for the first time did you discuss
2     this case with Officer Peralta?

3           "Answer, I don't know.  I don't remember.

4           "Question, when you say 'in the beginning,' what did you
5     mean by that?

6           "Answer, when we had to write a to/from.  I don't know who
7     I asked who he is because I didn't even know him, and I ran
8     into him in the parking lot and I introduced myself to him.
9     And I said 'do you know anything about this' and he said no.
10    And I said they said that we beat him up, and that was it.

11          "Question, is that the only conversation that you've had
12    with Officer Peralta about either the incident of September
13    3rd, 2017, or this lawsuit?

14          "Answer, yes.

15          "Question, and that was just a brief conversation in the
16    parking lot?

17          "Answer, correct.

18          "Question, and about when did this conversation take
19    place?

20          "Answer, I don't remember, but I know it was in the year
21    2017."

22          Did you give those answers to those questions?

23    A.    I sure did.

24    Q.    Now, do you as you sit here today see or -- do you have an
25    independent recollection of this conversation with Officer

Bailey - Cross - Miller

1    Peralta?

2    A.    It wasn't a conversation, it was in passing.

3    Q.    I see.

4    A.    That's all it was.

5    Q.    Okay.

6    A.    When he said no, I kept moving and I went to my car.

7    Q.    I see, okay.

8          And then you wrote your to/from, right?

9    A.    No.  I wrote the to/from before.

10   Q.    Okay.  In your to/from, and it's in evidence...

11   A.    Um-hum.

12   Q.    You said "at no time did I speak to inmate Magalios on

13   September 3rd, 2017."  Did you write that?

14   A.    I sure did.

15   Q.    You also discussed this case with Officer Blount, right?

16   A.    I don't really remember.  Blount...I don't really

17   remember.  I don't see them.  I work night -- at that time I

18   worked nights, they worked days.

19              MR. MILLER:  Page 62, your Honor.

20   Q.    Could you look at page 62 --

21              THE COURT:  First see if you can refresh him.

22              MR. MILLER:  Yeah, I'll do that first.

23   Q.    Officer Bailey, on page 62, if you start...on line 9, read

24   line 9 maybe through line 17...

25   A.    "Question, about Officer Blount" --

Bailey - Redirect - Turkle

1               THE COURT:  No, to yourself.

2    Q.    No --

3               THE WITNESS:  Oh.

4    Q.    -- read it to yourself.  Five through 17.

5               THE COURT:  You can read more if you want.

6               (Witness complies)

7               MR. MILLER:  I'm sorry, your Honor, you're correct.

8    Q.    You can go to page 63, line 7.

9               (Extended pause.)

10   Q.    Tell me when you're done.

11   A.    Okay.

12   Q.    Okay, this calls for a yes or no.

13   A.    Um-hum.

14   Q.    Does reading pages 62 and 63 refresh your recollection to

15   the question did you discuss these allegations with Officer

16   Blount?

17   A.    Yes.

18   Q.    And you did speak to Officer Blount about these

19   allegations, correct?

20   A.    Yes.

21              MR. MILLER:  Thank you.  No further questions.

22              THE COURT:  Any redirect?

23              MR. TURKLE:  Just very briefly, your Honor.

24              THE WITNESS:  Um-hum.

25   REDIRECT EXAMINATION

1   BY MR. TURKLE:

2   Q.   Officer Bailey, do you recall what you said to Officer

3   Blount concerning the allegations?

4             MR. MILLER:  Objection.

5   A.   We didn't speak about it --

6             THE COURT:  Hold on, there's an objection.

7             THE WITNESS:  Oh, okay.

8             THE COURT:  Sustained.  It's the witness's own

9   statement.

10  Q.   Officer Bailey, what did you say to Officer Blount about

11  the allegations?

12            MR. MILLER:  Your Honor, the same objection.

13  A.   It was that --

14            THE COURT:  When there's an objection, you have to

15  wait for me to rule.

16            THE WITNESS:  Well, I didn't hear.

17            THE COURT:  When he stands up.

18            THE WITNESS:  He's speaking so soft I can't hear.

19            THE COURT:  Well, it's very important that you be

20  able to hear, so please let us know that --

21            MR. MILLER:  Your Honor, I have to say, this is the

22  first time ever that anyone has told me they can't hear me.  In

23  my life.

24            THE COURT:  Just make sure you stand up when you're

25  objecting.  If Mr. Miller stands up, it means it's objecting.

Blount - Direct - Turkle

```
 1              You're trying to elicit your own client's out of
 2    court statement?  Sustained.
 3              MR. TURKLE:  I have no further --
 4              THE COURT:  Unless you want to point me to something
 5    in 801 or 804.
 6              MR. TURKLE:  No, your Honor.
 7              Thank you, Officer Bailey.
 8              THE COURT:  You can step down, Officer Bailey.
 9              (Witness excused)
10              THE COURT:  Defendants may call their next witness.
11              MR. TURKLE:  We'd like to call Officer Edward Blount.
12    EDWARD BLOUNT, called as a witness by the Defendants, having
13    duly sworn, testified as follows:
14              THE DEPUTY CLERK:  Please state your full name for
15    the Court and spell out your last name slowly.
16              THE WITNESS:  My name is Edward Blount, B-L-O-U-N-T.
17              MR. MAGALIOS:  What was that?
18              MR. MILLER:  What did he do?
19              THE COURT:  Did you say something, Officer?
20              THE WITNESS:  No.
21              THE COURT:  Are you sure?
22              THE WITNESS:  No.
23              MR. MAGALIOS:  Yeah, he did.
24              THE COURT:  Don't testify from your seat, Mr.
25    Magalios.
```

Blount - Direct - Turkle

| 1 | | I thought I saw you say something. |
|---|---|---|
| 2 | | THE WITNESS:  I didn't say anything. |
| 3 | | THE COURT:  Okay. |
| 4 | | DIRECT EXAMINATION |
| 5 | | BY MR. TURKLE: |
| 6 | Q. | Good afternoon, Officer Blount. |
| 7 | A. | Good afternoon. |
| 8 | Q. | Are you presently employed? |
| 9 | A. | Am I presently what? |
| 10 | Q. | Employed. |
| 11 | A. | Yes, sir. |
| 12 | Q. | And by whom are you employed? |
| 13 | A. | New York State Department of Correctional Services & |
| 14 | | Community...Community Services. |
| 15 | Q. | Supervision, heh, heh. |
| 16 | A. | Supervision. |
| 17 | Q. | Are you a correction officer? |
| 18 | A. | Yes. |
| 19 | Q. | When did you begin working for DOCCS? |
| 20 | A. | 2009. |
| 21 | Q. | Where do you currently work? |
| 22 | A. | Fishkill Correctional. |
| 23 | Q. | And when were you first assigned to Fishkill Correctional |
| 24 | | Facility? |
| 25 | A. | 2015. |

1    Q.    Now, let's turn your attention right to September 3rd,

2    2017.  Did you work that day?

3    A.    I believe I did.

4    Q.    What was your assignment that day?

5    A.    I had the desk in visit/frisk.

6    Q.    And what shift did you work?

7    A.    Tour 2.

8    Q.    What were your duties in the frisk area on September 3rd,

9    2017?

10   A.    My duties there are to fill out the logbooks, assign the

11   officers, um...do the um...heh.  Excuse me, I'm sorry.  I make

12   sure I give a call to the watch commander after we have all the

13   inmates accounted for.

14   Q.    How many officers were assigned to the frisk area on

15   September 3rd, 2017?

16   A.    I believe four.

17   Q.    Now, describe for the jury what procedures inmates undergo

18   when they enter into the frisk area.

19   A.    The inmates enter the frisk area from the back of

20   visit/frisk, they come up three stairs to a porch, they wait

21   there.  An officer will tell them to proceed.  They'll knock on

22   the door, they'll come in.  They're in an area of approximately

23   seven by five, that they're told to face the wall, put their

24   hands on the wall where they're pat-frisked, and after they're

25   pat-frisked, they're scanned with a portable wand.

1    After that is done, they put all their clothing back on as

2  to whatever they took off, jackets, whatever, so they can be

3  searched.  They come in and they pass their passes and their ID

4  to the officer.  They stand to the side of the wall.  After

5  they're standing there waiting, the officer is logging them in

6  to the logbook and they're logging them into, I guess it's

7  the...a count sheet.  Count pages actually.  We put their name,

8  DIN number, housing unit, on these sheets of paper.

9  We hand the inmate their IDs, we keep the passes in a separate box, we

10  tell them to walk about 12 to 15 feet to the door, to the visit room,

11  wait at the yellow line, wait for the officer to call them up.  Once

12  the officer calls them up, they're given their seating assignments.

13  Q.   So where do inmates go when you're done processing them?

14  A.   Excuse me, sir?

15  Q.   Where do the inmates go when you've completed the

16  processing.

17  A.   This -- um, the um...visit room officers gives them their

18  seating assignment.  There's a door about four feet wide, eight

19  feet high.  They go through the door and they wait at the

20  yellow line, and then they proceed after the officer tells them

21  to come up.  They pass them their ID, the officer tells them

22  where they're gonna be seated at.

23  Q.   So they go into the visiting room --

24  A.   They don't -- they're in the visiting room.  They're just

25  standing behind a yellow line.

1   Q.   Okay.  Now, in September of 2017, what protocols, if any,

2   did DOCCS have in place with regard to physical touching

3   between inmates and their visitors?

4   A.   Well, they're allowed to touch one another, but they're

5   just not allowed to have any prolonged kinds of, hugs, or

6   grappling or whatever, grinding, whatever they do.  They're not

7   allowed to do that, but that's not done in my area.

8   Q.   Okay.

9   A.   Because there are no visitors allowed back there.

10   Q.   And please briefly describe, because I know we've heard

11   testimony about this, the procedure an inmate follows when his

12   visit is over.

13   A.   I didn't hear that question clearly.

14   Q.   Just briefly describe for the jury the procedure that's

15   followed once an inmate visit is over.

16   A.   Once the inmate's visit is over, the family member and the

17   inmate walk to the visit room podium.  They receive a pass from

18   the visit room officer, the visitor.  The inmates come back to

19   the door, they knock on the door.  Then they can gently push

20   the door to come into visit/frisk.

21       If we tell them to wait outside for a few moments, they

22   have to wait outside for a few moments, but if we're free,

23   we'll let them come in, they'll go through another door

24   straight down.  If they don't have a net bag, but generally

25   they do have a net bag, they'll pick their net bag up, they'll

1    go directly back down and sit on the benches down there.

2    They'll wait to be called.  Once we get a call from another

3    area that the visitor has left, we wrap their IDs and their

4    passes together, we walk it out and we put it in a black box at

5    the end of the corridor.  After that is done, an officer...will

6    take the inmate out to strip-frisk.  There are nine booths out

7    there.  They go through a set of double doors.  They can pick

8    whatever booth -- the officer picks whatever booth they want

9    them to go in.

10        Once that's completed, the inmate gets dressed, they go

11   and pick up their packages, they go out the package room door

12   adjacent to the package room door.  They'll be on the walkway

13   at that time.  Directly facing them will be bravo.  Adjacent to

14   bravo, there would be a gym with two gym officers.  There's one

15   officer in bravo post.  Then they will proceed to their housing

16   unit areas.

17   Q.   Now, within the visiting area, would there be supervisory

18   officials assigned to the visit, slash, frisk area?

19   A.   Yes, sir.

20   Q.   And can you tell us, not necessarily by name, the rank of

21   the officials who would be in the visit, slash, frisk area?

22   A.   At any given time during the day there's a sergeant

23   available.  There are also two captains, one lieutenant, and

24   probably the dep of security on weekends that have to make

25   passes through and sign logbooks in general.

Blount - Direct - Turkle

 1   Q.   Now, on September 3rd, 2017, did you know Officer Peralta

 2   by name?

 3   A.   No.

 4   Q.   Did you --

 5   A.   I didn't know him.

 6   Q.   To your knowledge, was Officer Peralta assigned to the

 7   strip-frisk area on September 3rd, 2017?

 8   A.   No.

 9   Q.   Do you know what assignment Officer Bailey had on

10   September 3rd, 2017?

11   A.   No, I don't know.

12   Q.   Did you see Officer Bailey in the strip-frisk area on

13   September 3rd, 2017?

14   A.   No.

15   Q.   Did you see Officer Bailey interact with Mr. Magalios on

16   September 3rd, 2017?

17   A.   Interact with who?

18   Q.   With Mr. Magalios.

19   A.   No.

20   Q.   Did you interact with Mr. Magalios that day?

21   A.   Probably in the morning.

22   Q.   Describe that interaction.

23   A.   I took his pass --

24           MR. MILLER:   Objection to the word 'probably.'   It

25   means he's guessing.

1              THE WITNESS:  I'm not --

2              THE COURT:  Well, do you remember specifically or are

3    you inferring from what your duties were that day?

4              THE WITNESS:  I probably -- I took his ID in the

5    morning.  If I had the desk, I took his ID and I took his pass.

6              THE COURT:  So you're inferring from what your job

7    was --

8              THE WITNESS:  That's correct.

9              THE COURT:  -- that you must have done that.

10             THE WITNESS:  Yes, ma'am.

11             THE COURT:  Do you have a specific memory of it?

12             THE WITNESS:  No, I don't.

13             THE COURT:  Okay.

14   Q.   Now, prior to September 3rd, 2017, did you interact with

15   Mr. Magalios?

16   A.   Good morning, good afternoon, give me your ID, give me

17   your pass.

18   Q.   Did you interact with Mr. Magalios in any area of Fishkill

19   other than in the visit/frisk area?

20   A.   No.

21   Q.   Did you ever exchange harsh words with Mr. Magalios?

22   A.   No.

23   Q.   Did you ever threaten him?

24   A.   No.

25   Q.   Did you ever issue Mr. Magalios a misbehavior report?

Blount - Direct - Turkle

1   A.  No.

2   Q.  Did Mr. Magalios ever threaten you prior to September 3rd,

3   2017?

4   A.  According to him he has.

5   Q.  Well, prior to September 3rd, 2017 --

6   A.  No.

7   Q.  To your knowledge, prior to September 3rd, 2017, did Mr.

8   Magalios ever...file a grievance against you?

9   A.  No.

10  Q.  To your knowledge, what time did Mr. Magalios's visit end

11  on September 3rd, 2017?

12  A.  You're going to have to repeat that, I...

13  Q.  To your knowledge --

14          THE COURT:  Do you have a recollection of what time

15  Mr. Magalios's visit ended on September 3rd, 2017.

16          THE WITNESS:  No, I don't.

17  Q.  Did you see Mr. Magalios after his visit ended?

18  A.  I don't recall him.

19  Q.  Do you see any DOCCS employee interact with Mr. Magalios

20  after his visit ended?

21  A.  Definitely not.

22  Q.  Did you hear any verbal exchanges between a DOCCS official

23  and Mr. Magalios --

24  A.  No, sir.

25  Q.  -- after his visit ended?

```
1    A.    No.

2    Q.    To your knowledge, following the visit, did Mr. Magalios

3    undergo a strip-search?

4    A.    He would have had to have leaved {sic} the visit/frisk

5    area.

6    Q.    Did you participate in a strip-search of Mr. Magalios?

7    A.    No.

8    Q.    Did you enter the strip-search area where the strip-search

9    was performed?

10   A.    At some points during the afternoon, I -- or morning

11   whenever anybody's leaving, I probably would get up and check

12   to see who's out there.

13   Q.    Do you recall performing any strip-searches that day?

14   A.    I could have, but I can't be certain of that.

15   Q.    Did you observe Mr. Magalios being punched by Officer

16   Peralta --

17   A.    No.

18   Q.    -- on September 3rd --

19   A.    No.

20   Q.    -- 2017?

21   Did you observe Mr. Magalios being punched by Officer Bailey on

22   September 3rd --

23   A.    No, sir.

24   Q.    -- 2017?

25        Did you observe Mr. Magalios being punched by any DOCCS
```

1    employee --

2    A.   No.

3    Q.   -- on September 3rd, 2017?

4         Did you observe Mr. Magalios being brought to the ground

5    by Officer Peralta?

6    A.   No, sir.

7              MR. MILLER:  Your Honor, this is getting repetitive;

8    I object.

9              THE COURT:  Is it fair to say you didn't see any sort

10   of physical contact between Mr. Magalios and other DOCCS

11   employees after the time you admitted him to the visiting area?

12             THE WITNESS:  No, ma'am.

13             MR. TURKLE:  Then I have nothing further.

14             Thank you, Officer.

15             THE COURT:  Go ahead, Mr. Miller.

16   CROSS-EXAMINATION

17   BY MR. MILLER:

18   Q.   Good afternoon, Officer Blount.

19   A.   It's Blount.

20   Q.   Blount, okay.  Good afternoon, Officer Blount.

21   A.   Good afternoon.

22   Q.   You just testified on direct that you never exchanged

23   harsh words with Mr. Magalios back at Fishkill, correct?

24   A.   No, I -- no.

25   Q.   Well, just ten minutes ago, didn't you just exchange harsh

1    words with him when you took the stand?

2    A.    There's -- no.

3    Q.    Are you denying that you said something starting with a B

4    to him?

5    A.    No.  Yes, I am denying that.

6    Q.    Are you aware that speaking out of turn in a courtroom is

7    against the rules?

8    A.    I'm aware of it now that you're saying that.

9    Q.    But you're testifying that you didn't say anything to him

10   when you just took the stand?

11   A.    I didn't say anything to him.  If I did, something may

12   have just blurted out, but I did not direct anything to him.

13   Q.    But you do understand that if you blurted something out,

14   you were breaking the rules, right?

15   A.    I didn't -- I don't know the rules and I don't recall

16   saying anything to him.

17   Q.    You've been sitting here for a number of days; you're not

18   aware that in a federal courtroom you're supposed to follow the

19   rules?

20              MR. TURKLE:  Objection, your Honor; argumentative.

21              THE COURT:  Yeah.  Sustained.

22   Q.    You said in your testimony that sergeants, lieutenants,

23   captains, deputy, superintendents, they all pass through the

24   visiting room, especially on weekends --

25   A.    I said visit/frisk.

Blount - Cross - Miller

1   Q.   Okay.

2   A.   They do go into the visiting room, also, sir.

3   Q.   And when they do that, do they sign their name that

4   they're --

5   A.   Most --

6   Q.   -- there?

7   A.   -- of the time they do.

8   Q.   May I finish my question?

9   When they do that, do they sign the log to indicate the time that

10  they, that they do that.

11  A.   Sometimes they do, sir.

12  Q.   Okay.  So, for example...when the lieutenant made his

13  rounds at around maybe ten o'clock, he signed in, right?

14  A.   Is that the frisk logbook?

15              THE COURT:  What exhibit are we looking at?

16              MR. MILLER:  This is the processing logbook.

17  A.   I wouldn't know about that, sir.

18              THE COURT:  What exhibit are we looking at?

19              MR. MILLER:  This is, I believe, 16.

20              THE COURT:  Okay.

21  Q.   I'm just asking you, is this the type of signature you

22  would find in the logbook if a supervisor was making rounds.

23  A.   I don't know what supervisor --

24              MR. TURKLE:  Objection.

25  A.   -- sign or how they sign in other areas.  I know what they

1    do in frisk area.  If that's not a frisk logbook, I can't give

2    you a definitive answer about that.

3    Q.   So in the frisk room logbook, would the supervisor sign in

4    when he does his rounds?

5    A.   Yes, sir.  Supposably.

6    Q.   I'm sorry?

7    A.   It's not a definite.  Sometimes they're in a rush, they

8    may miss it.

9    Q.   So sometimes they don't do their job properly, correct?

10    A.   It's not about --

11          MR. TURKLE:  Objection.

12    A.   -- doing their job properly, sir.  It's about they may be

13    in a rush to get to another area, something may be happening,

14    that -- where they have to leave.

15    Q.   Okay.  Do you have a recollection of any supervisors going

16    through the frisk room on 9/3/2017?

17    A.   I'm sure the sergeant would have had to come through by

18    probably eleven a.m.

19    Q.   Okay.  And what was the name of that sergeant?

20    A.   Buonato.

21    Q.   At about eleven, because he was assigned, as you know, to

22    the processing area, right?

23    A.   He was assigned to building 13, processing...package.

24    Q.   Okay.

25    A.   Building 12.

```
 1    Q.    And so there might have been a time during the tour that
 2    he would sort of make rounds through the frisk room area and
 3    the visiting area, correct?
 4    A.    I just said that.
 5    Q.    And then he'd go back to the processing area, right?
 6    A.    I don't know where he goes after that.
 7    Q.    Okay.  Who were you working with in the frisk room that
 8    day?
 9    A.    Don't recall.  I know I saw my name as the head and that's
10    it.
11    Q.    Does the name Officer Colon ring a bell?
12    A.    It rings a bell, but he probably was not assigned with me.
13    Q.    I'm just asking you does the name Officer Colon ring a
14    bell.
15    A.    It does ring a bell.
16    Q.    Could you just describe what he looks like physically.
17    A.    About five-six, male, Hispanic, short-cut hair, about 140,
18    150 pounds I would gather?
19    Q.    And what about Officer Barto; are you familiar with him?
20    A.    Who?
21    Q.    Officer Barto.
22    A.    Yes, I'm familiar with him.
23    Q.    And was he assigned to the frisk room on September 3rd --
24    A.    I can't recall.
25    Q.    -- 2017?
```

Blount - Cross - Miller

1    A.   I can't recall.

2    Q.   Have you reviewed the frisk room logbook for that day in

3    preparation for your testimony?

4    A.   I may have months ago, but if you're asking me whether or

5    not I recall their names being in the frisk book {sic} logbook

6    today, I can tell you no.

7              MR. MILLER:  Just one second, your Honor.

8              (Brief pause.)

9              MR. MILLER:  I'd like to have these two pages marked

10   for identification as Plaintiff's 17, and I'm going to, with

11   the Court's permission, hand it to the witness.

12             MS. ACOSTA-PETTYJOHN:  I'm sorry, what page --

13             THE COURT:  Make sure you show them to Ms.

14   Acosta-Pettyjohn.

15             MS. ACOSTA-PETTYJOHN:  What page is it?

16             (Off-the-record discussion)

17             MR. MILLER:  May I approach the witness?

18             THE COURT:  Yes.

19   Q.   Officer Blount, take a look at these two pages, will you,

20   and look up when you're finished.

21             (Extended pause.)

22   A.   Okay.

23             MR. MILLER:  I'm sorry, there's a third page.

24   Q.   Officer Blount, I'm going to approach and just give you a

25   third page to that item (handing), so it's complete.

Blount - Cross - Miller

```
 1                 THE COURT:  So there's three pages to Exhibit 17?

 2                 MR. MILLER:  Three pages, yes.

 3     A.    Okay.

 4     Q.    Do you recognize those three pages?

 5     A.    Uh, they look like strip/frisk...I mean, visit/frisk

 6     logbook.

 7     Q.    For what date?

 8     A.    Um, 9/3...

 9     Q.    What year?

10     A.    Seventeen.

11     Q.    And is this the log that's maintained by the officers

12     assigned to the frisk room?

13     A.    Uh --

14                 THE COURT:  Are we talking about the pat-frisk or the

15     strip-frisk?  Or both.

16                 THE WITNESS:  Strip-frisk.

17     Q.    The --

18     A.    It doesn't matter.

19     Q.    It's the same room, right?

20     A.    No, they're not the same rooms, but it's visit room -- the

21     frisk/visit room.

22     Q.    Right.

23     A.    I mean...I'm confused right now.

24     Q.    Okay, let me, let me ask you another question.

25     A.    You can repeat the question.
```

1    Q.    Before I -- go ahead.

2    A.    You can repeat the question.

3    Q.    Okay.

4          Is this logbook maintained in the frisk room area by the

5    officers assigned to that area?

6    A.    Yes, sir.

7    Q.    Okay.  And it indicates -- it would indicate the time that

8    an inmate goes through the area for his visit, correct?

9    A.    Yes, sir.

10   Q.    It doesn't indicate the time that the inmate leaves after

11   his visit, does it?

12   A.    No, sir.

13   Q.    Okay.  And it also would indicate the officers assigned to

14   the frisk room on that day --

15   A.    Yes, sir.

16   Q.    -- correct?

17   A.    Yes, sir.

18              MR. MILLER:  Your Honor, I would offer these three

19   pages into evidence as Plaintiff's 17.

20              MR. TURKLE:  No objection.

21              THE COURT:  Received.

22              (Plaintiff's Exhibit 17 received in Evidence)

23   Q.    Now...may I have it back, please?

24   A.    (Handing).

25   Q.    Thank you.

Blount - Cross - Miller

1     In looking at Plaintiff's 17, can you tell us who was

2   assigned to the frisk room area on 9/3/2017?

3   A.   Officer Barto, Officer Colon.  We were shorthanded that

4   day obviously.

5   Q.   I'm just asking you for the names right now.

6   A.   I just gave it to you.

7   Q.   Say it again.

8   A.   Officer Barto, Officer Colon.

9   Q.   And yourself.

10  A.   Yes.

11  Q.   You've already described Officer Colon.  Can you describe

12  Officer Barto?

13  A.   Yes, sir.  Um, white, about five-foot-five, about 160

14  pounds, probably in his forties.

15  Q.   Now, you three officers performed pat-frisks upon inmates

16  entering the room that day, correct?

17  A.   Yes.

18  Q.   And, in fact -- let me go -- so everyone can see what I'm

19  talking about...it's sort of blocked off, but do you see the

20  last column here (pointing)?

21  A.   Yes.

22  Q.   And that last column would indicate the name of the

23  officer who is doing the frisk, correct?

24  A.   Um...the pat-frisk, not the strip-frisk.

25  Q.   No, I agree.  We were talking about the pat-frisk.

1    A.    It's the pat-frisk.

2    Q.    And it looks like you were switching off, right?

3    A.    Uh...no.  Not at this time.

4    Q.    Tell me what, tell me what that last column would

5    indicate.

6    A.    The last column, the two officers that are doing the

7    pat-frisk, they do switch off.  One does a wand or scanner, one

8    does a pat-frisk.  By the time they're completed their

9    pat-frisk they're at the door, and I should have the IDs,

10   filling out the paperwork for them so they can go on their

11   visits.

12   Q.    So it's your testimony that you weren't doing pat-frisks

13   because you were at the desk or the door?

14   A.    I'm looking at the time and that was my handwriting.

15   Q.    Okay, but I asked you weren't you guys, like, switching

16   off throughout the tour that day.

17   A.    Not throughout the whole day.  At a certain point, after

18   the eleven-thirty a.m., once the counts go up I'll get up and

19   I'll take a break, I'll come back and start doing the counts

20   over again, but we don't have the sheet anymore because that

21   had already gone up at eleven-thirty, so we don't need the

22   count sheets, we just log them in the logbook at that point --

23   after eleven-thirty a.m.

24   Q.    Okay, I'm going to page 2 of Plaintiff's 16.  Same column,

25   it's got your name there, right?

1    A.    Yep.

2    Q.    Does that mean you were doing pat-frisks and you were --

3    A.    Probably.

4              THE COURT:   You gotta let --

5    Q.    Officer Blount --

6              THE WITNESS:   Yes, I'm sorry, ma'am.

7              THE COURT:   Just make sure for the sake of the court

8    reporter that you let the lawyer finish the question and then

9    give your answer.

10             THE WITNESS:   Yes, ma'am.

11   Q.    So does this page indicate that you guys were switching?

12   A.    Yes, sir.

13   Q.    Switching around?

14   A.    Yes.

15   Q.    Okay, now...other than the three officers who you've

16   named, including yourself, were there any other officers

17   assigned to the frisk room on September 3rd?

18   A.    No, sir.

19   Q.    So, therefore, when inmates are done with their visit and

20   they...come through this door, it's the same three officers who

21   would be doing the strip-searches, right?

22   A.    Basically.

23   Q.    Well, basically --

24   A.    Yes.

25   Q.    -- the answer should be yes, right?

1    A.    Yes.

2    Q.    Thank you.

3    A.    You're welcome.

4    Q.    Okay.

5    A.    Heh, heh, heh.

6    Q.    Now, let's go back to Plaintiff's 16.  Does Plaintiff's 16

7    indicate to you the time that Mr. Magalios entered the frisk

8    room?

9    A.    Well, what it indicates to me if he's saying that he left

10   at one a.m., it means that I was still at -- or nine-thirty...I

11   can't see that.

12             MR. MILLER:   Can Counsel stipulate --

13   A.    9:10 a.m. he entered the area, the visit/frisk area.

14   Q.    All right, so that's the time he entered, right?

15   A.    Yes, sir.

16   Q.    I'm now going to page 2 of this logbook.  Does this page

17   indicate the time that Alexander Hall came in for a frisk for

18   his visit?

19   A.    Mm, it says 10:20 a.m.

20   Q.    And who was right behind him?

21   A.    Uh, Gianniti {sic}.

22             MR. MILLER:   Thank you, Officer Blount.

23             THE COURT:   Any redirect?

24             MR. TURKLE:   Very, very briefly.

25   REDIRECT EXAMINATION

1  BY MR. TURKLE:

2  Q.  Officer Blount, you just looked at a document that

3  reflected that Mr. Giannini and Inmate Hall had come into the

4  frisk area about 10:20 on October 3rd -- on September 3rd,

5  2017, correct?

6  A.  Yes, sir.

7  Q.  Was there any indication there as to what time their visit

8  ended?

9  A.  No, there isn't.

10        MR. TURKLE:  Thank you.

11        THE COURT:  You may step down, Officer Blount.

12        THE WITNESS:  Yes, ma'am.

13        (Witness excused)

14        THE COURT:  Defendants may call their next witness.

15        MS. ACOSTA-PETTYJOHN:  Our next witness is the

16  doctor, your Honor.

17        THE COURT:  Oh.

18        MS. ACOSTA-PETTYJOHN:  He's set to be here tomorrow

19  morning.

20        THE COURT:  All right, you don't have any

21  housekeeping or anything you need to do?

22        MS. ACOSTA-PETTYJOHN:  Not right now other than the

23  verdict sheet, your Honor.

24        THE COURT:  Okay.

25        I know you'll be very disappointed to learn that

1    we're going to have to break early today.  Defendants are

2    calling one more witness who is a doctor, and to accommodate

3    the doctor's schedule, we've agreed that he didn't have to come

4    today and sit around, that he could come first thing tomorrow,

5    so I think what will happen tomorrow is we will hear the

6    Defendant's doctor at nine-thirty, if there is a rebuttal case

7    from Plaintiff it would be very brief, and then we're going to

8    go right into the closing arguments of the lawyers, and I'll be

9    giving you my instructions on the law, and I imagine the case

10   will be yours some time tomorrow.

11          We will stick to our usual hours of nine-thirty to

12   two-thirty unless you all agree that you want to come earlier

13   or stay later, so it may be that in reliance on nine-thirty to

14   two-thirty you've made arrangements and so you can't change

15   those hours, but if it got to be two-thirty tomorrow and you

16   thought you were close or if you wanted to come in earlier on

17   Friday and that was agreeable to everybody, you could adjust

18   the hours and we'll, we'll adjust to you, but only if that

19   works for everybody, and you certainly don't need to discuss it

20   now.

21          So, one more time, don't discuss the case, don't do

22   any outside research, keep an open mind, you still haven't

23   heard all of the evidence and you haven't heard my instructions

24   on the law or what the lawyers have to say.  Have a good

25   evening and we will resume at nine-thirty tomorrow.

1           (Open court; jury not present)

2           THE COURT:  All right, my law clerk -- everyone can

3    sit.

4           My law clerk sent around yesterday the latest update

5    of the charge.  It says "4/27/21 Draft" on the front.  I made

6    some very non-substantive tweaks from the previous version that

7    you saw.  The only things I wanted to draw your attention to is

8    that on page 17, we used to say...in terms of the excessive

9    force claim that one of the things the jury had to find was

10   that the Defendants struck the Plaintiff.  I changed it to

11   'used force against the Plaintiff' because the testimony is

12   that Officer Bailey held the Plaintiff's head down and sort of

13   slammed him, not that he struck him.  And I think everything

14   else was not non-substantive, but my law clerk sent you a red

15   line so you should have been able to see the changes.

16          At this point I think we are safe in striking, on

17   page 5, where I explain what stipulations are.  It said "a

18   stipulation is simply an agreement between parties as to what

19   certain facts were or what the testimony would be if certain

20   people testified before you."  I think we can strike the latter

21   part because we didn't have any of that.  All right.

22          So any objections to the charge itself?  We'll get to

23   the verdict form in a second.

24          MR. MILLER:  Not from the Plaintiff, your Honor.

25          MS. ACOSTA-PETTYJOHN:  No objections, your Honor.

1              THE COURT:  All right.

2              Now, I understand Defendants do have an objection to

3    the verdict form.  Tell me about that.

4              MS. ACOSTA-PETTYJOHN:  Your Honor, I think our

5    objection is more on the phrasing of the verdict form.  We've

6    seen this form before where it says "has the Plaintiff met

7    their burden of proof against Defendant" so-and-so.  I don't

8    know if the wording that it's in now will confuse the jury.

9              THE COURT:  Well, I guess for the record I should

10   make it clear.  It says "for each claim against each Defendant,

11   for whom do you find on Plaintiff's claim for excessive force

12   against Defendant Mathew Peralta, for whom do you find on

13   Plaintiff's claim for failure to intervene against Defendant

14   Blount."

15             I know I could build the burden of proof into that

16   question, but I don't know that I have to.  What do you think

17   would be the source of confusion?

18             MS. ACOSTA-PETTYJOHN:  For me, your Honor, it

19   reads -- and, again, I don't know if that's how the jury is

20   going to read it, but for me it reads kind of like...who do you

21   like better as opposed to who has the burden of proof.

22             THE COURT:  Do you have an opinion, Mr. Miller?

23             MR. MILLER:  I do.  I respectfully disagree with Ms.

24   Acosta-Pettyjohn.

25             The charge makes it very clear who has the burden

1  and what that burden is, and I find it unnecessary to remind

2  them in the verdict interrogatories.  That, frankly, in my

3  opinion could be more confusing because it's sort of reminding

4  them or it's accentuating one aspect of a very long charge.

5         Basically what the verdict form states here is a very

6  simple question, and the questions assume the jury has listened

7  to the charge and can follow the instructions, so I find these

8  questions very clear and they clearly don't favor one side or

9  the other.

10        THE COURT:  Yeah, I'm going to leave it as is.

11        I don't see the need to build the burden of proof into

12  the question any more than any other portion of the

13  instructions.  If they're -- they'll have the instructions with

14  them in the jury room.  If they have -- if they listen to them

15  and they follow them, there's no way they could answer the

16  question without applying the burden of proof, so asking them

17  'for whom do you find' is not in a vacuum, it's right after

18  they've been told the law they have to apply to make that

19  finding, so I'm going to leave it as it is.

20        Any other business we should take care of?

21        Actually, one thing is we've added some exhibits today

22  that need to be put on the thumb drive...

23        MR. MILLER:  Yes.

24        THE COURT:  And if there are going to be any tomorrow

25  that aren't already on the thumb drive, let's make sure that

1    you folks take care of that tonight.

2            So I would imagine the doctor is not going to take

3    all morning.  I don't know if there's going to be a rebuttal

4    case, but I imagine it will be brief, so be prepared to sum up

5    tomorrow morning.

6            Anything else we should discuss now?

7            MR. MILLER:  No, your Honor, other than I am -- not

8    that this is the time to ask this, but I'm a little concerned

9    about what happened this morning and I'm not sure if there's

10   anything that I should be doing at this point.  The fact that

11   the security staff in the building has been informed indicates

12   to me that maybe I don't need to do anything further, but I'm

13   certainly all ears if there's anything that the Court feels I

14   need to do at this point.

15           THE COURT:  Look, I, I informed the marshals.  I

16   don't know if they're pursuing it.  I hope they are.  Even if

17   they're not, that doesn't mean the U.S. Attorney would pursue

18   it.

19           I mean, I don't think there's anything you're obliged

20   to do.  You're welcome to report the conduct to whoever you see

21   fit.  I imagine whatever animosity exists between -- now I've

22   forgotten the gentleman's name.  Mr. Zamara is it?

23           MR. MAGALIOS:  Zamani.

24           THE COURT:  Zamani.  -- and Mr. Magalios preexisted

25   this trial...

```
 1              MR. MILLER:  Yes, it did.

 2              THE COURT:  So I don't...you know, it's certainly up

 3   to you whether you or your client feel like you need to take

 4   any, any additional steps, but in terms of the part that is

 5   arguably witness tampering, the marshals have been informed and

 6   it's their call what to do after that.

 7              MR. MILLER:  Okay.

 8              THE COURT:  All right, I'll see everybody at

 9   nine-thirty.

10              MR. MILLER:  Thank you.

11              THE COURT:  Have a good evening.

12              MS. ACOSTA-PETTYJOHN:  Thank you, Your Honor.

13              MR. TURKLE:  Thank you.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX OF EXAMINATION

 2

 3    Examination of:                              Page

 4

 5    NICHOLAS GIANNINI

 6    Direct By Mr. Miller. . . . . . . . . . . . 331

 7    Cross By Ms. Acosta-Pettyjohn . . . . . . . 343

 8

 9    MATHEW PERALTA

10    Direct By Ms. Acosta-Pettyjohn. . . . . . . 368

11    Cross By Mr. Miller. . . . . . . . . . . . .395

12    Redirect By Ms. Acosta-Pettyjohn . . . . . .434

13

14    REUBEN FEBUS

15    Direct By Mr. Turkle . . . . . . . . . . . .437

16

17    TIMOTHY BAILEY

18    Direct By Mr. Turkle . . . . . . . . . . . .445

19    Cross By Mr. Miller. . . . . . . . . . . . .458

20    Redirect By Mr. Turkle . . . . . . . . . . .466

21

22    EDWARD BLOUNT

23    Direct By Mr. Turkle . . . . . . . . . . . .468

24    Cross By Mr. Miller. . . . . . . . . . . . .477

25    Redirect By Mr. Turkle . . . . . . . . . . .489
```

```
 1                       GOVERNMENT EXHIBITS

 2

 3    Exhibit No.                                  Received

 4

 5    Plaintiff's 6A. . . . . . . . . . . . . . . . .331

 6    Plaintiff's 15. . . . . . . . . . . . . . . . .421

 7    Plaintiff's 16. . . . . . . . . . . . . . . . .421

 8    Plaintiff's 17. . . . . . . . . . . . . . . . .484

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```