```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  --------------------------------x

 3  NICHOLAS MAGALIOS,

 4              Plaintiff,

 5        V.                              19 CV 6188(CS)
                                          TRIAL
 6
    C.O. MATHEW PERALTA,
 7  C.O. TIMOTHY BAILEY,
    C.O. EDWARD BLOUNT,
 8
                Defendants.
 9
    --------------------------------x
10
                                   United States Courthouse
11                                 White Plains, New York
                                   April 29, 2021
12

13

14

15  Before:  THE HONORABLE CATHY SEIBEL, District Judge

16

17                    APPEARANCES

18  SIVIN & MILLER, LLP
         Attorneys for Plaintiff
19  GLENN D. MILLER

20

21  LETITIA JAMES
         Attorney General for the State of New York
22  JESSICA ACOSTA-PETTYJOHN
    BRUCE J. TURKLE
23       Assistant Attorneys General

24

25
```

Magalios v. Peralta - Jury Trial

```
 1            THE COURT:  Good morning, everyone.

 2            MR. MILLER:  Good morning.

 3            MR. TURKLE:  Good morning.

 4            MS. ACOSTA-PETTYJOHN:  Good morning.

 5            THE COURT:  You can all have a seat.

 6            Walter, you can bring in the Jury.

 7            (Open court; Jury present)

 8            THE COURT:  Good morning, everyone.

 9            ALL:  Good morning.

10            THE COURT:  We will continue with Defendant's case.

11            Go ahead, Mr. Turkle.

12            MR. TURKLE:  Thank you, Your Honor.  I'd like to call

13 Dr. Gidumal.

14 DR. RAMESH GIDUMAL, called as a witness by the Defendants,

15 having been duly sworn, testified as follows:

16            THE DEPUTY CLERK:  Please state your full name for the

17 Court and spell it out slowly.

18            THE WITNESS:  Dr. Ramesh Gidumal, R-A-M-E-S-H,

19 Gidumal, G-I-D-U-M-A-L.

20            THE COURT:  Whenever you're ready, Mr. Turkle.

21            MR. TURKLE:  Thank you, Your Honor.

22            Your Honor, prior to questioning Dr. Gidumal, we have

23 stipulated with Plaintiff to the authenticity of medical records

24 that comprise Defendant's Exhibits A, B, C, and D.  I'd like to

25 offer them into evidence.
```

1          THE COURT:  A, B, C, and D?

2          MR. TURKLE:  Yes.

3          THE COURT:  All right, they're received.

4          (Defendant's Exhibits A, B, C, and D are received in

5    Evidence)

6          MR. TURKLE:  Thank you, Your Honor

7    DIRECT EXAMINATION

8    BY MR. TURKLE:

9    Q.   Good morning, Dr. Gidumal.

10   A.   Good morning.

11   Q.   Are you a physician licensed to practice in the State of

12   New York?

13   A.   Yes.

14   Q.   And when were you licensed?

15   A.   In 1981.

16   Q.   Please describe for the Jury your educational background.

17   A.   Sure.

18       I went to high school not far from here, went to Bronx

19   Science in the Bronx.  Then I went to the University of

20   Pennsylvania, I graduated in three years, and that was in 1976.

21   I graduated with honors.

22       I then went to Mt. Sinai Medical School.  I graduated Mt.

23   Sinai Medical School in 1980.  I then did a one-year internship

24   at Mt. Sinai in general surgery, and then I did a four-year

25   residency program at NYU Bellevue that ended in June of 1985.  I

1  graduated as chief resident.

2      I then did two fellowships, one with Jim Andrews who takes

3  care of the Yankees in June of 1985 to December of '85, and then

4  I did a shoulder fellowship with Charlie Near at Columbia, and

5  then I was asked to join the staff at NYU in April of '86.

6  Q.   Thank you, Dr. Gidumal.

7      Are you board certified?

8  A.   I'm board certified.  And the board recommends that you

9  show ongoing competency and so I've been recertified every ten

10 years, and I recertified last in 2018, so I'm good until 2028.

11 Q.   And can you explain for the Jury what it means to be board

12 certified.

13 A.   Yeah, board certified means that you have graduated from

14 medical school; you've done an accredited residency program, and

15 the accredited residency program is one that encompasses a

16 variety of the orthopaedic components, so you've done some spine

17 surgery, some trauma, some shoulder, some pediatrics, some

18 tumors, some foot, et cetera; and then after you've done a

19 variety of things for five years, you then can go ahead and do a

20 fellowship, but you don't need a fellowship to do...board

21 certified.

22      You then take a written exam that on paper shows that

23 you know what you're doing, and then two years later you take an

24 oral exam, and as part of the oral exam, you submit all of the

25 operations that you've done, and five independent people look at

1  the cases, look at the X-rays, and make sure that you're

2  operating for appropriate indications and you're doing

3  appropriate surgery, and then you're considered board-certified.

4  Q.   Have you published in any area of orthopaedics?

5  A.   Yes.

6          THE COURT:  Can I just interrupt with one question?

7          You're board-certified in general surgery or...I

8  didn't catch what you're board-certified in.

9          THE WITNESS:  I'm board certified in orthopaedic

10 surgery.

11         THE COURT:  Orthopaedic surgery, thank you.

12 Q.   Have you published in the area of orthopaedics?

13 A.   Yes.

14 Q.   And can you describe for the Jury some of the articles that

15 you've published.

16 A.   Yeah, I've published articles on shoulder injuries, I've

17 published articles on trauma, on fractures, and on sports

18 medicine.

19 Q.   Now, in your practice, approximately how many patients have

20 you treated for shoulder injuries?

21 A.   I treated a lot.  I take care of the majority of shoulder

22 injuries at NYU.  I also take care of the shoulder injuries at

23 Bellevue Hospital, so through the years I've taken care of over

24 ten thousand shoulder injuries.

25 Q.   Now, Dr. Gidumal, were you assigned to perform a task in

1  this case?

2  A.   A what in this case?

3  Q.   A task in this case.  A task related to the shoulder injury

4  alleged by the Plaintiff, Mr. Magalios.

5  A.   Yes.

6           MR. MILLER:  Maybe the form should be changed, your

7  Honor.

8           THE COURT:  Well, obviously the doctor's here for a

9  reason.

10 Q.   Are you being compensated for your time?

11 A.   Yes.

12 Q.   Is the compensation arrangement the usual and regular fee

13 for these types of matters?

14          MR. MILLER:  Objection to form.

15          THE COURT:  Sustained.  Don't lead.

16 Q.   Now, Dr. Gidumal, what was your assignment in this case?

17 A.   My assignment in this case was to review the medical

18 records, to examine Mr. Magalios, and based on the records and

19 the X-ray reports and his examination to determine if Mr.

20 Magalios sustained a significant injury to his sternoclavicular

21 joint and his acromioclavicular joint, basically to his

22 shoulder.

23 Q.   What medical records did you review, Dr. Gidumal?

24 A.   The medical records that I reviewed were the records from

25 Fishkill Correctional --

```
 1           MR. MILLER:  Might I just ask if the doctor's
 2  refreshing his recollection that he let us know what he's
 3  reviewing?
 4           THE COURT:  Are you looking now at the records that
 5  you reviewed?
 6           THE WITNESS:  I'm looking at my report that lists the
 7  records that I reviewed.
 8           THE COURT:  Okay, that's fine.
 9           MR. MILLER:  Okay, thank you.
10           THE COURT:  That's fine.  Go ahead.
11  A.   Okay, so the answer your question is I looked at the
12  Fishkill Correctional Facility records, I looked at the
13  Multi-Diagnostic Services reports, as well as the operative
14  report from Montefiore Hospital.
15  Q.   What diagnostic studies did you review with regard to the
16  -- strike that.
17       What diagnostic studies did you review prior to September
18  3rd, 2017?
19  A.   I reviewed the -- Mr. Magalios was complaining of severe
20  right shoulder pain prior to September 3rd, 2017, and
21  consequently --
22           MR. MILLER:  Objection, your Honor.  There's no
23  foundation for that.
24           THE COURT:  What diagnostic studies did you review
25  prior to September 3rd, 2017, so that would seem to be not
```

1  responsive, but...the not-responsive objection is an objection

2  of the questioner, so overruled.

3  Q.   You can continue, Doctor.

4  A.   He was complaining of severe pain in his right shoulder

5  prior to September 3rd, 2017, and consequently he was seen in

6  the infirmary on August 31st, 2017, complaining of severe right

7  shoulder pain.  And he was sent for -- he was sent for an X-ray,

8  and the X-ray was done on September 1st, 2017, for severe right

9  shoulder pain, and I reviewed the report of those X-rays.

10 Q.   Now, what information did you obtain from reading the

11 September 1st, 2017, radiographic report?

12 A.   Basically that he was complaining of right shoulder pain,

13 he was complaining of decreased motion, he was complaining of

14 crepitus, and the X-ray report showed that he had degenerative

15 arthritis of his shoulder joint, specifically his

16 acromioclavicular joint, and that there was no other injuries

17 noted.

18 Q.   What's crepitus, Doctor?

19 A.   Crepitus is when the bones rub up against each other.  Some

20 people refer to it as they can feel, like, some sandpaper, and

21 it's when the two bones are rubbing against each other because

22 the cartilage has worn away, and you have bone spurs digging

23 into each other and you can hear the bones rubbing.  And that's

24 crepitus.

25 Q.   Now, you also mentioned the acromioclavicular joint.  Can

1  you tell the Jury what that is.

2  A.   That's the joint right up here on top of the shoulder

3  (pointing), and when that gets injured, you read it sometimes in

4  the papers and they say the person sustained a shoulder

5  separation.

6  Q.   (Indicating).

7  A.   That's right, exactly where you're pointing is it, and

8  that's referred to sometimes as a shoulder separation, and

9  that's this area right up here (indicating).

10         MR. TURKLE:  Let the record reflect that Dr. Gidumal

11  was referring to the shoulder area on his left shoulder.

12         THE COURT:  Sort of the top of his left shoulder.

13         MR. TURKLE:  Right.

14  Q.   Now, you mentioned a productive articular change.  Can you

15  describe for the Jury what a productive articular change is.

16  A.   Sure.

17     When the -- what happens is that the joints -- when you

18  break open, for example, a chicken joint, you'll see some

19  slippery surfaces at the joint.  Some people refer to it as

20  gristle.  That's articular cartilage.  That's where the two

21  bones rub up against -- slide against each other.

22     As that joint wears away, you have the loss of that

23  slippery surface, you have bone underneath, and the bone rubs up

24  against each other.  That's what causes the crepitus.  And the

25  bone rubbing against each other causes changes within the bone,

1    it causes edema, swelling, and that causes what I refer to as

2    productive changes, which are bone spurs, and the bone spurs are

3    something that sticks down and digs into other tissue.  You can

4    feel it sometimes as a bump on top of the shoulder.  There's

5    also a bump on the bottom where it's rubbing into the rotator

6    cuff.

7        And that's referred to as productive changes.

8    Q.   Now, to what extent is a productive articular change

9    indicative of a traumatic event?

10   A.   Well, you can get -- there are two ways to get arthritis in

11   this particular area.  One is overuse, for example, if you're in

12   construction, if you do a lot of carrying, if you're a baseball

13   pitcher, if you're just doing lots of use; and the second is an

14   injury.  The injury, over the course of decades later you end up

15   with post-traumatic arthritis, and that's productive changes.

16       And the one that most people sort of know about nowadays

17   is, for example, Joe Namath.  Joe Namath when he was with the

18   Jets had injuries to his knees, and that's the reason he

19   couldn't really run and he developed arthritis in his knees, and

20   down the road, maybe twenty, thirty years later, he ended up

21   with knee replacements.  Or Dick Butkus with the Chicago bears,

22   et cetera.

23       Post-traumatic arthritis is something that occurs decades

24   later after an injury.

25   Q.   Did you review any diagnostic studies that were taken after

1  September 3rd, 2017?

2  A.   Yes, I did.

3       So after September 3rd, 2013 -- seventeen, he was

4  complaining of the same right shoulder pain, and so they sent

5  him off for another X-ray.  And that X-ray was done on September

6  28th, 2017, and the results showed the same type of problems,

7  which is moderate productive changes of the acromioclavicular

8  joint.  It showed no changes on the report from the X-rays that

9  were done prior to September 3rd.

10 Q.   To what extent were there material differences between the

11 September 1st, 2017, X-ray, and the September 28th, 2017, X-ray?

12 A.   The X-ray showed no material difference between the two.

13 The only difference between the two is that the report on

14 September 28, 2017, specifically says, I guess they were told to

15 look for, but that's speculation, that there was no AC joint

16 separation present.

17      An AC joint separation is something that shows up on an

18 X-ray, and so they specifically mentioned that there was no

19 acromioclavicular joint separation present.

20 Q.   Did you review any other diagnostic studies that were taken

21 after September 3rd, 2017?

22 A.   Yeah, on January 10, 2018, he underwent an MRI of his

23 shoulder joint, and the MRI basically confirmed what the X-rays

24 showed, which is that it showed severe degenerative changes of

25 the acromioclavicular joint.  It showed some bursitis, but no

1  specific tears, no AC joint separation, no rotator cuff damage,
2  no dislocations, no fractures.
3  Q.   What evidence, if any, was there in the MRI that Mr.
4  Magalios had sustained an acute traumatic injury?
5  A.   An MRI -- an X-ray is very good at showing bone.  The
6  reason you get an MRI is that the MRI is much better at showing
7  soft tissue, and the soft tissues that it shows would be the
8  muscles, the ligaments in that area, and so an MRI would show
9  what we refer to as T2 signal abnormality, it would show
10 swelling, it would show bone marrow edema, it would show some
11 evidence that there was irritation or damage to a particular
12 area.
13     So in this particular case, it showed the acromioclavicular
14 joint arthritis and the swelling associated with the arthritis,
15 which was the bone marrow edema, which, again, like we talked
16 about, is something, for example, you refer to as water on the
17 knee, for example, when you have arthritis in the knee.  You get
18 water on the AC joint when you have arthritis in the AC joint.
19     So it showed some evidence of the arthritis.  If there was
20 a traumatic injury, it would show some bleeding or swelling or
21 something consistent with a traumatic injury.
22 Q.   Now, Doctor, based upon your review of the X-rays of
23 September 1st, 2017, and September 28th, 2017, and the MRI, did
24 you form an opinion within a reasonable degree of medical
25 certainty as to whether those studies revealed evidence of any

1  traumatic injury?

2  A.   Yes, I did.

3  Q.   And what was your conclusion?

4  A.   My conclusion was that the X-rays and the MRIs showed no

5  evidence of any significant traumatic injury to the shoulder

6  joint.

7  Q.   Now, are you aware that Mr. Magalios had undergone

8  arthroscopic surgery on his right shoulder in October 2018?

9  A.   Yes.

10  Q.   And did you review medical records with regard to the

11  surgery that had been prepared by a Dr. Holder?

12  A.   Yes.

13  Q.   And what was your findings based on your review of those

14  records?

15  A.   Well, according to the operative report, the diagnosis --

16  after the operating surgeon evaluated everything and did his

17  operation, his diagnosis was that Mr. Magalios suffered from

18  shoulder impingement and acromioclavicular joint arthritis.

19  After reviewing everything, he didn't find any evidence of a

20  traumatic injury.

21      And the operation that he did was to remove the arthritis

22  in the acromioclavicular joint, to remove the bone spurs or the

23  productive changes, and to shave down the acromion, again, to

24  get rid of the productive changes or the bone spurs.

25  Q.   Did you review an intraoperative evaluation of Mr.

1  Magalios's shoulder?

2  A.   You mean did I read the operative report?

3  Q.   Yes.

4  A.   Yes.

5  Q.   And did it reflect or to what extent did it reflect any

6  acute traumatic injury?

7  A.   I mean, I'd have to look at the operative report itself,

8  but according to my synopsis, it doesn't have anything.  But I'd

9  have to look at the report itself.

10 Q.   To what extent was the surgery performed for the repair of

11 a tear?

12 A.   There was no, there was no tear found and there was no tear

13 repaired because there was no tear found.

14 Q.   Okay.  Did you also perform a physical examination of Mr.

15 Magalios?

16 A.   Yes, I did.  I performed a physical examination on December

17 7th, 2020.

18 Q.   And what were your findings based on that physical

19 examination?

20 A.   Basically I found that he had evidence of having undergone

21 arthroscopic surgery, I found that his range of motion now was

22 well preserved, that he had good strength, that his muscle girth

23 was equal on both sides, meaning that he wasn't preferentially

24 using one side or the other, that there was no particular

25 tenderness or instability found.

1   Q.   Now, we've heard testimony in this case from a Dr.

2   Varlotta.  He testified that Mr. Magalios had a grade --

3            MR. MILLER:  Objection to form.

4   Q.   -- 2 subluxation of the right acromioclavicular joint.

5            THE COURT:  Overruled.

6            MR. TURKLE:  Excuse me?

7            THE COURT:  There was an objection.  And I overruled

8   it.  And you kept going.

9            MR. TURKLE:  I'm sorry, I didn't hear the objection.

10  Q.   First of all, Dr. Varlotta, what is a grade 2 subluxation?

11  A.   A grade 2 subluxation is when the clavicle pops up and the

12  shoulder drops down because the ligaments around the

13  acromioclavicular joint have been torn and it's no longer

14  holding the joint in place.

15       It's, for example, if you dislocate your shoulder, that's

16  the glenohumeral joint, and when the shoulder slides out of

17  place because the ligaments were torn, and that's a dislocation

18  if it pops out all the way, a subluxation is if it pops out part

19  of the way.

20  Q.   Did you draw a conclusion as to whether Mr. Magalios had a

21  grade 2 subluxation of the right acromioclavicular joint?

22  A.   Well, basically after reviewing the X-ray reports, the MRI

23  reports, the operative reports, there was no evidence that Mr.

24  Magalios sustained a grade 2 separation of his AC joint, and as

25  a matter of fact, the radiologist on September 28th, 2017,

1 specifically said he was specifically looking for and noted that

2 there was no AC joint separation.

3 Q.   Did the radiographic studies reveal that the

4 acromioclavicular joint deformity was preexisting?

5 A.   Right, basically in this particular case, which you rarely

6 have, is you have an X-ray done a couple of days before and then

7 shortly thereafter, and they both show that the

8 acromioclavicular joint was arthritic and that there was no

9 traumatic change between the two X-rays.

10 Q.   Now, we also heard from Dr. Varlotta that Mr. Magalios has

11 a grade 1 subluxation of the right sternoclavicular joint.  What

12 is your conclusion with regard to that finding?

13 A.   Well, the sternoclavicular joint is this one right here

14 (indicating).  If you go on top of your chest, you get a little

15 notch which is the top of the sternum which is called the

16 manubrium, and you just move off to one direction or the other

17 and that's the sternoclavicular joint.

18      If you look at the records, Mr. Magalios has no subjective

19 complaints of pain in his sternoclavicular joint, the X-rays

20 don't show any subluxation or dysfunction of the

21 sternoclavicular joint, the MRIs don't show any subluxation or

22 dysfunction of the sternoclavicular joint, the operative report

23 doesn't show any evidence of a sternoclavicular joint injury.

24      On my exam he didn't have any evidence of any subluxation

25 of his sternoclavicular joint, so I'm not sure how you could

1    make that diagnosis because there's nothing in the records

2    having anything to do with the sternoclavicular joint.

3    Q.    Now, Dr. Varlotta opined that as a result of the September

4    3rd, 2017, alleged assault, Mr. Magalios needs to be on a

5    variety of medications.

6        Did you form an opinion as to whether Mr. Magalios requires

7    to be on any medications?

8    A.    All I know is that when I was looking at the record -- when

9    I examined him, Mr. Magalios was back to work, he wasn't taking

10   any of those medications, he wasn't currently in physical

11   therapy, he hadn't really had any treatment for over a year, and

12   so it was my opinion that he didn't -- he wasn't currently

13   getting it, he didn't currently have complaints requiring it,

14   and so, therefore, I didn't think he was going to need it.

15   Q.    Do you have an opinion as to whether Mr. Magalios requires

16   such treatments as chiropractic manipulation and injection of

17   steroids as a result of the September 3rd, 2017, injury?

18   A.    Again, as of the medical records for the last several years

19   he hasn't required it, so I don't know why he would need it if

20   he doesn't need it.

21   Q.    Dr. Gidumal, have you formed an opinion within a reasonable

22   degree of medical certainty as to the cause of Mr. Magalios's

23   right shoulder pain?

24   A.    Yes.

25   Q.    And what is your opinion?

1  A.   My opinion is that Mr. Magalios was suffering from right

2  shoulder pain in August of 2017, the X-rays showed that he had

3  arthritis of his acromioclavicular joint with impingement on his

4  rotator cuff, he underwent an operation to take care of the

5  arthritis in his acromioclavicular joint and the bone spurs and

6  the impingement and so, therefore, it's my opinion within a

7  reasonable degree of medical certainty that Mr. Magalios

8  suffered from acromioclavicular joint arthritis that was

9  operatively dealt with and that was his problem.

10 Q.   Now, Doctor, do you have an opinion within a reasonable

11 degree of medical certainty as to whether the alleged September

12 3rd, 2017, assault was a substantial factor in bringing about

13 injuries to Mr. Magalios's right shoulder?

14 A.   Again, he had the shoulder pain before, he had the shoulder

15 pain after, the MRI didn't show any evidence of any exacerbation

16 of his preexisting arthritis, the operative report didn't show

17 any evidence of exacerbation of his acromioclavicular joint

18 arthritis, and so it's my opinion within a reasonable degree of

19 medical certainty that Mr. Magalios suffered from arthritis of

20 his AC joint and that the assault had really no bearing on his

21 AC joint arthritis.

22          MR. TURKLE:  I have nothing further.

23          Thank you, Doctor.

24          THE COURT:  Mr. Miller.

25          MR. MILLER:  Yes.

```
 1  CROSS-EXAMINATION

 2  BY MR. MILLER:

 3  Q.   Good morning, Doctor.

 4  A.   Good morning.

 5  Q.   We've met before, correct?

 6  A.   I don't remember, but you told me we did, yes.

 7  Q.   And it's sort of in the same setup where you were in the

 8  witness box, except there was no glass around you and I didn't

 9  have a mask on.

10  A.   Okay.

11  Q.   Right?

12  A.   Again, I don't remember.

13  Q.   This is the first time you've been in this type of setting,

14  right?

15  A.   Yes.

16  Q.   First time you've been in a court with a lawyer asking

17  questions that has a mask on, right?

18  A.   Yes.

19  Q.   Okay, I'm going to ask you in a few minutes about your

20  experience as a testifier in court as sort of a side gig from

21  your job at NYU, correct?

22  A.   Yes.

23          MR. TURKLE:  Objection.

24          THE COURT:  Overruled.

25  Q.   But I'm going to ask you something else before all that.
```

```
 1        One of your first answers to Mr. Turkle's questions was
 2   that Mr. Magalios was suffering from severe right shoulder pain
 3   before September 3rd, 2017.  That was your testimony, right?
 4   A.   Yes.
 5   Q.   And where did you get that information from?
 6   A.   From the Fishkill medical records.
 7   Q.   Would that be the entry of August 3rd, 2017?
 8   A.   I have August 31st, but maybe it was August 3rd.  I don't
 9   -- I have August 31st.
10   Q.   I believe that what you think is a 1 might be a slash, but
11   it doesn't matter because it's before September 3rd, right?
12   A.   Yes.
13   Q.   And that visit to the infirmary was a required physical, it
14   wasn't a sick call visit, right?
15   A.   I assumed it was a sick call.
16   Q.   Okay.  If I were to tell you that there's been testimony
17   that because Mr. Magalios was new or relatively new to Fishkill
18   he was required to go for an exam, that wouldn't change any of
19   your opinions, right?
20   A.   It would change from severe to having shoulder pain.
21   Q.   Well, I think you're, you're gleaning where I'm, where I'm
22   leading.
23        You said he was complaining about severe shoulder pain on a
24   required check-in visit with the infirmary, and I am sure you're
25   aware that that word 'severe' is important in the context of
```

1 this case.  Are you now withdrawing that word 'severe' from your

2 direct examination?

3 A.   If you're telling me that it was a required visit as

4 opposed to a sick call visit, the answer is yes.

5 Q.   Okay.  Now, forget about what I told you about a required

6 visit.  Let's put that aside.  I'm not going to move away from

7 this subject quite yet, Doctor, because whatever the reason for

8 the visit was, I want you to tell this Jury why you said

9 'severe' if it's not indicated in the report.

10 A.   Because as part of my responsibility at NYU, I volunteer to

11 take care of shoulder injuries at Bellevue Hospital, and one of

12 the places that we take care of patients at Bellevue Hospital is

13 in the prison unit.  And I've been taking care of prisoners for

14 over twenty years, and the only way that the prisoners get to

15 see us is if they have marked or severe pain, if they have a

16 little ache or pain, they don't get to see us to evaluate.

17         So that's the reason for why I said what I said.  I've

18 been taking care of prisoners for decades.

19 Q.   Okay.  I'm not sure you answered my question, but I think I

20 get the point.  The point is that you are now, for whatever

21 reason, with some degree of apology, taking that word 'severe'

22 out of your testimony, right?

23         THE COURT:  Well, he's -- on the assumption that was

24 built in to your question.

25         MR. MILLER:  Okay.

```
 1              THE COURT:  In fairness.
 2              MR. MILLER:  Okay.
 3  Q.   I want you to look at the entry, I promise you, and then
 4  I'll nip this issue in the bud, all right?
 5              I want you to look at the entry from August of 2017,
 6  and I want you to read to the jury if there's any indication of
 7  complaints of severe right shoulder pain.
 8              MS. ACOSTA-PETTYJOHN:  What page are you looking at?
 9              MR. MILLER:  Same page.
10  Q.   It would be the August 2017 entry that I believe you were
11  referring to.
12              THE COURT:  Well, you --
13  Q.   It's page 28 of, of Plaintiff's Exhibit 3.  If you have
14  Counsel's copy, it would be the Bates stamp number on the bottom
15  117.
16              MR. TURKLE:  It would be Exhibit A.  Of Defendant's
17  exhibits.
18              (Brief pause.)
19              MR. MILLER:  Mr. Clark, I might need the TV on.
20  A.   "Thirty-year-old male from" --
21  Q.   Wait a second, Doctor.  I'm going to put it up on the
22  screen.
23              (Brief pause.)
24  Q.   Just take a look at the screen and confirm that we're
25  looking at the same thing.
```

A.    Yeah, I think so.

Q.    Okay.

A.    Thirty-year-old male from Burn Kill?

Q.    Let me stop you there.

THE COURT:  I think that says Bare Hill.

Q.    Bare Hill, and I want you to assume that that's the facility that he was transferred from.

A.    Okay, "from Bare Hill, leaving in sixteen months, twelve, slash, eighteen, no medical issues, complaining of right shoulder clicking times one month," uh..."offered HIV/hepatitis, see patient" -- I can't read that.  Head..."weight 206.6 pounds," little..."heavy"...

THE COURT:  I think it says lifting.

A.    "Lifting heavy, muscle pain, asthma/inactive...last night, inhaler use, two years ago, non-smoker, quit three weeks ago, labs within normal limits, X-rays right shoulder."

Q.    Okay.  And that's the entry that you relied upon in your direct exam when you said he was complaining about severe right shoulder pain, right?

A.    Correct.

Q.    Okay.  Now, let's talk about your experience as a testifier.  Well, let me rephrase that with all due respect.

Your experience as an expert witness in the courtroom...

A.    Yes.

Gidumal - Cross - Miller

```
1  Q.   It's quite extensive, right?
2  A.   I do about one to two cases a year.
3  Q.   Do you feel comfortable up on the witness stand?
4  A.   No, I feel more comfortable in the operating room.
5  Q.   Okay.  You feel -- you have experience...on the witness
6  stand?
7            MR. TURKLE:  Objection.
8  A.   Again, I've done it about one to two times a year.
9  Q.   Well, would it be fair to say that you have testified about
10 a dozen times as of 2015 for the City of New York as a defense
11 witness?
12 A.   No, I think that would be unfair to say.
13 Q.   You testified in the Supreme Court of New York, County of
14 Bronx, on October 26th, 2015, correct?
15 A.   Okay.
16 Q.   And I'm going to show you page 824 of your testimony in
17 that case, and I'm just going to -- excuse me, I'm just going to
18 --
19 A.   Okay.
20 Q.   -- ask you if this refreshes your recollection about as of
21 2015, how many times you had testified then for the City of New
22 York.
23           MR. MILLER:  May I approach?
24           THE COURT:  Yes.
25 Q.   This is the caption (handing).
```

1   A.   Okay.

2   Q.   Sort of in the middle where the cross-examination begins?

3   A.   Yes.  So your question was the --

4   Q.   My question is very simple; first, have you read that page.

5   A.   Yes.

6   Q.   And does it refresh your recollection as to my question as

7   to the number of times as of that date that you had testified

8   for the City of New York as a defense witness.

9   A.   Okay, let me just --

10  Q.   Just yes or no, does it refresh your recollection.

11  A.   Yes.

12  Q.   Okay.

13  A.   So the question here was, "in the last forty years, how

14  many times have you testified for the City," and the answer was,

15  "as of this date, over -- since 1986, I have testified ten to

16  twelve times for the City of New York from 2021 until 2015,"

17  which is the way I understood your question.

18          I have not testified for the City ten or twelve times,

19  I have testified for the City maybe two or three times over the

20  last six years.

21          THE COURT:  So the confusion was as of 2015.

22          THE WITNESS:  Right, as of meaning --

23          THE COURT:  So let's ask it again.

24          As of 2015, how many times have you testified as a

25  defense witness for New York City.

```
 1            THE WITNESS:  Right, so as of two thousand -- even as
 2   of 2021, for the City of New York I have testified maybe ten to
 3   twelve times over the last thirty to forty years.
 4            MR. MILLER:  May I approach and take that back?
 5            THE COURT:  Yes.
 6            So you haven't testified for the City since 2015?
 7            THE WITNESS:  If I have, I have testified maybe once
 8   or twice.  But I don't really even think it was that.
 9   Q.   Okay, and in addition to testifying for the City of New
10   York as of October of 2015, you had already -- you had also
11   testified about ten times as a defense witness for other
12   entities other than the City of New York, correct?
13   A.   Okay, so now --
14   Q.   Again, I think I said this before, this is as of October of
15   2015, so is that true or not?
16   A.   So meaning from 1986 until 2015, have --
17   Q.   As of 2015?
18   A.   Okay, so --
19            THE COURT:  Up until 2015.
20            THE WITNESS:  Up until 2015 have I testified ten times
21   for a variety of defendants.  The answer is yes, I testify about
22   one to two times a year.
23   Q.   Okay, now...the past year has been a pretty slow year for
24   testifying, correct?
25            MR. TURKLE:  Object.
```

```
 1              THE COURT:  Overruled.
 2  A.   Yes.
 3  Q.   And that's because the courts have been closed, nothing to
 4  do with your choice, right?
 5  A.   Yes.
 6  Q.   In 2018, according to your affidavit, you testified...four
 7  times.  Would that be fair to say?
 8  A.   I don't remember.
 9  Q.   Would you like to see your affidavit?
10  A.   Yeah.
11              MR. MILLER:  May I approach?
12              THE COURT:  Yes.
13  Q.   (Handing).
14  A.   That is correct, so four times in '18 and three times in
15  '19.
16  Q.   Okay, thank you.  You stole my next question.
17       And then COVID came and so I guess you were not testifying
18  after, after...the last time would be November of 2019, right?
19  A.   Correct.
20  Q.   And in March of 2019, you testified as a defense witness on
21  behalf of the State of New York, right?
22  A.   Yes.
23  Q.   And in addition to that one time that you testified for the
24  State of New York on March 26th, 2019, have you testified on
25  other occasions for the State of New York?
```

1  A.   I've testified for the State of New York, you know, maybe

2  four or five times over the several decades I've been doing

3  this.

4  Q.   And this is not -- as one would expect, this is not

5  criticism, this is not volunteer work on your part, right?

6  A.   That is correct.

7  Q.   This is a business decision that you make because it's

8  worth your time, right?

9  A.   Yes.

10  Q.   And just so we understand why it's worth your time, let's

11  focus on this particular case.  Are you being compensated for

12  the time you're spending here in court today?

13  A.   Yes.

14  Q.   And were you compensated for the work that you did for the

15  State of New York on this case before today?

16  A.   Yes.

17  Q.   Okay, let's start with the amount of compensation that

18  you're receiving for your appearance here today in court.  What

19  is that amount?

20  A.   I'm getting paid $5,000 for not -- for my testimony here

21  today.

22  Q.   Okay, so they're paying you 5,000 for your testimony here

23  today, and are you billing them separately for the prep time for

24  this case?

25  A.   The prep time, the time I lost yesterday because this case

Gidumal - Cross - Miller

1  was supposed to go yesterday, the time coming up here, et

2  cetera, are not being billed, so the five thousand actually

3  includes the time I lost from the office today and the time I

4  lost from the office and operating yesterday.

5  Q.    Okay.  Just so we're clear, when you use the word 'lost,'

6  usually that's a sad story.  This is, this is your business

7  decision to testify as a, as a side gig, right?

8  A.    Yes.

9  Q.    Okay.  Now, you said that the operative report of Dr.

10  Holder indicates no exacerbation of a preexisting injury, right?

11  A.    Correct.

12  Q.    You read that in the operative report?

13  A.    Which page -- I'll read you the operative report --

14  Q.    I'm just asking you, did -- you don't need to; it's in

15  evidence.

16  A.    All right.

17  Q.    I'm just asking you, because the Jury will see the

18  operative report --

19  A.    Okay.

20  Q.    -- in the jury room.  I'm asking you, are you telling us

21  that Dr. Holder wrote that there was no exacerbation of a

22  preexisting injury?

23  A.    I'm writing {sic} that Dr. Holder said that he had

24  acromioclavicular joint arthritis and Dr. Holder did not write

25  that he had post-traumatic synovitis, he did not write that he

1    had acromioclavicular joint separation, he did not write that

2    there was a tear, he did not write that he saw any traumatic

3    lesions, et cetera.

4    Q.   Okay.

5    A.   So those are all things that he would have written had he

6    seen them, had they been there.

7    Q.   Okay, and --

8              THE COURT:  Could you do me a favor and maybe keep

9    yourself, like, five, six inches from the mike?  When you get to

10   three or four inches, we get feedback.

11             THE WITNESS:  Oh, okay.

12             THE COURT:  Thanks.

13   Q.   So just so we're clear, you made inferences from the

14   operative report that led you to conclude as an expert for the

15   Defendants that he said there was no exacerbation of a

16   preexisting injury, right?  He didn't say that.

17   A.   He did not document any exacerbation of a preexisting

18   injury.  He did not say there was any synovitis, he did not say

19   there was any fracture, he did not say there was any

20   dislocation, so what's as important as what he did say is what

21   he didn't say.

22   Q.   Got it, okay.  You understand that no one's claiming that

23   there was a fracture or a separation, right?

24   A.   You're claiming that this was an exacerbation.

25   Q.   Yes, exactly.

Gidumal - Cross - Miller

1   A.   And there is no evidence in the operative report of any

2   exacerbation of his preexisting acromioclavicular joint

3   arthritis.   There is no evidence in the operative report of an

4   acromioclavicular joint separation.

5   Q.   Would it be fair to say that there's no evidence in the

6   operative report one way or the other as to whether or not there

7   was an exacerbation?   Could you agree with me on that?

8   A.   No.   I would say that if there was an exacerbation, it

9   would be in the operative report.

10   Q.   Okay.

11   A.   If there was an AC joint separation, he would have said

12   there was an AC joint separation, the same way that there was

13   arthritis and he said there was arthritis.

14   Q.   Would you agree that the nature of a trauma is important

15   for a doctor in an expert witness capacity to determine whether

16   or not that trauma exacerbated, let's say, a preexisting

17   arthritic condition?

18   A.   I don't understand the question.

19   Q.   I can rephrase it.

20         THE COURT:   Please do.

21         MR. MILLER:   Okay.

22   Q.   Would you agree, Doctor, that in order to form an opinion

23   as an expert witness about whether or not a certain trauma

24   exacerbated an arthritic condition, you would need to know what

25   the trauma was?

1  A.   Yes, it would be helpful.

2  Q.   Okay.  And in this case, we agree that we have a

3  disagreement over whether or not there was trauma, but I want

4  you to assume that the trauma suffered by Mr. Magalios was being

5  thrown to the floor by rather strong individuals where his right

6  shoulder made impact with a hard floor, okay?

7       I want you to just assume that for a second, okay?

8  A.   Okay.

9  Q.   Is that the kind of trauma that you would want to know

10 about before rendering an opinion about whether or not there's

11 an exacerbation of a preexisting arthritic condition?

12 A.   As is the case in medicine, the more information you have,

13 the more helpful it is.

14 Q.   Okay, so the answer is yes?

15 A.   Yes.

16 Q.   When you wrote your report, did you know that that was the

17 claim in this case?

18 A.   Yes.

19 Q.   And if Mr. Magalios, or for that matter anyone, was your

20 patient and in August of 2017 they came to you complaining of

21 right shoulder clicking -- which is what the complaint was,

22 right?  In August of 2017?

23 A.   That's the complaint on the Fishkill...

24 Q.   Yes.

25 A.   Note, but the complaint for the X-ray was -- let me just

1  read it to you...the complaint for the X-ray was right shoulder

2  pain, decreased range of motion, and crepitus.

3  Q.   Okay.

4  A.   So, again, depends on the question you're asking.

5  Q.   All right.  Let's assume that a patient comes to you with

6  those complaints.  In August of 2017.

7  A.   Okay.

8  Q.   And then a few weeks later they come to you and they say,

9  'Dr. Gidumal, remember I was complaining about that clicking and

10 maybe some pain?  Well, I had an accident and I got thrown to

11 the floor and I landed on that right shoulder and now it's

12 really, really painful and I can't move my arm and -- what could

13 you do for me.'

14     Would you say to that patient, 'ah, no exacerbation,' or

15 would you start treating that patient?

16 A.   Neither.

17 Q.   Okay.

18 A.   I would examine --

19 Q.   Thank you, Doctor.

20 A.   -- the patient and determine what the physical examination

21 showed.  I would see how the patient walked into the room.  I

22 would have him undress.  I would watch the way he undressed.  I

23 would take a look at the acromioclavicular joint.  I would see

24 if there was any swelling, any bruising, any bleeding, any

25 ecchymosis, any abrasions, any deformity.  I would look to see

Gidumal - Cross - Miller

1  if there was any tenderness.  I would examine the joint and see

2  if there was any motion, any crepitus, so I wouldn't just treat

3  him and -- but I would examine him.

4      I would then get some X-rays and see if anything abnormal

5  showed up on the films, and then I would make a decision in

6  terms of a diagnosis and then I would treat him.

7  Q.   Okay, and you would send him for an MRI, right?

8  A.   Depends.

9  Q.   Okay, well, in this case he was sent for an MRI, right?

10 A.   Right.

11 Q.   And in this case the MRI didn't show moderate arthritic

12 changes like the X-rays did, it showed severe degenerative

13 changes of the AC joint, correct?

14 A.   Correct.

15 Q.   And that was...

16 A.   January.

17 Q.   In January.

18 A.   Yes.

19 Q.   So wouldn't it be fair to say that this is a change from

20 the X-ray report?

21 A.   Oh, you got a different test.  A different test is going to

22 give you a different result.

23      You can't compare an X-ray to an MRI, you can compare an

24 X-ray to an X-ray, and so the comparison is not the X-ray to the

25 MRI of January, the comparison is the X-ray of...post-accident

1  versus the X-ray of pre-accident.  Those are comparable things.

2  Q.   Okay.  Doctor, but when you did your analysis and you read

3  in the MRI report that Mr. Magalios has severe -- this is in

4  January of 2018 -- has severe degenerative changes of the AC

5  joint, you didn't know if he had severe degenerative changes of

6  the AC joint before September 3rd; wouldn't that be fair to say?

7  A.   It would be fair to say that he had degenerative arthritis

8  of his acromioclavicular joint before September, after

9  September, and the MRI showed no evidence that there was any

10 exacerbation.

11        If there had been an exacerbation like you were

12 saying, he was thrown to the ground, and the AC joint was

13 injured, you would see evidence of an AC joint injury on the MRI

14 and you did not.

15        MR. MILLER:  Your Honor, I'd move to strike.  That's

16 unresponsive.

17        THE COURT:  Well, the question was...hold on.

18        (Brief pause.)

19        THE COURT:  You asked him if he didn't know, and he

20 was giving you an explanation, I think, as to why he thinks he

21 knows, so overruled.

22        MR. MILLER:  Okay.

23 Q.   Let me ask the question again, and my goal is to have you

24 answer this question yes or no, all right?  If you can't, you'll

25 let me know.  All right?  Okay, Doctor?

1   A.    Um-hum.

2   Q.    When you reviewed the MRI report and you read that there's

3   severe degenerative changes of the AC joint, yes or no, did you

4   know whether or not Mr. Magalios had severe degenerative changes

5   of the AC joint before September 3rd, 2017?  Could you answer

6   that yes or no?

7   A.    Yes.

8   Q.    And the answer is?

9   A.    Yes, I knew what the X-ray reports were, I saw the X-ray

10  reports before I saw the MRI report.

11  Q.    And the answer is you...what?

12  A.    Knew that he had degenerative arthritis of his AC joint.

13  Q.    Okay, you left out maybe the operative term, severe.

14  That's a term that you've used before in your testimony, so let

15  me ask the question one more time, okay?  And focus on the word

16  'severe,' if you will.

17  A.    Okay.

18  Q.    When you reviewed the MRI report of January 2018 and you

19  saw that one of the impressions was severe degenerative changes

20  of the AC joint, yes or no, were you able to determine if Mr.

21  Magalios had severe degenerative changes of the AC joint before

22  September 3rd, 2017?

23  A.    No.

24  Q.    Okay.  Thank you.

25        Now, I want to look -- I want you to -- do you have a copy

```
 1  of the MRI report in front of you?
 2  A.   No.
 3  Q.   Well, it's Plaintiff's 5...
 4  A.   I have Defendant's.
 5          THE COURT:  Do you know what page it would be in
 6  Defendant's A?
 7          MR. MILLER:  I have Bates stamp number 22.  I don't
 8  know if that is helpful.
 9          MS. ACOSTA-PETTYJOHN:  I don't know what you're
10  looking at right now.
11          MR. MILLER:  The MRI report (showing).
12          THE COURT:  Oh, look at Defendant's Exhibit C.
13          MR. MILLER:  Oh, it's C, okay.
14          MR. TURKLE:  Exhibit C.
15          MS. ACOSTA-PETTYJOHN:  Okay, what page is that?
16          THE COURT:  We don't have Bates stamp 22.  It starts
17  at 125.  If it's got a Bates stamp of 22, it's not C.
18          MR. MILLER:  Okay, if you have Defendant's --
19  Q.   Well, yeah, I mean, do you have the MRI report?
20  A.   No, I have Defendant's exhibits.
21          MR. TURKLE:  Do you see Exhibit C?  The tab that says
22  C.
23          MS. ACOSTA-PETTYJOHN:  It's not C.
24          MR. TURKLE:  Oh, it wasn't there.
25          THE WITNESS:  Yes, I got it.
```

```
 1              THE COURT:  I have a concern the parties are not
 2  looking at the same thing because Exhibit C has Bates numbers
 3  125 --
 4              THE WITNESS:  It's 126.
 5              THE COURT:  -- to 128.
 6              THE WITNESS:  It's 126.
 7              THE COURT:  Right, but Mr. Miller has something with a
 8  Bates number of 22, so I want to make sure --
 9              MR. MILLER:  Can I approach to make sure he's looking
10  at the same thing?
11              THE COURT:  Yes.  Please do.
12              (Brief pause.)
13              MR. MILLER:  Yes, your Honor, it is.
14              THE COURT:  Okay.
15  Q.  Okay, Doctor, in looking at that report, in the findings,
16  do you see where it says towards the bottom "there is marrow
17  edema surrounding the AC joint"?  Do you see that?
18  A.  Yes.
19  Q.  Now, edema is an indication of trauma, correct?
20  A.  Edema is an indication of swelling, which can be from
21  arthritis, which can be from trauma, which can be from
22  connective tissue diseases, which can be from any number of
23  sources.
24  Q.  Okay.  Thank you.
25      So just so we're clear, marrow edema could be an indication
```

1   of trauma, correct?

2   A.   Yes.

3   Q.   Yes or no.

4   A.   Yes.

5   Q.   In your narrative report, which I'm sure you read before

6   coming here today, correct?

7   A.   Yes.

8   Q.   Could you turn to page 4?

9   A.   Yes.

10  Q.   Tell me when you're there.

11  A.   I'm there.

12  Q.   I'm going to read the -- in the fifth paragraph where it

13  starts "the MRI."

14  A.   Okay.

15  Q.   And just make sure I'm reading this correctly.  This is

16  your report.

17  A.   Um-hum.

18  Q.   "The MRI showed absolutely no evidence of an acute

19  traumatic injury, i.e., no T2 signal abnormality"...

20  A.   Um-hum.

21  Q.   "Bone marrow edema"...

22  A.   Right.

23  Q.   "Fracture location."

24  A.   Correct.

25  Q.   That's a mistake on your part, right?

Gidumal - Cross - Miller

1  A.   No.

2  Q.   Well, don't you say the MRI does not show bone marrow

3  edema?

4  A.   When you're talking about a traumatic injury to the

5  acromioclavicular joint, bone marrow edema would be manifested

6  by swelling on the acromial and the clavicular side, so that's

7  how you can differentiate the traumatic from the osteoarthritic.

8  In this particular case, it's strictly on the distal clavicle,

9  and if you take a look at the operative report, he only resects

10  the distal clavicle because that's the arthritic area.  If it

11  was a traumatic injury, then you would be dealing with bone

12  marrow edema on both sides.

13           So I don't think it's fair to say that it is a

14  mistake.  I think it is fair to say that I took the mistaken

15  assumption that the person who was reading this would be able,

16  would be able to know the difference in terms of what bone

17  marrow edema shows on a traumatic injury versus a degenerative

18  injury.

19  Q.   And when you say you assume somebody who is reading this,

20  are you referring to, like, me, Counsel, the Jury?  Who were you

21  --

22  A.   Right.

23  Q.   -- referring to?

24  A.   Right.

25  Q.   Any of us, right?

1        So, like, when you say in your report as clear as

2   my...foggy glasses can read, "the MRI showed no bone marrow

3   edema," you assume that we would infer that you didn't mean

4   that, even though the MRI says there is marrow edema surrounding

5   the AC joint.  You assumed that --

6            MR. TURKLE:  Objection.

7   Q.   -- we would read through, through all that?

8            MR. TURKLE:  Objection, your Honor.

9            THE COURT:  Overruled.

10  A.   That's correct.

11  Q.   Okay.  Thank you for that.

12       Now, did you read also the physical therapy consults and

13  the orthopaedic consults in the DOCCS records?

14  A.   I went through the DOCCS records, yes, I looked at the

15  physical therapy reports, yes.

16  Q.   And in reading those records...

17            MR. MILLER:  Just give me one second.

18            (Brief pause.)

19  Q.   This is page 62 of Plaintiff's...3 in evidence.  Did you

20  read that page or do you have it yet?

21  A.   I don't have Plaintiff's.  I only have Defendants.

22  Q.   Okay, maybe Counsel can assist you to the right page.  It's

23  right on the screen, also.

24            MR. TURKLE:  This is in A, right?  00141.  It also

25  says -- has a big "62" on the bottom (showing).

1          THE WITNESS:  Yeah, but I don't know where to look.

2          MS. ACOSTA-PETTYJOHN:  It's Exhibit A.

3          MR. TURKLE:  Exhibit A?

4          THE WITNESS:  Yeah.

5          MS. ACOSTA-PETTYJOHN:  And look for page 140...

6          MR. TURKLE:  One.

7          THE WITNESS:  Okay, got it.

8          MS. ACOSTA-PETTYJOHN:  And that's the same page you're

9  looking at now, right?

10         THE WITNESS:  Yes.  Um-hum.

11  Q.  Okay, so this is a note that states "31-year-old male with

12  persistent right shoulder pain post-injury, September 2017,

13  completed eight sessions of PT, PT recommends further testing,

14  MRI on right shoulder with mild sub-AC bursitis, please

15  reevaluate."

16      You read that note, correct?

17  A.  Yes.

18  Q.  And did you -- in determining whether or not there was an

19  exacerbation, did you take into consideration this note and

20  others like it?

21  A.  Yes.

22  Q.  Yes or no.

23  A.  Yes.

24  Q.  You did, okay.

25      Now, page 63, this is also a PT note dated March 2018.

1  "Thirty-one-year-old male with persistent right shoulder pain,
2  saw PT," and they're apparently recommending further PT.  Did
3  you take into consideration that note?
4  A.   Yes.
5  Q.   Yes or no.
6  A.   Yes.
7          MR. MILLER:  One second.
8          (Brief pause.)
9  Q.   We're now going to page 70 of Plaintiff's 3, and the Bates
10 stamp is on the bottom there, 132.  Tell me when you find it.
11 A.   Yes.
12 Q.   This is an orthopaedic consult, correct?
13 A.   Yes.
14 Q.   And did you take into consideration this orthopaedic
15 consult note?
16 A.   Yes.
17 Q.   And is there any indication there that there was no
18 exacerbation of a previous problem?
19 A.   If you take a look at the note and you read the impression,
20 the impression is right shoulder impingement, which is not a
21 traumatic condition, and AC joint arthritis, which is not a
22 traumatic condition.  He has AC joint arthritis, which is what
23 he had before the September event, and he has impingement, which
24 is from the spurs of the acromioclavicular joint, so the
25 orthopaedist --

Gidumal - Cross - Miller

```
 1           THE COURT:  Could you get a little further away from
 2  the mike?  Because your P's are popping.  You don't have to be
 3  that far away, but when you get within three inches, your P's
 4  start popping.
 5           THE WITNESS:  Is this okay?
 6           THE COURT:  A little closer would be better, but not
 7  too close.
 8  A.   So, yes, if you take a look at the orthopaedic note, he
 9  basically says he has right shoulder impingement and he says he
10  has AC joint arthritis.  He says nothing about a
11  sternoclavicular joint separation, he says nothing about an
12  acromioclavicular joint separation, he says nothing about a
13  traumatic injury.  He basically notes that he has impingement
14  and arthritis.
15  Q.   Doctor, my question is, is there an indication that there's
16  no exacerbation of a previous arthritic condition.  Yes or no.
17  A.   That is correct, he doesn't document any evidence of a
18  traumatic exacerbation of a preexisting condition.  He only
19  documents the presence of a preexisting condition.
20  Q.   And I'm looking at page 71 of Plaintiff's 3, and let me
21  show you the Bates stamp number, 131.
22       Without reading -- I'm not going to read it all, it's all
23  in evidence, but did you review this page when you determined
24  that there was no exacerbation of a previous arthritic shoulder?
25  A.   That's correct, because if you take a look at that report,
```

Gidumal - Cross - Miller

1  he basically says the exact same thing, that he has a shoulder

2  impingement and osteoarthritis, no AC joint separation, no

3  documentation of any traumatic injury, and he schedules him for

4  an acromioplasty, which is to remove the bone spurs, and a

5  distal clavicle excision, which is what you do for AC joint

6  arthritis.  It's not the treatment for an acromioclavicular

7  joint separation or a traumatic injury to the A -- for an acute

8  traumatic injury to the AC joint.

9      So, yes, I took a look at that report and I agree with the

10  orthopaedist that he is suffering from acromioclavicular joint

11  arthritis with no documentation of any acute exacerbation.

12  Q.   Okay.  Now, at this point, from this report, page 71, it's

13  clear to you that twenty sessions of physical therapy have not

14  helped, correct?

15  A.   And you would not expect twenty sessions of physical

16  therapy to help for a preexisting osteoarthritis, so, yes, that

17  is clear and that's fair.

18  Q.   And maybe, maybe I should preface my question with yes or

19  no, and if you can't answer yes or no, let us know.

20      Would it be fair to say that at the time that this report

21  was written, the Lidocaine injections had not helped either?

22  Yes or no.

23  A.   That is correct.

24  Q.   And so, therefore, he was scheduled for surgery, right?

25  A.   Right, for treatment of his arthritic condition, correct.

```
 1              MR. MILLER:  Thank you, Doctor.  No further questions.

 2              THE COURT:  Redirect?

 3              MR. TURKLE:  Yeah, I don't have anything, your Honor.

 4         Thank you so much, Dr. Gidumal.

 5              THE COURT:  You may step down, Doctor.

 6              (Witness excused)

 7              THE COURT:  Anything else from Defendants?

 8              MS. ACOSTA-PETTYJOHN:  We have no further witnesses,

 9    your Honor.

10              THE COURT:  Do Defendants rest?

11              MS. ACOSTA-PETTYJOHN:  At this time I would like to

12    renew my 50B motion, your Honor.

13              THE COURT:  All right.  It's denied.

14         Any rebuttal case?

15              MR. MILLER:  No rebuttal.  Plaintiff rests.

16              THE COURT:  All right.

17              What that means, ladies and gentlemen, is you've now

18    heard all the evidence.  You still haven't heard the closing

19    arguments of the lawyers, we're going to do that right now, and

20    then I'll instruct you on the law, so don't, don't start making

21    any decisions yet, not until you've talked to one another in the

22    jury room, but we're getting -- we're edging toward that time.

23              As I told you at the beginning, what the lawyers say

24    is not evidence, but they are allowed, now that the evidence is

25    in, to make arguments to you about what they think you should
```

Closing - Ms. Acosta-Pettyjohn

1  conclude from the evidence that you've heard.  If a lawyer makes

2  a representation about the evidence that's different from what

3  you remember, it's your recollection that controls.  Likewise,

4  if a lawyer says something about the law that turns out to be

5  different from what I instruct you, it's what I say that

6  controls, but I think you'll find it helpful to hear the

7  contrasting views of the lawyers before you go to deliberate.

8           As I said at the beginning, the Plaintiff has the

9  burden of proof, so the Plaintiff in closing arguments gets the

10 last word, so we will start with Defendant's closing argument.

11          Ms. Acosta-Pettyjohn.

12          MS. ACOSTA-PETTYJOHN:  Thank you, Your Honor.

13          Good morning, Judge, ladies and gentlemen.

14          First and foremost, we'd like to thank you for sitting

15 here patiently and hearing and listening to all of the testimony

16 and taking in all the evidence.  After a few days of listening

17 to testimony and seeing the evidence, it's your job to determine

18 if the Plaintiff met his burden of proof and if his story is

19 fact or fiction.

20          Now, the Judge is going to instruct you on the law,

21 but, briefly, the Plaintiff has to prove that these officers,

22 Officer Peralta and Officer Bailey, used excessive force and

23 that all three officers, individually or separately, failed to

24 intervene on that use of force.  Now, if the Plaintiff's story

25 doesn't make sense, it's because it didn't happen.

1          Plaintiff claims that Officer Peralta and Officer

2    Bailey were so enraged that he kissed his wife that they

3    conspired to meet him at the frisk area and assault him.  You've

4    heard Plaintiff claim that Officer Bailey smushed his face on

5    the floor while Officer Peralta commenced to punch and kick him.

6    Now, you heard not only from these officers and Officer

7    Pumarejo, but you also heard from Plaintiff himself that kissing

8    is allowed.  You've heard from Plaintiff himself that he's

9    kissed on other occasions during this visits and he had no

10   problem before.

11          Now, you also heard on this day Officer Peralta was

12   posted in visiting room 2, Officer Bailey was in the yard, and

13   Officer Blount was in the frisk area.

14          Now, Plaintiff wants you to believe that these three

15   officers who are not working together somehow spoke to each

16   other and were able to meet him at the frisk area to assault

17   him.  Does that make sense?  And all this happened because he

18   simply kissed his wife.  Again, something that's allowed.  Now,

19   why would these three officers be so enraged by a simple kiss

20   that they would risk leaving their post, risk getting

21   disciplined, all because an inmate kissed his wife.  That

22   doesn't make sense.

23          Now, Plaintiff was so sure that the female officer,

24   Officer Pumarejo, immediately said something to him as soon as

25   he entered the visiting area, and he was also so sure that about

1  thirty minutes after that Officer Peralta approached him and

2  asked is there a problem.

3          Now, the visiting logs are in evidence, and I want you

4  to see that the Plaintiff entered the visiting room around nine,

5  ten a.m., which means that Officer Peralta would have approached

6  him around 9:40 a.m.  And you heard from Mr. Hall, who stated

7  that he was in the visiting room and he saw these altercations

8  happen, he sees a female officer approach Magalios's table, he

9  sees Officer Peralta approach the Plaintiff's table in a very

10 aggressive manner, disrespectful manner, and he used very

11 aggressive tones in speaking to Magalios, but I want you to look

12 at the processing log for the visiting room.  Mr. Hall didn't

13 enter the visiting room until 10:20, over an hour after Magalios

14 entered, so how would he have seen any of these altercations if

15 this all happened about half an hour before he even entered that

16 room?  Does that make sense?

17         Another thing to keep in mind, Mr. Hall said that he

18 saw a boot print on the Plaintiff's back, but, ladies and

19 gentlemen, you saw the pictures, did you see a boot print?

20 There were none.

21         Now, you heard from Mr. Ryan who knows Mr. Magalios

22 very well, they work as masons together in Fishkill, and Mr.

23 Ryan said that the first thing the Plaintiff wanted to do is

24 call his wife.  He didn't mention that he needed to seek medical

25 attention, he didn't mention that he needed to report it to

1  anybody.   No, he simply wanted to call his wife.   Does that make

2  sense?

3         Now, you also heard from Mr. Giannini who stated that

4  he was one of the inmates in the frisk waiting area when the

5  assault occurred, and according to Mr. Giannini, he was told to

6  move and leave that area.   You heard Mr. Giannini say that he

7  was never escorted, he simply moved to the area.   And he moved

8  to the area just around the corner from the benches and Mr.

9  Giannini heard some screaming and yelling before the alleged

10 assault, and during the alleged assault, he heard 'ah' while he

11 was around the corner.

12        Now, according to Mr. Giannini, he is sure the assault

13 took place in the strip-frisk area, and you saw the diagram, the

14 strip-frisk area is past the waiting area to the left, and he

15 was sure of that because of the noises that he was hearing from

16 that area.   However, Mr. Magalios is sure that this assault

17 occurred in the waiting area where the benches were.   Now, if

18 Mr. Giannini was where he said he was, he would have been able

19 to witness the assault because, again, there were no officers

20 watching him and he was only around the corner.

21        Now, all these witnesses, Mr. Hall, Mr. Giannini, and

22 Mr. Ryan, all wrote statements, two of which are in evidence.   I

23 want you to look at those statements.   It's interesting that

24 those statements are written to the same law office shortly

25 after the incident occurred.   Now, is it possible that these

1 witnesses unsolicited on their own decided to write affidavits

2 and decided to just happen to send them to the same place?  Or

3 is it possible that they were asked by Mr. Magalios to write

4 these statements so he can set the stage for a lawsuit?

5          Now, you know what else is interesting about these

6 statements?  That nowhere in these statements does it say

7 anything about any injuries.  You heard them on the stand and

8 they were so sure about the injuries that they saw on Mr.

9 Magalios and it was so important for them to tell you these

10 injuries.  However, if it was that important, why isn't it in

11 their statement?

12          Now, none of these witnesses actually saw an assault,

13 none of these witnesses saw anything happen to Mr. Magalios, and

14 none of these witnesses can corroborate Mr. Magalios's story

15 because they have holes in their stories that don't make sense.

16          Now, Plaintiff claims that he was also sitting in the

17 visit area towards the back with his back against the yard, but

18 also facing the officers who would had been to his right side,

19 which means that he purposely wasn't sitting with his back to

20 the yard, but maybe sitting diagonal?  Does any of that make

21 sense to you?

22          Plaintiff claims that following the kiss with his wife

23 and being yelled at by Officer Pumarejo, who, again, doesn't

24 recall any interaction with the Plaintiff, Plaintiff felt so

25 uncomfortable in his visit that he ended his visit early.  His

1  visit started around nine, he ended it around one, and the

2  reason he felt so uncomfortable is because Officer Peralta was

3  staring at him the whole visit.  Now, if Officer Peralta was

4  staring at him the whole visit, how could he have conspired with

5  Officer Bailey or anybody else to attempt an assault or commit

6  an assault on the Plaintiff if he was too busy staring at the

7  Plaintiff the whole visit, the whole four hours?  Also, keep in

8  mind that he wasn't that uncomfortable if the visit lasted four

9  hours.

10          Now, the Plaintiff wants you to believe that once he

11  arrived at the frisk area, Officer Bailey was already in that

12  area speaking to another officer about the Plaintiff's identity,

13  and then that's when Officer Peralta came in and proceeded to

14  frisk and assault the Plaintiff.  Well, we already know that no

15  officer escorted anyone anywhere as per Mr. Giannini, but he

16  wants you to believe that he received an onslaught of punches

17  and kicks and that Officer Bailey used both of his hands and

18  held his head to the floor with his knee on his back while

19  Officer Peralta was punching and kicking him, his head and his

20  back.

21          Now, ladies and gentlemen, you've seen Officer Bailey.

22  He's not a little guy.  And you've seen Officer Peralta.  If

23  Officer Bailey's both hands were covering Magalios's head while

24  he was on the floor, how could Officer Peralta could have been

25  punching his head?

1          Now, another thing that doesn't make sense is the
2  Plaintiff was sure that after the assault he sat down on the
3  benches and then proceeded right after that to pick up his
4  packages.  Yet, Mr. Giannini claims that the Plaintiff was all
5  balled up and that's how he knew something happened, so which
6  one is it?

7          Now, the Plaintiff testified that he picked up his
8  packages and he went through several areas of the facility,
9  passing several correction officers, and he wants you to believe
10 that the correction officers weren't really at their post, they
11 were off doing something else, and you also heard testimony that
12 there is a medical unit or a clinic right after leaving the
13 frisk area, but Plaintiff didn't go to the medical unit either,
14 he simply went to his housing unit, and I'm assuming that's
15 because the medical unit was also not going to do their job.

16         Now, he claims that he tried to report this when he
17 got to his medical unit to an officer and the officer told him
18 that he had to wait because shifts were changing, but you heard
19 from Sergeant Vantassell himself that if an inmate asked for a
20 sergeant, the correction officer is required to get that
21 sergeant regardless if there's a shift change or not.

22         Now, Plaintiff didn't report his alleged assault or
23 injuries to Sergeant Vantassell until about 3:50 p.m., and when
24 Sergeant Vantassell asked him how come you didn't report it
25 sooner, Plaintiff said it wasn't a big deal.  And you heard Mr.

1  Miller's questioning on this and he asked this line of

2  questioning about two or three times, hoping that Sergeant

3  Vantassell's answer would change, and Sergeant Vantassell was

4  certain, 'Magalios told me it wasn't a big deal.'

5        Now, once he did report it, he claimed that all these

6  officers were involved, but he was only able to report to

7  Sergeant Vantassell an Officer P.  Do you know why?  It's

8  because he had virtually no interaction with any other officer.

9  He testified he had no problem with Officer Bailey or Officer

10  Blount before this incident, and he didn't even know who Officer

11  Peralta was until the day of this incident.

12        Now, he wants you to believe that these three officers

13  who had no issues with him before, no bad blood with him before,

14  all of a sudden were so enraged at him kissing his wife, again,

15  something very common and something that officers and inmates

16  alike know is allowed, that they decided to somehow conspire to

17  meet him in the frisk area and assault him.  Does that make

18  sense?

19        Now, do you believe Plaintiff's story?  I want you not

20  only to look at his words and hear what he said, but look at his

21  demeanor, how did he come off.

22        When Mr. Miller was questioning him, he was slightly

23  emotional when he was answering these questions, but did his

24  demeanor change when he spoke to me?  Did he become cross, did

25  he become short?  Where did his emotions go?  And I know you've

1  witnessed the demeanor of the officers here today, but I want

2  you to understand something.  They're exhausted.  They've been

3  going through all this to defend something that they didn't do,

4  to defend a story that's made up.  Now, you've heard the

5  Plaintiff testify on the stand and he's testified that the

6  correction officers, all they do is drink coffee and eat donuts,

7  and he took every opportunity he could to demean their

8  profession.  He clearly does not like correction officers.

9           But you've also heard testimony from Officer Peralta,

10 Officer Bailey, and Officer Blount, and they testified that --

11 Officer Peralta testified that he was in the visiting room area

12 and that he never went to the frisk area, he never frisked

13 anybody, he doesn't even recall any interaction with the

14 Plaintiff

15          And you heard from Officer Bailey that he was in the

16 yard that day, and he actually did interact with the Plaintiff

17 and the Plaintiff was having some inappropriate touching with

18 his visitor, at which point Officer Bailey said, 'hey, side by

19 side, let me see your hands,' or something along those lines,

20 and that was the extent of their interaction.  Officer Bailey

21 then stayed in the yard.  The Plaintiff came back into the

22 visiting room.  Yet, somehow Officer Bailey and Officer Peralta

23 spoke to each other in the four hours that Officer Peralta was

24 also staring at the Plaintiff.

25          You heard from Officer Blount that he was in the

1 processing area and he probably did process Magalios in the

2 morning because part of his job and duties is to process the

3 inmates that go into the visiting room, and they have said

4 nothing for you not to believe them.  You heard when Mr. Miller

5 was questioning them, he was badgering them about not

6 remembering who they worked with or who they spoke to the day of

7 and days after the incident.  This incident allegedly occurred

8 four years ago.  This is not a memory test.

9        Now, you also heard Mr. Miller ask the officers if

10 they were being accused of a potential assault or an -- of a

11 potential crime why were they not running around the facility

12 getting statements and gathering as many witnesses as they can

13 so that they can prove they were innocent.  Well, you heard on

14 the stand from multiple officers that they write a to/from.

15 When an incident is alleged they write a to/from.  That to/from

16 goes up the chain of command for investigation.  These officers

17 didn't have to look for statements or witnesses because they did

18 nothing wrong, and it's not like they were trying to create a

19 paper trail for a lawsuit.

20        Now, I want you to look at the evidence, and I want

21 you to look at the processing logbook for the visiting room.

22        According to Peralta, no one was in the -- the three

23 inmates that were in the frisk area were asked to leave and he

24 was assaulted in the risk area.  Well, according to the

25 processing log, several inmates came in and out of the frisk

Closing - Ms. Acosta-Pettyjohn

554

1   area during that time, and Officer Blount testified himself that

2   that's his handwriting on that log, so while this alleged

3   assault was happening, several inmates were being signed in and

4   out or in to the visiting area, so if an assault happened, don't

5   you think somebody would have seen?

6          Now, because there was no assault, there had been

7   nothing to intervene, but even if you believe Plaintiff's story

8   that an assault happened, Plaintiff himself said that the

9   assault only lasted thirty to sixty seconds.  Now, if the

10  assault lasted from thirty to sixty seconds, that would not have

11  given any officer any opportunity to notice the assault, to

12  intervene, and to prevent an assault from occurring.

13         Now, Plaintiff wants you to believe that his injury --

14  Plaintiff wants you to believe that Sergeant Vantassell took him

15  to the medical unit because of his injuries and because of the

16  allegations that he claimed.  However, you heard Sergeant

17  Vantassell, and Sergeant Vantassell said that regardless of the

18  allegations and regardless of the injury, Sergeant Vantassell's

19  required to take an inmate to medical regardless of what they're

20  claiming happened and that's how he starts his procedure.  So

21  the protocol's always the same.  The point of interest package

22  is always the same.  There is nothing different because of an

23  allegation.

24         Now, Plaintiff also wants you to believe that the

25  injury to his right shoulder was caused or worsened by an

1  assault that occurred on September 3rd, 2017, but he wants you

2  to believe that he was thrown to the ground, punched and kicked,

3  and the Plaintiff's doctor, Dr. Varlotta, wants you to believe

4  that because of this incident he now has several subluxations to

5  his shoulder, but Dr. Varlotta himself even admitted that

6  nowhere in the two years of medical records that he reviewed

7  there's any mention of any subluxations.

8          And I know that you just witnessed the testimony of

9  Dr. Gidumal and you heard Mr. Miller ask him several questions

10  about being here to testify and being compensated to testify,

11  and you heard Dr. Gidumal say that he's being compensated for

12  not being in his office today, he's being compensated for not

13  treating his patients today.  He's not being compensated to

14  testify a certain way.

15          Now, regardless of his testimony here, he has shown

16  that he has forty years of experience and qualifications as an

17  orthopaedic surgeon.  He read through these medical records, and

18  from his review of the medical records, there's no difference

19  from the injury prior to this alleged incident to after this

20  alleged incident.  And you heard Mr. Miller question him about,

21  'hey, it doesn't say that on here, does it, it doesn't say that

22  on here, does it,' but you heard Dr. Gidumal say, 'yes, you look

23  at what's said and you look at what isn't said.'  Dr. Gidumal

24  testified if a doctor sees something wrong, he has to note it.

25  Imagine if a doctor had to write everything that wasn't wrong

1  with you.  You'd be in a doctor's office forever.  That doesn't

2  make sense.

3          Now, the one thing that both doctors agree on is that

4  the X-rays from before the incident and the X-rays from after

5  the incident are essentially identical, there's no change in

6  condition, and Dr. Gidumal testified that in the X-ray after the

7  incident on September 28th there was no objective evidence of

8  any trauma event, no joint separation, no fracture, no injury,

9  nothing has changed to his shoulder from before the incident to

10  after the incident.  Now, if the Plaintiff was struck with so

11  many onslaught of punches and kicks, there would have been

12  documentation of a trauma.  Also, ladies and gentlemen, look at

13  the pictures.  If he was attacked as badly as he said he was

14  attacked, he probably would have more than a few marks.

15          Now, Mr. Magalios also testified that since his

16  release from Fishkill in 2018 he didn't seek any medical

17  treatment, he didn't take any medications for his shoulder or

18  his pain, and he also testified that he worked and he builds

19  sets for TVs and movies and he worked ten-hour days during

20  construction of these sets.  Clearly his shoulder injury has not

21  stopped him from doing anything.

22          Now, ladies and gentlemen, nothing has happened here.

23  Plaintiff has created a story and a story that doesn't make

24  sense.

25          MR. MILLER:  Objection to the word 'story.'

1          THE COURT:  Overruled.

2          MS. ACOSTA-PETTYJOHN:  He wants to blame these three

3    officers who virtually didn't know him at all, that they

4    attacked him because he kissed his wife, again, something

5    everybody knows is common, and that they conspired to assault

6    him.  Yet, at no point is there evidence that they spoke to each

7    other that day.

8          Now, we ask to you look at the testimony, we ask you

9    to look at all the evidence, and we ask you that if you do that,

10   you will find that our clients, these three officers, did

11   nothing wrong.

12         Thank you.

13         THE COURT:  Thank you, Ms. Acosta-Pettyjohn.

14         Mr. Miller.

15         MR. MILLER:  Thank you.

16         Good morning again, everybody.

17         My sense is that this was a two- or three-day trial

18   and that you have all taken in everything in this courtroom.

19   Not only the testimony from the witness stand and not only the

20   exhibits that were shown to you, but I think you've also taken

21   in the demeanor of everybody, and I guess this goes without

22   saying that judging credibility is something that one cannot do

23   well if it's just taking the words, it's the whole thing, and if

24   it's one thing that you will walk from this trial and think

25   about, I believe, will be the demeanor of not just Mr. Magalios

1  and the three Defendants here, but every witness, because that's

2  how, that's how you judge people.  That's how you determine

3  who's telling the truth.  You, you look at the evidence, what's

4  credible, what makes no sense whatsoever.  I'm asking you -- and

5  maybe this doesn't need to be stated, but I'll say it anyway.

6  I'm asking you not to be distracted by the tension in the

7  courtroom, the tension between witnesses and parties of

8  witnesses and the lawyers.  You know, everyone has a job to do

9  and, you know, we both do our best to represent our clients and

10  it's important not to be distracted by that.

11        It's important not to be distracted by this sort of

12  robotic slogan of care, custody, and control that we hear out of

13  the mouths of the officers.  Those are words, and if they're

14  just words, they have no meaning, if there's substance behind

15  them, then they've got meaning, and the word 'care' is what you

16  should focus on, was Mr. Magalios cared for that day,

17  because...maybe it's hard to feel one's experience when they're

18  an inmate.

19        And by the way, he's not complaining about being an

20  inmate.  He served his time.  He made mistakes as a younger

21  person, and he was in jail.  It's how he was treated, it was the

22  care, and these officers know that when these inmates are in

23  their care, there's, there's no outside protection, there's no

24  -- as we learned yesterday, there's no video cameras.  It's easy

25  for these guys to move potential witnesses away from certain

1  areas.  They have, they have control of -- the officers have

2  control of their surroundings, and so when Counsel argues to

3  you, you know, there's no witnesses, yes, that's why, that's why

4  these cases are more difficult for juries than cases that take

5  place maybe out in the public where someone can pull out a phone

6  and videotape.  These are hard cases, but what I'm asking all of

7  you to do is to take in all the credible evidence, all the

8  documents that assist you in determining what's credible, and in

9  your own heads try to visualize what a videotape would show if

10 there were a videotape.

11     And I think maybe it's important sort of to go in

12 chronological order and talk first about Alexander Hall.

13     Nobody was looking at clocks.  I don't think it's important

14 for you in determining truthfulness the exact time that people's

15 name is written on a log when they enter into a frisk area.  Mr.

16 Magalios wasn't looking at a clock, he wasn't timing how long it

17 would take for Officer Peralta to come over to him.  What we

18 learned from Mr. Hall is just a small slice of what he saw that

19 day.  If he wanted to make something up, his testimony would

20 have been way broader and way more comprehensive and way more

21 helpful for Mr. Magalios, but he testified to the sliver of what

22 he saw, and what he saw challenges the credibility of Officer

23 Peralta and Officer Pumarejo.  That little sliver of testimony

24 that he saw Peralta come over in an aggressive way and engage in

25 some back and forth, that's all he saw.  He didn't hear the

1  words.  He didn't really understand the context of what was

2  going on, but that's what he saw.  He was on the stand for five

3  minutes because that's all he saw, and that little bit of

4  testimony makes, I hope, makes us all wonder about the

5  credibility of Peralta.

6          And, yes, I think it's silly for someone to testify,

7  under oath, that they didn't know who their partner was

8  yesterday, September 3rd.  That's just silly.  When you write a

9  to/from memo on September 4th, you, if you're innocent, are

10  going to write everything you remember.  From yesterday.  'I was

11  standing along the wall with my partner, Officer Pumarejo,

12  Officer Buckley, we were standing there, there was no activity,

13  nothing happened, I don't know what he's talking about,' that's

14  what an innocent person would write.  Someone who is guilty will

15  write one or two sentences, deny, deny, deny, 'I don't remember

16  who I was with, I don't remember anything.'  That is where your

17  visceral reaction to someone's testimony plays a role.  Did

18  Officer Peralta's testimony ring true?  Did his demeanor make

19  you feel comfortable about the credibility of what he was

20  saying?

21          And I ask the same question about Officer Pumarejo,

22  because she wrote a memo also the next day.  She didn't remember

23  working with him and he didn't remember working with her?  If I

24  ask you who did you sit next to yesterday, I think you might

25  know the answer.  If I ask you a year from now who did you sit

1  next to yesterday, you might not know.  This is yesterday, and

2  what we have here is implausible deniability.  Not even

3  plausible deniability, this is implausible deniability.

4  Because...these officers -- and, again, I'm really focusing on

5  Officer Peralta, but I'm really talking about all of them.  The

6  sense you get from them is that they don't care how silly their

7  answers are, how implausible their answers are.

8         They, he, Peralta and the others, they appear to take

9  it for granted that a correction officer can always get away

10  with it when the accuser is an inmate.  It appears that they

11  assumed through their to/from memos, through their demeanor,

12  through their testimony here, that a mere denial, a mere denial,

13  a two-, three-sentence denial, a mere

14  I-don't-know-I-don't-remember-denial would end the inquiry.

15  They never expected that the inmate they were dealing with on

16  September 3rd was going to risk retaliation to pursue his

17  grievance.  These guys didn't know that this inmate would report

18  the assault to a sergeant, write letters to the AG two days

19  later, write a letter to the commissioner of DOCCS, report it to

20  OSI, write another grievance, and hire a lawyer.  They didn't

21  think the guy they were dealing with would do those things.

22         No, these guys were thinking...pardon me when I say

23  this, these guys were thinking what loser lawyer would take a

24  case like this where there are no videos, no witnesses, and the

25  word of an inmate; what loser lawyer, they would think, would

1  take a case like this.  Well, you're looking at such a lawyer.

2  And I'd like to reintroduce myself.  My name is Glenn Miller,

3  and it is my honor to be representing Nicholas Magalios.  Not

4  only because his civil rights were violated and he is seeking

5  compensation, but also with the hope that your verdict will send

6  a message to these Defendants and others like them that maybe,

7  just maybe, those few bad apples in a department with a vast

8  majority of hardworking, dedicated public servants will think

9  twice next time they want to violate an inmate's rights.

10         And I think this is a good time to move on to Nicholas

11  Giannini.

12         I don't think they even attempted to challenge Mr.

13  Giannini's credibility.  Here is a young man who came into this

14  courtroom after having been threatened, who was obviously

15  nervous, who obviously has no connection whatsoever to Mr.

16  Magalios.  They didn't live near each other at Fishkill.  They

17  just happened to be in the same waiting area when this happened.

18  And Mr. Giannini obviously who's a young man, who's on parole,

19  got driven down here from Wappingers Falls by his dad, comes

20  into a federal court and swears to tell the truth, and, once

21  again, his testimony was just really a sliver of what happened,

22  but that sliver should make you all question the credibility of

23  those three gentlemen over there.

24         That little sliver puts Officer Bailey and Officer

25  Peralta in that frisk room, a place they denied being in.  That

1   testimony puts more than three officers in that frisk room where

2   you heard from Officer Blount that they were short-staffed that

3   day and they only had three assigned.  That testimony from Mr.

4   Giannini tells you that these guys were out to hurt somebody.

5   They were angry, they were nasty.  They knew there were no

6   cameras in there.  They knew that if they take these inmates on

7   the bench and just bring them around the corner, you saw the

8   photos, they're going to be in the jury room, you'll see where

9   Mr. Giannini was placed against the wall, you'll see that he

10  could not have seen around that corner, down where those benches

11  are.  So, yes, Counsel is right, Mr. Giannini didn't see the

12  assault, but he heard the assault, and he knew something was up

13  when they whisked him away around the corner, and he knew that

14  something bad had happened when he returned to those benches

15  when he saw Mr. Magalios.

16          Again, if Mr. Giannini wanted to...help Mr. Magalios

17  and expand and exaggerate, he would have said more.  He would

18  have said 'I saw the assault,' he would have given you more than

19  what he saw, but this young man told you what he saw and what he

20  heard, and there is no way, at least that I can think of, that

21  you as the finders of fact can reconcile the testimony of Mr.

22  Giannini and the denials of the Defendants without calling the

23  credibility on one of them.  The closest thing we have to a

24  video are the eyes and ears of Mr. Giannini.  Taken together

25  with the testimony of Mr. Magalios and the exhibits that you'll

1    see in the jury room, I submit that's enough for you, the

2    finders of fact, to create your own vision using all of your

3    senses about what happened in that frisk room.

4            I don't think it's important for me to tell you my

5    opinion about the demeanor of the three Defendants.  My job in

6    summing up to you is to argue to you the facts, try to put

7    things in order for you, try to persuade you.  You sat in this

8    courtroom the same way I did.  You saw what I saw with regard to

9    the demeanor of the three Defendants.  You probably saw more

10   than I saw.  I was sitting facing this way.  You might have

11   heard the snickering, you might have heard the laughter, you

12   might have heard the disrespect that one or more of them showed

13   to this Court.  That's up to you.  That's up to you to decide

14   the demeanor of them, the demeanor of Mr. Magalios, the demeanor

15   of all the witnesses, including the experts.

16           I just want to say a quick word about Mr. Magalios.

17           One of the most important questions asked of all of

18   you during jury selection was whether you could be fair to

19   someone who was once an inmate, and you all said that you can,

20   and, frankly, that's why you've all been selected as jurors.

21   That was the most important question as far as I'm concerned.

22           He made mistakes as a younger man.  He did his time.

23   He did his time well.  He contributed to DOCCS.  He worked

24   Monday through Friday.  He never got in trouble.  And they're

25   right, he never had issues with these guys.  This was a one off.

Closing - Mr. Miller

1  This was something that happened that day.  And when he got out,

2  it took him two days to go to work and work he has done since

3  December of 2018.  Yes, you know something about his failed

4  marriage.  That's irrelevant.  That's a distraction.  He has a

5  child.  He deserves to be viewed like anyone else, and, frankly,

6  his account of what happened that day is completely consistent

7  with the testimony of Mr. Hall and Mr. Giannini and Mr. Ryan and

8  the photos of the frisk area.

9       Mr. Magalios did something that, as you heard during

10  this trial, inmates are assumed not to do, report corrections

11  officers for assault when you know you have more than a year to

12  go in that facility.  He's an adult, he's not a kid, and he knew

13  that he had to get to the bottom of this, even if it meant

14  potential retaliation.  Did he call a lawyer?  Yes, he did.  He

15  called anyone he could find outside the prison walls to make

16  that record because he was scared about being set up, he was

17  scared what these guys were going to do to him next.  How can

18  they hold that against him?  How can they question his timing of

19  things?  I guess you need to be a prisoner, be an inmate, to

20  understand how risky it is to report three corrections officers

21  to their colleagues.

22       If you find, if you find that one or more of these

23  corrections officers, Defendants, are liable for excessive

24  force, Eighth Amendment violation for failure to intervene, you

25  will then be instructed that you must consider what's known as

1  damages.

2          Now, there are two types of damages.  There's

3  compensatory and there's punitive.  I want to address the

4  compensatory damages first.  Compensatory damages, as you'll

5  learn from the charge, is pain and suffering, both physical and

6  emotional, and in this case, they both play a big role in Mr.

7  Magalios's pain and suffering.

8          The physical pain that you should consider in

9  determining pain and suffering started the first time he was

10 illegally touched by one of those guys over there.  That's

11 physical pain.  Being beaten down is physical pain.  Being

12 punched and kicked and have your head smushed to the ground with

13 two very strong hands is physical pain.  There is no doubt that

14 the bruises, the abrasions, whatever injuries he suffered from

15 the kicks and the punches to the back, to the knee, and you'll

16 see the photos again, they went away.  When we talk about the

17 pain, we're talking about the pain during the assault and right

18 after.  It's the shoulder that is a challenge because we have

19 two highly-qualified doctors who treat shoulders all the time

20 agreeing on some things and disagreeing on other things.

21         I say this with all due respect to Dr. Gidumal, who is

22 an excellent orthopaedic surgeon, but chose, as a, as a

23 businessman, that part of what he does, part of what he has been

24 doing in his career, is to earn money for defendants, including

25 the State, so I do ask you to consider his bias, and the reason

Closing - Mr. Miller

1  I started out my cross-examination by asking him what he meant

2  by Mr. Magalios complaining about severe pain in his right

3  shoulder beforehand is because that brought out, loud and clear,

4  Dr. Gidumal's bias in this case.

5        He knew what the issues were, he knew exactly how

6  important it was for him to squeeze in that word 'severe,' but

7  when you all learned, with my first question, it wasn't even a,

8  it wasn't even a fight.  You know, you've seen me, you know,

9  you've seen me go at it with witnesses.  That part wasn't even a

10  fight.  He threw in the towel.  He said, okay, I admit it, he

11  wasn't complaining about severe shoulder pain.  Did he make a

12  mistake or was he biased?

13        And I think that you all, sitting here, listening to

14  both doctors, have a very good understanding of the right

15  shoulder, and you all have a very good understanding that

16  everyone in this room, I'm sure, has some type of arthritic

17  condition somewhere on their body, but that doesn't mean that

18  it's changing their life, it doesn't mean it's, it's causing

19  severe pain, but if that slight arthritic problem you have gets

20  assaulted or traumatized, it can be slight arthritis in the neck

21  and you get hit in the rear in your car, that doesn't mean that

22  you have to have a fractured spine to all of a sudden have

23  terrible pain in your neck.  This man's shoulder was thrown to

24  the ground.  The reports at DOCCS, I couldn't get it from Dr.

25  Gidumal, you'll see it from the records, one entry after the

1 next after the next it talks about the increased pain after an

2 assault from September of 2017.

3          I'll tell you this.  I submit that if it weren't for

4 this assault, Mr. Magalios would never have needed all that

5 physical therapy, would never have needed those injections,

6 would never have needed the surgery.  The surgery helped.  Mr.

7 Magalios is not gilding the lilly.  He said the surgery helped.

8 That's what surgeries do; they help.  I believe it was a

9 year-and-a-half, a year-and-a-half between September 3rd and the

10 surgery, and I submit to you that that's the period of time that

11 you should consider Mr. Magalios's pain and suffering with

12 regard to his right shoulder, that period of time, and then

13 about four to six weeks post surgery where, like anyone else

14 after surgery, he was having terrible recovery pain.

15          I think it's very hard to quantify if the problems he

16 has now with his shoulder are much worse than before September

17 3rd.  I think it is, but, frankly, I don't feel comfortable

18 saying to you that it's a slam-dunk.  I do feel comfortable

19 saying to you that if it wasn't for this attack, he would never

20 have gone through all that pain and suffering with the right

21 shoulder.  That's what I feel comfortable saying to you, and

22 that's the physical pain part of compensatory damages.

23          The emotional pain one could argue, and I don't know

24 if this is true, but one could argue was worse, was worse than

25 the physical pain, but the emotional pain starting the moment

Closing - Mr. Miller

```
 1  that Mr. Magalios realized he was about to get beaten, not
 2  knowing what's going to happen, not knowing how bad it's gonna
 3  be, and knowing that there's no cameras and there's no witnesses
 4  and that he can't defend himself, that's scary.  That's scary.
 5  And I hope that none of us are in any way cavalier about the
 6  level of fear that he was having right before this beat-down
 7  began, and I hope, and I assume, that no one is going to be
 8  cavalier about the fear he felt when this beating was going on,
 9  not knowing when it's going to end, not knowing how far it's
10  going to go, and not knowing the condition he's going to end up
11  in when the beating's over.  The physical pain is one thing.
12  The fear, the fear, Members of the Jury, not one of us have ever
13  been in this situation.  I'm asking you to think about the fear,
14  the fear of having these guys and maybe others standing around
15  whose names we don't know, with no help, helpless.  That's why I
16  take these cases.
17            I can go on with the fear.  I can go on with the fear
18  of any moment for the next eighteen months not knowing when
19  someone's going to retaliate against you for pushing this case,
20  for speaking to OSI, and doing all the other things that I
21  already talked about.  Think about eighteen months constantly
22  looking behind your back.  Think about that time when Officer
23  Bailey decided to just take a trip to 16-2 and put his feet up
24  on the table.  That's taunting.  That's a disgrace.  That's
25  fear.
```

```
 1              If you put the physical and the emotional pain and
 2   suffering together, amongst the eight of you you will arrive at
 3   an amount of compensatory damages that you feel is fair and
 4   adequate.  We're not looking for a penny less nor a penny more
 5   than what you all feel is fair and adequate.  I can suggest an
 6   amount.  I'm going to suggest an amount --
 7              THE COURT:  Uh...
 8              MR. MILLER:  No?
 9              THE COURT:  No, you're not.
10              MR. MILLER:  I will not suggest an amount because I
11   follow the rules, and I will not suggest an amount, but I want
12   you, please, to just bring it all in, every, every element that
13   I just talked about, and then you're going to be faced with
14   possibly a more challenging question, and that question deals
15   with punitive damages.
16              Punitive damages is something that you will decide
17   from the gut.  It's a visceral reaction.  Because basically what
18   punitive damages is is punishment.  It's a question that you're
19   going to ask yourselves, do we want to take off our gloves, it's
20   a boxing term, and let these guys know that as citizens, we
21   don't appreciate what you guys are doing.  Or what you guys did
22   to Mr. Magalios.  And we don't appreciate that you then tried to
23   cover it up.  And we don't appreciate that you then denied it,
24   under oath, in this courtroom.
25              There's something that all of us have instructed our
```

```
 1  kids, our students, our grandchildren, from a very young age.
 2  Don't be a bully.  Bullies are bad.  Bullies are really --
 3  bullies have no redeeming qualities.  Some bullies are worse
 4  than others.  The bully in the school yard or the bully in the
 5  neighborhood...bad enough, but a bully with authority and a
 6  bully with a badge and a bully in a state prison needs to be
 7  punished.  You have the power as the Jury to send a message, not
 8  only to these three Defendants, but the small percentage of
 9  correction officers like them.  Punitive damages is a message,
10  don't do that.  Punitive damages could be two times more than
11  compensatory damages, three times, four times more.  Whatever
12  your gut tells you.
13          The only suggestion -- I'm not going to state any
14  numbers, but the only suggestion that I make with regard to
15  punitive damages is that Officer Blount be assessed less
16  punitive damages than the other two.  Not intervening is a
17  violation of the Eighth Amendment, but physically beating down
18  an inmate who's helpless, frankly, is worse, and I'm going to
19  ask you to assess punitive damages against all three, but I
20  think a message -- there could be a message if you hit Peralta
21  and Bailey with more.
22          Mr. Magalios was not on a level playing field in that
23  frisk waiting area on September 3rd, 2017.  Those guys had an
24  advantage.  Now, in federal court, Southern District of New
25  York, White Plains, New York, we are on a level playing field,
```

Magalios v. Peralta - Jury Trial

1   and as I said to you during my opening statement, because we are

2   on a level playing field, whatever your verdict is, justice will

3   have been served, and I thank you for your attention throughout

4   this trial.

5            THE COURT:  Thank you, Mr. Miller.

6            It's time for our lunch break.  It will be tempting,

7   but please don't discuss the case until after you've heard my

8   instructions on the law, which will be right after lunch, and

9   then the case will be yours, so we will resume at twenty after

10  twelve.

11           (Open court; jury not present)

12           THE COURT:  When Mr. Clark gets back, I want the

13  lawyers for each side to confirm with him that what's on the

14  thumb drive is everything that's supposed to go back and doesn't

15  include anything that's not supposed to go back, and we'll

16  resume in thirty minutes.

17           (Luncheon recess)

18           (Continued on next page)

19

20

21

22

23

24

25

```
 1                    AFTERNOON SESSION

 2                    12:20 p.m.

 3          (In open court; jury not present)

 4          THE COURT:  Have both sides checked that what I now

 5  understand is not a thumb drive, but a drive on our network,

 6  that the exhibits that are going back to the jury are the proper

 7  ones from both sides' point of view?

 8          MR. MILLER:  Yes.

 9          MS. ACOSTA-PETTYJOHN:  Yes.

10          THE COURT:  Okay.  Good.  Then let's get the jury.

11          (In open court; jury present)

12          THE COURT:  Welcome back, ladies and gentlemen.

13  In a moment, I'm going to instruct you on the law.  By statute,

14  I have to give you these instructions verbally, but I find it's

15  a lot to take in just through the ears, so I'm going to hand out

16  copies of what I'm reading from so that you can follow along.

17          You can follow along if you choose.  The one rule,

18  though, is I'll ask you to literally stay on the same page with

19  me.  Don't read ahead.  If you think you missed something, don't

20  go back and look at it, because I do think the one recipe for

21  confusion is if what you're hearing through your ears and seeing

22  through your eyes are two different things.  So if you'll just

23  read along with me.  You'll be able to keep these copies with

24  you in the jury room, and I think that will be helpful in

25  absorbing what I have to say.
```

1          So my clerks are now going to hand out -- my law clerk

2   is now going to hand out what I'll be reading from.

3          (Pause)

4          THE COURT:  So we begin on page 3.

5          Members of the jury, we have almost reached that point

6   where you will begin your final function as jurors, which, as I

7   hope you all appreciate, is one of the most important duties of

8   citizenship in this country.

9          My instructions will be in four parts.  First, I will

10  start with some general introductory instructions about the

11  roles of the Court and the jury and the burden of proof.

12  Second, I will give you instructions concerning the evaluation

13  of evidence.  Third, I will describe the law to be applied to

14  the facts as you find them to be established by the evidence.

15  The fourth and final section of these instructions will relate

16  to your deliberations.

17         It is my duty to instruct you as to the law and it is

18  your duty to accept these instructions of law and apply them to

19  the facts as you determine them.  If an attorney stated a legal

20  principle different from any that I state to you in my

21  instructions, it is my instructions you must follow.

22         You should not single out any instruction as alone

23  stating the law, but you should consider my instructions as a

24  whole when you retire to deliberate.  You should not be

25  concerned about the wisdom of any rule that I state.  Regardless

1  of any opinion you may have about what the law may be or ought

2  to be, it would be a violation of your oath to base your verdict

3  on any view of the law other than that which I give you.

4          You, the members of the jury, are the sole and

5  exclusive judges of the facts.  You pass on the evidence,

6  determine the credibility of witnesses, resolve such conflicts

7  as there may be in the testimony, draw whatever reasonable

8  inferences you decide to draw from the facts as you determine

9  them and determine the weight of the evidence.  In doing so,

10  remember you took an oath to render judgment impartially and

11  fairly, without prejudice or sympathy or fear, based solely on

12  the evidence and the applicable law.

13          Plaintiff has the burden to prove each and every

14  element of his claim by a preponderance of the evidence.

15          What does preponderance of the evidence mean?  To

16  establish a fact by a preponderance of the evidence means to

17  prove that the fact is more likely true than not.  A

18  preponderance of the evidence means the greater weight of the

19  evidence.  It refers to the quality and persuasiveness of the

20  evidence, not the number of witnesses or documents.

21          In determining whether a claim has been proven by a

22  preponderance of the evidence, you may consider the relevant

23  credible testimony of all witnesses, regardless of who may have

24  called them, and all the relevant credible exhibits received in

25  evidence, regardless of who may have introduced them.  The

1 credible evidence means the testimony or exhibits that you find

2 to be worthy of belief.

3         If, after considering all of the evidence, you are

4 satisfied that Plaintiff has carried his burden on each

5 essential element of his claim, then you must find in his favor.

6 If, after such consideration, you find that the evidence

7 produced by Plaintiff is outweighed by the evidence against his

8 claim or that the credible evidence on a given issue is evenly

9 divided between Plaintiff and defendants, then you must decide

10 that issue against Plaintiff.  That is because Plaintiff must

11 prove more than a simple equality of evidence; he must prove

12 each element of the claim by a preponderance of the evidence.

13 On the other hand, Plaintiff need not prove more than a

14 preponderance.  So long as you find that the scales tip, however

15 slightly, in favor of Plaintiff that what he claims is more

16 likely true than not, then that issue will have been proven by a

17 preponderance of the evidence.

18         You may have heard of proof beyond a reasonable doubt,

19 which is the proper standard of proof only in a criminal trial.

20 That requirement does not apply to a civil case such as this and

21 you should put it out of your mind.

22         You are to consider only the evidence in the case.

23 The evidence in the case is the sworn testimony of the

24 witnesses, the exhibits received in evidence and any

25 stipulations to which the parties have agreed.

1          A stipulation is simply an agreement between the
2  parties as to what certain facts were.  The stipulations are the
3  same for your purposes as the presentation of live testimony.
4  You should consider the weight to be given such evidence just as
5  you would any other evidence.

6          If is for you alone to decide the weight, if any, to
7  be given to the testimony you have heard and exhibits you have
8  seen.  Testimony or exhibits that I have excluded or stricken or
9  told you to disregard are not evidence and may not be considered
10  by you in rendering your verdict.  Similarly, with respect to
11  any evidence that I directed you to consider for a limited
12  purpose during the trial, you should consider such evidence only
13  as I have directed you.

14          You are not to consider as evidence the questions
15  asked by the parties' lawyers.  It is the witnesses' answers
16  that are evidence, not the questions.  Arguments by the
17  attorneys are not evidence because the attorneys are not
18  witnesses.  What they have said to you in their opening
19  statements and their summations is intended to help you
20  understand the evidence to reach your verdict.  If, however,
21  your recollection of the evidence differs from the statements
22  made by the lawyers in their opening statements or summations,
23  it is your recollection that controls.

24          Further, any statements or rulings that I may have
25  made do not constitute evidence.  Because you are the sole and

1  exclusive judges of the facts, I do not mean to indicate any

2  opinion as to what the facts are or what the verdict should be.

3  The rulings I have made during the trial are not any indication

4  of my views.  Also, you should not draw any inference from the

5  fact that I may, on occasion, have asked certain questions of

6  witnesses.  Those questions were intended only to clarify or

7  expedite and are not an indication of my view of the evidence.

8  In short, if anything I have said or done seemed to you to

9  indicate an opinion relating to any matter you need to consider,

10  you must disregard it.

11         There are two types of evidence that you may properly

12  use in reaching your verdict.

13         One type of evidence is direct evidence.  Direct

14  evidence is a witness' testimony about something the witness

15  knows by virtue of the witness' own senses; something the

16  witness has seen, felt, touched or heard.  Direct evidence may

17  also be in the form of an exhibit.

18         The other type of evidence is circumstantial evidence.

19  Circumstantial evidence is evidence that tends to prove one fact

20  by proof of other facts.  Here's a simple example of

21  circumstantial evidence.

22         Assume that when you came to the courthouse this

23  morning, the sun was shining and it was a nice day.  Assume that

24  the courtroom blinds are drawn and you cannot look outside.  As

25  you're sitting here, someone walks in with an umbrella that is

1  dripping wet.  Somebody else then walks in with a raincoat that

2  is also dripping wet.  You cannot look outside and you cannot

3  see whether or not it is raining, so you have no direct evidence

4  of that fact, but, on the combination of the facts that I have

5  asked you to assume, it would be reasonable and logical for you

6  to conclude that between the time you arrived at the courthouse

7  and the time these people walked in, it had started to rain.

8  That is all there is to circumstantial evidence.  You infer on

9  the basis of reason, experience and common sense from an

10  established fact the existence or the nonexistence of some other

11  fact.  Some facts, such as a person's state of mind, can only

12  rarely be proven by direct evidence.

13         Circumstantial evidence is of no less value than

14  direct evidence.  The law makes no distinction between the two,

15  but simply requires that you, the jury, decide the facts in

16  accordance with all the evidence, both direct and

17  circumstantial.

18         I have used the term 'infer' and the lawyers, in their

19  arguments, have asked you to draw inferences.  When you draw an

20  inference, you conclude from one or more established facts that

21  another fact exists and you do so on the basis of your reason,

22  experience and common sense.  The process of drawing inferences

23  from facts in evidence is not a matter of guesswork, suspicion

24  or speculation.  An inference is a reasoned, logical deduction

25  or conclusion that you, the jury, may draw, but are not required

1  to draw, from the facts which have been established by either

2  direct or circumstantial evidence.  In considering inferences,

3  you should use your common sense and draw from the facts that

4  you find to be proven whatever reasonable inferences you find to

5  be justified in light of your experience.

6          Now for the important subject of evaluating testimony.

7  How do you evaluate the credibility or believability of the

8  witnesses?  The answer is that you use your plain common sense.

9  There is no magic formula by which you can evaluate testimony.

10          You should use the same tests for truthfulness that

11  you would use in determining matters of importance in your

12  everyday lives.  You should ask yourselves did the witness

13  impress you as honest, open, and candid or was the witness

14  evasive and edgy, as if hiding something?  How did the witness

15  appear; that is, the witness' bearing, behavior, manner and

16  appearance, while testifying?  How responsive was the witness to

17  the questions asked on direct examination and on

18  cross-examination?  You should consider the opportunity the

19  witness had to see, hear and know about the things about which

20  the witness testified, the accuracy of the witness' memory, the

21  witness' candor or lack of candor, the witness' intelligence,

22  the reasonableness and probability of the witness' testimony,

23  its consistency or lack of consistency with other credible

24  evidence and its corroboration or lack of corroboration by other

25  credible evidence.

1          In short, in deciding credibility, you should size up

2   the witness in light of the witness' demeanor, the explanations

3   given and all of the other evidence in the case.  Always

4   remember to use your common sense, good judgment and life

5   experience.

6          Few people recall every detail of every event

7   precisely the same way.  A witness may be inaccurate,

8   contradictory or even untruthful in some respects and, yet,

9   entirely believable and truthful in other respects.  It is for

10  you to determine whether such inconsistencies are significant or

11  inconsequential.

12          If you find that a witness intentionally testified

13  falsely, that is always a matter of importance you should weigh

14  carefully.  If you find that any witness has willfully testified

15  falsely as to any material fact -- that is, as to an important

16  matter -- the law permits you to disregard completely the entire

17  testimony of that witness upon the principle that one who

18  testifies falsely about one material fact is likely to testify

19  falsely about everything.  You are not required, however, to

20  consider such a witness as totally unbelievable.  You may accept

21  so much of the witness' testimony as you deem true and disregard

22  what you feel is false.

23          By the processes which I have just described, you, as

24  the sole judges of the facts, decide which of the witnesses you

25  will believe, what portion of their testimony you accept and

1    what weight you give to it.

2           You've heard evidence that, at some earlier time, a

3    witness has said or done something that counsel suggested was

4    inconsistent with the witness' trial testimony.  If that prior

5    inconsistent statement was sworn testimony, such as deposition

6    testimony, it can be considered as evidence.  Likewise, if the

7    prior inconsistent statement was that of a party, it can be

8    considered as evidence against that party.  Otherwise, evidence

9    of a prior inconsistent statement is not to be considered by you

10   as affirmative evidence in determining liability.  Evidence of a

11   prior inconsistent statement was placed before you for the more

12   limited purpose of helping you decide whether to believe the

13   trial testimony of the witness who made the contradictory

14   statement.

15          If you find that the witness made an earlier statement

16   that conflicts with the witness' trial testimony, you may

17   consider that fact in deciding how much of the witness' trial

18   testimony, if any, to believe.  In making this determination,

19   you may consider whether the witness purposely made a false

20   statement or whether it was an innocent mistake, whether the

21   inconsistency concerns an important fact or a small detail,

22   whether the witness had an explanation for the inconsistency and

23   whether that explanation appealed to your common sense.

24          It is exclusively your duty, based on all the evidence

25   and your own good judgment, to determine whether the prior

1  statement was inconsistent and, if so, how much, if any, weight

2  to give to the inconsistent statement in determining the

3  credibility of the witness.

4       You have heard the testimony of Plaintiff and some of

5  his witnesses who were previously convicted of criminal

6  offenses.  Those prior convictions were put in evidence only for

7  a limited purpose, for whatever light they may shed on the

8  Plaintiff's and the witnesses' credibility.  You may consider

9  the fact that the Plaintiff or witness has been convicted of a

10 crime in deciding how much of their testimony to accept and what

11 weight, if any, it should be given, but not for any other

12 purpose.

13      In deciding whether to believe a witness, you should

14 specifically note any evidence of bias, hostility or affection

15 that the witness may have toward one of the parties.  Likewise,

16 you should consider evidence of any other interest or motive

17 that the witness may have in cooperating or not cooperating with

18 a particular party.  If you find any such bias, hostility,

19 affection, interest or motive, you must then consider whether or

20 not it affected or colored the witness' testimony.

21 You should also take into account any evidence that a witness

22 may benefit or suffer in some way from the outcome of the case.

23 Such interest in the outcome may create a motive to testify

24 falsely and may sway a witness to testify in a way that advances

25 the witness' own interests.  Therefore, if you find that a

1  witness has an interest in the outcome of this trial, then you

2  should bear that factor in mind when evaluating the credibility

3  of the witness' testimony and accept it with great care.

4            Keep in mind, though, that it does not automatically

5  follow that testimony given by an interested witness is to be

6  disbelieved.  There are many people who, no matter what their

7  interest in the outcome of the case may be, would not testify

8  falsely.  It is for you to decide, based on your own perceptions

9  and common sense, to what extent, if at all, the witness' bias

10 or interest has affected the witness' testimony.  You are not

11 required to disbelieve an interested witness.  You may accept as

12 much of the witness' testimony as you deem reliable and reject

13 as much as you deem unworthy of acceptance.

14           You've heard evidence during the trial that witnesses

15 have discussed the facts of the case and their testimony with

16 the lawyers before the witnesses appeared in court.  You may

17 consider that fact when you are evaluating a witness'

18 credibility, but there is nothing either unusual or improper

19 about a witness meeting with lawyers before testifying.  Such

20 consultation conserves your time and the Court's time.  In fact,

21 it would be unusual for a lawyer to call a witness without such

22 consultations.  The weight, if any, you give to the fact or the

23 nature of the witness' preparation for his or her testimony or

24 the number of times the witness met with counsel is a matter

25 completely within your discretion.

 1          You've heard testimony of witnesses who are

 2   corrections officers.  The testimony of a witness who is

 3   employed by the State, including the Department of Corrections

 4   and Community Supervision, is not entitled to any more or less

 5   consideration or any greater or lesser weight by virtue of the

 6   witness' position than that of any other witness.

 7          You've also heard the testimony of witnesses who

 8   are -- actually, I think we don't have current, only former

 9   inmates.  The testimony of someone who was or is an inmate is

10   not entitled to any more or less consideration or any greater or

11   lesser weight by virtue of that fact than that of any other

12   witness.

13          It is your decision, after reviewing all of the

14   evidence, whether to accept or reject all or parts of the

15   testimony of a Corrections or inmate witness as you would any

16   other witness and to give that testimony whatever weight, if

17   any, you find it deserves.

18          Additionally, the fact that Plaintiff was incarcerated

19   at the time of the alleged incident has no bearing on whether

20   his rights were violated.  You should evaluate his credibility

21   in the same way that you would evaluate the credibility of any

22   witness.

23          You've heard what's called expert testimony.  An

24   expert is allowed to express an opinion on those matters about

25   which the witness has special knowledge and training.  Expert

1  testimony is presented to you on the theory that someone who is

2  experienced in the field can assist you in understanding the

3  evidence or in reaching an independent decision on the facts.

4          In weighing an expert's testimony, you may consider

5  the expert's qualifications, opinions and reasons for

6  testifying, the thoroughness and care of the expert's work and

7  the reasonableness of any assumptions the expert made as well as

8  all the other considerations that ordinarily apply when you are

9  deciding whether or not to believe a witness' testimony.  You

10  may give the expert testimony whatever weight, if any, you find

11  it deserves in light of all the evidence in this case.  You

12  should not, however, accept a witness' testimony merely because

13  the witness is an expert, nor should you substitute it for your

14  own reasoned judgment and common sense.  The determination of

15  the facts in this case rests solely with you.

16          It is the duty of the attorney for each side of a case

17  to object when the other side offers testimony or other evidence

18  which the attorney believes is not admissible.  Counsel also

19  have the right and duty to ask the Court to make rulings of law.

20  All those questions of law must be decided by me.  You should

21  not show any prejudice against an attorney or the attorney's

22  client because the attorney objected to the admissibility of

23  evidence or asked for a conference out of the hearing of the

24  jury or asked the Court for a ruling on the law.  As I already

25  indicated, my rulings on the admissibility of evidence do not

1  indicate any opinion about the weight or effect of such

2  evidence.

3           You are the sole judges of the credibility of all

4  witnesses and the weight and effect of all evidence.  If,

5  however, I sustained an objection to any evidence or if I

6  ordered evidence stricken or disregarded, that evidence must be

7  entirely ignored.

8           There are people whose names you heard during the

9  course of the trial, but who did not appear to testify.  I

10 instruct you that each party had an equal opportunity or lack of

11 opportunity to call any of these witnesses; therefore, you

12 should not draw any inferences or reach any conclusions about

13 what they would have testified to had they been called.  Their

14 absence should not affect your judgment in any way.

15          Now turning to the substantive instructions.

16          Plaintiff Nicholas Magalios claims that on September

17 3rd, 2017, while he was a prisoner at the Fishkill Correctional

18 Facility, he was subjected to the use of excessive force by

19 Fishkill corrections officers, including defendants Mathew

20 Peralta and Timothy Bailey and others.  Plaintiff further claims

21 that defendant Correction Officer Edward Blount and Officers

22 Peralta and Bailey observed this use of excessive force by their

23 fellow officers and failed to intervene to prevent and/or stop

24 that use of force.

25          Plaintiff now brings this lawsuit against Peralta,

1  Bailey, and Blount alleging that their actions violated

2  Plaintiff's right under the Eighth Amendment to the U.S.

3  Constitution not to be subjected to cruel and unusual

4  punishment.  Plaintiff is seeking an award of compensatory

5  damages and punitive damages against all three defendants.

6  All three defendants deny that they used any force, much less

7  excessive force, against Plaintiff on September 3rd, 2017.

8  Accordingly, defendants seek a judgment in their favor.

9  Plaintiff brings this claim pursuant to Section 1983 of Title 42

10  of the United States Code, which is the federal civil rights law

11  that provides a remedy for individuals who have been deprived,

12  under color of state law, of the rights, privileges and

13  immunities secured by the United States Constitution and federal

14  statutes.  I will refer to this law as Section 1983 for short.

15          Section 1983 holds that:

16          "Every person who, under color of any statute,

17  ordinance, regulation, custom or usage of any State or Territory

18  or the District of Columbia, subjects or causes to be subjected

19  any citizen of the United States or other person within the

20  jurisdiction thereof to the deprivation of any rights,

21  privileges or immunities secured by the Constitution and laws,

22  shall be liable to the party injured."

23          Don't worry.  I'm going to explain that.

24          To establish a Section 1983 claim, Plaintiff Magalios

25  must prove by a preponderance of the evidence each of the

1 following three elements:

2          First, the Plaintiff must prove that the defendants

3 were acting under color of state law at the time of the

4 incidents.  It is not contested that all three defendants, as

5 New York State Corrections Officers, were acting under color of

6 state law at the time of the alleged incident; therefore, I

7 direct you to find that Plaintiff has satisfied this first

8 element.

9          Second, the Plaintiff must prove that the defendants'

10 conduct deprived the Plaintiff of a right secured by the

11 Constitution of the United States; that is, the right to be free

12 from the use of excessive force under the Eighth Amendment.

13          Third, the Plaintiff must prove that the defendants'

14 acts were a proximate cause of injuries sustained by the

15 Plaintiff.

16          It is for you to decide, based on my instructions and

17 the evidence that has been presented in this trial, whether

18 Plaintiff has established the essential elements of his claim by

19 a preponderance of the evidence.

20          I will now explain the two contested elements of

21 Plaintiff's Section 1983 claim, elements two and three, in

22 greater detail.

23          The second element the Plaintiff must prove by a

24 preponderance of the evidence is that the defendant deprived

25 Plaintiff of a federal right.  In order for a Plaintiff to

1  establish this second element, he must show by a preponderance

2  of the evidence that, one, the defendant you are considering

3  acted in the manner that the Plaintiff alleges and, two, that

4  defendant's conduct caused the Plaintiff to suffer the loss of a

5  federal right.

6          Plaintiff Magalios brings separate claims against each

7  defendant.  First, Plaintiff alleges that he was subjected to

8  excessive force by Defendants Peralta and Bailey on September

9  3rd, 2017 and, second, Plaintiff alleges that all three

10  defendants failed to intervene on his behalf when his

11  constitutional rights were being violated and excessive force

12  was used against him by other officers.

13          I will discuss each of these in turn.  I'll start with

14  excessive force.

15          Plaintiff alleges that Defendants Peralta's and

16  Bailey's actions deprived him of his right as a convicted

17  prisoner to be free from the use of excessive force by prison

18  officials.

19          The Eighth Amendment to the United States

20  Constitution, which prohibits cruel and unusual punishment,

21  protects convicted prisoners from malicious and sadistic uses of

22  physical force by prison officials.  In this case, Plaintiff

23  claims that, without cause and without provocation on his part,

24  Defendants Peralta and Bailey used force against Plaintiff,

25  causing him to sustain injuries to his shoulder and bruising on

1  his body.  Plaintiff, therefore, has the burden of proving by a

2  preponderance of the evidence that, one, the defendant you are

3  considering used force against Plaintiff; two, that defendant's

4  use of such force was excessive and applied maliciously and

5  sadistically, for the purpose of causing harm, rather than in a

6  good-faith effort to maintain or restore order; and, three, that

7  defendant's use of such force caused harm to Plaintiff.

8        A correction officer has the right and duty to use

9  such reasonable force as is necessary under the circumstances to

10 maintain order and assure compliance with prison regulations.

11 Accordingly, in this context, excessive force is force that

12 exceeds what would be reasonable for a correction officer to use

13 for such purposes under all the facts and circumstances

14 presented by the situation.

15       Further, it is not enough to show that, in hindsight,

16 the amount of force used seems excessive.  Plaintiff must also

17 show that the defendant in question used force maliciously and

18 sadistically for the purpose of causing harm.

19       Maliciously means intentionally injuring another

20 without just cause or reason.  Sadistically means doing so with

21 excessive cruelty or a delight in cruelty.

22       In deciding whether Plaintiff has proven his claim,

23 you should consider, one, whether a defendant used force against

24 Plaintiff; two, whether there was a need for the application of

25 force; and, three, the relationship between that need for force,

1  if any, and the amount of force applied.

2          In considering whether there was a need for force, you

3  should consider all the relevant facts and circumstances that

4  the defendant reasonably believed to be true at the time of the

5  encounter.  Such circumstances include whether the defendant

6  reasonably perceived a threat to the safety of staff or inmates

7  and, if so, the extent of that threat.  In addition, you should

8  consider whether defendant made any efforts to temper the

9  severity of the force used.

10          You may also consider whether a Plaintiff was

11  physically injured and the extent of such injury.  Not every

12  push or shove, even if it may later seem unnecessary in the

13  peace of the courtroom, violates a prisoner's constitutional

14  rights, but a use of force can violate the Eighth Amendment even

15  if it does not cause significant injury.  Although the extent of

16  injuries to Plaintiff may help in your evaluation, even a use of

17  force with minimal injury can establish a cognizable

18  constitutional claim if force was applied maliciously and

19  sadistically.

20          Now turning to failure to intervene.

21          Plaintiff claims that each of the defendants was

22  obligated, but failed, to intervene and stop the use of force by

23  others.  You should only consider this claim if you find that

24  excessive force was used by someone.

25          A correction officer who, while not participating in

1  an assault upon an inmate, is present while it occurs may

2  nonetheless bear responsibility for any resulting constitutional

3  deprivation.  In addition to protecting prisoners from malicious

4  and sadistic uses of physical force by prison officials, the

5  Eighth Amendment to the United States Constitution requires

6  prison officials to take reasonable measures to guarantee the

7  safety of inmates in their custody.

8         In determining whether Plaintiff has proven this

9  claim, Plaintiff must establish, again by a preponderance of the

10 evidence, that, one, the defendant you are considering possessed

11 actual knowledge of the use by another correction officer of

12 excessive force; two, that defendant had a realistic opportunity

13 to intervene and prevent the harm from occurring -- that is,

14 that he had sufficient time to intercede and a capability to

15 prevent the harm; and, three, that defendant intentionally

16 refused or failed to take reasonable measures to end the use of

17 excessive force.

18        Only if you find that Plaintiff has shown by a

19 preponderance of the evidence that the defendant you are

20 considering had actual knowledge of the use of excessive force

21 by another officer, had a realistic opportunity to stop the use

22 of excessive force from occurring and intentionally refused or

23 failed to do so should you find that that defendant deprived

24 Plaintiff of a federal right by failing to intervene.

25        Plaintiff asserts that Defendants Peralta and Bailey

1  both used excessive force personally and failed to intervene in

2  the use of excessive force by others.  You will see on the

3  verdict form that you will be asked to state your verdict

4  separately for those defendants on each of those theories.  To

5  find for Plaintiff against Defendants Peralta or Bailey, you

6  must be unanimous as to whether he has established the use of

7  excessive force or the failure to intervene or both.  It is not

8  sufficient if some of you find that Plaintiff has established

9  the use of excessive force and others of you find that Plaintiff

10  has established failure to intervene.

11         The third element which Plaintiff must prove by a

12  preponderance of the evidence is that the Defendant's acts were

13  a proximate cause of injuries sustained by Plaintiff.  An act is

14  a proximate cause of an injury if it was a substantial factor in

15  bringing about that injury and if the injury was a reasonably

16  foreseeable consequence of the Defendant's actions.  Thus, if

17  you find that a Defendant deprived Plaintiff of a federal right

18  with the requisite state of mind, the third element requires you

19  to determine whether Plaintiff has established by a

20  preponderance of the evidence that the Defendant's acts

21  proximately caused injury to Plaintiff.

22         A proximate cause need not always be the nearest cause

23  in either time or space.  In addition, there may be more than

24  one proximate cause of an injury.  Many factors or the conduct

25  of two or more people may operate at the same time, either

1 independently or together, to cause an injury.

2          An act is a proximate cause of an injury if it was a

3 substantial factor in bringing about the injury and if the

4 injury was a reasonably foreseeable consequence of the

5 Defendant's acts.  In other words, if the Defendant's act had

6 such an effect in producing the injury that a reasonable person

7 would regard it as being a cause of the injury, then the act is

8 a proximate cause.

9          It is for you to decide whether Plaintiff has

10 established by a preponderance of the evidence each of the

11 essential elements of his 1983 excessive force or failure to

12 intervene claims against each of the Defendants.  If you find

13 that Plaintiff has satisfied all of the essential elements of

14 his Section 1983 claim as to a particular Defendant, you must

15 find in Plaintiff's favor on that claim as to that Defendant.

16 If you find that Plaintiff has failed to establish one or more

17 of the essential elements of his Section 1983 claim by a

18 preponderance of the evidence as to a particular Defendant, you

19 must return a verdict for that Defendant on that claim.

20          Although Defendants Peralta, Bailey, and Blount are

21 being represented by the same counsel, you are not to treat them

22 as one person.  Each defendant is entitled to fair, separate and

23 individual consideration of the case without regard to your

24 decision as to the other Defendants.  Although there are three

25 defendants in this case, it does not follow that if one is held

 1 liable, one or both of the others is liable as well.

 2 Now turning to damages.

 3         If Plaintiff has proven by a preponderance of the

 4 evidence that a Defendant is liable under Section 1983, then you

 5 must determine the damages to which the Defendant is entitled.

 6 You should not infer that Plaintiff is entitled to recover

 7 damages merely because I am instructing you on how to award

 8 damages.  It is your function to decide on liability, and I am

 9 instructing you on damages only so that you will have guidance

10 should you decide that Plaintiff is entitled to recover.

11         If you determine that Plaintiff is entitled to

12 damages, the damages you award must be fair and reasonable and

13 neither inadequate nor excessive.

14         As I said a moment ago, you may award damages only for

15 those injuries which you find Plaintiff has proven by a

16 preponderance of the evidence to have been a proximate result of

17 conduct by defendants in violation of Section 1983.

18         If Plaintiff has proved all essential elements of his

19 Section 1983 claim, then you must award him such sum of money as

20 you believe will fairly and justly compensate him for any injury

21 you believe he actually sustained as a proximate result of the

22 misconduct of any Defendant.  You shall award actual damages

23 only for those injuries which you find that Plaintiff has proven

24 by a preponderance of the evidence.  Moreover, you shall award

25 actual damages only for those injuries which you find Plaintiff

1  has proven to have been the proximate result of conduct by a

2  Defendant in violation of the Eighth Amendment.  That is, you

3  may not simply award actual damages for any injuries suffered by

4  Plaintiff.  You must award actual damages only for those

5  injuries that are a proximate result of conduct by one or more

6  Defendants that violated Plaintiff's federal rights.

7          Plaintiff may be entitled to damages for any physical

8  pain and suffering he experienced as a result of any Defendant's

9  conduct and that which can reasonably be expected in the future.

10  There is no requirement that evidence of the monetary value of

11  such intangible things as physical pain and suffering be

12  introduced into evidence.  In order to recover damages for such

13  injuries, Plaintiff must present credible evidence regarding

14  such injuries and corroboration of that testimony by the

15  circumstances of the case.

16          In addition, Plaintiff may be entitled to damages

17  resulting from an injury caused by any Defendant that aggravated

18  a pre-existing condition.  If you find that, before this

19  incident, Plaintiff had a shoulder injury or condition and

20  further find that, because of the incident, this injury or

21  condition was aggravated so as to cause increased suffering and

22  disability, then Plaintiff is entitled to recover for any

23  increased disability or pain resulting from such aggravation.

24  He is not, however, entitled to recover for any physical ailment

25  or disability which existed prior to the incident or for any

1 injuries or conditions from which he may now be suffering which

2 were not caused or contributed to by the incident.  The

3 Plaintiff can recover only for damages caused by aggravation of

4 the pre-existing condition, not the condition itself.  The

5 Plaintiff should be compensated only to the extent that you find

6 his condition was made worse by the Defendant's actions.

7 Generally, a defendant is liable for damages resulting from an

8 injury even if the underlying physical or mental condition of

9 the plaintiff is not known to the defendant if the defendant's

10 actions made the injury greater or worsened an existing

11 condition.  In other words, a defendant who injures a plaintiff

12 takes his victim as he finds him and is responsible for any

13 reasonably foreseeable damages that flow from the injury.  A

14 defendant is not responsible, however, for those injuries which

15 would have resulted purely from the original condition.  Lastly,

16 the fact that Plaintiff may have had a physical condition that

17 made him more susceptible to injury than a normal healthy person

18 does not relieve the Defendants of all liability for all

19 injuries sustained as a result of their actions.  The Defendants

20 are liable even though those injuries are greater than those

21 that would have been sustained by a normal healthy person under

22 the circumstances.

23          Plaintiff may be entitled to compensatory damages for

24 emotional distress, inconvenience and loss of enjoyment of life

25 he has suffered as a result of a Defendant's conduct.  But

Magalios v. Peralta - Jury Charge

1    Plaintiff's subjective testimony standing alone is generally

2    insufficient to sustain an award of emotional distress damages.

3    Rather, Plaintiff's testimony of emotional injury must be

4    substantiated by other evidence that such an injury occurred,

5    such as the testimony of witnesses to Plaintiff's distress or

6    the objective circumstances of the violation itself.

7         Evidence that a plaintiff has sought medical treatment

8    for the emotional injury, while helpful, is not required in

9    determining the amount of the award.  It may often be impossible

10   for you to arrive at a precise amount; nonetheless, it is

11   necessary to arrive at a reasonable award that is supported by

12   the evidence offered by Plaintiff.

13        Actual damages must not be based on speculation or

14   sympathy; they must be based on the evidence presented at trial.

15        If you find a Defendant is liable, you may also, in

16   your discretion, make an award of punitive damages.  Punitive

17   damages are awarded, in the discretion of the jury, to punish a

18   defendant for extreme or outrageous conduct and to deter or

19   prevent a defendant and others like that defendant from

20   committing such conduct in the future.

21        You may award Plaintiff punitive damages if you find

22   that the acts or omissions of a Defendant were done maliciously

23   or wantonly.  The definition of malice for purposes of punitive

24   damages is different than the definition of malice for purposes

25   of excessive force.  For purposes of punitive damages, an act or

1  failure to act is maliciously done if it is prompted by ill-will
2  or spite toward the injured person.  An act or failure to act is
3  wanton if done in callous disregard of or indifference to the
4  rights of the injured person.  Plaintiff has the burden of
5  proving by a preponderance of the evidence that a Defendant
6  acted maliciously or wantonly with regard to Plaintiff's rights.
7          If you find by a preponderance of the evidence that a
8  Defendant acted with malicious intent to violate Plaintiff's
9  federal rights or unlawfully injure him or if you find that a
10 Defendant acted with a callous disregard of Plaintiff's rights,
11 then you may award punitive damages against that Defendant.  An
12 award of punitive damages, however, is discretionary.  That is,
13 if you find that the legal requirements for punitive damages are
14 satisfied, then you may decide to award punitive damages or you
15 may decide not to award them.
16          In making this decision, you should consider the
17 underlying purpose of punitive damages.  Punitive damages are
18 awarded, in the jury's discretion, to punish a defendant for
19 outrageous conduct and to deter him and others like him from
20 similar conduct in the future.  Thus, in deciding whether to
21 award punitive damages, you should consider whether the
22 Defendant may be adequately punished by an award of actual
23 damages only or whether the conduct is so extreme and outrageous
24 that actual damages are inadequate to punish the wrongful
25 conduct.  You should also consider whether actual damages

1  standing alone are likely to deter or prevent the Defendant from

2  again committing any wrongful acts he may have committed or

3  whether punitive damages are necessary to provide deterrence.

4  Finally, you should consider whether punitive damages are likely

5  to deter or prevent other persons from committing wrongful acts

6  similar to those Defendants may have committed.

7         If you decide to award punitive damages against a

8  Defendant, these same purposes should be considered by you in

9  determining the appropriate sum of money to be awarded as

10  punitive damages.  That is, in fixing a sum to be awarded, you

11  should consider the degree to which the Defendant against whom

12  you are awarding punitive damages should be punished for his

13  wrongful conduct and the degree to which an award of one sum or

14  another will deter the Defendant you are considering or those

15  standing in his shoes from committing wrongful acts in the

16  future.

17         I want to reiterate that, although there are three

18  Defendants in this case, each Defendant is entitled to fair,

19  separate, and individual consideration of the case without

20  regard to your decision as to any other Defendant.

21  Nevertheless, you might find that more than one Defendant is

22  liable for a particular injury.  If two or more persons unite in

23  an intentional act that violates another person's rights, then

24  both of those persons are jointly liable for the acts of each of

25  them.  The law does not require the injured party to establish

1  how much of the injury was done by each particular Defendant

2  that you find liable.  Thus, if you find that all Defendants

3  acted jointly, then you may treat them jointly for the purposes

4  of deciding compensatory damages, but punitive damages, if you

5  decide to award them, must be decided on an individual basis.

6  Now a few words about your deliberations.

7          In a few minutes, you will go into the jury room to

8  begin your deliberations.  It is your duty as jurors to consult

9  with one another and to deliberate with a view to reaching an

10 agreement.  Each of you must decide the case for yourself, but

11 you should do so only after consideration of the case with your

12 fellow jurors.

13         Your verdict and the answers to each question on the

14 verdict form must be unanimous.  Discuss and weigh your

15 respective opinions dispassionately, without regard to sympathy,

16 without prejudice or favor toward any party, and adopt that

17 conclusion which in your good conscience appears to be in

18 accordance with the evidence.

19         As you deliberate, please listen to the opinions of

20 your fellow jurors and ask for an opportunity to express your

21 own views.  Every juror should be heard.  No one juror should

22 hold center stage in the jury room and no one juror should

23 control or monopolize the deliberations.  You should all listen

24 to one another with courtesy and respect.  If, after stating

25 your own view, and if, after listening to your fellow jurors,

1  you become convinced that your view is wrong, do not hesitate

2  because of stubbornness or pride to change your view.  On the

3  other hand, do not surrender your honest convictions and beliefs

4  concerning the weight or effect of the evidence solely because

5  of the opinions of your fellow jurors or because you are

6  outnumbered or for the mere purpose of returning a verdict.

7  Your final vote must reflect your conscientious belief as to how

8  the issues should be decided.  Your verdict must be unanimous.

9           You are not to discuss the case until all jurors are

10  present.  Five, six or seven jurors together is only a gathering

11  of individuals.  Only when all eight jurors are present do you

12  constitute a jury and only then may you deliberate.

13          Your first task when you retire to deliberate is to

14  vote on one of you to sit as your foreperson.  The foreperson

15  does not have any more power or authority than any other juror

16  and the foreperson's vote or opinion does not count for any more

17  than any other juror's vote or opinion.  The foreperson is

18  merely your spokesperson to the Court.  The foreperson will send

19  out any notes for the Court and, when the jury has reached a

20  verdict, the foreperson will notify Mr. Clark and give the

21  verdict in open court.

22          The exhibits will be loaded onto the computer in the

23  jury room.

24          If you want any of the testimony read back to you,

25  that can be arranged.  Bear in mind that it is not always easy

Magalios v. Peralta - Jury Charge

1  for the court reporter to locate the particular testimony that

2  you might want, so be as specific as you possibly can as to what

3  witness and what portion of that witness' testimony you would

4  like to hear.

5         Any communication with the Court should be in writing,

6  signed by your foreperson, and given to Mr. Clark, who will be

7  here in the courtroom while you are deliberating.  I will

8  respond to any questions or requests you have as promptly as

9  possible either in writing or by having you return to the

10 courtroom so I can speak with you in person.

11        If at any time you are not in agreement, you are not

12 to reveal the standing of the jurors -- that is, the split of

13 the vote -- to anyone, including me, at any time during your

14 deliberations.  So do not ever indicate, in a note or otherwise,

15 what the vote is or which way the majority is leaning or

16 anything like that.  Nobody outside the jury should know how the

17 jury stands on any issue until a unanimous verdict is reached.

18        And if you do have a note, rather than coming out of

19 the jury room and coming in here to find Mr. Clark, just call

20 him on his cell or send him a text, say you have a note.  Don't

21 say anything more than that.  He'll come to your door to get the

22 note.

23        If you took notes during the course of the trial, you

24 should not show your notes to or discuss your notes with any

25 other juror during your deliberations.  Any notes you have taken

Magalios v. Peralta - Jury Charge

1  are to be used solely to assist you.  The fact that a particular

2  juror has taken notes entitles that juror's view to no greater

3  weight than those of any other juror.  Finally, your notes are

4  not to substitute for your recollection of the evidence in the

5  case.  If you have any doubt as to any testimony, you may

6  request that the testimony be read back to you, as I mentioned a

7  moment ago.

8            Under your oath as jurors, you are to evaluate the

9  evidence calmly and objectively, without prejudice or sympathy.

10  You are to be completely fair and impartial.  You are to be

11  guided solely by the evidence or the lack of evidence in this

12  case.

13            It would be improper for you to consider, in deciding

14  the facts of the case, any personal feelings you may have about

15  the race, religion, national origin, sex, sexual orientation,

16  disability or age of any party or witness or any other such

17  irrelevant factor.  It would be equally improper for you to

18  consider any sympathy you might feel for an individual in a

19  lawsuit.  All parties are entitled to the same fair trial at

20  your hands.  They stand equal before the law and are to be dealt

21  with as equals in this court.

22            When you retire to deliberate, the foreperson will

23  receive a verdict form on which to record your verdict.  You

24  will also each have a copy of the form.  You will see that it

25  has various questions for you to answer in the order they

1  appear.  Follow the instructions on the verdict form regarding

2  which questions you need to answer.  When the foreperson has

3  completed the verdict form, the foreperson must sign it.  And

4  the form will be marked as a Court Exhibit.

5          The most important part of this case, members of the

6  jury, is the part that you, as jurors, are about to play as you

7  deliberate on the issues of fact.  It is for you and you alone

8  to decide whether Plaintiff has proven the elements of his claim

9  against each Defendant by a preponderance of the evidence.  I

10  know you will try the issues that have been presented to you

11  according to the oath that you have taken as jurors.  In that

12  oath, you promised that you would well and truthful try the

13  issues in this case and render a true verdict according to the

14  law and the evidence.  Your function is to weigh the evidence in

15  the case and reach your decisions based solely on the evidence.

16  Your duty is to decide the issues before you fairly and

17  impartially and to see that justice is done.

18          I now have to spend a moment with counsel, so please

19  sit where you are without speaking.

20          Do counsel need to see me on anything about the

21  charge?  Okay.  Let's gather over here, but as distantly as we

22  can.

23          (At the sidebar)

24          THE COURT:  Did I miss anything?

25          MR. MILLER:  Just one word, your Honor, on page 24,

Magalios v. Peralta - Jury Trial

```
 1   the last line.
 2          THE COURT:  Yes.
 3          MR. MILLER:  What you read to the jury was outrageous
 4   conduct and to deter him instead of or.  I haven't had time to
 5   evaluate the importance of that error, but you did say and.
 6          THE COURT:  Okay.  I'll let them know that I did that.
 7   Do defendants have any objections to the charge as read?
 8          MS. ACOSTA-PETTYJOHN:  No.  We're fine, your Honor.
 9          THE COURT:  Okay.
10          MR. MILLER:  That's it.
11          (In open court; jury present)
12          THE COURT:  I am told that, at the bottom of page 24,
13   I misread the last line.  That sentence should read:  Punitive
14   damages are awarded, in the jury's discretion, to punish a
15   defendant for outrageous conduct or to deter him and others like
16   him from similar conduct in the future.  I may have said 'and,'
17   but it's "or."
18          With that, ladies and gentlemen, now you can discuss
19   the case.  I will assume, unless I hear otherwise, that you want
20   to go until 2:30.  If you decide you want to stay and that's
21   okay with everybody, just send me a note letting me know.  If I
22   don't hear otherwise, I'll assume you want to leave at 2:30 and
23   that you want to start at 9:30 tomorrow.  There is no time
24   pressure.  Take as long as you need.  And as I said, if you have
25   any need to communicate with me, write it in a note, send Walter
```

1    a text and he'll come get it from you, and I will respond to you

2    as soon as I can.  I'm going to let the lawyers go now to get

3    their lunch, so if you have a note for me between now and 2:00,

4    let's say, you might not get an immediate answer because I'll

5    need to confer with them, but I'll get you an answer to any of

6    your notes as soon as I can.

7              And you may now discuss the case and begin your

8    deliberations.  Thank you very much.

9              (At 1:15 p.m., the jury commenced deliberations)

10             THE COURT:  If you all want to go out and grab a bite,

11   that's fine.  Just be back by 2.  And leave your number with

12   Walter so, if we do get a note, he can call you.  Otherwise, I

13   will assume that you are either going to be in the courtroom or

14   somewhere on the fifth floor, not lurking by the jury room door.

15   Probably best to stay in here because there just isn't a lot of

16   room to roam around out there now with our new jury rooms.  And

17   the jurors do have to leave that room to go to the restroom, so

18   probably best not to hover near the jury room.  And we'll see

19   what they want to do.

20             All right.  Thank you, everybody.

21             MS. ACOSTA-PETTYJOHN:  Thank you.

22             MR. TURKLE:  Thank you, your Honor.

23             (Recess pending verdict)

24             (In open court; jury not present)

25             THE COURT:  We have a note.  "We all need to leave at

1  3 p.m. today and return tomorrow."

2          So I guess I can just write on it.  That's fine.

3  I generally have them come back in when they're ready to leave

4  just to give them the speech about not discussing the case and

5  all that, so maybe I'll just -- I mean, with your permission,

6  maybe I'll just have Walter tell them that that schedule is fine

7  and that I'll have them come back in the courtroom just before

8  3.

9          MR. MILLER:  That's fine, your Honor.

10          MS. ACOSTA-PETTYJOHN:  Yes, that's fine, your Honor.

11          THE COURT:  All right.

12          So, Walter, you can just tell them.  I assume they

13  mean they want to start at 9:30, but if they mean a different

14  time, they can tell me when they come back in at 3.

15          It's not signed.  If you want to read the tea leaf of

16  who the foreperson is, I can't help you.  If I had to guess, I

17  would say it looks like a woman's writing, but you can never be

18  sure about that.

19          So I will come back a few minutes before 3 if there's

20  no news between now and then.

21          (Recess pending verdict).

22          (In open court; jury not present)

23          THE COURT:  That other note was Court Exhibit 3.  This

24  will be Court Exhibit 4.

25          "Can we see/have actual pages of pictures of

1  Plaintiff's injuries."

2          Which is kind of a weird question because isn't that

3  on the computer?  Aren't those photos on the computer.

4          MS. ACOSTA-PETTYJOHN:  Yes.

5          THE COURT:  I guess they want hard copies, which is

6  funny because I would think the digital copies would be better,

7  but maybe they don't like the monitors in there or something.

8  It's Exhibit J, I think.  No, no.  J is the exhibits of photos

9  of the jail.  The photos of the injuries are Exhibit 2.

10 Does anybody have an extra set?

11         MR. MILLER:  I do, your Honor.  These are copies.  I

12 don't know if you have the originals.

13         MS. ACOSTA-PETTYJOHN:  I don't have the originals.

14         THE COURT:  Who has the earliest -- I was actually a

15 little baffled as to why these pictures were such poor quality.

16 I assumed they were digital.  Are the digital versions what's on

17 the computer or is what's on the computer copies of copies?

18 Because these aren't real good.  Anyway, they are the best we

19 have.  The ones that were put onto the jury's computer, were

20 they the original digital photos or were they just --

21         MR. MILLER:  Those were copies of what we got in

22 discovery, so -- they're probably checking to see if they have a

23 better copy.

24         THE COURT:  Well, but I'm asking, so what the jury has

25 in the computer isn't a digital image?  It was a digital image

Magalios v. Peralta - Deliberations

1  of a paper image?

2          MR. MILLER:  That's it, yes.

3          THE COURT:  Yes.  I don't know why you didn't use the

4  originals.  I just work here.

5          MS. ACOSTA-PETTYJOHN:  I don't know if these are

6  better than what they have, but this is also what I have.

7          (Pause)

8          MR. MILLER:  These look about the same.

9          MS. ACOSTA-PETTYJOHN:  Yes.

10          MR. MILLER:  You do not have the --

11          MS. ACOSTA-PETTYJOHN:  No.  That's all we have.

12          THE COURT:  Where would the original digital images be

13  located?

14          MS. ACOSTA-PETTYJOHN:  When we received the photos,

15  your Honor, we received a copy of the photos in the file.

16          THE COURT:  Okay.  So your homework for today is to

17  see if you can get the first-generation digital images, because

18  that's clearly -- clearly, they want a better version of these

19  pictures.

20          Now, I'm thinking out loud.  However, I'm not sure,

21  the record being closed, that I could give them a better --

22  Could you quiet down, please.

23          At this point, the record being closed, I'm not sure a

24  better photo could be added to it anyway, so I withdraw what I

25  just said.

Magalios v. Peralta - Deliberations

1  We'll just send them the paper copies and I'll have Walter tell

2  them this is the best we have, if that's all right with you.

3           MR. MILLER:  Unless we stipulate to having them locate

4  the original copies.

5           THE COURT:  Well, if the parties are in agreement, I

6  think I can do it.  If they can locate the digital copies, we

7  can give them digital copies, if both sides are amenable.

8           MS. ACOSTA-PETTYJOHN:  I don't want agree to anything

9  now, your Honor, because I have to find out if we can even

10 locate those copies between now and tomorrow, your Honor.

11          THE COURT:  Well, of course, but, again, I'm

12 scratching my head as to why neither lawyer asked for them given

13 how crummy these photos are, but I just work here.

14          I think Mr. Clark should bring in the paper photos,

15 say that this is the best we have on hand, and if better ones

16 can be located and the parties can agree, then we'll pleasantly

17 surprise the jury tomorrow with that, but we shouldn't suggest

18 to them that they're going to get anything better.

19          Literally just say this is the best we have and hand

20 them to them.

21          All right.  See you at 3 unless we get more notes.

22          (Recess pending verdict).

23          (In open court; jury present)

24          THE COURT:  Hi, everyone.

25          I just want to remind you before you go home don't

```
 1  discuss the case.  If you go home and your boss or your spouse

 2  or your family or friends or anybody says, you know, how's the

 3  trial going, just say it's going.  Don't even tell them you're

 4  in deliberations because then they'll start asking questions and

 5  you don't want to answer them.  So just say it's moving along

 6  and that the Judge has told you not to go into it any further.

 7           Don't do any research on your own.  I won't tell you

 8  not to think about it because I'm sure you'll be thinking when

 9  you go home tonight, but don't discuss it.

10           I'm assuming you want to resume at 9:30.

11           THE JUROR:  Nine.

12           THE COURT:  Nine?  Okay.  Very good.  Start at 9.

13           We'll have your lunch at around the same time.  And

14  we'll wait to hear from you.

15           When you arrive in the morning, you don't have to come

16  in here first.  So as soon as you're all present, you can start

17  deliberating.  And we will be at your service.

18           Have a good evening.  Drive carefully.  See you

19  tomorrow.

20           (In open court; jury not present)

21           THE COURT:  All right.  I'll see everyone -- well, be

22  here at 9.  I mean, I may not see you at 9.  I will see you when

23  they have a note.

24           If you do end up being able to get a better version of

25  those photos, confer with Mr. Miller about what you want to do
```

 1   and let Walter know to let me know.  If we can get them better

 2   versions of the photos, I'll send them in.  We'll figure it out.

 3   All right.  Have a good night, everyone.

 4           MR. MILLER:  Thank you, your Honor.

 5           MS. ACOSTA-PETTYJOHN:  Thank you, your Honor.

 6           MR. TURKLE:  Thank you.

 7           (Adjourned to Friday, April 30, 2021 at 9:00 a.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2

 3   Examination of:

 4

 5   DR. RAMESH GIDUMAL

 6   Direct Examination by Mr. Turkle. . . . . . . . . . .500

 7   Cross Examination by Mr. Miller . . . . . . . . . .516

 8

 9

10                  E X H I B I T S

11

12   Exhibit No.                              Received

13

14   Defendant's A . . . . . . . . . . . . . . . . . . .500

15   Defendant's B . . . . . . . . . . . . . . . . . . .500

16   Defendant's C . . . . . . . . . . . . . . . . . . .500

17   Defendant's D . . . . . . . . . . . . . . . . . . .500

18

19

20

21

22

23

24

25
```