UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
NICHOLAS MAGALIOS,

                                  Plaintiff,

      - against -

C.O. MATHEW PERALTA,
C.O. TIMOTHY BAILEY, and
C.O. EDWARD BLOUNT,

                               Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 19-CV-6188 (CS)

Appearances:

Edward Sivin
Sivin, Miller & Roche LLP
New York, New York
*Counsel for Plaintiff*

Jessica Acosta-Pettyjohn
Bruce J. Turkle
Assistant Attorneys General
Office of the Attorney General of the State of New York
New York, New York
*Counsel for Defendants*

Seibel, J.

      Before the Court is Defendants' motion for a new trial or remittitur of the damages award. (ECF No. 45.)

## I.   BACKGROUND

      I assume the parties' familiarity with the factual and procedural background of the case. Plaintiff Nicholas Magalios brought this action pursuant to 42 U.S.C. § 1983, alleging that on September 3, 2017, while he was a prisoner at Fishkill Correctional Facility ("Fishkill"), he was the subject of excessive force, in that he was beaten without provocation by Fishkill corrections

officers, including Defendants C.O. Mathew Peralta and C.O. Timothy Bailey.  (ECF No. 1 ¶ 15.)  He further asserted that Defendants Peralta, Bailey, and C.O. Edward Blount observed the actions of their fellow officers and deliberately failed to prevent and/or stop these actions, despite having reasonable opportunities to do so.  (*Id.* ¶¶ 16-18.)  Plaintiff maintained that Defendants' actions, which were undertaken under color of state law, were sadistic and malicious and otherwise not justified, in violation of Plaintiff's rights under the Eighth Amendment.  (*Id.* ¶¶ 20, 22.)  Plaintiff further alleged that Defendants' actions resulted in serious injuries, including an injury to his shoulder that required surgical repair.  (*Id.* ¶ 19.)  Defendants denied all of Plaintiff's allegations, and maintained that they did not use any force, much less excessive force, against Plaintiff on the date in question.  (*See* ECF No. 10.)

The case was tried between April 26 and April 30, 2021, and the jury returned a verdict finding Defendants jointly and severally liable for $50,000 in compensatory damages, and imposing punitive damages of $350,000 against Peralta, $350,000 against Bailey, and $250,000 against Blount.

## II.    LEGAL STANDARD

### A.    Motion for a New Trial

A "court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  A motion for a new trial "may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in

2

admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

Whether to grant a new trial pursuant to Rule 59 is in the district court's "sound discretion." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 143 (2d Cir. 1998). "[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (cleaned up). In other words, "[a] court considering a Rule 59 motion for a new trial . . . should only grant such a motion when the jury's verdict is egregious." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) (cleaned up).

**B.**     **Remittitur of Damage Awards**

"When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on the question of damages. Alternatively, the court may grant remittitur," *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 411 (S.D.N.Y. 1996) (cleaned up), which "is the process by which a court compels a plaintiff to choose between a reduction of an excessive verdict and a new trial," *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 579 (S.D.N.Y. 2011) (cleaned up).

"Remittitur is appropriate to reduce verdicts only in cases in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award." *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1027 (2d Cir. 1991) (cleaned up). "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990). "A verdict shocks the judicial conscience only if it surpasses an upper limit, and whether that has been surpassed is not

3

a question of fact with respect to which reasonable persons may differ, but a question of law." *Jackson v. Tellado*, No. 11-CV-3028, 2018 WL 4043150, at *2 (E.D.N.Y. Aug. 24, 2018) (cleaned up).

### III.   DISCUSSION

Defendants' memorandum of law, (ECF No. 46), focuses exclusively on the punitive damages awarded by the jury, which Defendants contend are excessive.  "Punitive damages are available in a § 1983 action when a defendant's conduct is shown to be motivated by an evil motive or intent or when it involved reckless or callous indifference to the federally protected rights of others."  *Thomas v. Kelly*, 903 F. Supp. 2d 237, 265 (S.D.N.Y. 2012) (cleaned up). "Although a jury has wide discretion, a district court may refuse to uphold a punitive damage award when the amount is so high as to shock the judicial conscience and constitute a denial of justice."  *Id.* at 265-66 (cleaned up).  "The Second Circuit instructs that '[i]n gauging excessiveness, [courts] must keep in mind the purpose of punitive damages:  to punish the defendant and to deter him and others from similar conduct in the future."  *Anderson v. Osborne*, No. 17-CV-539, 2020 WL 6151249, at *7 (S.D.N.Y. Oct. 20, 2020) (alterations in original) (quoting *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996)).

"In determining whether a punitive damages award is excessive, federal trial courts reviewing a jury's verdict should relate the facts of the underlying case, construed in the light most favorable to the nonmoving party, to the three guideposts used by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)."  *Thomas*, 903 F. Supp. 2d at 266 (cleaned up).  These three guideposts, or "*Gore* factors," are:  (i) "degree of reprehensibility" of the defendants' conduct; (ii) the "disparity between the harm or potential harm and the punitive damages award;" and (iii) the difference between the punitive damages award and "the civil and

criminal penalties for comparable misconduct." *DiSorbo v. Hoy*, 343 F.3d 172, 186-87 (2d Cir. 2003).

A. **Degree of Reprehensibility**

The first *Gore* factor is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. The Second Circuit has described certain "aggravating factors that are associated with particularly reprehensible conduct and contribute to the sense that some wrongs are more blameworthy than others," including, but not necessarily limited to, "whether a defendant's conduct was violent or presented a threat of violence" and "whether a defendant acted with deceit or malice as opposed to acting with mere negligence." *Lee*, 101 F.3d at 809.

Contrary to Defendants' argument, the evidence at trial, viewed in the light most favorable to Plaintiff, amply supports a finding that Defendants' conduct was reprehensible, violent, deceitful, and malicious. *See Wright v. Musanti*, 887 F.3d 577, 588 (2d Cir. 2018) ("[Defendant] asserts that the award of punitive damages was erroneous because there was no evidence of the requisite 'high degree of moral turpitude' required to impose that sanction. . . . But this unadorned argument is premised on [defendant]'s version of the facts."). As I noted on the record at trial after the jury had been dismissed, this was one of the strongest cases for excessive force I have seen in my years on the bench, and I believe the evidence greatly exceeded a preponderance. (ECF Nos. 50, 52-55 ("Tr."), at 623:7-8.)[1]

---

[1] The Trial Transcript was filed under five separate docket entries, but it is consecutively paginated across those entries. For the sake of convenience, I refer to the Transcript as one document, and citations to page numbers refer to the numbers in the upper right-hand corner of each page, rather than the numbers generated by the Court's Electronic Case Filing ("ECF") System.

5

Plaintiff, whom the jury found credible, testified that the Defendants targeted him without justification;[2] that they removed any potential witnesses from the room in advance of the assault; and that Bailey held him down while Peralta and others he could not identify brutally kicked and punched him for approximately thirty to sixty seconds while Blount and others he could not identify looked on and did nothing. (*Id.* at 151:13-152:22, 153:13-154:11, 165:11-170:12.) Other witnesses, who testified that they either heard the assault take place or saw Plaintiff shortly afterwards, corroborated his account. (*Id.* at 236:5-239:19, 248:6-250:10, 252:4-256:14, 337:1-343:11, 348:11-356:6.) Plaintiff and other witnesses testified about the significant bruising and marks on Plaintiff's back, (*id.* at 178:3-24, 238:16-239:14, 250:4-7, 341:5-20, 342:14-17), including a mark in the shape of a boot print, (*id.* at 239:8-14), and abrasions and lacerations on his knees, (*id.* at 178:3-20). In addition to testimony from Plaintiff, (*id.* at 179:25-180:20, 183:2-186:20), an expert testified that the assault aggravated a shoulder injury, which required surgery, (*id.* at 194:3-208:3, 213:24-223:10). The jury obviously found Defendants responsible for the beating, and the fact that it awarded Plaintiff $50,000 in compensatory damages suggests that they accepted at least some, if not all, of the testimony about the nature of the injuries caused by Defendants.

---

[2] Plaintiff's theory, which was borne out by corroborating witnesses, was that he was targeted because of an interaction in the visiting room. According to Plaintiff, when Plaintiff greeted his wife with a hug and a kiss, a correction officer yelled out, "No fucking kissing!" (Tr. at 141:10-16, 265:21-266:4.) Defendant Peralta then came over to Plaintiff and asked, "Is there a fucking problem?" (*Id.* at 142:10-11, 266:14-17.) Plaintiff responded that he wanted to know why he had gotten yelled at when regulations allow an embrace at the beginning of a visit. (*Id.* at 142:11-13.) Peralta responded, "Is there a fucking problem?" to which Plaintiff replied that there was not. (*Id.* at 13-15.) Thereafter Peralta and the other officers repeatedly stared at Plaintiff and appeared to be discussing him, in response to which Plaintiff, through his facial expression, nonverbally questioned why he was being singled out. (*Id.* at 142:17-143:4.)

The Second Circuit has noted that a law enforcement officer's "abuse[] of a position of respect and authority to commit malicious . . . acts of violence," as the jury found to have happened here, is "reprehensible" and constitutes the sort of misconduct that punitive damages awards serve to deter. *DiSorbo*, 343 F.3d at 188. The evidence convincingly showed that the attack here was not a misjudgment in an evolving situation or even an overreaction to a provocation, but rather a totally inexcusable premeditated targeting of an inmate who had done nothing to deserve it. I thus find it disturbing that Defendants' counsel would argue that "there is no evidence in the record that Defendants acted maliciously or wantonly to support a punitive damage award," (ECF No. 48 at 1), or that "the reprehensibility factor does not weigh in favor of a high punitive damages award," because "the only demonstrable injuries sustained by Plaintiff were a few red marks, minor injuries that hardly speak of a malicious assault where Plaintiff was allegedly kicked and punched for approximately thirty to sixty seconds," (ECF No. 46 at 6).[3] Counsel's obligation to advocate for their clients does not require them to bury their heads in the sand or to risk their own credibility.

Defendants also created false reports and gave false testimony that categorically denied using any force against Plaintiff and contended that Plaintiff fabricated the story entirely. (Tr. at 391:8-394:15, 430:3-432:25, 433:17-21, 450:23-452:17, 455:19-457:20, 464:10-14, 475:13-477:14.) Because the jury accepted Plaintiff's version of events, it also necessarily found that

---

[3] Defendants' attempt to disregard the shoulder injury by relegating it to a footnote and noting that Plaintiff has had no treatment for it since his release, (*see* ECF No. 46 at 6 n.2), is wholly unconvincing. Had the jury believed that the assault caused only "a few red marks," the compensatory damages award likely would not have approached $50,000. Further, Plaintiff and his expert explained that the surgery he had while still incarcerated had largely fixed the problem by relieving Plaintiff's severe pain, and that it required no further treatment other than a regimen of anti-inflammatory medications and injections that Plaintiff could choose to take if he experienced severe pain again in the future. (Tr. at 185:10-186:10, 222:22-223:10, 228:2-229:4, 281:13-282:10.)

7

Defendants lied repeatedly throughout those reports and that testimony, demonstrating the malicious and deceitful nature of their conduct. *See Jennings v. Yurkiw*, 18 F.4th 383, 391 (2d Cir. 2021) ("The reprehensible nature of the officers' conduct is underscored by the elaborate steps they took to cover up their misconduct."); *Theodat v. City of N.Y.*, No. 16-CV-3977, 2019 WL 4385794, at *8 (E.D.N.Y. Sept. 13, 2019) (evidence that defendant was "lying when he testified that he did not remember" the subject events of the lawsuit supported finding of deceit or malice), *aff'd on other grounds*, 818 F. App'x 79 (2d Cir. 2020) (summary order).[4]

Accordingly, the reprehensibility factor militates in favor of a substantial punitive damages award.

### B. Disparity Between Harm and Amount of Punitive Damages Award

With respect to the second guidepost, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003). "Courts often consider the ratio of the punitive damages award to the compensatory award, and consider whether that ratio is reasonable in the circumstances of the case." *Thomas*, 903 F. Supp. 2d at 267 (cleaned up). "The Supreme Court has repeatedly stressed the impossibility of making any bright-line test," however, "as the propriety of the ratio can vary enormously with the particular facts of the case." *Id.* "When the compensable injury was small but the reprehensibility of the defendant's conduct was great, the ratio of a reasonable punitive award to

---

[4] Some of Defendants' testimony was laughable. For example, Peralta testified that after learning on September 4, 2017 of Plaintiff's allegation against him, he gave no thought to what had happened the day before or with whom he had worked in the visiting room on that day, (Tr. 490:3-8); claimed not to recognize the visiting room logbook despite its containing his name and his September 3 assignment, (Tr. 409:25-412:22); and purported not to understand what Plaintiff's counsel meant when counsel asked him to assume something, (Tr. 412:23-413:7).

the small compensatory award will necessarily be very high." *Payne v. Jones*, 711 F.3d 85, 102 (2d Cir. 2013). Accordingly, although courts have "held that a 4:1 ratio might be close to the line of constitutional impropriety," such a ratio "may comport with due process in cases where a particularly egregious act" occurred and the compensatory damages awarded by the jury do not appear to have accounted for it. *Rosas v. Balter Sales Co.*, No. 12-CV-6557, 2018 WL 3199253, at *11 (S.D.N.Y. June 29, 2018) (cleaned up); *see Thomas v. iStar Financial, Inc.*, 652 F.3d 141, 149 (2d Cir. 2010) ("[T]he Supreme Court has concluded that [a punitive damages] award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.") (cleaned up). While this calculation may be a helpful frame of reference for courts, "[t]he Second Circuit has generally been reluctant to place much weight on the ratio of punitive to compensatory damages." *Jennings v. Yurkiw*, No. 14-CV-6377, 2019 WL 6253813, at *5 (E.D.N.Y. Nov. 22, 2019), *aff'd* 18 F.4th 383 (2d Cir. 2021); *see Payne*, 711 F.3d at 103 (the "ratio of punitive to compensatory damages, by itself, tells nothing about whether the punitive award was excessive").

Additionally, there is an absence of explicit direction from the Second Circuit as to how courts should properly compute such ratios where, as here, defendants are jointly and severally liable for compensatory damages but individually liable for separate amounts of punitive damages. *See Alla v. Verkay*, 979 F. Supp. 2d 349, 374 (E.D.N.Y. 2013). In *Jennings* the Second Circuit, without commenting on this issue directly, weighed the ratio of total punitive damages to total compensatory damages. 18 F.4th at 391-92. Judge Briccetti took this same approach in in *Anderson v. Osborne*, No. 17-CV-539, 2020 WL 6151249, at *8 (S.D.N.Y. Oct. 20, 2020). Using this method, the ratio of punitive damages to compensatory damages is 19:1, which is much greater than the 4:1 ratio in *Jennings* and the 7.67:1 ratio in *Anderson*.

Other district courts in the circuit have taken different approaches. Some have adopted the Eighth Circuit approach of "'divid[ing] the individual punitive damages awards by the individual pro rata shares of the actual damages,'" *Alla*, 979 F. Supp. 2d at 374 (alteration in original) (quoting *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000)). Still other courts have compared each Defendant's punitive damages to the total amount of actual damages. *See Bouveng v. Nyg Capital LLC*, 175 F. Supp. 3d 280, 347 (S.D.N.Y. 2016). Respectfully, I think that the approach taken in *Bouveng* provides the most appropriate frame of reference here. "Joint and several liability," by its nature, "imposes on each wrongdoer responsibility for the *entire* damages awarded, even though a particular wrongdoer's conduct may have caused only a portion of [it]." *Rodick v. City of Schenectady*, 1 F.3d 1341, 1348 (2d Cir. 1993) (emphasis added) (cleaned up). Punitive damages, in contrast, serve "to punish [a] *particular defendant*." *Wright*, 887 F.3d at 588 (emphasis added). In other words, compensatory damages are not calculated defendant-by-defendant, but punitive damages are. It thus seems counterintuitive to prorate the collective compensatory damages amount and compare that to an individual punitive damages amount, or to disregard the individual nature of punitive damages and instead compare the total punitive damages amount to the compensatory damages amount. Accordingly, for purposes of this analysis, the resulting ratios between $350,000, $350,000, and $250,000 in punitive damages and $50,000 in compensatory damages are, respectively, 7:1, 7:1, and 5:1.

In weighing whether these ratios are excessive, the *Gore* Court noted: "[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of . . . damages. A higher ratio may also be justified in cases in which the injury is hard to detect . . . ." *Gore*, 517

10

U.S. at 582; *cf. State Farm*, 538 U.S. at 426.  The Second Circuit has also elaborated that "when the harm to the plaintiff is substantial, and sufficient to result in a compensatory award large enough to finance a reasonable contingent attorneys' fee, even a single digit ratio can mean a high punitive award."  *Payne*, 711 F.3d at 102-03.  Here, where the $50,000 compensatory damages award appears to adequately reflect the harm done to the Plaintiff, and that harm is not difficult to detect, the 7:1, 7:1, and 5:1 ratios appear to be high.

      **C.**      **Difference Between Remedy and Penalties in Comparable Cases**

            **1.**      **Criminal Penalties**

"Where a jury imposes punitive damages for a violation of § 1983, the penalties imposed under federal criminal law offer a useful comparison."  *Jennings*, 18 F.4th at 393; *see Anderson v. Aparicio*, 25 F. Supp. 3d 303, 312 (E.D.N.Y. 2014), *aff'd sub nom. Anderson v. County of Suffolk*, 621 F. App'x 54 (2d Cir. 2015) (summary order).  Plaintiff argues that the individual punitive damages awards against Defendants here comport with potential penalties under federal law for similar conduct.  (ECF No. 47 at 15-17.)  Defendants do not address this argument.  (*See* ECF No. 48.)  The maximum fine for a federal criminal civil rights violation is $250,000 or twice the gross loss from the offense.  *See* 18 U.S.C. §§ 241, 242, 3571.  While "the officers were unquestionably on notice that abuse of power could lead to a term of imprisonment as well as to a substantial fine," *Jennings*, 18 F.4th at 393, two of the awards here exceed the $250,000 figure in the criminal statute, and the one that equals it is for the less culpable Defendant.  Thus this comparison suggests the awards are somewhat excessive.

## 2. Punitive Damages Awards in Similar Cases

The Second Circuit has noted that "[c]ourts have often found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases." *Payne*, 711 F.3d at 104.

Courts within this circuit have upheld a wide range of punitive damage awards for cases of excessive force and failure to intervene. *See, e.g.*, *Jennings*, 18 F.4th at 389, 393-94 (affirming punitive damages awards of $250,000, $75,000, and $30,000 against individual defendants for a total of $355,000); *Jackson*, 2018 WL 4043150, at *9 (finding punitive damages awards for individual officers ranging from $50,000 to $400,000, for a total of $2,675,000, to be reasonable in case of severe injury); *Greenaway v. County of Nassau*, 327 F. Supp. 3d 552, 571 (E.D.N.Y. 2018) (upholding jury award of $100,000 in punitive damages per officer); *Denman v. Sanders*, No. 05-CV-25, 2006 WL 452018, at *9 (S.D.N.Y. 2006) (remittitur of punitive damages to $200,000 in tandem with a $50,000 compensatory damages award).[5]

Perhaps the most recent factually similar case to this one is *Anderson v. Osborne*, in which Judge Briccetti upheld punitive damages awards against the individual officers ranging from $50,000 to $275,000, for a total of $575,000, in tandem with a $75,000 compensatory damages award. 2020 WL 6151249, at *7-9. In doing so, Judge Briccetti observed:

> Clearly, the jury concluded plaintiff was punched, stomped, and beaten without provocation. Furthermore, in crediting plaintiff's version of events, the jury plainly discredited the defendants' testimony and other record evidence, and concluded defendants lied to cover up their use of unprovoked, excessive force against plaintiff, an inmate in their charge.
>
> The jury's varying punitive damages awards against each defendant further demonstrates the jury's careful discrimination as to the evidence, and that the jury separately weighed each defendant's conduct in view of his individual culpability.

---

[5] These figures are not adjusted for inflation.

12

> Moreover, the ratio of punitive damages to compensatory damages for each individual defendant is less than 4:1 in each case.

*Id.* at *8.[6]

*\*\*\**

Courts evaluating excessiveness "must keep in mind the purpose of punitive damages: to punish the defendant and to deter him and others from similar conduct in the future." *Lee*, 101 F.3d at 809 (cleaned up). The task before the Court, then, is "to determine what amount[s] would be sufficient to punish th[ese] particular defendant[s] and deter others of similar mind." *Wright*, 887 F.3d at 588 (cleaned up). While I believe that the jury's award here is somewhat excessive in light of potential criminal penalties, awards in similar civil cases, and the aforementioned ratio of punitive to compensatory damages, the reprehensible nature of the Defendants' conduct, and the fact that similar acts often go undetected in correctional facilities, mandates a significant punitive damages award to deter the Defendants, and others like them, from engaging in similar acts in the future.

Accordingly, I find that a remittitur of the punitive damages awards to $200,000 for Defendant Peralta, $200,000 for Defendant Bailey, and $100,000 for Defendant Blount is appropriate. This reduces the ratio of punitive damages to compensatory damages to 4:1, 4:1, and 2:1, respectively, and conforms with the limits of fines imposed under federal law for

---

[6] I am puzzled by Defendants' statements in their memorandum that reliance on *Anderson* is "grossly misplaced" because "[t]he record evidence here did not demonstrate that Defendants engaged in comparable violent conduct" and that unlike this case, "the jury in *Anderson*, 'plainly discredited the defendants' testimony and other record evidence, and concluded defendants lied to cover up their use of unprovoked, excessive force against plaintiff, an inmate in their charge.'" (ECF No. 48 at 6 (quoting *Anderson*, 2020 WL 6151249, at *8).) While I agree that the injuries suffered by Plaintiff and the plaintiff in *Anderson* were not identical (as reflected in the $25,000 difference in compensatory damages), Judge Briccetti's characterization of the jury's findings in *Anderson* could just as easily have been written about the jury's findings as to Defendants' conduct in this case.

13

comparable conduct.  Further, the total punitive damages amount – $500,000 – is in line with the total award upheld by Judge Briccetti in *Anderson*.  This award is sufficiently high to accomplish the goals of punitive damages, but not so excessive as to violate due process.[7]

Lastly, I note that I inquired of Defendants' counsel after the verdict whether the State of New York would pay the punitive damages, and was told that it was not clear and that the employing agency might make the determination.  (Tr. at 622:14-623:21.)  It seems to me that the conduct here cannot but be regarded as intentional wrongdoing that would release the state from any obligation to indemnify.[8]  I encourage the relevant decision makers, in considering whether to voluntarily indemnify, to consider the Second Circuit's recent observation that "[b]y voluntarily undertaking to satisfy [the defendant's] obligations, the State sends the message that individual defendants will not suffer financial consequences for even malicious or reckless violations of constitutional rights."  *Williams v. Marinelli*, 987 F.3d 188, 203 (2d Cir. 2021).  The *Williams* court recognized that where "the State has voluntarily paid the judgment on behalf of the employee who was found to have committed a malicious or reckless violation of rights, and who was assessed punitive damages" for "the express purpose of punishing or deterring

---

[7] I add that the jury's awards do not shock my individual judicial conscience.  "Reprehensible" may not be a strong enough word to describe Defendants' conduct here.  They have disgraced themselves and their office, and such conduct seems to be all too acceptable among certain employees of New York's prison system.  But it seems to me that the legal standard that an award must be reduced if it "shocks the judicial conscience" refers not simply to the personal views of the presiding judge, but also to the collective view of the judiciary.  I infer that based on the third *Gore* factor (and, to an extent, the second) and on the general principle that district judges are to be guided by precedent.

[8] *See* N.Y. Pub. Off. Law § 17.3(a) ("The state shall indemnify and save harmless its employees in the amount of any judgment obtained against such employees in any state or federal court, or in the amount of any settlement of a claim, or shall pay such judgment or settlement . . . provided that . . . the duty to indemnify . . . shall not arise where the injury or damage resulted from intentional wrongdoing on the part of the employee.").

similar conduct," that action conflicts with § 1983's "goal of deterrence." *Id.* While *Williams* involved aggravating factors not present here,[9] and while it did not find indemnification alone would be preempted by § 1983, any fair-minded analysis of the situation would have to recognize that on the egregious facts here – where there is no arguable justification for the force used and no arguable construction of the verdict other than that Defendants lied at trial – the State's payment of punitive damages would entirely defeat their purpose, would send a terrible message to other correction officers, and might even help lay the groundwork for a successful *Monell* claim against the State in the future.

The jury's verdict here sent a strong message about what the community thinks about the use of excessive force by correction officers against the inmates in their care. The members of the jury were plainly disgusted by Defendants' conduct, and they would likely be equally disgusted if they learned that Defendants were to suffer no professional or financial repercussions from their actions and that the taxpayers of New York State were instead going to satisfy Plaintiff's judgment. Further, I cannot think of a more effective tool for deterring future misconduct than a correction officer, who has been found to have engaged in wanton or malicious violation of constitutional rights, having his wages garnished or losing his savings or real property.

## IV. **CONCLUSION**

For the reasons stated herein, Defendants' motion is DENIED, conditioned on Plaintiff accepting reduced punitive damages in a total amount of $500,000 ($200,000 each for

---

[9] Not only did the state in that case voluntarily pay the compensatory and punitive damages, but it then proceeded to attempt to recoup more than half that amount through state laws allowing for recovery of the costs of incarceration and the costs of public defender services. *See Williams*, 978 F.3d at 194-95.

Defendants Peralta and Bailey and $100,000 for Defendant Blount). Should Plaintiff not accept the remitted amount by March 3, 2022, Defendants' motion for a new trial will be granted as to punitive damages only. *See Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996) (directing new trial on issue of punitive damages only if plaintiff declines to accept reduced amount). The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 45).

**SO ORDERED.**

Dated: February 10, 2022
      White Plains, New York

                                                CATHY SEIBEL, U.S.D.J.